No. 24-2071

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

VIRGINIA COALITION FOR IMMIGRANT RIGHTS, et al.,

*Plaintiffs – Appellees*,

v.

SUSAN BEALES, in her official capacity as Virginia Commissioner of
Elections, et al.,

*Defendants – Appellants.*

On Appeal from the United States District Court
for the Eastern District of Virginia

**EMERGENCY MOTION FOR STAY PENDING APPEAL**

Charles J. Cooper
Joseph O. Masterman
Bradley L. Larson
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
cooper@cooperkirk.com

*Counsel for Defendants-Appellants*

Jason S. Miyares
  *Attorney General*
Thomas J. Sanford
  *Deputy Attorney General*
Erika L. Maley
  *Solicitor General*
Graham K. Bryant
  *Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.....................................................................ii

INTRODUCTION................................................................................1

BACKGROUND ...................................................................................2

    I.    Legal and Factual Background ..............................................2

    II.   Procedural Background ..........................................................8

ARGUMENT .......................................................................................10

    I.    The underlying merits favor the Defendants, so they cannot be "entirely clearcut" in favor of the Plaintiffs...........12

        A.    The NVRA's quiet period provision does not apply to removal of noncitizens ............................................12

        B.    Virginia's noncitizen removal process relied on individualized data and was thus not systematic.......20

    II.   Virginia will be irreparably harmed absent a stay, not the Plaintiffs.................................................................................23

    III.  The Plaintiffs unreasonably delayed filing suit .....................25

    IV.  The changes required by the district court's injunction will create significant costs, confusion, and hardship ...........28

CONCLUSION ....................................................................................30

CERTIFICATE OF COMPLIANCE........................................................33

CERTIFICATE OF SERVICE................................................................34

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Arcia v. Florida Secretary of State*,
772 F.3d 1335 (11th Cir. 2014)............................................. 19, 20, 21

*Arizona v. Intertribal Council of Ariz.*,
570 U.S. 1 (2013)........................................................... 3, 15

*Bell v. Marinko*,
367 F.3d 588 (6th Cir. 2004).............................................. 19

*Crawford v. Marion County Elec. Bd.*,
553 U.S. 181 (2008) (opinion of Stevens, J.)....................................25

*Davidson v. United Auto Credit Corp.*,
65 F.4th 124 (4th Cir. 2023) ............................................. 12

*Husted v. A. Phillip Randolph Institute*,
584 U.S. 756 (2018)........................................................21

*La Union de Pueblo Entero v. Abbott*,
__ F.4th __, 2024 WL 4487493 (5th Cir. Oct. 16, 2024) ................. 2, 29

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014).............................................. 24

*Maryland v. King*,
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ........................... 23

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) (Kavanaugh, J., concurring in grant
of applications for stays)............................................. *passim*

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................ 10

*Pierce v. North Carolina State Bd. of Elec.*,
97 F.4th 194 (4th Cir. 2024) .................................... 2, 11, 23

*Purcell v. Gonzales,*
   549 U.S. 1 (2006) .............................................. 11, 24

*Reynolds v. Sims,*
   377 U.S. 553 (1964) ........................................... 19, 24

*Taylor v. Freeman,*
   34 F.3d 266 (4th Cir. 1994) ................................... 27

*Tennessee Conf. of the NAACP v. Lee,*
   105 F.4th 888 (6th Cir. 2024) (per curiam) ........................ 2

*United States v. Smith,*
   919 F.3d 825 (4th Cir. 2019) .................................. 12

*Wise v. Circosta,*
   978 F.3d 93 (4th Cir. 2020) ................................... 29

**Statutes**

18 U.S.C. § 611 ................................................ 16

52 U.S.C. § 20501 .......................................... 3, 18, 19

52 U.S.C. § 20501 *et seq.* ...................................... 2

52 U.S.C. § 20503 .............................................. 3

52 U.S.C. § 20504 .............................................. 3

52 U.S.C. § 20507 ......................................... *passim*

52 U.S.C. § 20510 ............................................. 26

Va. Code Ann. § 24.2-404 ..................................... 5, 7

Va. Code Ann. § 24.2-404.4 ..................................... 16

Va. Code Ann. § 24.2-410.1 .................................. 5, 23

Va. Code Ann. § 24.2-420.1 .................................. 8, 24

Va. Code Ann. § 24.2-427 ....................................... 7

## Other Authorities

ELECT, 2023 Annual Virginia Election Retrospective &
    Look Ahead (Mar. 6, 2024), https://tinyurl.com/229x8z8u ............... 24

Eligible, Merriam-Webster, (https://www.merriam-
    webster.com/dictionary/eligible) (last accessed Oct. 25,
    2024) ............................................................................................ 17

Federal Rule of Appellate Procedure 8 ..................................................... 1

H.R. Rep. No. 103-9 (1993) ..................................................................... 19

Ineligible, Merriam-Webster, (https://www.merriam-
    webster.com/dictionary/ineligible) (last accessed Oct. 25,
    2024) ............................................................................................ 17

S. Rep. 103-6 (1993) ................................................................................ 19

Suzanne Gamboa, Virginia Removes 6,303 'Noncitizens'
    From Voter Rolls, Fueling Fraud Allegations, NBC News
    (Aug. 23, 2024), https://tinyurl.com/5f8evrjh .................................. 26

Va. Const. art. II, § 1 .............................................................................. 16

Voter, Merriam-Webster (https://www.merriam-
    webster.com/dictionary/voter) (last accessed Oct. 25, 2024) .............. 17

# INTRODUCTION

Less than two weeks before the 2024 Presidential Election, and more than a month into early voting, a district court has forced Virginia officials to place around 1,600 *self-identified noncitizens* back onto its voter rolls, in violation of Virginia law and all common sense. About 600 of these individuals checked a box at the DMV stating that they are not citizens and about 1,000 were positively identified as noncitizens through the Federal Government's own Systematic Alien Verification for Entitlements (SAVE) database. The district court based this drastic injunction on a provision of the National Voter Registration Act (NVRA) that does not even apply to the removal of noncitizens and other void *ab initio* registrations. And even if it did apply to the removal of noncitizens, Virginia's program complied with it anyway.

This injunction, which prohibits the application of a law that has been on the books since the Justice Department precleared it in 2006, will irreparably injure Virginia's sovereignty, confuse voters, overload the board of elections and general registrars, and likely even trick some noncitizens into thinking that they are eligible to vote. This Court should stay this election-eve injunction. *See Pierce v. North Carolina State Bd.*

*of Elec.*, 97 F.4th 194, 229 (4th Cir. 2024); *La Union de Pueblo Entero v. Abbott*, __ F.4th __, 2024 WL 4487493, at \*3 (5th Cir. Oct. 16, 2024); *see also id.* at \*5 (Ramirez, J., concurring in the judgment); *Tennessee Conf. of the NAACP v. Lee*, 105 F.4th 888, 896 (6th Cir. 2024) (per curiam).

Virginia thus respectfully moves for a stay of the district court's injunction pending appeal. Virginia further requests an immediate administrative stay to permit the orderly resolution of this motion, and in any event requests a ruling by no later than 10 a.m. Monday, October 28, 2024. If the Court declines to grant a longer stay, it should at a minimum stay the injunction until Friday, November 1, to permit the Supreme Court to consider an application for a stay.[1]

## BACKGROUND

### I. Legal and Factual Background

Based on its finding that "the right *of citizens* of the United States to vote is a fundamental right," Congress enacted the National Voter Registration Act, 52 U.S.C. §§ 20501 *et seq.* Among other things, the NVRA is intended to "enhance[] the participation of eligible *citizens* as voters in

---

[1] Pursuant to Federal Rule of Appellate Procedure 8(a)(2)(C), both the United States and the organizational plaintiffs were provided notice of this stay motion. They oppose this motion and will be filing responses.

elections for Federal office," to "protect the integrity of the electoral process," and to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(a)(1), (b) (emphasis added).

To promote eligible citizens' participation in federal elections, the NVRA requires "each State [to] establish procedures to register to vote . . . by application made simultaneously with an application for a motor vehicle driver's license." *Id.* § 20503(a), (a)(1); *see generally id.* § 20504. These procedures require that "each State shall . . . ensure that any eligible applicant is registered to vote in an election." *Id.* § 20507(a)(1). "[I]f the valid voter registration form of the applicant is submitted to the appropriate motor vehicle authority," then the applicant must be allowed to vote. *Id.* § 20507(a)(1)(A). The substantive qualifications for a "valid application," such as citizenship status, is a question for the States. *See Arizona v. Intertribal Council of Ariz.*, 570 U.S. 1, 16 (2013) (explaining that states oversee *who* is eligible to vote).

At the same time the NVRA required States to allow "eligible applicants" to "register[]," it imposed conditions on removing these "registrants" from the rolls. 52 U.S.C. § 20507(a)(3). Under the NVRA's General Removal Provision, a person who is an "eligible applicant" and has

properly registered to vote "may not be removed from the official list of eligible voters except" in four enumerated circumstances: voter request, death of the voter, voter felony conviction or mental incapacity, and change in voter residence (if certain procedures are followed), *id.* § 20507(a)(3), (4).

In addition to the General Removal Provision's ban on removing "registrants" from the list of "eligible voters," which applies at all times, the NVRA also contains a special prohibition on certain removals close to federal elections. Section 8(c)(2), the so-called Quiet Period Provision, prohibits States from "systematic[ally]" removing "ineligible voters" from the rolls within 90 days of a federal election, with exceptions for systematic removals due to voter request, death of the voter, and voter felony conviction or mental incapacity. *Id.* § 20507(c)(2).

To ensure that its rolls remain clean while also complying with the NVRA, Virginia amended its election code in 2006 to require the DMV to send the information of any individual who declares himself to be a noncitizen on a DMV form to the Virginia Board of Elections (ELECT). Va. Code Ann. § 24.2-410.1. ELECT checks that person's information against the Virginia Election and Registration Information System

4

(VERIS) to ensure that these self-declared noncitizens are not mistakenly included on the voter rolls. A-177 ¶ 6.[2] Only if there is a match does ELECT forward the information to the local registrars to continue the verification process. *Id.*

ELECT's general policy is to send local registrars only the records of persons who affirmatively and contemporaneously declared that they are not citizens on a DMV form. A-176 ¶ 22. It did, however, also recently collaborate with the DMV to ensure that persons who engaged in DMV transactions between July 1, 2023, and June 30, 2024, and had noncitizen documents on file, were not improperly on the voter rolls. A-184 ¶ 21; A-176 ¶ 22. To accurately ensure that noncitizens were not registered, and that any individuals who had subsequently become naturalized citizens were not mistakenly removed, the DMV ran these individuals' information through the Department of Homeland Security's SAVE database. *See* Va. Code Ann. § 24.2-404(E) (requiring ELECT to use SAVE "for the purposes of verifying that voters listed in the Virginia voter registration system are United States citizens"); A-184 ¶ 22; A-176 ¶ 23.

---

[2] This notation refers to the Appendix containing relevant excerpts from the record, which is appended to this motion.

The SAVE database can determine whether a noncitizen resident has subsequently obtained citizenship. A-177 ¶¶ 27-29. Only those persons registered to vote who had noncitizen documents on file with the DMV and also were confirmed as current noncitizens in a fresh SAVE search were transmitted to the local registrars for each jurisdiction to act upon. A-184-85 ¶¶ 19, 22-23; A-176 ¶ 24-25. ELECT's transmissions of individuals' information to the local registrars from this ad hoc process occurred in late August 2024. A-176 ¶ 25. ELECT's individualized approach, which confirmed noncitizen status with a SAVE search within the previous 30 days, ensured that no naturalized citizens were removed from the voter rolls based on outdated DMV documents during the ad hoc process. A-184 ¶¶ 19, 22; A-176-77 ¶¶ 22-24; 30-31.

When ELECT finds a match between a noncitizen and a person on the voting rolls, either after a person has checked the noncitizen box or failed a recent SAVE search, ELECT sends the person's information to the local general registrar, who manually confirms the match. A-173 ¶ 7. Virginia law requires "general registrars to delete . . . the name of any voter who . . . is known not to be a United States citizen by reason of" that person's self-declaration of noncitizen status or from information

ELECT received from a SAVE verification. Va. Code Ann. § 24.2-404(A)(4); *see id.* § 24.2-427(C). Accordingly, the registrar *manually* reviews each potential match on an individual basis to confirm that the noncitizen and the registered voter identified in VERIS are the same person. A-173 ¶ 7. The registrar has discretion in this process to correct any errors she spots, such as that the person identified in the DMV file and the person in VERIS are not the same individual or that the registrar has superior information as to the person's citizen status. A-264; *see* Va. Code Ann. § 24.2-427(B) (registrar is to act based on information "known by him"). If the registrar determines that the noncitizen and the registered voter are the same person, then the registrar will mail the individual a "Notice of Intent to Cancel" that individual's registration to vote. Va. Code Ann. § 24.2-427(C); A-301.

The Notice of Intent to Cancel explains that ELECT recently received information from the DMV that the recipient may not be a citizen and asks the recipient to affirm within 14 days that he is a citizen in order to stay on the voter rolls. A-309. If the recipient fails to return the printed affirmation of citizenship in the preaddressed envelop within the 14-day period, he is removed from the voter rolls and sent another notice

explaining his removal and providing a number to call if he thinks there has been a mistake. By default, Virginia also provides a grace period and does not actually cancel registrations until 21 days after the Notice of Intent to cancel is sent. A-302; A-174 ¶¶ 10-11. Even if the person fails to respond to any of these notices, he can still reregister with no impediments or show up in person and same-day register to vote, including on Election Day. A-174 ¶ 14.; *see* Va. Code Ann. § 24.2-420.1.

Governor Youngkin's Executive Order 35, issued on August 7, 2024, did not create these processes. That order simply required the DMV and ELECT to update their data-sharing efforts on a daily basis and affirm that they were following pre-existing law. A-313.

## II. Procedural Background

The Plaintiffs in these consolidated cases—the United States and an assortment of advocacy organizations ("Organizational Plaintiffs")—asked the district court to inject itself into the Commonwealth's reasonable and longstanding election processes shortly before the election, and weeks after early voting had begun. Despite *Purcell* and its progeny, the district court obliged. It first concluded that *Purcell* was not controlling because claims under the Quiet Period Provision are inherently close to

an election, and "this is not a case where the plaintiffs are seeking to enjoin the enforcement of Virginia's election laws."[3] A-460-61. The court thus "applied . . . the *Winter* factors" as if there were not an election looming. A-461.

The court held that the NVRA's Quiet Period Provision applies to noncitizens and that Virginia's program was "systematic." A-463. Balancing the equities, it relied on hearsay and a handful of anecdotal evidence to conclude that Virginia's program was going to cause irreparable harm and was against the public interest because "[t]h[at] evidence" only showed that the noncitizens it ordered Virginia to add to its voting rolls "failed to return a form and attest that they were citizens." A-472.

Thus, on October 25th, only ten days before a hotly contested election, the district court ordered Virginia to, within five days, restore approximately 1,600 noncitizens to the voter rolls, initiate a mass mailing to those noncitizens notifying them that they had been placed back on the rolls, promulgate guidance for the local registrars to follow, issue pub-

---

[3] It is unclear what the district court could have meant by this, especially as it entered an injunction that stopped Virginia from enforcing state law only minutes later.

lic statements retracting the previously mailed cancellations, and "educate local officials, poll workers, and the general public," including "the tracking of poll worker training in all 95 counties and independent cities in the Commonwealth." A-490-91. The Defendants moved for a stay of the injunction and the district court denied the motion. A-486-87. They now move for this Court to stay the injunction pending appeal in accordance with well-settled principles of election law.

## ARGUMENT

The district court entered a broad injunction on the eve of an election, accepting a sweeping argument about a complex statutory provision that this Court has never interpreted. This Court should therefore grant the stay.

Although in most circumstances an applicant for a stay pending appeal must satisfy the *Nken* factors, *see Nken v. Holder*, 556 U.S. 418, 426 (2009), they do not apply here. Considerations specific to "election cases" require courts to apply far more searching review of election-eve injunctions. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of applications for stays); *see generally Purcell v. Gonzales*, 549 U.S. 1 (2006).

Thus, courts should stay an injunction of a state election law issued close to an election unless plaintiffs have demonstrated "at least the following": "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Merrill*, 142 S. Ct. at 881. Although this Circuit has not explicitly adopted this four-part test, it recently applied it. *See Pierce v. North Carolina State Bd. of Elec.*, 97 F.4th 194, 229 (4th Cir. 2024). Plaintiffs fail to establish a single factor, much less all four.[4]

---

[4] The district court erred not only by failing to apply the *Merrill* test, but by failing to apply *any* formulation of *Purcell*. Even if this Court concludes that *Purcell* and related cases do not require what Justice Kavanaugh believes they do, that is no reason to ignore the doctrine altogether. The Defendants would prevail under any *Purcell* standard here, and they also meet the traditional *Nken* factors for the reasons described in this motion.

I. **The underlying merits favor the Defendants, so they cannot be "entirely clearcut" in favor of the Plaintiffs**

First, the Plaintiffs failed to show that the merits are "entirely clearcut" in their favor. *Merrill*, 142 S. Ct. at 881. Indeed, the merits heavily favor the Defendants.

A. **The NVRA's quiet period provision does not apply to removal of noncitizens**

The NVRA's Quiet Period Provision does not apply to the removal of individuals, such as noncitizens, who were never eligible to vote in the first place. Virginia's removal of noncitizens within 90 days of the election therefore did not violate the law.

When interpreting the NVRA, courts must start, as always, with the statute's plain language. *See Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 128 (4th Cir. 2023). To discern the meaning of that language, courts look to the meaning of the words, informed by the context in which they are used, which "often provides invaluable clues to understanding the[ir] meaning." *United States v. Smith*, 919 F.3d 825, 837 (4th Cir. 2019).

Section 8 of the NVRA governs "the administration of voter registration for elections for Federal office." 52 U.S.C. § 20507(a). It provides that "State[s] shall . . . ensure that any *eligible applicant* is registered to

vote." *Id.* § 20507(a)(1) (emphasis added). The instruction is simple—those applicants who are "eligible" must be "registered" by the State. *Id.* Section 8 then provides different ways that an applicant with a "valid voter registration form" can register, such as through the DMV. *See id.* § 20507(a)(1)(A)-(D). Once the "eligible applicant['s]" "valid voter registration form" is accepted, the statute refers to him as a "registrant," and provides him certain protections. *See id.* § 20507(a)(3).

After explaining how an "eligible applicant" can become a "registrant" through submitting a "valid voter registration form," Section 8 explains in the General Removal Provision how a "registrant" can be removed from the list of "eligible voters." *Id.* The "name of a registrant may not be removed from the official list of eligible voters" *at all* except in four enumerated circumstances: voluntary removal of the registrant, felony conviction or adjudication of mental incapacity, death of the registrant, or change in residence (if certain procedures are followed). *Id.* § 20507(a)(3)-(4). In short, once an "eligible applicant" becomes a "registrant," Section 8 of the NVRA narrowly restricts the reasons he can be removed. *Id.* § 20507(a)(1).

The removal restrictions become stricter in the 90 days before a federal election. At that point, the Quiet Period Provision prohibits "systematic," as compared to individualized, removal programs targeting "ineligible voters." 52 U.S.C. § 20507(c)(2). The Quiet Period Provision incorporates three of the four exceptions in the General Removal Provision: request of the registrant, criminal conviction or mental incapacity, and death of the registrant. *Id.* § 20507(c)(2)(B). It does not permit removing registrants based on a change in residence.

In short, an "eligible applicant" becomes a "registrant" upon filing a "valid voter registration form," and is then protected from removal at all times, unless such removal is pursuant to one of four enumerated exceptions. Within 90 days of an election, the rules get stricter, with the "systematic" removal of "ineligible voters" being prohibited, subject to three exceptions. *Id.* § 20507(c)(2)(A).

But the NVRA does not prohibit the removal from the voter rolls of persons, such as noncitizens and minors, who were never "eligible applicant[s]" and thus could not become "registrant[s]." The Quiet Period Provision does not cover noncitizens at all, and thus Virginia's removal of noncitizens within 90 days of the election did not violate federal law.

Concluding that a noncitizen is a "registrant" protected under the NVRA would lead to absurd and unconstitutional results. Again, there are only four exceptions from the Act's blanket prohibition on removing a "registrant." *See* 52 U.S.C. § 20507(a)(3)-(4). A noncitizen who invalidly registers is not one of them. Therefore, if "registrant" includes noncitizens who end up on the rolls, then the NVRA bars States from removing noncitizens from its rolls *at any time*.

Such a restriction on a State's removal power would be both facially absurd and unconstitutional. The Supreme Court has made clear that the "Elections Clause empowers Congress to regulate how federal elections are held, but not who may vote in them," and forcing States to keep noncitizens on their voter rolls would cross the line into regulating "who" may vote in federal elections. *Arizona v. Intertribal Council of Ariz.*, 570 U.S. 1, 16 (2013). Indeed, the Supreme Court has said that it would "raise serious constitutional doubts" if Congress interfered with voter eligibility in a lesser way, such as restricting how States can gather information related to enforcing their eligibility requirements. *Id.* at 17. The text and structure of the General Removal Provision thus make clear that "registrant" only refers to those who were originally "eligible applicants." 52

U.S.C. § 20507(a)(1). Noncitizens do not qualify; the right to vote is limited to U.S. citizens. Va. Const. art. II, § 1; Va. Code Ann. § 24.2-404.4; 18 U.S.C. § 611.

The District Court agreed that noncitizens can be removed under the General Removal Provision at any time, presumably because they are not "registrants." A-467 ("[T]he Commonwealth . . . ha[s] the authority to investigate and remove noncitizens from the registration rolls."). Yet there is no textual basis to divorce the Quiet Period Provision from the General Removal Provision. Given that the General Removal Provision places no restrictions on the removal of noncitizens, who were never "eligible applicants" or "registrants" to begin with, it follows that the Quiet Period Provision does not apply to noncitizens either.

The Quiet Period Provision states that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). As noted previously, it then incorporates by cross-reference three of the four exceptions from the General Removal

Provision: "request of the registrant," "criminal conviction or mental incapacity," and "the death of the registrant." *Id.* § 20507(c)(2)(B).

The provision only limits the removal of "ineligible voters," *id.* § 20507(c)(2)(A), and only a "registrant" can become an "eligible voter." The term "voter," standing alone, excludes noncitizens. A "voter" is a person who "votes or has the legal right to vote." Voter, Merriam-Webster, (https://www.merriam-webster.com/dictionary/voter) (last accessed Oct. 25, 2024). In the NVRA, it is a synonym for "registrant," a person who *validly* completed the application process. See p. 13, *supra*. The adjectives "eligible" or "ineligible" then narrow the term "voters" to apply to two subsets of "voters." An "eligible voter" is a person who is "qualified to participate" in a given election. Eligible, *supra*, (https://www.merriam-webster.com/dictionary/eligible) (last accessed Oct. 25, 2024). On the other hand, an "ineligible voter" is a person who had "vote[d] or ha[d] the legal right to vote" but is "not qualified" in a given election. Ineligible, *supra*, (https://www.merriam-webster.com/dictionary/ineligible) (last accessed Oct. 25, 2024). For example, a voter, or a registrant, could become ineligible because he has moved away, been convicted of a felony, or been

declared mentally incapacitated. *See* 52 U.S.C. § 20507(a)(3)(B), (a)(4)(B).

Thus, the Quiet Period Provision restricts programs with the "purpose" of "systematic[ally]" removing voters—those who "vote[d] or ha[d] the legal right to vote," but who are no longer "qualified" to vote in a given election (perhaps because the person moved to a different jurisdiction). The plain text of the Quiet Period Provision therefore does not prohibit removing from the rolls persons who never could have validly registered in the first place because such persons were never "eligible voters" or even "ineligible voters." 52 U.S.C. § 20507(c)(2)(A). They are not "voters" or "registrants" at all. Therefore, States are free to systematically remove noncitizens, minors, and fictitious persons anytime, including within 90 days of an election, without running afoul of the NVRA.

The statutory-purpose section of the NVRA further indicates that noncitizens are not protected by the Quiet Period Provision. The "Findings and Purposes" section of the NVRA declares that the goal of the statute is to "promote the exercise of" the "right of *citizens* of the United States to vote" and to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(a), (b) (emphasis added).

Interpreting the NVRA to restrict the removal of noncitizens, who Section 8(a)(1) makes clear are not allowed to even become "registrants," would make a mockery of the goal of ensuring "accurate and current voter registration rolls." *Id.* It would also dilute the "right of citizens of the United States to vote." *See Reynolds v. Sims*, 377 U.S. 553, 555 (1964).[5]

To be sure, some courts, including the court below, have come out the other way. *See Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1348 (11th Cir. 2014). But other judges have correctly concluded that "Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place." *Bell v. Marinko*, 367 F.3d 588, 591-92 (6th Cir. 2004). And while the only federal appellate court to address the issue concluded, over

---

[5] The legislative history of the NVRA also indicates that the Quiet Period Provision applies only to the removal of originally valid registrations. The Senate Report described the Provision's goal as forcing "[a]ny program which the States undertake to *verify addres*ses" to be "completed not later than 90 days before a primary or general election." *See* S. Rep. 103-6, at 18-19 (1993) (emphasis added). Likewise, the House Report stated that the Quiet Period Provision simply "applies to the State outreach activity such as a mailing or a door to door canvas." H.R. Rep. No. 103-9, at 16 (1993). The Report specifically confirms that the NVRA "should not be interpreted in any way to supplant th[e] authority" of election officials "to make determinations as to [an] applicant's eligibility, such as citizenship, as are made under current law and practice." *Id.* at 8.

a dissent, that the Quiet Period Provision applies to noncitizens, it failed to analyze the plain meaning of the term "voter" or how only "eligible applicant[s]" can become "registrants." *Arcia*, 772 F.3d at 1347. It also recognized that the logical conclusion of its interpretation was the absurdity that Congress had banned States from *ever* removing noncitizens from their voter rolls. Yet it brushed these concerns aside by declaring that "Congress could change the language of the General Removal Provision to assuage any constitutional concerns." *Id.* That decision, we respectfully submit, is plainly wrong.

The Plaintiffs come far short of showing that the merits are "entirely clear" in their favor.

## B. Virginia's noncitizen removal process relied on individualized data and was thus not systematic

Even if the Quiet Period Provision applies to noncitizens, Virginia did not violate it. The Quiet Period Provision does not bar all removals from the rolls within 90 days of a federal election. It only prohibits those done "systematic[ally]." 52 U.S.C. § 20507(c)(2)(A). All parties agree that a removal based on individualized information is not "systematic" within the meaning of the NVRA. *See* A-463; A-070-71; A-106; *see Arcia*, 772

F.3d at 1348 ("[T]he 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90-day window.").

Virginia's removal of noncitizens here falls on the "individualized" side of the line. *Arcia*, 772 F.3d at 1348. DMV forwards the names of individuals who have newly declared themselves to be noncitizens to ELECT, which forwards those self-declared noncitizens who appear on voter rolls to local registrars. A-173 ¶¶ 3-8; A-182-84 ¶¶ 5, 12–20. There is another step of individualized review when the local registrar contacts each self-declared noncitizen by mail, providing an opportunity for the individual to mail back within 14 days a pre-printed form affirming his citizenship. As the Supreme Court has noted with respect to this very type of procedure, "a reasonable person with an interest in voting is not likely to ignore notice of this sort," and thus can be expected to "take the simple and easy step of mailing back the preaddressed" card. *Husted v. A. Phillip Randolph Institute*, 584 U.S. 756, 779 (2018). And if he does not return the pre-printed affirmation of citizenship, he is sent a Notice of Cancellation that invites him a second time to contact the local registrar to correct any mistake concerning his citizenship. The process thus

begins with a personal attestation of noncitizenship and ends in the removal of that person from the voter rolls only when he is sent two individualized letters offering opportunities for an individual corrective response. This is the very definition of an individualized process.

The ad hoc process was similarly individualized. The process was limited to individuals who had provided residency documents to the DMV demonstrating noncitizenship, which DMV confirmed with a SAVE search. A-176 ¶ 22-24. To ensure that people who had subsequently obtained citizenship would not be removed based on old data, ELECT required an additional, fresh SAVE search to show that each person remained a noncitizen before sending the individual's information to the local registrar. A-176-77 ¶¶ 22–24, 29–31; A-184 ¶¶ 21-22. Even then, the registrar again conducted an individualized review and provided each person an opportunity to attest to his citizenship to remain on the rolls. A-173 ¶ 7; A-302; A-174 ¶¶ 10–11. The district court put great weight on the fact that "electronic comparison[s]" were used in the matching process to conclude that the program was "systematic." A-464. But the use of electronic tools in a larger process does not automatically make the

process "systematic," particularly where, as here, the process involved several layers of individualized review and contact with each person.

## II. Virginia will be irreparably harmed absent a stay, not the Plaintiffs

Enjoining a state from enforcing its "duly enacted" laws automatically "inflict[s] 'a form of irreparable injury.'" *Pierce*, 97 F.4th at 225 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). That is exactly what the district court did here, enjoining Virginia from enforcing Va. Code Ann. § 24.2-410.1, a longstanding law passed in 2006. And as discussed further below, enjoining Virginia from enforcing its state election laws on the eve of the election will irreparably harm it by imposing significant costs, confusion, and hardship. See Part IV, *infra*. Virginia will suffer irreparable harm without a stay.

Not only will the Commonwealth of Virginia be irreparably harmed absent a stay, so will its voters and the public at large. The injunction leaves Virginia with no way to determine who is eligible to vote and who is not within the next two weeks, and over 1,000 of the removed self-identified noncitizens were confirmed as noncitizens by fresh SAVE searches. Noncitizen voting "drives honest citizens out of the democratic

process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzales*, 549 U.S. 1, 4 (2006) (per curiam). Citizens' "right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." (quoting *Reynolds v. Sims*, 377 U.S. 553, 555 (1964)). Once this dilution occurs, there can be no remedy for legitimate voters. There is "no do-over and no redress" after "the election occurs." *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

Plaintiffs contend that they will suffer irreparable harm without an injunction because citizens removed from the rolls will lose the right to vote. Not so. Even assuming a citizen was removed from the voter rolls because he mistakenly checked the wrong box at the DMV and somehow missed both notices, he can still same-day register, including on Election Day itself, and cast a provisional ballot. *See* Va. Code Ann. § 24.2-420.1. 98% of provisional ballots are counted, and a person's prior removal from the rolls provides no basis to reject a provisional ballot, so long as the person attests to his citizenship in his same-day registration. ELECT,

2023 Annual Virginia Election Retrospective & Look Ahead at 25–26 (Mar. 6, 2024), https://tinyurl.com/229x8z8u; A-174-75, A-178 ¶¶ 13-16; 39. The ability to cast a provisional ballot "provides an adequate remedy" in these circumstances, meaning that the harm is not "irreparable." *Crawford v. Marion County Elec. Bd.*, 553 U.S. 181, 197-98 (2008) (opinion of Stevens, J.).

## III. The Plaintiffs unreasonably delayed filing suit

A plaintiff cannot overcome *Purcell* if he has "unduly delayed" bringing his complaint. *Merrill*, 142 S. Ct. at 881. Because both Plaintiffs here chose to bring their complaints at the last minute, this prong provides another reason to grant a stay.

The statute that sets up Virginia's noncitizen removal process was enacted and precleared in 2006. Every aspect of the present suit could have been litigated back then. Instead, the Plaintiffs waited until Governor Youngkin issued Executive Order 35, which simply increased the rate at which the data was shared between agencies. Indeed, Virginia has been removing noncitizens during the so-called quiet period since at least 2010. A-175 ¶ 17.

Even after Governor Youngkin issued Executive Order 35 on August 7th, the Plaintiffs still failed to act. The Organizational Plaintiffs waited to sue until two months into the three-month quiet period, on October 7. The district court ignored their failure because they claimed that they did not have enough information to sue in August, but much of the evidence in this case was already public, including the law they are challenging. The Organizational Plaintiffs also fault the NVRA's exhaustion provision, but that only requires the aggrieved party wait until 20 days after filing a notice with the State, 52 U.S.C. § 20510(b)(2), so it cannot explain the 60-day delay here. The United States' only excuse for its tardiness is that the voting-rights section of the Department of Justice was somehow unaware of this law until October of 2024, even though it was precleared in 2006. A-354. This Court should not reward DOJ's apparent incompetence. If the media is widely reporting on a controversy,[6] the United States surely could have become informed earlier by exercising diligence.

---

[6] *See, e.g.*, Suzanne Gamboa, Virginia Removes 6,303 'Noncitizens' From Voter Rolls, Fueling Fraud Allegations, NBC News (Aug. 23, 2024), https://tinyurl.com/5f8evrjh.

Plaintiffs argued that *Purcell* cannot apply to the quiet period because, by their nature, violations can only occur within 90 days of an election. A-113-14. But that argument cannot excuse Plaintiffs' decision to wait until the eve of the election to seek relief, even though there was nothing stopping them from bringing the claims at least 40 days earlier. The decision to wait has serious consequences. If Plaintiffs had brought these claims at the beginning of the quiet period, they could have been addressed through a far less burdensome status quo injunction, simply ordering Virginia to temporarily cease its process. Instead, the district court imposed a multi-part *mandatory* injunction upon Virginia on the eve of the election, requiring Virginia's voting officials to add more than a thousand individuals to its voter rolls past the state deadline for doing so, to send out mailings to each of these individuals and every registrar, and to conduct trainings of poll workers and registrars "in all 95 counties." A-492 ¶ 7; see *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) ("Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances."). Further, early voting started in Virginia on September 20, its voting registration process (apart from same-day registration) closed on

October 15, and the deadline to request an absentee ballot was October 25. If the Plaintiffs had been diligent in bringing this suit, the issues could have been settled before those critical dates.

## IV. The changes required by the district court's injunction will create significant costs, confusion, and hardship

"Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges." *Merrill*, 142 S. Ct. at 880 (opinion of Kavanaugh, J.). In large part because these burdens increase as election day gets closer, Virginia closes its registration system 21 days before the election. A-177 ¶ 32-33. Yet the district court would reopen it, forcing the varied general registrars to re-enroll over 1,000 noncitizens.

Not only does the injunction force the various registrars to re-enroll self-identified noncitizens past the registration deadline, it also requires ELECT to take a variety of burdensome remedial actions. For example, officials must draft and "issue guidance to county registrars in every local jurisdiction" directing them on compliance with the injunction, as well as "tracking . . . poll worker training in all 95 counties and independent cities." A-490, A-492 ¶¶ 4, 7. Attempting to send such notices and to give

last-minute guidances and trainings to general registrars and poll work-
ers will create confusion and make even-handed administration of the
election much more difficult. A-179-80 ¶¶ 44-46. There is no way to guar-
antee that the 133 registrars in Virginia will apply such newly promul-
gated guidance in the same manner. The potential for unequal treatment
across jurisdictions is exactly what *Purcell* is designed to avoid. *See La
Union de Pueblo Entro v. Abbott*, __ F.4th __, 2024 WL 4487493, at *3
(5th Cir. Oct. 16, 2024); *see also id.*, at *5 (Ramirez, J., concurring in the
judgment); *Wise v. Circosta*, 978 F.3d 93, 98–99, 103 (4th Cir. 2020).

And all of this would cause a massive influx of work for the regis-
trars and confusion among voters just days before a presidential election.
A-179-80 ¶¶ 44-46. Every minute spent on compliance with this injunc-
tion is a minute that could have been spent on ensuring a smooth and
trustworthy election. The 2024 Presidential Election is shaping up to be
a close one, and the last thing that Virginia election administrators need
is to jump through a series of court-imposed hoops to allow self-identified
noncitizens back on the voter rolls.

Finally, the court-ordered remedial mailings telling people that
they have been improperly removed from the voter rolls may very well

confuse noncitizens into thinking they can vote. Not only would such a mistake potentially expose the noncitizen to criminal charges, such court-introduced errors would severely undercut the public's faith in our electoral system. The point of *Purcell* is that election administration is a complicated endeavor even without judicial interference. "Late judicial tinkering with election laws," even with the best of intentions, "can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill*, 142 S. Ct. at 881 (opinion of Kavanaugh, J.).

## CONCLUSION

The motion for a stay of the preliminary injunction pending appeal should be granted. The Court should also grant an immediate administrative stay to permit the orderly resolution of this motion, and it should at a minimum stay the injunction until Friday, November 1, to permit the Supreme Court to consider an application for a stay. In any event, because the district court ordered Virginia to comply with the mandatory injunction no later than October 30, 2024, and because further appellate review may be necessary, Virginia respectfully requests that this Court issue a ruling by no later than 10 a.m. Monday, October 28, 2024.

Dated: October 25, 2024

RESPECTFULLY SUBMITTED,

**COMMONWEALTH OF VIRGINIA; VIRGINIA STATE BOARD OF ELECTIONS; SUSAN BEALS**, in her official capacity as Virginia Commissioner of Elections; **JOHN O'BANNON**, in his official capacity as Chairman of the State Board of Elections; **ROSALYN R. DANCE**, in her official capacity as Vice-Chairman of the State Board of Elections; **GEORGIA ALVIS-LONG**, in her official capacity as Secretary of the State Board of Elections; **DONALD W. MERRICKS** and **MATTHEW WEINSTEIN**, in their official capacities as members of the State Board of Elections; and **JASON MIYARES**, in his official capacity as Virginia Attorney General

*/s/ Erika L. Maley*

Erika L. Maley (VSB #97533)
*Solicitor General*
Counsel for Defendants-Appellants

Charles J. Cooper
Joseph O. Masterman
Bradley L. Larson
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
cooper@cooperkirk.com


*Counsel for Defendants-Appellants*

Jason S. Miyares
   *Attorney General*
Thomas J. Sanford
   *Deputy Attorney General*
Erika L. Maley
   *Solicitor General*
Graham K. Bryant
   *Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

## CERTIFICATE OF COMPLIANCE

This motion is accompanied by a separate motion for an expansion of the length limitations of Fed. R. App. P. 27(d)(2)(A) from 5,200 words to 6,200 because this motion contains 6,163 words, excluding the portions not subject to that limitation. This response complies with the typeface and the type style requirements of Rule 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century typeface.

*/s/ Erika L. Maley*

Erika L. Maley
*Solicitor General*
Counsel for Defendants-Appellants

## CERTIFICATE OF SERVICE

I certify that on October 25, 2024, I electronically filed the foregoing motion with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *Erika L. Maley*

Erika L. Maley (VSB #97533)
*Solicitor General*
Counsel for Defendants-Appellants

**APPENDIX**

# INDEX TO APPENDIX

| Document | Date | Page Number |
|---|---|---|
| Complaint by United States of America | 10/11/2024 | A-001 |
| Amended Complaint by Virginia Coalition for Immigrant Rights | 10/15/2024 | A-013 |
| Motion for Preliminary Injunction by Virginia Coalition for Immigrant Rights | 10/15/2024 | A-047 |
| Brief in Support of Preliminary Injunction by Virginia Coalition for Immigrant Rights | 10/15/2024 | A-051 |
| Motion for Preliminary Injunction by United States of America | 10/16/2024 | A-085 |
| Brief in Support of Preliminary Injunction by United States of America | 10/16/2024 | A-089 |
| Consolidation Order | 10/22/2024 | A-119 |
| Memorandum in Opposition of Preliminary Injunction by Commonwealth of Virginia | 10/22/2024 | A-120 |
| Declaration of Ashley Coles | 10/22/2024 | A-172 |
| Declaration of Steven Koski | 10/22/2024 | A-181 |
| Declaration of Graham Bryant | 10/22/2024 | A-186 |
| Exhibit A to Graham Bryant Declaration | 10/22/2024 | A-189 |
| Exhibit B to Graham Bryant Declaration | 10/22/2024 | A-190 |
| Exhibit C to Graham Bryant Declaration | 10/22/2024 | A-197 |
| Exhibit D to Graham Bryant Declaration | 10/22/2024 | A-199 |
| Exhibit E to Graham Bryant Declaration | 10/22/2024 | A-245 |
| Exhibit F to Graham Bryant Declaration | 10/22/2024 | A-267 |
| Exhibit G to Graham Bryant Declaration | 10/22/2024 | A-309 |
| Exhibit H to Graham Bryant Declaration | 10/22/2024 | A-312 |
| Exhibit I to Graham Bryant Declaration | 10/22/2024 | A-313 |
| Exhibit J to Graham Bryant Declaration | 10/22/2024 | A-318 |
| Transcript of 10/24/2024 Hearing | 10/24/2024 | A-321 |
| Transcript of 10/25/2024 Hearing | 10/25/2024 | A-450 |
| Order Granting Preliminary Injunction | 10/25/2024 | A-489 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>    v.<br><br>COMMONWEALTH OF VIRGINIA; VIRGINIA STATE BOARD OF ELECTIONS; and SUSAN BEALS, in her official capacity as Commissioner of Elections,<br><br>          Defendants. | Civil Action No. |

## **COMPLAINT**

The United States of America alleges:

1.      Only U.S. citizens are eligible to vote in U.S. federal elections.  That fact is not in dispute, and there is no evidence of widespread noncitizen voting in the United States.  But that is not what this case is about.

2.      This case is about Section 8(c)(2) of the National Voter Registration Act (NVRA), also known as the Quiet Period Provision, which requires states to complete systematic programs intended to remove the names of ineligible voters from registration lists based on failure to meet initial eligibility requirements by no later than 90 days before federal elections. 52 U.S.C. § 20507(c)(2).

3.      The Quiet Period Provision helps to mitigate the risk that errors in systematic list maintenance will disenfranchise, confuse, or deter eligible voters by ensuring that they have adequate time to address errors and understand their rights.

4.      On August 7, 2024—90 days before the November 5, 2024, federal General Election—the Commonwealth of Virginia announced the formalization of a systematic process to remove "individuals who are unable to verify that they are citizens to the [Virginia] Department of Motor Vehicles from the statewide voter registration list" (the "Program").

5.      In this action, the United States alleges that the implementation of the Program violates the Quiet Period Provision.

6.      The Quiet Period Provision embodies Congress's clear and considered judgment to restrict states from engaging in systematic processes aimed at removing the names of ineligible voters from the rolls in the final days before an election.  And for good reason: systematic removal programs are more error-prone than other forms of list maintenance, and eligible voters placed on the path to removal days or weeks before Election Day may be deterred from voting or unable to participate in the election on the same terms that they would have but for the Commonwealth's error.

7.      The Commonwealth's unlawful actions here have likely confused, deterred, and removed U.S. citizens who are fully eligible to vote—the very scenario that Congress tried to prevent when it enacted the Quiet Period Provision.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 52 U.S.C. § 20510(a) and 28 U.S.C. §§ 1331 and 1345.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 127(a) and 1391(b).

## PARTIES

10.     The United States brings this civil action for declaratory or injunctive relief necessary to carry out the NVRA.  52 U.S.C. § 20510(a).

2

11.     The Commonwealth of Virginia is a state of the United States and is obligated to comply with Section 8 of the NVRA.  52 U.S.C. §§ 20503(a)(1), 20504.

12.     The Virginia State Board of Elections, through the Department of Elections (ELECT), "supervise[s] and coordinate[s] the work of the county and city electoral boards and of the registrars to obtain uniformity in their practices and proceedings and legality and purity in all elections."  Va. Code § 24.2-103(A).

13.     Defendant Susan Beals is the Commissioner of Elections, the chief election officer of the Commonwealth of Virginia.  Va. Code § 24.2-102(B).  As Virginia's chief election official, Commissioner Beals is responsible for coordinating Virginia's responsibilities under the NVRA.  52 U.S.C. § 20509; Va. Code § 24.2-102(B).  Commissioner Beals is required, under Executive Order 35, to certify to the governor that ELECT removes individuals identified by the Virginia Department of Motor Vehicles (DMV) as "unable to verify that they are citizens" from the statewide voter registration list.  *See* Commonwealth of Virginia, Office of the Governor, Executive Order Number Thirty-Five: Comprehensive Election Security Protecting Legal Voters and Accurate Counting (Aug. 7, 2024), https://perma.cc/CK4L-PQ3K.  Commissioner Beals is sued in her official capacity.

## FACTUAL ALLEGATIONS

### Section 8(c)(2) of the National Voter Registration Act

14.     Section 8 of the NVRA establishes requirements for the administration of voter registration for elections for federal office.  52 U.S.C. § 20507.

15.     Section 8(c)(2) of the NVRA, the Quiet Period Provision, specifically directs that a "State shall complete, not later than 90 days prior to the date of a primary or general election

3

for federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(c)(2)(A).

16.     The Quiet Period Provision does not preclude the removal of names from official lists of voters at the request of the registrant, by reason of criminal conviction or mental incapacity (as provided by State law), or by reason of the death of the registrant.  52 U.S.C. § 20507(c)(2)(B)(i); *see also* 52 U.S.C. § 20507(a)(3)(A)-(B), (4)(A).

17.     The Quiet Period Provision also does not preclude correction of an individual voter's registration records pursuant to the NVRA.  52 U.S.C. § 20507(c)(2)(B)(ii).

18.     The Quiet Period Provision applies to systematic programs intended to remove the names of ineligible voters based on failure to meet initial eligibility requirements—including citizenship—at the time of registration.  *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1343-48 (11th Cir. 2014).

19.     The Quiet Period Provision thus strikes a careful balance: it permits systematic removal programs at any time *except* for the 90 days before a federal election because that is when the risk of disfranchising eligible voters is the greatest.

**Virginia's Process to Remove Alleged Noncitizens**

20.     On August 7, 2024, 90 days before the November 5, 2024, federal General Election, the Virginia Governor issued Executive Order 35.  *See* Commonwealth of Virginia, Office of the Governor, Executive Order Number Thirty-Five: Comprehensive Election Security Protecting Legal Voters and Accurate Counting (Aug. 7, 2024), https://perma.cc/CK4L-PQ3K.

21.     The Executive Order formalized the Program and announced that 6,303 individuals had been removed from the rolls pursuant to the same process between January 2022 and July 2024.

4

**A-004**

22.     Executive Order 35 required, among other things, the Commissioner to "certify" to the Governor that procedures were in place to provide "Daily Updates to the Voter List."

23.     The "Daily Updates" include "[r]emov[ing] individuals who are unable to verify that they are citizens to the Department of Motor Vehicles from the statewide voter registration list."

24.     The "Daily Update" also included "compar[ing] the list of individuals who have been identified as non-citizens to the list of existing registered voters and then [requiring] registrars notify any matches of their pending cancellation unless they affirm their citizenship within 14 days."

25.     Voters are identified as possible noncitizens under the Program if they chose "No" in response to questions about their United States citizenship status on certain forms submitted to the DMV.

26.     Voters who chose "No" are identified as possible noncitizens even if they have previously submitted voter registration forms where they have affirmed that they are U.S. citizens.

27.     When an individual has chosen "No" on a form submitted to the DMV, the Program does not require the DMV to verify the accuracy of that response.

28.     The Virginia DMV sends the Department of Elections (ELECT) a list of purported noncitizens that is generated by the process explained above.

29.     ELECT then attempts to match individuals on the list provided by the DMV to individuals on the voting rolls.

30.     ELECT sends each local registrar a list of purported noncitizens who ELECT identifies as registered to vote in the registrar's jurisdiction.

31.     Once ELECT sends each list compiled pursuant to the Program to a registrar, the registrar is required to review each entry on the list and confirm that it matches a voter on their jurisdiction's voter rolls.

32.     The Program does not require the DMV, ELECT, or local registrars to take any steps to confirm an individual's purported noncitizen status prior to mailing the individual a "Notice of Intent to Cancel."  Neither ELECT nor local registrars take any steps to confirm an individual's purported noncitizen status other than mailing the individual a "Notice of Intent to Cancel."

33.     In fact, local registrars do not have any discretion under the Program to decline to send a Notice of Intent to Cancel, even when the registrar has reason to believe that the voter is a United States citizen.

34.     The local registrar sends a Notice of Intent to Cancel to all voters who appear on their jurisdiction's voter rolls. *See* Exhibit 1.  That Notice reads: "[w]e have received information that you indicated on a recent DMV application that you are not a citizen of the United States.  If the information provided was correct, you are not eligible to vote.  If the information is incorrect and you are a citizen of the United States, please complete the Affirmation of Citizenship form and return it using the enclosed envelope.  If you do not respond within 14 days, you will be removed from the list of registered voters.  If you believe this notice has been issued in error or have questions about this notification, please call the Office of General Registrar."

35.     If a voter fails to respond within 14 days, the voter's registration is automatically removed from the voter rolls and the voter is sent a Voter Registration Cancellation Notice. *See* Exhibit 2.  That notice informs the voter that the local registrar "has stricken [the voter's] name

from the Voter Registration List" "on the basis of official notification from the Virginia Department of Elections that [the voter] failed to timely respond to a request to affirm [their] United States Citizenship with the 14 days allowed by the Code of Virgina (§24.2-427)."

36.     The Voter Registration Cancellation Notice notes that the voter has been "Declared Non-citizen."

37.     The Voter Registration Cancellation Notice says only to contact "this office" if you believe the removal is incorrect.  It does not provide information on re-registering to vote.

38.     Local registrars have no discretion to prevent cancellation under the Program if the voter does not return an Affirmation of Citizenship, even if the local registrar has reason to believe that the voter is a United States citizen.

39.     The Program is an automated program that constitutes systematic voter list maintenance.

**Voters Have Been Removed From the Rolls Within the 90-Day Quiet Period as a Result of the Program**

40.     The Virginia Governor issued Executive Order 35 exactly 90 days before the general election.

41.     All efforts to carry out the Program mandated by Executive Order 35 would therefore occur during the Quiet Period before the November 5, 2024, federal General Election.

42.     Any voter registration cancellations carried out after August 7, 2024, therefore have occurred in the Quiet Period before the November 5, 2024, federal General Election.

43.     Executive Order 35 directed continued action by requiring ELECT to certify that it continues to remove noncitizens from the voter rolls through the Program.

44.     ELECT has sent, and continues to send, lists of noncitizens as identified by the Program to local registrars during the Quiet Period.

**A-007**

45.     The most recent list was sent by ELECT to local registrars at least as recently as the week of October 7, 2024.

46.     Local registrars continue to send Voter Registration Cancellation Notice letters to voters on those lists.

47.     The voter registrations of those individuals who fail to respond to the Voter Registration Cancellation Notice continue to be automatically cancelled.

48.     Commissioner Beals confirmed that removals pursuant to the Program are ongoing when she testified before the Virginia House Privileges and Elections Committee on September 4, 2024.  *See* Virginia House of Delegates, Recording of House Privileges and Elections Committee Meeting, at 3:09:10pm (Sept. 4, 2024), https://virginiageneralassembly.gov/house/chamber/chamberstream.php.

49.     On September 19, 2024, Commissioner Beals again confirmed that removals pursuant to the Program are ongoing when she sent a letter to the Virginia Governor confirming that daily updates to the voter lists include "[r]emoving individuals who declare or provide documentation indicating no-citizenship status and who do not respond to an affirmation of citizenship notice.  To that end, DMV now shares non-citizen data daily with [the Department of Elections]."  *See* Exhibit 3.

50.     Local registrars have also confirmed that removals pursuant to the Program are ongoing.  The Fairfax County General Registrar's Report, dated September 12, 2024, reported that 28 voters identified by ELECT as purported noncitizens were removed from the county's voter rolls between August 1, 2024, and August 31, 2024.  *See* Fairfax County Office of Elections, General Registrar's Report at 1 (Sept. 12, 2024), https://perma.cc/FD5V-38RF.

51.     At the September 2024 Loudoun County Election board meeting, the Loudoun County Registrar noted that she receives daily information regarding noncitizens and the registar's staff is sending notices of intent to cancel to those individuals.  *See* Loudoun County Electoral Board, Meeting recording for September 12, 2024,

https://lfportal.loudoun.gov/LFPortalInternet/Browse.aspx?startid=308878&row=1&dbid=0&cr=1.

52.     Loudoun County removed 90 individuals identified as possible noncitizens in September 2024.  *See* Loudoun County Electoral Board, Meeting Agenda for October 10, 2024 at 6, https://lfportal.loudoun.gov/LFPortalinternet/0/edoc/847739/10-10-2024%20LCEB%20Agenda%20Packet.pdf.

53.     From January through August 2024, Loudoun County had removed a total of only 62 individuals identified as alleged noncitizens.

54.     Virginia has therefore conducted, and is continuing to conduct, a systematic process aimed at identifying and removing voters suspected of not meeting Virginia's voter qualification requirements as to citizenship.

55.     That systematic process is being conducted within 90 days of the November 5, 2024, federal General Election.

**Impact of the Program**

56.     The individuals identified as "noncitizens" by the Program include U.S. citizens.

57.     In Prince William County, at least 43 of the 162 individuals identified and subsequently removed before July 31, 2024, using the methodology formalized by the Program for failure to respond to the Notice of Intent to Cancel were likely U.S. citizens.  *See* Prince

William County Electoral Board, Meeting Recording for September 30, 2024 at 28:00-33:00, https://www.youtube.com/watch?v=Zr0LSt3xwCk.

58.     At least some voters removed from the rolls have re-registered.  Registration to vote in Virginia requires that a voter attest that they are a U.S. citizen.

59.     The Program identifies U.S. citizens as noncitizens based on the above-described methodology.  At least some of those U.S. citizen voters are removed from the rolls because they do not respond to the Notice of Intent to Cancel within 14 days.  That Voter Registration Cancellation Notice does not provide information on re-registering to vote.

## CAUSE OF ACTION

60.     The United States re-alleges and incorporates by reference the allegations set forth above.

61.     Defendants' continuation of a systematic process to remove purported noncitizens registered to vote in Virginia within 90 days of the November 5, 2024, federal General Election violated and continues to violate Section 8(c)(2) of the NVRA, 52 U.S.C. § 20507(c)(2).

62.     Unless and until ordered to do so by this Court, Defendants will not resolve and remedy this violation of Section 8(c)(2) of the NVRA.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court enter an ORDER:

(1)     Declaring that Defendants have violated Section 8(c)(2) of the NVRA;

(2)     Enjoining Defendants, their agents and successors in office, and all persons acting in concert with them from future non-compliance with Section 8(c)(2) of the NVRA;

(3)     Requiring Defendants, their agents and successors in office, and all persons acting in concert with them to halt use of the Program until after the November 5, 2024, federal

General Election;

(4)     Requiring Defendants, their agents and successors in office, and all persons acting in

concert with them, to restore to the voter rolls those U.S. citizens whose registration was

cancelled pursuant to the Program during the Quiet Period;

(5)     Requiring Defendants, their agents and successors in office, and all persons acting in

concert with them, to provide a remedial mailing to voters who received Notices of Intent

to Cancel as part of the Program during the Quiet Period or whose registration was

cancelled as part of the Program during the Quiet Period

a.      Informing those affected U.S. citizens that they have been restored to the voter rolls;

b.      Explaining that these voters may cast a regular ballot on Election Day in the same

manner as other eligible voters;

c.      Advising individuals who are U.S. citizens, including naturalized citizens, that their

identification by the Program does not establish that they are ineligible to vote or

subject them to criminal prosecution for registering to vote or for voting; and

d.      Advising individuals who are not U.S. citizens that they remain ineligible to cast a

ballot in elections in Virginia;

(6)     Requiring Defendants, their agents and successors in office, and all persons acting in

concert with them to provide prompt and clear information to the general public

concerning the halting and reversal of the Program within the Quiet Period and the ability

of impacted eligible voters to vote unimpeded on Election Day;

(7)     Requiring Defendants, their agents and successors in office, and all persons acting in

concert with them to take all reasonable and practicable efforts to educate local officials,

officers of election, and all other election workers concerning the cessation of the

11

**A-011**

Program, the restoration of impacted voters to active status, and the ability of impacted voters to cast a regular ballot without submitting supplemental paperwork or documentation; and

(8)     Ordering any such additional relief as the interests of justice may require.

Date:  October 11, 2024

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

JESSICA D. ABER
United States Attorney
Eastern District of Virginia

*/s/ Sejal Jhaveri*
R. TAMAR HAGLER
RICHARD A. DELLHEIM
SEJAL JHAVERI
KEVIN MUENCH
BRIAN REMLINGER
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W
Washington, D.C. 20530
(202) 305-5451
Sejal.Jhaveri@usdoj.gov

*/s/ Steve Gordon*
Steven Gordon
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Ave.
Alexandria, VA 22314
(703) 299-3817
Steve.Gordon@usdoj.gov

CHRISTOPHER R. KAVANAUGH
United States Attorney
Western District of Virginia

*/s/ Christopher R. Kavanaugh*
United States Attorney
United States Attorney's Office
Western District of Virginia
255 West Main Street
Charlottesville, VA 22902
(434) 293-4283
Christopher.Kavanaugh@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| VIRGINIA COALITION FOR IMMIGRANT RIGHTS; LEAGUE OF WOMEN VOTERS OF VIRGINIA; LEAGUE OF WOMEN VOTERS OF VIRGINIA EDUCATION FUND; AFRICAN COMMUNITIES TOGETHER, | |
| *Plaintiffs*, | |
| v. | Case No. 1:24-cv-01778-PTG-WBP |
| SUSAN BEALS, in her official capacity as Virginia Commissioner of Elections; JOHN O'BANNON, in his official capacity as Chairman of the State Board of Elections; ROSALYN R. DANCE, in her official capacity as Vice-Chairman of the State Board of Elections; GEORGIA ALVIS-LONG, in her official capacity as Secretary of the State Board of Elections; DONALD W. MERRICKS and MATTHEW WEINSTEIN, in their official capacities as members of the State Board of Elections; and JASON MIYARES, in his official capacity as Virginia Attorney General, | |
| *Defendants*. | |

<u>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

Plaintiffs Virginia Coalition for Immigrant Rights ("VACIR"), League of Women Voters of Virginia and League of Women Voters of Virginia Education Fund (together "LWVVA" or "the League"), and African Communities Together ("ACT") bring this action against Susan Beals, in her official capacity as Virginia Commissioner of Elections; the Virginia State Board of Elections

1

Members, in their official capacities; and Jason Miyares, in his official capacity as Virginia Attorney General, and allege the following:

## INTRODUCTION

1.      The right to vote is fundamental and foundational to American democracy. Every American citizen has the right to vote, regardless of where they were born. This action challenges a voter purge effort (the "Purge Program") that patently violates Congress's framework for protecting these fundamental rights through the National Voter Registration Act ("NVRA"). Less than 60 days ago, Defendants announced the latest version of an effort to implement an ongoing program to systematically remove certain voters from the rolls. But federal law mandates that no such voter cancelation or list maintenance programs may be conducted during the 90-day "quiet period" before an election. Congress prohibited such programs from occurring during this period to protect voter registration lists from the inevitable chaos of potentially inaccurate removals. Nevertheless, Defendants brazenly intensified their removal program the very day the quiet period commenced. Even the best designed list maintenance system undertaken with the best of intentions would be barred by federal law when so dangerously close to an election. That is reason alone to enjoin the continued operation of Defendants' Purge Program.

2.      Moreover, Defendants' Purge Program is far from such a well-designed, well-intended list maintenance effort. It is an illegal, discriminatory, and error-ridden program that has directed the cancelation of voter registrations of naturalized U.S. citizens and jeopardizes the rights of countless others. In a purported effort to flag potential noncitizens, Defendants' Purge Program relies on out-of-date information provided to the Department of Motor Vehicles, and perhaps other sources, _stretching back twenty years_. The State knows or should know that countless individuals who obtained drivers' licenses while legal permanent residents have become naturalized citizens,

2

many even registering to vote during naturalization ceremonies. But Defendants make no effort to conduct any individualized analysis. Instead, they have classified any person who has ever indicated they were a noncitizen as presumptively ineligible to vote unless they receive and respond to a State missive within fourteen days and provide *more* evidence of their citizenship. This violates the NVRA in various ways, including the requirement that list maintenance programs be uniform and nondiscriminatory. Finally, Defendants have conducted their Purge Program under a shroud of secrecy and obfuscation, refusing to provide information or documentation about their system as it has unfolded. The NVRA mandates that states must be transparent about their voter removal programs, even when undertaken outside of the quiet period, far more so when conducted on the eve of a major election.

3.      On August 7, 2024, only 90 days before the upcoming November 5 general election and 45 days before the start of early in-person voting, Virginia Governor Glenn Youngkin issued Executive Order 35 ("E.O. 35"), which provided instructions for the Purge Program of alleged noncitizens, relying on Va. Code § 24.2-427.[1] The Purge Program requires the Commissioner of the Department of Elections ("ELECT") to certify to the governor that it has procedures in place to make daily updates to the statewide voter registration list to "[r]emove individuals who are unable to verify that they are [U.S.] citizens to the Department of Motor Vehicles[.]" E.O. 35 at 3-4; *see also* Va. Code § 24.2-427(B)-(C).

---

[1] Although E.O. 35 claims to order the implementation of Va. Code § 24.2-429, the process described in E.O. 35 more closely aligns with Va. Code § 24.2-427. *See* E.O. 35 at 4 (Aug. 7, 2024), *available at* https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/eo/EO-35-Comprehensive-Election-Security-Ensuring-Legal-Voters-and-Accurate-Counting---vF---8.7.24.pdf. Plaintiffs therefore presume E.O. 35 intended to cite Va. Code § 24.2-427, but, either way, the Purge Program violates the National Voter Registration Act for the reasons stated herein.

3

4.       The Purge Program demands the expedition of interagency data sharing between the Department of Motor Vehicles ("DMV") and ELECT via a daily file of all alleged "non-citizens transactions, including addresses and document numbers." E.O. 35 at 4. ELECT is then required to make daily updates to the voter rolls by comparing "the list of individuals who have been identified as noncitizens to the list of existing registered voters[.]" E.O. 35 at 3-4.  Once ELECT has identified these alleged noncitizens, ELECT sends the data to county registrars and directs them to "notify any matches of their pending cancellation unless they affirm their citizenship within 14 days" of sending the notice, and ultimately cancel the voter's registration if the registrar's office does not receive this affirmation. *Id.*; *see also* Va. Code § 24-2.427(B)-(C).

5.       The Purge Program also directs counties to refer voters removed for alleged noncitizenship to Commonwealth Attorneys for criminal investigation and potential prosecution. E.O. 35 at 4. Some counties have also elected to refer those voters to Defendant Attorney General Miyares.

6.       The Purge Program by design and in implementation threatens the voting rights of eligible Virginia voters who are naturalized citizens. The Purge Program, ordered by Governor Youngkin and implemented by Defendants, affirmatively directs state agencies to identify and purge voters on a systematic and ongoing basis—including during the immediate lead up to the 2024 General Election—in direct violation of the 90-day quiet period mandated by the National Voter Registration Act ("NVRA"). 52 U.S.C. § 20507(c)(2)(A).

7.       Despite Plaintiffs' multiple requests, including through a letter from VACIR sent August 20, 2024, and a letter sent from VACIR and LWVVA on October 3, and in violation of the Public Disclosure of Voter Registration Activities provision of the NVRA, 52 U.S.C. § 20507(i), Defendant Beals has thus far provided little information related to the Purge Program, including

refusing to provide the identities of the persons subject thereto. As a result, Plaintiffs have not been able to determine conclusively who has been identified for removal or who has been removed. What is clear from Plaintiffs' investigation and the clear directives in E.O. 35 is that the Purge Program relies on erroneous data—from the DMV and perhaps other sources—that includes both naturalized and U.S.-born U.S. citizens and is ongoing during the 90-day quiet period.

8. The Purge Program systematically removes Virginians from the voter rolls shortly before the November 2024 general election based solely on the fact that they were at one point identified as a potential noncitizens—according to databases from the DMV or other sources—even if they have since become naturalized citizens and lawfully registered to vote or even if they are U.S.-born citizens who were mistakenly identified as noncitizens.

9. Governor Youngkin's ordered Purge Program, by design, identifies and classifies based on national origin without considering naturalized citizenship status. It then relies on that classification to mark individuals for removal from the voter rolls. The data and methodology that forms the basis of the Purge Program discriminates based on national origin and predictably sweeps in naturalized citizens. Many naturalized citizens have had interactions with the DMV prior to becoming a citizen. That is because all naturalized citizens were once legal permanent residents, and legal permanent residents are permitted to obtain driver's licenses and other forms of state identification, which can remain valid for up to eight years.

10. E.O. 35 claimed that Virginia has made "unprecedented strides in improving…protection against non-citizen registration," but evidence overwhelmingly shows that noncitizen registration and voting is vanishingly rare in Virginia and across the United States, and voter purges aimed at *alleged* noncitizens primarily prevent *eligible* naturalized citizens from casting ballots.

11.     In its implementation, the Purge Program arbitrarily sweeps in both naturalized citizens and U.S.-born citizens not targeted by the program. While U.S.-born citizens would only be marked as noncitizens in DMV data due to user error in mistakenly checking the wrong box or leaving a box unchecked during electronic transactions with the DMV, the Purge Program has also erroneously removed from the voter rolls at least some eligible voters who are U.S.-born citizens.

12.     Plaintiffs are nonprofit organizations whose missions are to help eligible Virginians register and vote and to provide services to Virginia's immigrant communities, including by providing education and assistance to Virginia's naturalized citizens in voter registration and voting. The organizations' members include naturalized and U.S.-born eligible U.S. citizens whose registrations are at risk under the Purge Program.

13.     Va. Code Ann. § 24.2-427(C) and the Purge Program harm Plaintiffs VACIR, LWVVA, and ACT directly because, instead of registering additional new voters and providing programs for Virginia's immigrant community, they have and will continue to spend time and money (1) identifying new citizens, including those who have been targeted for removal or purged; (2) educating the public, in particular new citizens, on how to respond to being targeted for removal and ensuring that they remain registered or, if they were purged, how to reregister; (3) assisting new citizens who have been targeted for removal with defending their registrations and right to vote; (4) ensuring that any voters who are affected by the Purge Program who are required to vote using a provisional ballot have their votes counted. It further harms Plaintiffs because they have members who are naturalized citizens. Enjoining the Purge Program is necessary to end these harms to Plaintiffs.

14.     Va. Code Ann. § 24.2-427(C) and the Purge Program violate the NVRA because they (1) constitute systematic voter list maintenance within 90 days preceding a federal election;

6

**A-018**

(2) discriminatorily identify naturalized citizens for removal and are not being carried out uniformly across local jurisdictions; and (3) require voters to provide additional proof of U.S. citizenship not required by the National Mail Voter Registration Application or voter registration applications at the DMV and public assistance agencies in order to remain registered. *See* 52 U.S.C. §§ 20504(c), 20505(a), 20506(a), 20507(b). Defendant Beals has further violated the Public Disclosure of Voter Registration Activities provision of the NVRA, 52 U.S.C. § 20507(i), by refusing to provide Plaintiffs with the list of voters identified as potential noncitizens within a reasonable amount of time despite having those records in her office's possession. Plaintiffs therefore respectfully request that the Court declare the Purge Program unlawful, enjoin Defendants from implementing the Purge Program, restore all unlawfully removed voters to the rolls and provide public and individualized notice thereof, produce the list of voters identified as potential noncitizens, and afford Plaintiffs all other just and proper relief.

## JURISDICTION AND VENUE

15.     This action is brought pursuant to 52 U.S.C. § 20510(b), which provides that "[a] person who is aggrieved by a violation of [the NVRA]…may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation."

16.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1357 because the claims in the action arise under the laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction to grant declaratory and injunctive relief and all other forms of relief available under federal law, including 28 U.S.C. §§ 2201 and 2202.

17.     This Court has personal jurisdiction over the Defendants, who are all elected or appointed officials and citizens of Virginia.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the Defendants engage in their official duties in this District, because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because at least one Defendant resides in this District and all Defendants are Virginia residents.

## PARTIES

**Plaintiffs**

19.     Plaintiff **Virginia Coalition for Immigrant Rights** is a multi-racial and multi-ethnic coalition of member organizations that exists to win dignity, power, and quality of life for all immigrant and refugee communities. They seek to create a Virginia where immigrant and refugee communities have full access to family, civic, economic, and social life.

20.     VACIR is comprised of 49 standing member organizations, including legal services providers, civil rights groups, and labor unions, each of which themselves work to support the immigrant community in Virginia through a variety of programs, including by assisting with voter registration and education for eligible naturalized citizens.[2] VACIR unifies those organizations and

---

[2] As of the filing of this Complaint, VACIR standing member organizations are ACLU People Power – Fairfax; ACLU of Virginia; African Communities Together; American Jewish Committee; AYUDA; Bread for the World; Centreville Immigration Forum; Church World Service; Coalition of Asian Pacific Americans of Virginia; Congregation Action Network; Cornerstone; Domestic Workers Alliance; Dream Project; Dreamers Mothers In Action; Edu Futuro; EMGAGE; Fuego Coalition; Hamkae Korean Community Center; Hispanic Organization of Leadership and Action; Jewish Community Relations Council; Just Neighbors; Korean American Association of Northern Virginia; Latina Institute for Reproductive Justice; League of United Latin America Citizens; Legal Aid Justice Center; Multicultural Community Center; Neighbor's Keeper; New Virginia Majority Education Fund; Northern Virginia Affordable Housing Alliance; NoVA Labor; Progress Virginia; Sacred Heart Catholic Community Center; SEIU 512; SEIU 32BJ; Shirlington Employment and Education Center; Sin Barreras; Tenants and Workers United; The Commonwealth Institute for Fiscal Analysis; Unitarian Universalist for Social Justice; United Food and Commercial Workers Local 400; Virginia Civic Engagement Table; Virginia Coalition of Latino Organizations; Virginia Immigration Intercollegiate Alliance; Virginia Interfaith Center for Public Policy; Virginia League of Planned Parenthood; Virginia League of Women Voters; Virginia Organizing; Virginia Poverty Law Center; and Voices for Virginia's Children.

supports them in achieving their shared goals, including by providing mini-grants to members to operate programs directed at assisting with voter registration and education for eligible naturalized citizens.

21.    The Purge Program has harmed and will continue to harm VACIR and its members in various ways. VACIR has had to divert significant resources away from its core activities including removing language barriers to obtain government assistance, oversight of immigration detention facilities, providing support for community oversight to the Temporary Protected Status program, advocacy activities related to expanding state programs affecting immigrant communities including Medicare expansion, and providing support for community mobilization around general voter registration efforts for New Americans, and toward responding to and attempting to mitigate the effects of E.O. 35 and the Purge Program in erroneously removing eligible voters from the rolls and intimidating eligible naturalized citizens from participating in voter registration and voting. VACIR's response efforts are ongoing and include investigating the Purge Program through submitting public records requests and spending thousands of dollars to cover the costs of production, engaging in direct multi-lingual public education and outreach to naturalized citizen voters about maintaining their voter registration and re-registering if they have been removed through the Purge Program, and supporting its members to adjust and redirect general community voter registration and outreach programs toward specifically responding to E.O. 35 and the Purge Program, including through educating and assisting naturalized citizen voters with checking their voter registration status and how to re-register if they have been removed.

22.    A number of VACIR's member organizations are membership organizations themselves whose members include substantial numbers of naturalized citizens, including

EMGAGE, African Communities Together, SEIU 32BJ, Hamkae Center, Latina Institute for Reproductive Justice-Virginia, Domestic Workers Alliance, NoVA Labor, and Tenants and Workers United. These organizations' naturalized citizen members are at particular risk of being purged because they may have previously self-identified as noncitizens with the Virginia DMV while applying for a driver's license and then later registered to vote through another means after obtaining their citizenship. As a direct result of E.O. 35 and the Purge Program, these members must now constantly re-check their registration status, may be forced to provide additional documentation to vote, may be intimidated from registering to vote or voting due to the Purge Program and the explicit public threat of investigation or prosecution in E.O. 35, and face other burdens due to the Purge Program.

23.     A number of VACIR's member organizations have also been directly harmed by being forced to divert resources away from core activities including providing direct support and assistance to community members through a variety of programs and toward responding to and attempting to mitigate the effects of E.O. 35 and the Purge Program in erroneously removing eligible voters from the rolls and intimidating eligible naturalized citizens from participating in voter registration and voting.

24.     Plaintiffs **League of Women Voters of Virginia and League of Women Voters Education Fund,** formed under Section 501(c)(4) and 501(c)(3) of the Internal Revenue Code, respectively, are nonpartisan, nonprofit, membership organizations that seek to encourage informed and active participation in government, work to increase understanding of major public policy issues, and influence public policy through education and advocacy. LWVVA is a state League of the national League of Women Voters, which was founded in 1920 as an outgrowth of the struggle to win voting rights for women, has more than 500,000 members and supporters, and

is organized in more than 750 communities in all 50 states and the District of Columbia. LWVVA has approximately 2,000 members across the state of Virginia. Some of LWVVA's members are naturalized citizens.

25.     LWVVA is comprised of dues-paying members who volunteer in Virginia communities to provide voter services. LWVVA has no paid employees or staff involved with the operation of the League. Through its volunteer leaders, LWVVA provides regular training to its members and to its nonpartisan partners to assist Virginians, including those who are naturalized citizens, in getting registered, voting, and confirming their registration status. LWVVA has also arranged required Virginia training for third party voter registration for its members and nonpartisan partner organizations. LWVVA does this work as a part of its mission to protect the right to vote for Virginia voters and considers its work registering voters, encouraging them to vote, and confirming their registration to be an expression of those core values. LWVVA uses voter registration assistance as a part of a larger dialogue about a citizen's voter registration, voting plan, and the importance of voter turnout: the goal is to ensure all eligible Virginia voters are registered to vote, have a plan to vote, and can and do actually vote.

26.     E.O. 35 and the Purge Program have harmed and will continue to harm the League and its members in various ways. First, the League has diverted and will continue to divert resources to counteract the harms created by the Purge Program. At the most consequential period of time for the League's core mission activities, the League first had to use its resources to rapidly understand the impact of E.O. 35 and its effect on Virginia voters. When the League learned of the Purge Program's identification of eligible Virginian voters for removal, the League had to expend its resources to counteract the immediate confusion and misinformation created by the Purge Program. The broadest way of doing so without amplifying false claims of noncitizen voting has

been to expand announcements for all Virginians to check their registration, even those who have no changes in their voter profile. The Purge Program has forced the League to both broaden these "check your registration" efforts beyond its previously targeted audience and to expand its focus on naturalized citizens. For instance, the League has already spent at least $600 to create, translate into multiple languages, and distribute a public service announcement (PSA) throughout the state reminding voters of their right to vote and instructing them to check that their registration is valid before Election Day. The League created and distributed the PSA in direct response to the Purge Program, to ensure that all Virginia voters—including voters that the League has registered and voters who are League members—are registered and are able to vote on Election Day, in furtherance of the League's goals of registering eligible voters and ensuring all eligible voters can vote. In direct response to the Purge Program, the League also increased its budget for digital media impressions on mobile devices by $2,000. These PSAs were necessary because the Purge Program has deregistered thousands of Virginians, including Virginians eligible to vote, and has unquestionably intimidated many more naturalized Virginians who are now less likely to vote for fear of criminal investigation and prosecution. Therefore, the Purge Program will decrease the number of registered voters and decrease voter turnout, directly harming the League's mission of increasing the number of registered voters and increasing voter turnout. The PSA was necessary to ameliorate those harms.

27. Separately, the League has devoted and will continue to devote resources and members' time to counteract the effects of the Purge Program, such as by helping members and registered voters determine whether they remain eligible and by helping voters who are purged restore their eligibility. This includes direct outreach and public outreach to naturalized citizens through media, such as the League President's September interview at Spanish speaking radio

station WRKE 100.3 LP-FM. The League is further burdened by diverting its coordination resources with other non-profits towards understanding and addressing the effects of E.O. 35 rather than coordinating on core voter assistance programs. Absent such diversion, the League would spend its money and member time on getting out the vote for the 2024 general election and planning its advocacy activities for the next year. It would also hold more voter registration drives.

28.     Aside from resource diversion, the Purge Program directly harms the League's mission. When voters are unlawfully purged, it decreases the number of voters in Virginia, contrary to the League's mission of increasing the number of registered voters and voter turnout. When voters are intimidated or must take additional steps to remain registered, it harms the League's mission of ensuring that voting is easy and open for all eligible Virginians.

29.     The Purge Program also harms the League's members. The League's membership includes naturalized citizens, and those members are at particular risk of being purged because they may have previously self-identified as noncitizens with the Virginia DMV. Those members must constantly re-check their registration status, may need to provide additional documentation to vote, are intimidated by the Purge Program and the threat of investigation or prosecution, and face other burdens due to the Purge Program.

30.     Further, Commissioner Beals's refusal to release information about the Purge Program, including the list of voters who have been removed on the basis of the Purge Program harms LWVVA's mission. Because LWVVA cannot contact the voters who have been removed on the basis of the Purge Program—including any LWVVA members—LWVVA cannot further its goals by ensuring all eligible voters targeted by the Purge Program are registered to vote.

31.     Plaintiff **African Communities Together** is a nonpartisan, nonprofit membership organization of African immigrants fighting for civil rights, opportunity, and a better life for

African immigrants and their families. Founded in 2013, ACT empowers African immigrants to integrate socially, advance economically, and engage civically.  ACT assists African immigrants in obtaining critical services, provides resources and infrastructure for community and leadership development, and supports community members to engage in civic life, including through education and assistance with voter registration and voting. ACT provides multilingual assistance to African immigrants related to immigration, jobs, civic participation, and other needs.

32.     ACT has approximately 12,460 members nationally, with approximately 1,079 residing in Virginia. Many of ACT's members are naturalized citizens. ACT's members pay voluntary membership dues. They participate in monthly membership meetings, leadership committees and trainings, issue-specific campaign committees, civic engagement. They also engage in public advocacy through collective actions and personal storytelling, volunteer work through community-focused programs, and many attend a national membership convention.

33.     ACT is operating a robust voter engagement program in Virginia with the goal of connecting with 85,000 registered voters in African immigrant communities in 2024. This program consists of six full-time paid staff, including a lead organizer, three field organizers, and two phone-bank leads, as well as ACT members who contribute on a volunteer basis. The program provides multilingual education and assistance with all aspects of voting and encourages voters to participate through outreach and engagement about the important role voting plays in shaping the opportunities and issues facing African immigrant communities.

34.     The Purge Program operated by Defendants has harmed and will continue to harm ACT and its members in various ways. ACT has had and continues to divert its staff and resources from other core activities toward attempting to mitigate the harms to its members and to Virginia's African immigrant community caused by E.O. 35 and the Purge Program. This has required

redirecting its voter engagement program by developing and producing new public education materials, revising the resources and scripts used by canvassers and phone bankers, and re-training paid staff and volunteers in order to support voters who may have been sent a removal notice or removed from the rolls by educating and assisting them in maintaining their voter registration and re-registering if necessary, as well as reassure voters about their eligibility and mitigate any intimidating effect related to the threat of referral to law enforcement and criminal investigation and prosecution as laid out in E.O. 35. Many ACT members who are naturalized citizens may have been sent a removal notice, removed from the rolls, or are at heightened risk of imminent removal due to having obtained a driver's license prior to becoming a citizen and having yet to update their DMV records.

### **Defendants**

35.     Defendant **Susan Beals** is the Virginia Commissioner of Elections. The Commissioner of Elections is the "principal administrative officer" of the Department of Elections, Va. Code § 24.2-102(B), and "the chief state election officer responsible for the coordination of state responsibilities under the National Voter Registration Act," *id*. § 24.2-404.1. Defendant Beals is also responsible for ensuring the implementation of the Purge Program by "certify[ing] in writing to the Governor" that the Purge Program's requirements are being met. E.O. 35 at 3. As the head of the Department of Elections, she is also responsible for generating the Purge Program's daily list of voters alleged to be noncitizens. *Id.* at 4. Defendant Beals is sued in her official capacity.

36.     Defendant **John O'Bannon** is the Chairman of the State Board of Elections ("the Board"); **Rosalyn R. Dance** is the Vice-Chairman of the Board; **Georgia Alvis-Long** is the Secretary of the Board; and **Donald W. Merricks** and **Matthew Weinstein** are members of the

Board (collectively "State Board of Election Members"). They are all sued in their official capacities. "The State Board, through the Department of Elections, shall supervise and coordinate the work of the county and city electoral boards and of the registrars to obtain uniformity in their practices and proceedings and legality and purity in all elections." Va. Code § 24.2-103(A). It is the duty of the Board to "make rules and regulations and issue instructions and provide information consistent with the election laws to the electoral boards and registrars to promote the proper administration of election laws." *Id*.

37.     Defendant **Jason Miyares** is the Attorney General of Virginia. Under Virginia law, the Attorney General has "full authority to do whatever is necessary or appropriate to enforce the election laws or prosecute violations thereof." Va. Code § 24.2-104(A); E.O. 35 at 4. Defendant Miyares endorsed the Purge Program, claiming credit for E.O. 35's original announced purge of 6,303 alleged noncitizens from the voter rolls.[3] Registrars and County Electoral Boards have since referred to Defendant Miyares for criminal investigation and possible criminal prosecution additional individuals whose voter registration was cancelled because of the Purge Program. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

**I.     The Purge Program and Governor Youngkin's Announcement of E.O. 35**

38.     Governor Youngkin announced E.O. 35 on August 7, 2024—exactly 90 days before the 2024 General Election on November 5 and 45 days before the start of early in-person voting. E.O. 35. With this timing, every subsequent voter removal is necessarily within the NVRA's "quiet period."

---

[3] Jason Miyares (@JasonMiyaresVA), X (Aug. 7, 2024, 1:57 PM), https://perma.cc/6JGJ-KLJD ("6,303. That's the number of noncitizens identified and removed from Virginia's voting rolls under our watch. I'm proud of my office's work to help ensure election integrity.").

39.     In his August announcement, Governor Youngkin was clear that the Purge Program had already begun, explaining that between January 2022 and July 2024, 6,303 voters were removed from the voter rolls based on DMV data shared with ELECT. E.O. 35 at 2. He also explained that the Program uses a systematic, ongoing process saying, "We verify the legal presence and identity of voters using DMV data and other trusted data sources to **update our voter rolls daily**, not only adding new voters, but **scrubbing the lists** to remove those that should not be on it, like…non-citizens that have accidentally or maliciously attempted to register."[4]

40.     The Purge Program is intended to and does operate systematically: it requires "daily updates" to cancel the voter registrations of individuals identified as potential non-U.S. citizens based on faulty and outdated data without a meaningful and individualized inquiry into its accuracy. *See* E.O. 35 at 3-4.

41.     Section 7.3 of the 2021 MOU indicates that a successful "match" between a record in Virginia's voter file and a record in the DMV database requires an exact match of Social Security Number, first name, last name, and date of birth. In the event a registrant does not provide a Social Security Number, then DMV matches on first name, last name, and date of birth.

42.     ELECT operators are given little, if any, guidance or criteria directing how to determine if a purported "match" between the records in the voter file and DMV database is accurate or false based on other information available to the operator. The Voter Registration List Maintenance Department of Motor Vehicles: Full SBE & Noncitizens Standard Operating Procedures (SOP) Section 4.1 merely states, "[t]he GR reviews the match to determine if the non-

---

[4] *Governor Glenn Youngkin Issues Executive Order to Codify Comprehensive Election Security Measures to Protect Legal Voters and Accurate Counts*, Office of the Governor (Aug. 7, 2024), https://www.governor.virginia.gov/newsroom/news-releases/2024/august/name-1031585-en.html (emphasis added).

citizen and registered voter identified by VERIS is the same person" without any further explanation or elaboration.

43.    In the event a DMV record indicating that an individual is a non-citizen matches to a record in Virginia's voter file, an "Affirmation of United States Citizenship form" must be sent to a registrant along with a letter entitled "Notice of Intent to Cancel." That letter informs the voter that "[w]e have received information that you indicated on a recent DMV application that you are not a citizen of the United States."

44.    Upon information and belief, neither the DMV, ELECT, nor county officials take any action to verify the veracity of the information suggesting an individual flagged through the Purge Program is in fact a noncitizen prior to sending the 14-day notice and initiating the removal process, instead putting the burden entirely on the voter to re-affirm their citizenship or face removal.

45.    If the registrant affirmatively responds and mails the local registrar a completed Affirmation of Citizenship form within 14 days, then the registrant is marked as confirming their citizenship and the registrant is removed from the list of flagged individuals, which state officials describe as the "Declared Non-Citizen Hopper."

46.    With respect to people who do not return the Affirmation of Citizenship form, the Notice of Intent to Cancel provides that "[i]f you do not respond within 14 days, you will be removed from the list of registered voters."

47.    The Purge Program further requires that registrars "immediately notify the Commonwealth's Attorney for their jurisdiction of this alleged unlawful conduct." E.O. 35 at 4.

II.        **Implementation of the Purge Program**

48.      Virginians have been removed from the rolls in the 90-day "quiet period" as a result of the Purge Program, and more will be removed until it is enjoined.

49.      ELECT has confirmed that it and registrars are daily receiving "non-citizen data" from the DMV and daily "[r]emoving individuals who declare or provide documentation indicating non-citizenship status and who do not respond to an affirmation of citizenship notice." Ex. 1. Indeed, ELECT and the DMV entered a new Memorandum of Understanding on September 3, 2024, ensuring the daily data exchanges will occur. Ex. 2.

50.      Counties are using these daily updates from ELECT to remove Virginians from the voter rolls. For example, Arlington, Fairfax, and Loudoun Counties have all followed ELECT's instructions and cancelled the registrations of voters as a result of the Purge Program. Exs. 3, 4, 5. Loudoun County confirmed eight cancellations in August for alleged noncitizenship, Ex. 6 at 9, and Fairfax confirmed 49 cancellations as a result of the Purge Program, Ex. 5 at 7.

51.      The 49 voter registration cancellations in Fairfax County were all due to a failure of the voter to reply affirming their citizenship within 14 days of the notice being sent. Originally, 66 voters were identified and noticed as alleged noncitizens, but 17 voters responded confirming their citizenship "and re-registered within the 14-day requirement." Ex. 5 at 7. A member of the Fairfax County Electoral Board acknowledged that "his understanding was that many of these individuals are citizens who inadvertently checked the wrong box or did not check any box for the citizenship question on the DMV website" but also noted that registrars are unable to do research into the source of the noncitizen DMV demarcation because "the local election offices have 'no way of knowing' how the individual answered the DMV citizenship question." Ex. 5 at 7.

52.     Arlington and Loudoun Counties also all referred alleged noncitizen voters to the Commonwealth Attorneys for their jurisdictions for criminal investigation and potential prosecution. Exs. 3, 5. Arlington County has also referred alleged noncitizens to Defendant Attorney General Miyares for investigation and potential prosecution. Ex. 3.

53.     During a September 30, 2024, Board of Elections hearing, Prince William Registrar Eric Olsen indicated that he has been asking registrants to re-verify that they are U.S. citizens even if they have previously returned an Affirmation of United States Citizenship Form to his office.

54.     At the September 30 meeting, Mr. Olsen said: "[w]e looked at 162 individuals that were listed as noncitizens in the VERIS system. Forty-three of those have voted. We looked at all forty-three of those. Every single one of them had verified their citizenship previously. Some by as many as five times. All had Social Security Numbers. And we had to cancel them because of state protocol, but we also didn't see any issue that they had done anything illegal."[5]

### III.         The Purge Program's Impact on Naturalized Citizens

55.     On information and belief, the Purge Program has resulted and will continue to result in the cancellation of the voter registration of naturalized U.S. citizens. Even though naturalized citizens have the same fundamental right to vote as U.S.-born citizens, the Purge Program systematically jeopardizes the voting rights of naturalized citizen voters. The Purge Program requires naturalized citizens to provide further citizenship verification to stay on the rolls or, if they do not do so within 14 days, confirms their removal and refers them for criminal investigation and prosecution.

---

[5] A recording of Mr. Olsen's statement is available at
https://www.youtube.com/watch?v=Zr0LSt3xwCk (29:00).

56.     Data from U.S. Citizenship and Immigration Services (USCIS) shows that thousands of Virginia residents are naturalized every year. In Fiscal Year 2023, the most recent full year for which state-specific data is available, 24,100 Virginia residents became naturalized citizens.[6] Naturalization applications generally increase in advance of general elections,[7] and, according to USCIS data last updated on August 12, 2024, there were still an estimated 270,588 lawful permanent residents in Virginia eligible to naturalize.[8]

57.     The Census Bureau has found that roughly 61% of naturalized citizens are registered to vote.[9]

58.     To become a naturalized citizen, a person must first be a lawful permanent resident (often colloquially called a "green card holder") for years. The sole exceptions are for a small number of people who become naturalized citizens due to certain service in the U.S. military or who were previously noncitizen nationals of the United States because they were born in certain U.S. territories. For that reason, all (or virtually all) naturalized citizens in Virginia lived in the United States for years before they were citizens, as noncitizens and lawful permanent residents.[10]

---

[6]     *Naturalization Statistics*, USCIS, https://www.uscis.gov/citizenship-resource-center/naturalization-statistics (last updated May 9, 2024).

[7]     *U.S. Naturalization Policy* 16-17, Congressional Research Service (Apr. 15, 2024), https://crsreports.congress.gov/product/pdf/R/R43366.

[8] *Eligible to Naturalize Dashboard*, USCIS (Aug. 12, 2024), https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data/eligible-to-naturalize-dashboard.

[9] *Voting and Registration in the Election of November 2022,* Table 11, U.S. Census Bureau (Apr. 2023), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-586.html.

[10] In addition, some children born outside the U.S. who were legal permanent residents become U.S. citizens by operation of law, in what is called "derived citizenship." These children are not required to go through the naturalization process or obtain any documentation when they become citizens. When they turn 18, they can register to vote if they are otherwise eligible. Individuals with derived citizenship were typically children when at least one parent became a naturalized citizen. *See Policy Manual, Chapter 4 - Automatic Acquisition of Citizenship after Birth (INA 320)*, USCIS, https://www.uscis.gov/policy-manual/volume-12-part-h-chapter-4. Derived citizens are subject to the same unlawful practices as naturalized citizens under the Purge Program, and the

59.    Virginia drivers' licenses, permits, and special identification cards are available to citizens and noncitizens alike including legal permanent residents, "conditional resident alien[s]," approved applicants for asylum, and entrants into the United States in refugee status. Va. Code § 46.2-328.1(A). Those forms of identification can remain valid during the applicant's authorized stay in the United States, up to the legal limit of eight years. *Id*. at §§ 46.2-328(B); 330(A).

60.    Because a person must ordinarily be a lawful permanent resident for years before becoming a naturalized citizen, and because a lawful permanent resident may obtain a driver's license, permit, or special identification card in Virginia, it is extremely likely that many naturalized citizen residents of Virginia had a noncitizen exchange with the DMV prior to naturalization.

61.    This means that an individual could obtain a driver's license or form of identification as a non-U.S. citizen and subsequently become a U.S. citizen and lawfully register to vote—for example by using a paper voter registration form at their naturalization ceremony— without updating their DMV record to reflect their citizen status. *See* Va. Code §§ 46.2-328.1(A), 330(A). Under these circumstances, the DMV's records would still indicate that an eligible voter was not a U.S. citizen at the time they obtained their identification, thereby improperly and erroneously triggering the removal process.

62.    Some individuals may have interactions with the DMV that do not result in their citizenship information being corrected or updated in the database, which increases the likelihood that the citizenship information contained in the DMV database is outdated for some individuals.

---

claims regarding the unlawfulness of the Purge Program with respect to naturalized citizens in this lawsuit apply equally to derived citizens—since they, too, were previously legal permanent residents and could have interacted with the DMV before becoming citizens.

63.    The DMV does not require people to show additional proof of citizenship or lawful residence when they renew their drivers' licenses (so long as they showed such proof since 2004 for legal permanent residents or 2020 for asylees or refugees).[11] Thus citizens who became naturalized *over the last twenty years* would likely not have updated citizenship documents on file with the DMV if they obtained a driver's license before their naturalization. The Purge Program directly threatens the voting rights of these citizens.

64.    Upon information and belief, eligible voters often mistakenly leave a box empty or check the wrong box during electronic transactions with the DMV in a way that indicates they are not a citizen despite having already confirmed their citizenship while registering to vote, thereby improperly and erroneously triggering the removal process. Ex. 5 at 7. This can impact naturalized citizens as well as U.S.-born U.S. citizens.

65.    Further, naturalized citizens in Virginia overwhelmingly come from communities of color that have historically been subject to discrimination in the exercise of their voting rights. For instance, in fiscal year 2022, the top five countries of origin for the 27,324 naturalized Virginia residents were: India (2,060), Afghanistan (1,803), Pakistan (1,357), Philippines (1,356), and El Salvador (1,685).[12]

66.    In other states, state officials have created similar legally flawed programs in reliance on information provided when an individual obtained a driver's license. In each of those cases, public reporting and lawsuits have uncovered that the programs targeted naturalized citizens.

---

[11] *Virginia's Legal Presence Law*, Virginia Department of Motor Vehicles, available at https://www.dmv.virginia.gov/licenses-ids/id-cards/legal-presence (last accessed Oct. 3, 2024).
[12] *Profiles on Naturalized Citizens*, U.S. Dep't of Homeland Sec., Office of Homeland Sec. Statistics, https://ohss.dhs.gov/topics/immigration/naturalizations/profiles-naturalized-citizens.

67.     Registration is the largest obstacle to voting in the United States. H.R. Rep. No. 103-9, at 3 (1993) ("Public opinion polls, along with individual testimony . . . indicate that failure to become registered is the primary reason given by eligible citizens for not voting. It is generally accepted that over 80 percent of those citizens who are registered vote in Presidential elections.").

68.     In passing the NVRA, Congress acknowledged that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3).

69.     On information and belief, Defendants have not taken any meaningful steps to ensure that individuals flagged by the Purge Program are not in fact U.S. citizens, even though (1) DMV data regarding citizenship is known to be outdated and unreliable as an indicator of current citizenship status, and (2) noncitizen designation or transactions in the DMV data are often the sole criterion to trigger voter registration cancellation.

70.     Because the Purge Program by design singles out individuals who were once identified in DMV records as noncitizens and subjects them to scrutiny not generally faced by U.S.-born citizens, the Purge Program discriminates based on national origin and against naturalized citizens.

71.     Beyond its patent violation of the NVRA's quiet period, Virginia's Purge Program subjects naturalized citizens who have previously attested to their U.S. citizenship under penalty of perjury—as all other Virginia voters do—to a duplicative, arbitrary, and discriminatory process to remain registered and vote. Giving voters less than two weeks to complete that process (including the time it takes to receive, complete and mail back the form) exacerbates the burdens

imposed by the Purge Program. The deadline increases the likelihood that U.S. citizens are removed from the voter rolls by this process even though they are eligible to vote.

## IV.       The Purge Program's Impact on U.S.-Born Citizens

72.     On information and belief, the Purge Program has resulted and will continue to result in the cancellation of the voter registration of U.S.-born citizens. Individuals interacting with the DMV through electronic transactions often mistakenly select the wrong box in fields prompting the individual to indicate whether they are a U.S. citizen.

73.     At least some individuals who are U.S. citizens mistakenly check the box indicating they are not a citizen, which would result in the individual being flagged in the DMV's noncitizens transactions list.

74.     Because the Purge Program requires the DMV to transmit the list of noncitizen transactions to ELECT on a daily basis, DMV staff may not be able to identify and correct any user errors by U.S. citizens mistakenly indicating they are not a citizen prior to transmitting the list to ELECT, leading to these citizens being erroneously identified to ELECT as potential noncitizens.

## V.        Plaintiffs' Thwarted Effort to Obtain Information from the State

75.     On August 20, 2024, Plaintiff VACIR sent a letter to Defendant Beals, Defendant Miyares, the DMV, and the Office of the Governor requesting copies of all records relating to the removal from the voter registration rolls of Virginia registered voters on the basis that they have been identified as a potential "non-citizen." Ex. 7. The request was made pursuant to the Public Disclosure of Voter Registration Activities provision of the NVRA, 52 U.S.C. § 20507(i). Defendant Beals made only a limited initial production of responsive records, despite a September

9 meeting with Defendant Beals's staff and numerous emails discussing the specific records responsive to the request.

76.     On October 3, 2024, Plaintiffs VACIR and LWVVA sent a letter entitled "Notice of Violation of National Voter Registration Act and Demand for Remediation and Documents" to Defendants Beals and Miyares. Ex. 8. That letter, sent pursuant to the NVRA (52 U.S.C. § 20510(b)(2)), informed Defendants Beals and Miyares that the Purge Program violates the three provisions of the NVRA listed in Counts One through Three, *infra*. The letter also demanded records pursuant to 52 U.S.C. § 20507(i)(1), including, among other things: individualized voter information for voters affected by the Purge Program; instructions provided to Boards of Registrars regarding implementation of E.O. 35; and communications between Defendant Beals and Defendant Miyares regarding the Purge Program. ELECT responded to that letter on October 7, 2024, asserting that its "established voter list maintenance processes comply with all applicable state and federal laws" and that it will provide the list of individuals cancelled due to being declared a non-citizen within 90 days from the date of VACIR's August request. Ex. 9.

## CLAIMS

### COUNT ONE
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(c)(2)(A)**
(*Ex parte Young*, 52 U.S.C. § 20510)
All Plaintiffs Against All Defendants

77.     Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

78.     The NVRA requires that Virginia complete "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" "not later than 90 days prior to the date of a[n] . . . election for Federal office." 52 U.S.C. § 20507(c)(2)(A). This provision, called the "90-Day Provision," means that Virginia may not take

any steps to implement any program to systematically remove voters within the 90-day period before the date of a general election—the "quiet period."

79.      The Purge Program violates the NVRA's 90-Day Provision because it (1) is a program with the purpose of systematically removing voters from the rolls and (2) has not been completed before the 90-day quiet period before the 2024 general election and was not completed before the 90-day quiet period before the 2024 primary elections.

80.      The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State…before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Purge Program is ongoing, with potential purges occurring daily, all within 30 days before the November 5, 2024 election for Federal office. E.O. 35 at 3-4. Plaintiffs can, therefore, bring a civil action without notice to Virginia's chief election official.

## COUNT TWO
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(b)(1)**
(*Ex parte Young*, 52 U.S.C. § 20510)
All Plaintiffs Against All Defendants

81.      Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

82.      The NVRA requires that voter list maintenance programs be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1).

83.      Va. Code Ann. § 24.2-427(C) and the Purge Program violate the NVRA's requirement that voter list maintenance programs be "uniform" and "nondiscriminatory" because they identify registered voters based on national origin and type of citizenship status. Because Defendants' Purge Program is triggered by DMV data indicating a voter had previously been identified as a noncitizen, the Purge Program is directed at individuals who were formerly

27

**A-039**

noncitizens versus U.S.-born, citizens. It inevitably and predictably (indeed, by design) identifies and places burdens on citizens born outside the United States whom Defendants know or should know may be naturalized.

84.     The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State…before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Purge Program is ongoing, with potential purges occurring daily, all within 30 days before the November 5, 2024 election for Federal office. E.O. 35 at 3-4. Plaintiffs can, therefore, bring a civil action without notice to Virginia's chief election official.

**COUNT THREE**
**Violation of the National Voter Registration Act, 52 U.S.C. §§ 20508(b)(1), 20505(a)(1)-(2)**
(*Ex parte Young*, 52 U.S.C. § 1983)
All Plaintiffs Against All Defendants

85.     Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

86.     The NVRA limits proof of citizenship to an attestation under penalty of perjury that the registrant is a U.S. citizen. *See Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1 (2013); *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016); 52 U.S.C. §§ 20505(a)(1)-(2), 20508(b)(2)(A)-(B).

87.     The NVRA provides that a state voter registration form "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. §§ 20505(a)(1)-(2), 20508(b)(1). Under the NVRA, a state voter registration form "shall include a statement that (A) specifies each eligibility

28

**A-040**

requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury." *Id.* §§ 20505(a)(1)-(2), 20508(b)(2); *see also id.* § 20504(c).

88.     By requiring certain voters to reaffirm their U.S. citizenship to remain registered, Va. Code Ann. § 24.2-427(C) and the Purge Program violate the NVRA's command that voters need only complete a voter registration form to be a registered voter in federal elections.

89.     By inserting an additional requirement that certain voters provide additional citizenship information about themselves as part of the State's DMV data checks and motor voter forms, Va. Code Ann. § 24.2-427(C) and the Purge Program also violates the NVRA's long-established principle that states may not add unnecessary voter registration requirements at any stage of the registration process by inserting an additional requirement that certain voters provide additional citizenship information about themselves as part of the State's DMV data checks and motor voter forms.

90.     The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State…before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Purge Program is ongoing, with potential purges occurring daily, all within 30 days before the November 5, 2024 election for Federal office. E.O. 35 at 3-4. Plaintiffs can, therefore, bring a civil action without notice to Virginia's chief election official.

**<u>COUNT FOUR</u>**
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(i)**
(*Ex parte Young*, 52 U.S.C. § 1983)
All Plaintiffs Against Defendant Beals

91.     Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

92.     The Public Disclosure of Voter Registration Activities provision of the NVRA provides that states "shall maintain for at least 2 years and shall make available for public inspection… all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1). The Public Disclosure Provision covers individualized records for registered voters subject to removal programs. *See PILF v. N.C. State Board of Elections*, 996 F.3d 257 (4th Cir. 2021); *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012); *see also* 52 U.S.C. 20507(i)(2).

93.     Defendant Beals has thus violated the Public Disclosure of Voter Registration Activities provision of the NVRA by refusing to provide Plaintiffs with the list of voters identified as potential noncitizens within a reasonable time period despite having those records in her office's possession at the time Plaintiff VACIR requested these records on August 20 and when Plaintiffs VACIR and LWVVA requested records on October 3.

94.     Defendant Beals's and her office's continuing refusal to provide the requested records up to and including the time of filing of this lawsuit—which now falls within the 30-day period prior to a federal election within which aggrieved parties have immediate standing to sue to vindicate their rights under the NVRA, 52 U.S.C. § 20510(b)(3)—is certainly unlawful and the requested records must now be produced immediately.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

a.      Declare that Va. Code Ann. § 24.2-427(C) and Defendants' Purge Program violate the NVRA;

b.      Declare that Defendant Beals's failure to produce records requested by Plaintiff VACIR on August 20, 2024, and by Plaintiffs VACIR and LWVVA on October 3, 2024, violate the Public Disclosure Provision of the NVRA;

c.      Preliminarily and permanently enjoin Defendants from implementing Va. Code Ann. § 24.2-427(C) and the Purge Program and from cancelling any voter's registration as part of the Purge Program or on the basis of failing to respond to a notice letter issued as a result of the implementation of the Purge Program;

d.      Order Defendants Beals and State Board of Election Members to instruct all Virginia county registrars to place back on the rolls in active status any persons whose voter registration was cancelled or marked inactive as part of the Purge Program, except for any voter who responded to a notice letter by affirming that they are not a U.S. citizen, and instruct that all impacted voters should be allowed to cast regular ballots if they appear at the polls so long as they are otherwise eligible to do so;

e.      Order Defendants Beals and State Board of Election Members to instruct all Virginia county registrars to send letters to affected voters retracting the notice letters already sent out on the basis of the Purge Program;

f.      Order all Defendants to take all such steps and instruct Virginia county registrars to take all such steps as are necessary to alert the public and all individuals who were sent notice

letters as a result of the implementation of the Purge Program that the notice letters sent pursuant to the Purge Program are being rescinded, that all eligible voters whose voter registration was cancelled or marked inactive due to the Purge Program may vote in the November 2024 general election, and that all eligible voters whose voter registration was cancelled or marked inactive due to the Purge Program are on the voter rolls and need not re-register to vote;

g.      Order Defendants Beals and State Board of Election Members to retract all referrals made to Virginia law enforcement for investigation or prosecution of individuals made based on the Purge Program;

h.      Order all Defendants to take all such steps as are necessary and instruct Virginia county registrars to take all such steps as are necessary to alert the public and all individuals whose voter registration was cancelled or marked inactive due to the Purge Program that no voter will be criminally investigated or prosecuted on the basis of the Purge Program, absent specific, individualized information that they have violated a law;

i.      Order all Defendants to provide Plaintiffs with all records concerning the implementation of the Purge Program, including, but not limited to, the lists of the names and addresses and other individualized data available of all persons to whom removal notice were sent and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made, as well as the lists of the names and addresses and all other individualized data available of all persons who have been subject to investigation for alleged violations of law as a result of the Purge Program and all records related to such investigations;

j.      Award Plaintiffs their costs and reasonable attorneys' fees in this action;

k.      Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

l.      Grant Plaintiffs such other relief as this Court may deem just and proper.

Date: October 15, 2024

Respectfully submitted,

/s/ Shanna Ports

Ezra D. Rosenberg*
Ryan Snow*
Javon Davis*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street, NW, Ste. 900
Washington, DC 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
rsnow@lawyerscommittee.org
jdavis@lawyerscommittee.org

Shanna Ports (VSB No. 86094)
Danielle Lang**
Kevin Hancock**
Brent Ferguson**
Simone Leeper*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
sports@campaignlegalcenter.org
dlang@campaignlegalcenter.org
khancock@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
sleeper@campaignlegalcenter.org

Orion Danjuma*
John Paredes*
THE PROTECT DEMOCRACY PROJECT, INC.
82 Nassau Street, # 601
New York, NY 10038
Telephone: (202) 579-4582
orion.danjuma@protectdemocracy.org
john.paredes@protectdemocracy.org

John Powers*
Hani Mirza*
ADVANCEMENT PROJECT
1220 L Street Northwest, Suite 850
Washington, D.C. 20005
(202) 728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org

Benjamin L. Berwick*
THE PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Anna Dorman*
THE PROTECT DEMOCRACY PROJECT, INC.
200 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
anna.dorman@protectdemocracy.org

*Attorneys for Plaintiffs Virginia Coalition for Immigrant Rights, the League of Women Voters of Virginia, the League of Women Voters of Virginia Education Fund, and African Communities Together*

*\*Motion for pro hac vice participation forthcoming.*
*\*\*Motion for pro hac vice participation pending*

33

**A-045**

**CERTIFICATE OF SERVICE**

I certify that on October 15, 2024, I electronically filed the above document with the Clerk of Court using the ECF system, which will provide electronic copies to any counsel of record. Plaintiffs' Counsel will also send courtesy copies to attorneys at the Virginia Attorney General's Office who have met with Plaintiffs' counsel regarding this matter.

/s/ Shanna Ports
Shanna Ports

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

VIRGINIA COALITION FOR IMMIGRANT
RIGHTS; LEAGUE OF WOMEN VOTERS
OF VIRGINIA; LEAGUE OF WOMEN
VOTERS OF VIRGINIA EDUCATION
FUND; AFRICAN COMMUNITIES
TOGETHER,

     *Plaintiffs*,

       v.

SUSAN BEALS, in her official capacity as
Virginia Commissioner of Elections; JOHN
O'BANNON, in his official capacity as
Chairman of the State Board of Elections;
ROSALYN R. DANCE, in her official capacity
as Vice-Chairman of the State Board of
Elections; GEORGIA ALVIS-LONG, in her
official capacity as Secretary of the State Board
of Elections; DONALD W. MERRICKS and
MATTHEW WEINSTEIN, in their official
capacities as members of the State Board of
Elections; and JASON MIYARES, in his
official capacity as Virginia Attorney General,

     *Defendants*.

     Case No. 1:24-cv-01778
     Judge Patricia Tolliver Giles

**PLAINTIFFS' OPPOSED MOTION
FOR PRELIMINARY INJUNCTION**

     Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Virginia Coalition for Immigrant

Rights, African Communities Together, League of Women Voters of Virginia Education Fund,

and League of Women Voters of Virginia hereby move for a preliminary injunction seeking the

1

following relief:

1. An Order Barring Defendants Beals, O'Bannon, Dance, Alvis-Long, Merricks, Weinstein, and Miyares from violating the National Voter Registration Act of 1993 ("NVRA") by purging registered voters within 90 days of an election and subjecting voters to a discriminatory and non-uniform removal system; and

2. An Order providing injunctive relief to remedy Defendants' violations of the NVRA as described in Plaintiffs' Proposed Order.

Plaintiffs' request for such relief relies upon their Memorandum of Law in support of this motion that is filed contemporaneously herewith, along with Plaintiffs' Proposed Order.

Ezra D. Rosenberg*
Ryan Snow*
Javon Davis*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street, NW, Ste. 900
Washington, DC 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
rsnow@lawyerscommittee.org
jdavis@lawyerscommittee.org

/s/ Shanna Ports
Shanna Ports (VSB No. 86094)
Danielle Lang**
Kevin Hancock**
Brent Ferguson**
Simone Leeper*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
sports@campaignlegalcenter.org
dlang@campaignlegalcenter.org
khancock@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
sleeper@campaignlegalcenter.org

Orion Danjuma*
John Paredes*
THE PROTECT DEMOCRACY PROJECT, INC.
82 Nassau Street, # 601
New York, NY 10038
Telephone: (202) 579-4582
orion.danjuma@protectdemocracy.org
john.paredes@protectdemocracy.org

John Powers**
Hani Mirza**
ADVANCEMENT PROJECT
1220 L Street Northwest, Suite 850
Washington, D.C. 20005
(202) 728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org

2

A-048

Benjamin L. Berwick*
THE PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Anna Dorman*
THE PROTECT DEMOCRACY PROJECT, INC.
200 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
anna.dorman@protectdemocracy.org

*Attorneys for Plaintiffs Virginia Coalition for Immigrant Rights, the League of Women Voters of Virginia, the League of Women Voters of Virginia Education Fund, and African Communities Together*

*\*Motion for pro hac vice participation forthcoming.*
*\*\*Motion for pro hac vice participation pending.*

3

**A-049**

**CERTIFICATE OF SERVICE**

I certify that on October 15, 2024, I electronically filed the above document with the

Clerk of Court using the ECF system, which will provide electronic copies to any counsel of

record. Plaintiffs' Counsel will also send courtesy copies to attorneys at the Virginia Attorney

General's Office who have met with Plaintiffs' counsel regarding this matter.


/s/ Shanna Ports
Shanna Ports

4

**A-050**

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

|  |  |
|---|---|
| VIRGINIA COALITION FOR IMMIGRANT RIGHTS; LEAGUE OF WOMEN VOTERS OF VIRGINIA; LEAGUE OF WOMEN VOTERS OF VIRGINIA EDUCATION FUND; AFRICAN COMMUNITIES TOGETHER,<br><br>      *Plaintiffs*,<br><br>      v.<br><br>SUSAN BEALS, in her official capacity as Virginia Commissioner of Elections; JOHN O'BANNON, in his official capacity as Chairman of the State Board of Elections; ROSALYN R. DANCE, in her official capacity as Vice-Chairman of the State Board of Elections; GEORGIA ALVIS-LONG, in her official capacity as Secretary of the State Board of Elections; DONALD W. MERRICKS and MATTHEW WEINSTEIN, in their official capacities as members of the State Board of Elections; and JASON MIYARES, in his official capacity as Virginia Attorney General,<br><br>      *Defendants*. | Case No. 1:24-cv-01778<br>Judge Patricia Tolliver Giles |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................1

STATEMENT OF FACTS ...................................................................................................2

    I.      Background .................................................................................................2

        A.  Virginia's Purge Program.........................................................................2

        B.  Executive Order 35 Broadens the Impact of Virginia's Purge Program .................4

    II.     Plaintiffs .................................................................................................9

ARGUMENT ...............................................................................................................10

    I.      Plaintiffs are Likely to Succeed on the Merits...............................................10

        A.  The Purge Program violates the NVRA's 90-Day Provision. ...............................10

        B.  The Purge Program Violates the NVRA's Requirement that Removal Programs be "Uniform" and "Nondiscriminatory."........................................................20

    II.     An Injunction is Necessary to Prevent Irreparable Harm. ...............................23

    III.    The Balance of Equities and Public Interest Favor an Injunction. ........................27

CONCLUSION...............................................................................................................28

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page**

*Arcia v. Florida Secretary of State*,
772 F.3d 1335 (11th Cir. 2014) ............................................................12, 13, 15, 16, 17, 19, 20, 24

*Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Ohio 2006) ....................................................23

*Forward v. Ben Hill County Board of Elections*, 509 F. Supp. 3d 1348 (M.D. Ga. 2020) ............16

*Gonzalez v. Governor of Georgia*, 978 F.3d 1266 (11th Cir. 2020)................................................23

*League of Women Voters of North Carolina v. North Carolina*,
769 F.3d 224 (4th Cir. 2014)...................................................................................................23, 28

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)......................................24

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) ..........................................................27

*Mi Familia Vota v. Fontes* (*Vota I*), 691 F. Supp. 3d 1077 (D. Ariz. 2023) ..................................16

*Mi Familia Vota v. Fontes* (*Vota II*), No. CV-22-00509-PHX-SRB, 2024 WL 862406 (D. Ariz.
2024) ...........................................................................................................................................22

*North Carolina State Conference of NAACP v. Bipartisan Board of Elections & Ethics
Enforcement*, No. 1:16CV1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) .....................16

*Othi v. Holder*, 734 F.3d 259 (4th Cir. 2013) ...............................................................................11

*Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) .........................15, 20

*Sullivan v. Stroop*, 496 U.S. 478 (1990)........................................................................................14

*Texas League of United Latin American Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL
7938511 (W.D. Tex. Feb. 27, 2019)..........................................................................................22

*United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012)...........................................21, 22

*United States v. Simms*, 914 F.3d 229 (4th Cir. 2019)..................................................................14

*U.S. Student Association Foundation v. Land*, 546 F.3d 373 (6th Cir. 2008) ..............................28

*Vitkus v. Blinken*, 79 F.4th 352 (4th Cir. 2023) ...........................................................................10

*Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685 (2022)...................................................................13

**Statutes**

52 U.S.C. § 10101(a)(2)(A) ...........................................................................................................22

52 U.S.C. § 10503(c) .......................................................................................................................5

52 U.S.C. § 20501 .........................................................................................................................28

52 U.S.C. § 20507(b) .....................................................................................................................14

52 U.S.C. § 20507(b)(1) .......................................................................................................2, 20, 21

52 U.S.C. § 20507(b)(2) .................................................................................................................14

52 U.S.C. § 20507(c)(2)(A) ................................................................................................1, 10, 11, 14

52 U.S.C. § 20507(a)(3)-(4) .............................................................................14

52 U.S.C. § 20507(a)(3)(A)-(B) .......................................................................13

52 U.S.C. § 20507(a)(4)(A) ..............................................................................13

52 U.S.C. § 20507(c)(2)(B)(i) ...............................................................12, 13, 14

52 U.S.C. § 20507(c)(2)(B)(ii) ...................................................................13, 14

52 U.S.C. § 20507(d) ........................................................................................13

52 U.S.C. § 20507(d)(3) ...................................................................................14

52 U.S.C. § 20507(e)(2)(A) ..............................................................................14

52 U.S.C. § 20507(f) .........................................................................................14

Va. Code Ann. § 24.2-410.1(A) ......................................................................2, 4

Va. Code Ann. § 24.2-427(C) ......................................................................2, 3, 4

Va. Code Ann. § 46.2-330(A) .............................................................................3

Va. Code Ann. § 46.2-328.1(A) ..........................................................................3

Va. Code Ann. § 46.2-328.1(B) ..........................................................................3

**Other Authorities**

Merriam-Webster, *Program*, https://www.merriam-webster.com/dictionary/program (last accessed Oct. 14, 2024) .............................................................................11

Merriam-Webster, *Systematic*, https://www.merriam-webster.com/dictionary/program (last accessed Oct. 14, 2024) .............................................................................11

Notice of Determination, 86 Fed. Reg. 233 (Dec. 8, 2021) ................................5

Press Release, Gov. Glenn Youngkin, *Governor Glenn Youngkin Issues Executive Order to Codify Comprehensive Election Security Measures to Protect Legal Voters and Accurate Counts*, Aug. 7, 2024, at https://www.governor.virginia.gov/newsroom/news-releases/2024/august/name-1031585-en.html .........................................................6

*Virginia's Legal Presence Law*, Virginia Department of Motor Vehicles, available at https://www.dmv.virginia.gov/licenses-ids/id-cards/legal-presence (last accessed Oct. 14, 2024) ...................................................................................................4

## <u>PRELIMINARY STATEMENT</u>

Plaintiffs respectfully request that this Court grant urgently needed injunctive relief to halt an ongoing purge of Virginia's voters on the eve of a major election and to restore voters removed in violation of federal law.[1] In the National Voter Registration Act of 1993 ("NVRA"), Congress recognized that systematic programs to purge voter rolls on the eve of a federal election inevitably threaten the rights of eligible voters. It thus prohibited "*any* program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" fewer than "90 days prior to the date of a primary or general election for Federal office." 52 U.S.C. § 20507(c)(2)(A) (emphasis added).

Despite these established protections of federal law, Governor Glenn Youngkin issued an executive order on August 7, 2024—exactly 90 days before the 2024 General Election—escalating a purge program already underway. Given that timing, the intention and effect of E.O. 35 is to command state and county election officials to continue systematic voter purges precisely when federal law mandates they must end. The text of the NVRA and relevant precedent are clear: such efforts are unlawful.

Available evidence further indicates that Defendants' system is particularly faulty and error-ridden. The state is relying on a largely automatic process that flags applicants as potential noncitizens by matching registration rolls to records from the Department of Motor Vehicles that are up to twenty years out of date. As the accompanying analysis of Dr. Michael McDonald demonstrates, this methodology has repeatedly proven to be fatally flawed. In states that have employed comparable systems, nearly every record flagged by such processes ultimately belonged

---

[1] On October 8, 2024, Plaintiffs moved for expedited discovery from Defendants concerning aspects of the state's voter removal program. Pls.' Emergency Mot. Disc., ECF No. 4. Plaintiffs reserve the right to supplement their request for injunctive relief with additional evidence if the expedited discovery motion is granted.

1

to an eligible, naturalized citizen.  Here, the prospect of disenfranchising eligible voters is far from abstract. County election officials have stated that they are being required to cancel registrations of individuals who appear to be citizens and have already affirmed their citizenship—sometimes repeatedly. Such a system impermissibly classifies voters based on their national origin and inherently imposes discriminatory burdens on naturalized citizens, violating the NVRA mandate that list maintenance programs be "uniform [and] nondiscriminatory." 52 U.S.C. § 20507(b)(1).

Plaintiffs are likely to succeed on the merits of their claims that Defendants' policies violate the NVRA, and Plaintiffs satisfy the remaining equitable factors for a preliminary injunction. Defendants' voter purge program (the "Purge Program") should therefore be enjoined and Plaintiffs' other requested injunctive relief should be granted as swiftly as practicable.

## STATEMENT OF FACTS

### I.  Background

#### A.  Virginia's Purge Program

Elements of Defendants' Purge Program existed prior to August 2024 but have now been extended into the 90-day period before an election protected under the NVRA. The impact of the program has also been amplified and exacerbated by alterations to Defendants' policies.

Before August 2024, the Virginia Department of Elections (ELECT), Virginia Department of Motor Vehicles (DMV), and local registrars collaborated to implement a purge program that systematically removes new citizen voters from registration lists. Va. Code Ann. § 24.2-410.1(A) requires the DMV to "furnish monthly to [ELECT] a complete list of all persons who have indicated a noncitizen status to the [DMV] in obtaining any document, or renewal thereof, issued pursuant to" Virginia's driver license provisions, and requires ELECT to "transmit the information from [that] list to the appropriate general registrars." Va. Code Ann. § 24.2-427(C) then requires county registrars to "mail notice promptly to all persons known by [them] not to be United States

2

citizens" based on the DMV's monthly list of alleged noncitizen voters or "from [ELECT] based on information received from the Systematic Alien Verification for Entitlements Program (SAVE Program)." The notice shall:

> inform the person of the report from the [DMV] or from [ELECT] and allow the person to submit his sworn statement that he is a United States citizen within 14 days of the date that the notice was mailed. The general registrar shall cancel the registrations of such persons who do not respond within 14 days to the notice that they have been reported not to be United States citizens.

*Id.*

According to a memorandum of understanding between the DMV and ELECT, the DMV specifically sends monthly to ELECT a list of Virginians who have answered "no" to a citizenship question on DMV paperwork. Ex. A at 4 (Declaration of Michael P. McDonald); Ex. B at 12-14 (DMV & ELECT MOUs). This monthly list extract includes a citizenship identifier ("N = Non-citizen"), and any record identified with an "N" will also include the date of the declaration. ELECT then "matches" the DMV data with voter registration records to identify specific registrants that are potentially noncitizens. Ex. A at 4-6. Section 7.3 of the MOU indicates that a successful match requires an exact match of a Social Security Number, first name, last name, and date of birth. Ex. A at 10; Ex. B at 21-22. In the event a registrant does not provide a Social Security Number, the DMV matches on first name, last name, and date of birth. Ex. A at 10.

Virginia drivers' licenses, permits, and special identification cards are available to citizens and noncitizens alike including legal permanent residents, "conditional resident alien[s]," approved applicants for asylum, and entrants into the United States with refugee status. Va. Code Ann. § 46.2-328.1(A). Those forms of identification can remain valid during an individual's authorized stay in the United States, up to the legal limit of eight years. *Id.* §§ 46.2-328.1(B); 330(A). The DMV does not require individuals to show additional proof of citizenship or lawful residence when they renew their identification, including drivers' licenses (so long as they have

3

**A-057**

provided such proof since 2004 for legal permanent residents or 2020 for asylees or refugees).[2]
Thus, DMV's citizenship information may be up to 20 years old.

   B.   Executive Order 35 Broadens the Impact of Virginia's Purge Program

       On August 7, 2024—90 days before the 2024 General Election on November 5, and 45
days before the start of early in-person voting—Virginia Governor Glenn Youngkin released
Executive Order 35 ("E.O. 35") announcing an expansion of Virginia's Purge Program outlined in
Va. Code Ann. §§ 24.2-410.1(A) and 24.2-427(C). Ex. C (E.O. 35).  Departing from the monthly
process laid out in state law, E.O. 35 directs the DMV to "expedite the interagency data sharing
with [ELECT] of non-citizens by generating a daily file of all non-citizen transactions." Ex. C at
4.[3] According to a 2024 memorandum of understanding between the DMV and ELECT, which
was entered into shortly after E.O. 35 was issued, the DMV now sends daily to ELECT a list of
Virginians who (1) have answered "no" to a citizenship question on DMV paperwork or (2)
regardless of how they respond to the citizenship question on DMV paperwork, have "legal
presence documents [with the DMV] indicating non-citizenship status." Ex. B at 3.

       The executive order, as a result, increases the frequency of improper removals by requiring
ELECT to engage in "daily updates" to cancel the registrations of voters identified as potential
non-U.S. citizens based on faulty and outdated data from the DMV without a meaningful and

---

[2] *Virginia's Legal Presence Law*, Virginia Department of Motor Vehicles, available at
https://www.dmv.virginia.gov/licenses-ids/id-cards/legal-presence (last accessed Oct. 14, 2024).
[3] E.O. 35 also directs the DMV, "[w]hen issuing a credential such as a driver's license," to "verify
applicants' proof of identity and legal status with the Department of Homeland Security Systematic
Alien Verification and Entitlements (SAVE) database and the Social Security Administration
database." Ex. C at 2. Such verification is only required in DMV transactions that involve the
issuance of a new credential. However, "[a]ll data collected by the DMV that identifies non-
citizens is shared with ELECT . . . ." *Id*. The DMV does nothing, however, to verify citizenship,
only the veracity of documents provided to establish proof of identity and legal presence.

individualized inquiry into its accuracy. *See* Ex. C at 3-4. As a practical matter, it also affords DMV officials very little time to capture or correct errors in the records transmitted.

According to ELECT's procedures for "Declared Non-Citizens," "matches" of individuals flagged by the DMV and present on registration rolls are automatically placed within the VERIS system in the "Declared Non-Citizen Hopper." Ex. A at 6; *see also* Ex. D (Hopper Processing and Information Instructions). This procedure is non-discretionary, meaning registrars must place registrants who match the DMV flags in the "Declared Non-Citizen Hopper" *even if* they have reason to believe the individual is in fact a citizen. Ex. A at 6; *see also* Ex. D at 35.

According to E.O. 35 and ELECT's policies, registrars must send those in the Declared Non-Citizen Hopper a "Notice of Intent to Cancel" letter along with an "Affirmation of United States Citizenship form." Ex. A at 6; *see also* Ex. E (Notice of Intent to Cancel); Ex. F (Affirmation of Citizenship Form).[4] That letter informs the voter that "[w]e have received information that you indicated on a recent DMV application that you are not a citizen of the United States." Ex. E; Ex. A at 6. If the registrant responds and provides their local registrar with a completed Affirmation of Citizenship within 14 days, the registrant is marked as having confirmed their citizenship and removed from the Declared Non-Citizen Hopper.[5] Ex. A at 6. With respect to people who do not

---

[4] All of these documents are provided to recipients exclusively in English, despite the fact that five localities in Virginia, including Fairfax and Prince William Counties are covered by Section 203 of the Voting Rights Act and thus have a "legal obligation to provide . . . minority language assistance." *See* Notice of Determination, 86 Fed. Reg. 233 (Dec. 8, 2021); 52 U.S.C. § 10503(c) ("Whenever any State or political subdivision subject to the prohibition of subsection (b) of this section provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable minority group as well as in the English language . . . .").

[5] The Affirmation of Citizenship form requires the voter to provide their name, address, telephone number, and email address, and sign their name under a statement that reads: "SUBJECT TO PENALTY OF LAW, I DO HEREBY AFFIRM THAT I AM A CITIZEN OF THE UNITED STATES OF AMERICA." Ex. F.

return the Affirmation of Citizenship, the Notice of Intent to Cancel provides that "[i]f you do not respond within 14 days, you will be removed from the list of registered voters." Ex. E; Ex. A at 6.

E.O. 35 further directs registrars to "immediately notify the Commonwealth's Attorney for their jurisdiction" of any individuals who do not affirm their citizenship within the 14-day window. Ex. C at 4. As Governor Youngkin explained, the Purge Program is systematic and ongoing:

> We verify the legal presence and identity of voters using DMV data and other trusted data sources to update our voter rolls daily, not only adding new voters, but scrubbing the lists to remove those that should not be on it, like . . . non-citizens that have accidentally or maliciously attempted to register.[6]

Between January 2022 and July 2024, 6,303 registrants were removed from the voter rolls based on DMV data shared with ELECT. Ex. C at 2; Ex. A at 6. Since July, additional registrants have been removed, including during the 90-day "quiet period," as a result of the escalation of the Purge Program. Ex. A at 8-9. Arlington, Fairfax, Prince William, and Loudoun Counties have acknowledged publicly that they followed ELECT's instructions and recently canceled the registrations of voters due to the Purge Program. Ex. A at 8-9; Ex. H (Arlington County Electoral Board Meeting Minutes); Ex. I (Fairfax Policy for Referring Individuals Removed from Voter Rolls); Ex. J (Fairfax County Electoral Board Minutes); Ex. K (Prince William County Meeting Recording); Ex. L (Loudoun County Electoral Board Meeting Agenda). Loudoun County confirmed eight cancellations in August for alleged non-citizenship, Ex. L at 9, and Fairfax confirmed 49 cancellations as a result of the Purge Program, Ex. J at 7; *see also* Ex. A at 8-9. The 49 cancellations in Fairfax County were all due to failure of the voters to reply affirming their citizenship within 14 days of the notice being sent. Ex. J at 7; Ex. A at 9. Originally, 66 voters

---

[6] *See* Press Release, Gov. Glenn Youngkin, *Governor Glenn Youngkin Issues Executive Order to Codify Comprehensive Election Security Measures to Protect Legal Voters and Accurate Counts*, Aug. 7, 2024, at https://www.governor.virginia.gov/newsroom/news-releases/2024/august/name-1031585-en.html.

were identified and noticed as alleged noncitizens, but 17 voters responded confirming their citizenship "and re-registered within the 14-day requirement." Ex. J at 7; *see also* Ex. A at 8. A member of the Fairfax County Electoral Board mentioned that "his understanding was that many of these individuals are citizens who inadvertently checked the wrong box or did not check any box for the citizenship question on the DMV website," but also noted that registrars are unable to do research into the source of the noncitizen DMV demarcation because "the local election offices have 'no way of knowing' how the individual answered the DMV citizenship question." Ex. J at 7; Ex. A at 8. Similarly, in Prince William County, during the September 30 Board of Elections meeting, General Registrar Eric Olsen described 162 individuals as being listed as noncitizens in the VERIS system. Ex. K; Ex. A at 9. Of those individuals, 43 had voted, all 43 had verified their citizenship previously (some as many as five times). Ex. K; Ex. A at 9. Yet, the county still was forced to cancel their registration in order to follow the state protocol dictated by E.O. 35. Olsen noted that being identified as a

> non-citizen in the VERIS system does not mean someone is not dispositively not a citizen. It is a categorization that largely comes from the DMV transfer of data and what it has done, if anything, is more likely has trapped a lot of people who are valid citizens who are being canceled from the process.

Ex. K.

Arlington, Fairfax, Prince William and Loudoun Counties also all referred individuals caught up in this purge process to the local Commonwealth Attorneys for criminal investigation and potential prosecution. *See* Ex. H; Ex. J at 7; Ex. K; Ex. L at 3. Arlington and Fairfax Counties have also both referred these individuals to Defendant Attorney General Miyares for investigation and potential prosecution. *See* Ex. H; Ex. J at 7.

Individuals interacting with the DMV through electronic transactions often mistakenly select the wrong box in fields prompting the individual to indicate whether they are a U.S. citizen.

Ex. A at 8. At least some individuals who are U.S. citizens mistakenly check the box indicating they are not a citizen, which would result in the individual being flagged in the DMV's noncitizen transactions list. Ex. J at 7. Because the Purge Program requires the DMV to transmit the list of noncitizen transactions to ELECT on a daily basis, DMV staff cannot identify and correct any user errors by U.S. citizens mistakenly indicating they are not a citizen prior to transmitting the list to ELECT, leading to these citizens being erroneously identified to ELECT as potential noncitizens. Moreover, citizens may be flagged as noncitizens for simply having the same first name, last name, and birth date as another Virginia resident who happens to be a noncitizen. Ex. A at 9-10.

The Purge Program classifies on the basis of national origin and places a discriminatory burden on naturalized U.S. citizens whose citizenship status has changed since their last interaction with the DMV. No state requires naturalized citizens to immediately update their citizenship status upon achieving U.S. citizenship, including the Commonwealth of Virginia. Ex. A at 7. Moreover, the DMV does not require Virginians to show additional proof of citizenship or lawful residence when they renew their drivers' licenses—which are valid for eight years—so long as they have provided such proof since 2004 for legal permanent residents or 2020 for asylees or refugees. Ex. A at 7. Furthermore, the DMV only attempts to verify citizenship information "[w]hen issuing a credential." Ex. A at 7; Ex. C at 2. Therefore, citizens who became naturalized *over the last twenty years* would likely not have updated citizenship documents on file with the DMV if they obtained a driver's license before their naturalization, which guarantees that they will be incorrectly flagged as noncitizens by the DMV through the daily and monthly update lists. *See* Ex. A at 7-9.

Alarmingly, registrants who affirmatively respond to the Affirmation of United States Citizenship form can be repeatedly flagged as potential noncitizens, unless they personally update their DMV citizenship status. Ex. A at 10-11. When a registrant provides citizenship information to ELECT, there is no mechanism for that information to be updated in the DMV customer

database. Ex. A at 10. The Purge Program directly and repeatedly threatens the voting rights of these citizens. Ex. A at 10-11.

## II. <u>Plaintiffs</u>

African Communities Together ("ACT") is a national nonpartisan membership organization of African immigrants advocating for civil rights, opportunity, and a better life for African immigrants and their families. ACT has over 1,000 members in Virginia and dedicated staff who support the thousands of African immigrants residing in the Commonwealth. As a core part of its work, ACT encourages and supports voter registration and participation among eligible African immigrant voters. As discussed in Part II *infra*, the Purge Program has disrupted internal operations and led to significant changes in their approach to voter engagement and advocacy leading up to the general election. *See* Ex. X ¶¶ 17-22 (Declaration of Gigi Traore, ACT) ¶¶ 17-22.

The League of Women Voters of Virginia ("LWVVA" or "the League") is a nonpartisan, nonprofit membership organization whose core mission is encouraging Virginians to participate in government, primarily through voting. In service of that mission, the League helps countless Virginians register to vote and stay registered, especially in the months just before general elections. As described in Part II, *infra*, the Purge Program has impeded that effort by ensuring that fewer voters will be registered and by forcing the League and its members to spend money and time trying to ameliorate the effect of the program on Virginia voters. *See* Ex. W ¶¶ 26-40 (Declaration of Joan Porte, LWVVA).

The Virginia Coalition for Immigrant Rights ("VACIR") is a multi-racial and multi-ethnic coalition of member organizations that exists to win dignity, power, and quality of life for all Virginia immigrant and refugee communities. VACIR is composed of 49 nonpartisan, nonprofit standing member organizations that seek to support Virginia's immigrant community through a

9

**A-063**

variety of initiatives, including voter education, voter empowerment, and programs assisting eligible naturalized citizens with voter registration and voting. As detailed in Part II, *infra*, the Purge Program has upended VACIR's normal activities and has forced VACIR to redirect its resources from other priorities toward responding to and mitigating the harms the Program has caused to immigrant communities in Virginia. *See* Ex. V ¶¶ 14-20 (Declaration of Monica Sarmiento, VACIR).

## ARGUMENT

A preliminary injunction is warranted if Plaintiffs establish: (1) likelihood of success on the merits; (2) irreparable harm absent preliminary relief; (3) that the balance of the equities tips in Plaintiffs' favor, and (4) that an injunction is in the public interest. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

## I.     Plaintiffs are Likely to Succeed on the Merits.

### A.     The Purge Program Violates the NVRA's 90-Day Provision.

Defendants are engaging in a blatant and continuing violation of the NVRA's prohibition against registration removal programs within the 90-day "quiet period" before an election.  Under the 90-Day Provision:

> A State shall complete, not later than 90 days prior to the date of the primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

§ 20507(c)(2)(A). Both the text of the statute and case precedent confirm that states may not implement any voter removal program or any step in such a program during this period.

We start with the text: Defendants' Purge Program does precisely what the plain text of federal law forbids. Ninety days before the November 5 general election and 45 days before the start of early in-person voting, the Governor announced—not the completion—but the *escalation*

of an ongoing program to purge purported noncitizens from voter rolls. The Purge Program requires county election officials and Commissioner Beals to certify that they are comparing records with DMV information (and potentially other agencies) and then canceling the registration of certain voters flagged in those databases. E.O. 35 outlines a required procedure: "The Department of Elections compares the list of individuals who have been identified as non-citizens to the list of existing registered voters and then registrars notify any matches of their pending cancellation unless they affirm their citizenship within 14 days." Ex. C at 4. The purpose of the program is to "[r]emove individuals who are unable to verify that they are citizens to the Department of Motor Vehicles from the statewide voter registration list, should that individual either intentionally or unintentionally attempt to register to vote . . . ." Ex. C at 4. The Governor boasted that prior to August 2024, similar processes (implemented less often) had already led the state to "remove[] 6,303 non-citizens from the voter rolls." Ex. C at 2. Defendants Beals and Miyares have affirmed that they are implementing and following the program including by initiating removals of voters on a daily basis. *See* Ex. P (Susan Beals, Certification of Election Security Procedures); Ex. Q at 6 (Va. Dep't of Elections, Annual List Maintenance Report).

By its own terms, procedures, and asserted goals, the Purge Program constitutes "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). "Unless Congress indicates otherwise, we give statutory terms their ordinary, contemporary, common meaning." *Othi v. Holder*, 734 F.3d 259, 265 (4th Cir. 2013) (citation omitted). *Merriam-Webster* defines a "program" as "a plan or system under which action may be taken toward a goal", and "systematic" as "methodical in procedure or plan." *See* Merriam-Webster, *Program*, https://www.merriam-

webster.com/dictionary/program (last accessed Oct. 14, 2024); Merriam-Webster, *Systematic*, https://www.merriam-webster.com/dictionary/program (last accessed Oct. 14, 2024).

Under any definition, Defendants are engaged in a methodical plan to, as E.O. 35 puts it, "scrub existing voter rolls and remove non-citizens . . . ." Ex. C at 2. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014) ("The fact that the provision now before us applies to 'any program' strongly suggests that Congress intended the 90 Day Provision to encompass programs of any kind, including a program . . . to remove non-citizens."). As outlined by the Governor and Defendant Beals, the steps of the current Purge Plan are (1) obtain a list of individuals from the DMV and potentially other agency sources who have been flagged as potential non-citizens, (2) compare that with the list of registered voters in the VERIS system on a daily basis, (3) send a letter to any registered voter in cases of a match, (4) cancel their registration if they do not respond to reaffirm citizenship within 14 days,[7] and (5) automatically refer any individual with a match for investigation and potential prosecution. This is not an ad hoc approach or case-by-case investigation of an individual's registration status—it is a standardized, systematized program to remove registered voters. Even presuming that such a list maintenance program were otherwise legal under the NVRA—and it is not, *see* Part I.B, *infra*—it would need to be completed 90 days prior to the election. Quite the contrary, Governor Youngkin and Defendants escalated and expanded this program just as the quiet period mandated it stop. The Purge Program flatly violates § 20507(c)(2)(A).

The NVRA does contain a set of circumscribed statutory exceptions permitting removal of registrants during the quiet period. *See* § 20507(c)(2)(B)(i) (clarifying that the 90-Day Provision

---

[7] There are some indications by county election officials that registrations are canceled as soon as a registrant is flagged as a potential noncitizen. Ex. J at 7 (stating that voters are "re-register[ing]" if they respond to the notice within 14 days).

"shall not be construed to preclude . . . the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a) . . . .").  However, these exceptions pertain to (1) removal requests initiated by a registrant, (2) criminal conviction, (3) mental incapacity, and (4) death of the registrant. *See* §§ 20507(a)(3)(A)-(B); 4(A). None of those provisions apply to removals due to other forms of ineligibility such as citizenship. Defendants' Purge Program thus creates an extra-textual procedure for removing possible non-citizens unless they respond to a letter within 14 days.[8] That procedure directly conflicts with the plain language of the 90-Day Provision and is preempted by federal law. *See Arcia*, 772 F.3d at 1345 ("The fact that Congress did not expressly include removals based on citizenship in its exhaustive list of exceptions to the 90-Day Provision is good evidence that such removals are prohibited.").

Defendants appear to erroneously believe the Purge Program is permissible under an NVRA provision stating that the quiet period "shall not be construed to preclude . . . correction of registration records pursuant to this chapter." 52 U.S.C. § 20507(c)(2)(B)(ii). *See* Ex. R (ELECT Correspondence with Fairfax County Board of Elections) ("Removing non-Citizens would be considered correction of the voter records[,] which is precluded from the 90-day prohibition."). If that is Defendants' understanding, it is mistaken for several reasons. First, the "*correction* of registration records" referenced in § 20507(c)(2)(B)(ii) is not the same thing as the "*removal of names* from official lists of voters" in § 20507(c)(2)(B)(i) (emphases added).  When interpreting a statute, "differences in language like this convey differences in meaning." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022) (quotation omitted); *see also id.* (applying "rule against ascribing to one word a meaning so broad that it assumes the same meaning as another statutory

---

[8] By illustrative comparison, the notice requirements outlined to remove voters who are ineligible due to change of address are far more protective and cautious about disenfranchising lawful voters than the procedures enacted by Defendants. *See* § 20507(d).

term.") (quotation omitted). If Congress had meant for "corrections" to include removals from the rolls altogether, it would have used the same term in both (B)(i) and (B)(ii).[9]

Furthermore, § 20507(c)(2)(B)(ii) refers specifically to "correction of registration records *pursuant to this chapter*." (emphasis added). Every other use of the term "correct" in § 20507 refers to address corrections for registrants who have moved.[10] Typically, "identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (quotation omitted). Thus, the traditional canons of statutory interpretation make clear that Congress did not include the term "correction" to give states free rein to embark on any voter removal program they choose. Section 20507(c)(2)(B)(ii) simply clarifies that even during the quiet period states may still conduct the various forms of address "correction" authorized "pursuant to this chapter."

More broadly, Defendants' (mis)interpretation of the provision is wrong because it would swallow up the NVRA's quiet period altogether. If Defendants were correct that states could— under the guise of making "corrections"—conduct whatever voter removal program they choose at any point, it would render meaningless § 20507(c)(2)(A)'s directive that states complete such programs "not later than 90 days prior" to an election. "[W]e cannot adopt a reading . . . that renders part of the statute superfluous over one that gives effect to its every clause and word."

---

[9] Likewise, the NVRA uses various terms to refer to "voter rolls" including "official lists of voters," § 20507(b)(2), "official list of eligible voters," *id.* §§ 20507(a)(3)-(4), or "voter registration roll." *Id.* § 20507(b). At no point does it refer to a voter's status on the rolls as a registered voter as the voter's "registration records."

[10] *See, e.g.*, 52 U.S.C. § 20507(c)(1)(B)(i) (outlining procedure by which "registrant may verify or *correct* the address information"); *id.* § 20507(d)(1)(B)(ii) (referring to voter action to "*correct* the registrar's record of the registrant's address"); *id.* § 20507(d)(3) (outlining steps by which "registrar shall *correct* an official list of eligible voters in elections for Federal office *in accordance with change of residence information obtained in conformance with this subsection*.") (emphases added); *see also id.* § 20507(e)(2)(A) (referring to address "correct[ions]" for voter record); *id.* § 20507(f) (same).

14

*United States v. Simms*, 914 F.3d 229, 241 (4th Cir. 2019) (quotation omitted); *see also Arcia*, 772 F.3d at 1345 n.4 (rejecting interpretation that "would render the 90 Day Provision completely superfluous,").

Although the Fourth Circuit has not directly interpreted the NVRA's 90-Day Provision, it has held in the context of § 20507(i)'s public disclosure requirements that review of voter information is a "'program'" under the NVRA "because it is carried out in the service of a specified end—maintenance of voter rolls . . . ." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012). The same analysis applies here where the Purge Program's explicit objective is to "scrub existing voter rolls." Ex. C at 2.

Precedent from sister jurisdictions is likewise unanimous: systematic removals of purported noncitizens during the quiet period violate the NVRA. *Arcia v. Florida Secretary of State*, where the Eleventh Circuit enjoined a similar program, is squarely on point. 772 F.3d at 1339. In *Arcia*, shortly before an election, the Florida Secretary of State compiled a list of registered voters who had previously presented the state with identification suggesting they were noncitizens, such as green cards or foreign passports. *Id*. He sent that list to county election officials and instructed them to perform additional research, then initiate a notice and removal process. *See id*. The "effort . . . to identify noncitizens was far from perfect"—it included citizens eligible to vote. *Id*.

The Eleventh Circuit concluded that the NVRA means what it says: that states may not operate any program with the purpose of systematically removing ineligible voters within the 90-day window. *Id*. at 1348. Thus, Florida's program was unlawful. *Id. Arcia* further held that the NVRA provision must be interpreted broadly. Congress' use of "the phrase 'any program' suggests that the 90 Day Provision has a broad meaning . . . [because] read naturally, the word 'any' has an

expansive meaning, that is one or some indiscriminately of whatever kind." *Id*. at 1344 (internal quotations omitted) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)).

Decisions by other federal courts follow *Arcia*'s reasoning. In *Mi Familia Vota v. Fontes* (*Vota I*), a district court reviewed an Arizona law requiring county recorders to conduct monthly reviews of registered voters without documentary proof of citizenship on file. 691 F. Supp. 3d 1077, 1085-86 (D. Ariz. 2023). The law required recorders to compare those lists with several local, state, and federal databases and issue notice of pending cancellation to individuals suspected of being noncitizens. *Id*. The court adopted *Arcia*'s reasoning, holding that "states must pause any such systematic purge within 90 days of a federal election . . . ." *Id*. at 1092. Similarly, a North Carolina district court enjoined a county board from removing 138 voters from the rolls during the quiet period after their registration was challenged by other residents under state law. *N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172, at *7 (M.D.N.C. Aug. 7, 2018). The court also followed *Arcia*, finding "[i]f a voter failed to appear in some form before the Beaufort County Board to contest its finding of probable cause, then the voter would have been removed from the rolls—and quite possibly disenfranchised— solely on the basis of a single mailing that may well have been sent to the wrong address. The NVRA prohibits elections officials from making such a grave error." *Id*. (internal citation omitted); *see also Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348, 1355 (M.D. Ga. 2020) (also following *Arcia*).

Congress had a strong rationale for prohibiting removal programs during the quiet period: to protect voter registration lists from the inevitable chaos of potentially inaccurate removals. The Eleventh Circuit observed that "*individualized removals*" that arise from "rigorous individualized

inquiry" may still occur during the quiet period because such rigorous inquiry will lead to "a smaller chance for mistakes." *Arcia*, 772 F.3d at 1346 (emphasis added). However:

> For programs that systematically remove voters . . . , Congress decided to be more cautious. At most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors. In the final days before an election, however, the calculus changes. Eligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote. This is why the 90 Day Provision strikes a careful balance: It permits systematic removal programs at any time *except for the 90 days before an election because that is when the risk of disenfranchising eligible voters is the greatest.*

*Id.* (emphasis added).

Defendants' Purge Program exemplifies Congress's concerns regarding erroneous removals. Virginia's system is likely worse than those enjoined in Florida and Arizona in terms of risk of disenfranchisement. Under Florida's program, the Secretary had directed local election officials to "conduct additional research" on individuals flagged as potential noncitizens "using 'whatever other sources you have.'" *Id.* at 1339.  In contrast, Defendants' Purge Program operates largely automatically and directs county election officials to trigger notice and removal based simply on the existence of "non-citizen transactions." Ex. C at 4. There is no additional, individualized research. As Dr. McDonald reports, under ELECT's procedures, whenever there is a "match" between data shared between election officials and the DMV, "[r]egistrants matched as non-citizens are placed within the Declared Non-Citizen Hopper." Ex. A at 6. Once that match is made, the process is largely automatic: notice of the pending cancellation "must be sent to a registrant" who must respond and re-affirm citizenship within 14 days. Ex. A at 6.

As Dr. McDonald outlines, there are tremendous risks of disenfranchisement inherent in such a procedure. His examination of comparable list matching systems in other states, like Georgia, Arizona, Texas, and Florida, reveals that nearly all individuals flagged as potential non-

citizens turned out to be eligible voters. Ex. A at 7-8. That is partly because DMV data is often significantly outdated. Ex. A at 7-8. That is certainly true in Virginia where various categories of immigrants—including legal permanent residents—are eligible to obtain drivers' licenses.  *See* Statement of Facts, Part I.A, *supra*. The DMV does not require legal permanent residents to show additional proof of citizenship or lawful residence when they renew their driver's licenses (so long as they showed such proof since 2004). Thus, citizens who became naturalized *over the last twenty years* would likely not have updated citizenship documents on file with the DMV if they obtained a driver's license before their naturalization. The Purge Program directly threatens the voting rights of these citizens.

Dr. McDonald's analysis also explains how both natural-born and naturalized citizens can be mistakenly flagged as noncitizens either through first name, last name, date of birth matches or by leaving pertinent citizenship documents blank when filling out DMV forms. Ex. A at 9-10. These concerns are hardly theoretical. In Prince William County, 162 people had been flagged as "Declared Non-Citizens" in the VERIS system. *See* Ex. K; Ex. A at 9. Forty-three of those individuals had voted and all 43 had already sent back affirmations of their citizenship previously, some multiple times. It is unclear whether these were naturalized citizens or natural born citizens. Regardless, there is no system in place to prevent someone previously flagged as a noncitizen from being swept up into the Purge Program again even after having previously confirmed their citizenship.  Ex. A at 10.

These serious administrative problems underscore how crucial the quiet period is to protecting the franchise.  If a voter—who has already affirmed their citizenship—keeps receiving notices requiring them to reaffirm citizenship yet again, the closer to an election the greater the risk that a voter will not receive or respond to the letter within 14 days. Indeed, Defendant Beals

was asked in a Virginia House of Delegates hearing on September 5, 2024 to identify "the biggest threat" to upcoming elections. Ex. S (Markus Schmidt, *Virginia's Top Elections Official Warns of Possible Delays in Mail-In Voting This Year*, Virginia Mercury (Sep. 5, 2024)).  Beals responded that *U.S. Postal Service delays* were at the top of her list of concerns. *See* Ex. S. Such fears are certainly warranted, but they only underscore the importance of the NVRA's 90-Day Provision in mandating that removals be resolved before voters risk disenfranchisement due to postal delays.

Defendant Miyares has boasted of the "6,303" number of purported "noncitizens identified and removed from Virginia's voting rolls under [his] watch" between 2022 and 2024. Ex. T (Jason Miyares (@JasonMiyaresVA), X (Aug. 7, 2024, 1:57 PM)). Under the Purge Program, each of those purported noncitizens must be referred for investigation and potential prosecution. However, an investigation by *The Washington Post* found that there were no prosecutions for noncitizen registration or voting from 2022 to 2024. Ex. U (Gregory S. Schneider & Laura Vozzella, *Youngkin Stokes Fear of Vast Noncitizen Voting in Virginia*, The Washington Post (Oct. 9, 2024)). Although Defendant Miyares established a special election integrity unit in 2022 to investigate voter fraud, his office confirmed he had never prosecuted any noncitizen for illegal voting. Ex. U. Indeed, *The Washington Post*'s investigation was unable to uncover *any* prosecution for noncitizen voting or registration over the past 20 years. A prosecutorial investigation resembles the sort of "rigorous individualized inquiry" that *Arcia* recognized as permissible during the quiet period due to the "smaller chance for mistakes." *Arcia*, 772 F.3d at 1346.  But the results of the required referrals speak for themselves: zero prosecutions, zero plea deals, zero evidence of a widespread problem with noncitizen voting from the state officials authorized to investigate.  This strongly suggests that the Purge Program's error rate is especially high. And it bolsters Congress's wisdom in

restricting voter removal programs close to an election "when the risk of disenfranchising eligible voters is the greatest." *Id*.

B.      The Purge Program Violates the NVRA's Requirement that Removal Programs Be "Uniform" and "Nondiscriminatory."

Defendants' Purge Program further violates the NVRA by impermissibly classifying based on a registrant's national origin and placing discriminatory burdens on naturalized citizens. The NVRA mandates that any list maintenance programs be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 . . . ." 52 U.S.C. § 20507(b)(1). As the Fourth Circuit has stated, this provision reflects Congress's view that the right to vote "is a fundamental right," that government has a duty to "promote the exercise of that right," and that discriminatory and unfair registration laws can have a "direct and damaging effect on voter participation" and "disproportionately harm voter participation by various groups, including racial minorities." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012) (quoting 52 U.S.C. § 20501(a)).

Defendants' Purge Program classifies registrants with DMV or other agency records indicating they are not natural born U.S. citizens as presumptively ineligible to vote. This is discrimination based on national origin and is impermissible under the NVRA.  As detailed *supra*, the Purge Program uses a separate electronic "bucket"—a "Declared Non-Citizen Hopper"—to classify any individual with a record of foreign birth or a "non-citizen transaction" with the DMV. Ex. A at 6; Ex. C at 4. As discussed *supra*, the problem with that classification is that the data ELECT receives from the DMV and other agencies is typically out of date. Ex. A at 7-8. In the case of DMV records, it may be up to twenty years out of date and does not account for people who have become naturalized citizens. Thus, the "Declared Non-Citizen Hopper" is *not* in fact a bucket for noncitizens; it almost always includes naturalized citizens. The Hopper instead

20

**A-074**

classifies individuals based on their records of foreign birth—those who were at some point noncitizens. Disenfranchising eligible voters based on that classification is the essence of national origin discrimination.

As detailed by Dr. McDonald, "Virginia's citizenship verification procedures subject naturalized citizens to additional voter registration-related burdens that are not faced by natural-born U.S. citizens." Ex. A at 8. Those burdens are significant. Not only must a noncitizen receive and timely respond to a written notice mailed by the state, the Purge Program requires them to be referred for criminal prosecution if they do not respond. A presumption of ineligibility to vote combined with a criminal referral due to an individual's national origin constitutes a severe and discriminatory burden by any measure. Scholarship shows that far lower burdens that affect the "cost" of registering and voting can have significant impacts on voter turnout. Ex. A at 11-12.

This form of inequitable treatment violates the text of 52 U.S.C. § 20507(b)(1), which requires "uniform[ity] and "nondiscrimin[ation]" in removal programs. It likewise violates the purpose of the NVRA to promote the exercise of the fundamental right to vote. Many former noncitizens are welcomed to register to vote at their naturalization ceremonies. Ex. W ¶ 12. But the Purge Program punishes new citizens if they exercise their fundamental right and further threatens them with criminal investigation if they fail to receive or respond within 14 days to a state missive demanding reaffirmation of citizenship.

Courts have repeatedly affirmed that citizenship matching protocols that similarly burden naturalized citizens are unlawful. For example, the court in *United States v. Florida* concluded that a comparable program likely violated Section 8(b). 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012). There, Florida's Secretary of State compiled a list that included all registered voters who had disclosed that they were noncitizens at the time they applied for a driver's license, had

21

subsequently naturalized and registered to vote, and had not updated their citizenship status with the state agency responsible for driver's licenses. *Id*. at 1347-48. The court explained that the program likely violated § 20507(b)(1) because its "methodology" for identifying suspected noncitizens swept in many naturalized citizens. *Id*. at 1350. Such a "burdensome" program "was likely to have a discriminatory impact" on eligible voters in violation of § 20507(b)(1). *Id*. Virginia's Purge Program employs a nearly identical, faulty methodology.

The District of Arizona reached a similar holding that a state statutory provision "requir[ing] county recorders to search" the SAVE database "only for naturalized voters who county recorders suspect are not U.S. citizens" was unlawful because it "subject[ed] only naturalized citizens to database checks." *Mi Familia Vota v. Fontes* (*Vota II*), No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *38 (D. Ariz. 2024). As the court explained, this use of the SAVE database effectively meant that only "[n]aturalized citizens will always be at risk" of removal from this process, in violation of the requirement that state officials refrain from applying discriminatory practices in determining who is qualified to vote. *Id*.; *see also* 52 U.S.C. § 10101(a)(2)(A); *Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019) (finding Texas's program likely violated the NVRA by "burden[ing]" naturalized voters with "ham-handed and threatening correspondence from the state," while "[n]o native born Americans were subjected to such treatment.").

"A state cannot properly impose burdensome [voter registration] demands in a discriminatory manner," *Florida*, 870 F. Supp. 2d at 1350, including by adopting national origin classifications that inequitably burden naturalized voters. *See Vota II*, 2024 WL 862406, at *22 (describing that because the state motor vehicle division "does not issue foreign-type credentials

to native born citizens, only naturalized citizens will ever be misidentified as non-citizens.").[11] Defendants' Purge Program is both inherently discriminatory and fundamentally flawed in its methodology. It is due to be enjoined.

## II.      An Injunction is Necessary to Prevent Irreparable Harm.

"[M]issing the opportunity to vote in an election is an irreparable harm." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1272 (11th Cir. 2020). "Courts routinely deem restrictions on fundamental voting rights irreparable injury," especially "discriminatory voting procedures." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) [hereinafter *LWVNC*] (collecting cases). "[O]nce the election occurs, there can be no do-over and no redress." *Id.*

The Purge Program immediately threatens both naturalized citizens and natural-born citizens who have erroneously filled out DMV forms—including members of Plaintiff organizations—with the irreparable injury of disenfranchisement and, furthermore, criminal investigation. As E.O. 35 notes, over 90% of Virginia voters register to vote online through ELECT, which requires a DMV credential, or when conducting transactions with the DMV. Ex. C at 1. But as discussed *supra*, DMV databases lack accurate information for naturalized citizens. Ex. A at 4. If, for any reason, a citizen falsely flagged in the Purge Program fails to respond to a citizenship affirmation letter within 14 days, they may be disenfranchised and investigated criminally.

Absent an injunction before the November election, and each day that the Purge Program continues, Plaintiffs' citizen members will be at risk of being erroneously flagged and therefore

---

[11] *See also Boustani v. Blackwell*, 460 F. Supp. 2d 822, 825 (N.D. Ohio 2006) (invalidating statute that "discriminate[s] based on national origin" by requiring differential treatment of naturalized citizens)

deprived of their right to vote and/or being subjected to criminal investigation and prosecution. *See, e.g., Arcia*, 772 F.3d at 1341 (finding a realistic probability that naturalized citizens would be misidentified by a program implemented within the 90-day window before an election). These processes also cause confusion about whether and how they can exercise their fundamental right. Ex. W ¶ 31. They further risk being identified or even re-identified in "daily updates" at any time. The deadline to register to vote online or by mail is October 15; after then, affected voters' options to re-register will be sharply curtailed.

Moreover, the Purge Program directly interferes with Plaintiffs' core organizational activities and perceptibly impairs their work. Ex. V ¶ 14; Ex. X ¶ 19. Helping Virginians register to vote and vote is a core organizational activity for each Plaintiff. Ex. V ¶12; Ex. X ¶ 5. Further, providing services specifically to Virginia's immigrant communities—including naturalized citizens—is core to both VACIR's and ACT's missions. Ex. V ¶¶ 4-5; Ex. X ¶¶ 13-14. The Purge Program threatens to purge voters that Plaintiffs helped register, and may have already done so, and chills voting by naturalized citizens with whom Plaintiffs work to encourage to vote. Ex. V ¶ 16; Ex. X ¶ 17. That harm is irreparable: voters whom Plaintiffs seek to assist who are unable to stay registered and vote in November or any particular election will never get that vote back. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding irreparable harm where policies "ma[d]e it more difficult for [plaintiff organizations] to accomplish their primary mission of registering voters" prior to voter registration deadline).

Further, the Purge Program interferes with Plaintiffs' core activities by forcing them to continue to divert limited resources from voter registration to respond to the Purge Program prior to the election, and by making it more difficult for each Plaintiff to successfully register as many voters as possible. *See, e.g.*, Ex. W ¶¶ 28, 30, 34.

24

Specifically, Plaintiff VACIR has had to divert significant resources away from its core activities, including supporting community mobilization around general voter registration efforts for New Americans, toward responding to and attempting to mitigate the effects of E.O. 35 and the Purge Program. Ex. V ¶¶ 14-18. VACIR's response efforts are ongoing and include: investigating the Purge Program through submitting public records requests and spending thousands of dollars to cover the costs of production; engaging in direct multilingual public education and outreach to naturalized citizen voters about maintaining their voter registration and re-registering if they have been removed through the Purge Program; and supporting its members to adjust and redirect general community voter registration and outreach programs toward specifically responding to E.O. 35 and the Purge Program, including through educating and assisting naturalized citizen voters with checking their voter registration status and how to re-register if they have been removed. *Id.*

LWVVA is likewise irreparably harmed by the Purge Program. It has diverted and will continue to divert resources to counteract the harms created by the Program. At the most consequential period of time for the League's core mission activities, the League first had to use its resources to rapidly understand the impact of E.O. 35 and its effect on Virginia voters. Ex. W ¶ 30. When the League learned of the Purge Program's identification of eligible Virginian voters for removal, the League had to expend resources to counteract the immediate confusion and misinformation created. Ex. W ¶ 30. LWVVA is currently distributing 6,000 postcards to registered voters purged from the voter list prior to May 2024 to advise them of their right to vote if they are naturalized citizens. Ex. W ¶ 32.[12] The postcards are being mailed to voters that the

---

[12] The League has been unable to contact more recently affected voters because of ELECT's refusal to timely share information about who has been purged.

League and its partners identified as highly likely to have been purged as a result of the early version of this Purge Program. The Purge Program has further required the League to broaden its "check your registration" efforts beyond its previously targeted audience in order to combat misinformation and to expand its focus on naturalized citizens. Ex. W ¶ 28. For instance, the League has already spent at least $600 to create, translate into multiple languages, and distribute a public service announcement (PSA) throughout the state reminding voters of their right to vote and instructing them to check that their registration is valid before Election Day. Ex. W ¶ 31. In direct response to the Purge Program, the League also increased its budget for digital media impressions on mobile devices by $2,000. Ex. W ¶ 35. The Purge Program has deregistered Virginians eligible to vote and has intimidated many other naturalized Virginians who will be less likely to vote for fear of criminal investigation and prosecution. The Purge Program directly harms the League's mission of increasing registered voters and improving turnout.

Separately, the League has devoted and will continue to devote resources and members' time to counteract the effects of the Purge Program, such as by helping members and registered voters determine whether they remain eligible and by helping voters who are purged restore their eligibility. Ex. W ¶¶ 27-31. This includes direct outreach and public outreach to naturalized citizens through media, such as the League President's September interview at Spanish-speaking radio station WRKE 100.3 LP-FM. Ex. W ¶ 33. The League is further burdened by diverting its coordination resources with other non-profits towards understanding and addressing the effects of E.O. 35 rather than coordinating on core voter assistance programs. Ex. W ¶ 34. Absent such diversion, the League would spend its money and member time on getting out the vote for the 2024 general election and planning its advocacy activities for the next year. Ex. W ¶ 38. It would also hold more voter registration drives. Ex. W ¶ 38.

Likewise, Plaintiff ACT has had to continuously divert staff and resources from its core activities to address the harms caused to its members and Virginia's African immigrant community by the Purge Program. Ex. X ¶ 19. These efforts include preparing to help voters who received removal notices or were purged from voter rolls, guiding them through re-registration, and providing reassurance about their eligibility–especially in light of threats of law enforcement referrals under E.O. 35. Ex. X ¶¶ 18-21. This has involved redirecting its voter engagement efforts by creating new public education materials, revising canvasser and phone banker scripts, and retraining staff and volunteers to support affected voters. *Id*. Many ACT members, particularly naturalized citizens, may have received removal notices, been purged from the rolls, or are at greater risk of removal due to having obtained a driver's license before becoming a citizen and never updating their citizenship status with the DMV. Ex. X ¶ 22.

Absent injunctive relief, Plaintiffs will suffer irreparable harm.

### III.    The Balance of Equities and Public Interest Favor an Injunction.

The ongoing injury to Plaintiffs and the public threatens the right to vote and outweigh any interest Defendants may have in carrying out the Purge Program. The public will be best served by an injunction. Plaintiffs and other Virginians are suffering violations of their rights under the NVRA. The state has no interest in defending actions that violate federal law. *See, e.g.*, *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011) (indicating that the State "is in no way harmed by issuance of an injunction that prevents [it] from enforcing unconstitutional restrictions.").

Congress, in creating the NVRA, has already struck the balance in Plaintiffs' favor. "Though the public certainly has an interest in a state being able to maintain a list of electors that does not contain any false or erroneous entries, a state cannot remove those entries in a way which

risks invalidation of properly registered voters." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388 (6th Cir. 2008).

Here, an injunction serves the public interest, because "the public has a strong interest in exercising the fundamental political right to vote." *LWVNC*, 769 F.3d at 248 (quotation omitted). "By definition, the public interest favors permitting as many qualified voters to vote as possible." *Id.* at 247 (quotation omitted). Moreover, there is an inherent public interest in fulfilling the NVRA's purpose of ensuring that every voter can vote. *See* 52 U.S.C. § 20501.

## CONCLUSION

This Court should grant Plaintiffs' motion for preliminary injunctive relief.

Ezra D. Rosenberg*
Ryan Snow*
Javon Davis*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street, NW, Ste. 900
Washington, DC 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
rsnow@lawyerscommittee.org
jdavis@lawyerscommittee.org

Orion Danjuma*
John Paredes*
THE PROTECT DEMOCRACY PROJECT, INC.
82 Nassau Street, # 601
New York, NY 10038
Telephone: (202) 579-4582
orion.danjuma@protectdemocracy.org
john.paredes@protectdemocracy.org

/s/ Shanna Ports
Shanna Ports (VSB No. 86094)
Danielle Lang**
Kevin Hancock**
Brent Ferguson**
Simone Leeper*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
sports@campaignlegalcenter.org
dlang@campaignlegalcenter.org
khancock@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
sleeper@campaignlegalcenter.org

John Powers**
Hani Mirza**
ADVANCEMENT PROJECT
1220 L Street Northwest, Suite 850
Washington, D.C. 20005
(202) 728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org

28

**A-082**

Benjamin L. Berwick*
THE PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Anna Dorman*
THE PROTECT DEMOCRACY PROJECT, INC.
200 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
anna.dorman@protectdemocracy.org

*Attorneys for Plaintiffs Virginia Coalition for Immigrant Rights, the League of Women Voters of Virginia, the League of Women Voters of Virginia Education Fund, and African Communities Together*

*Motion for pro hac vice participation forthcoming.*
**Motion for pro hac vice participation pending*

29

**A-083**

**CERTIFICATE OF SERVICE**

I certify that on October 15, 2024, I electronically filed the above document with the

Clerk of Court using the ECF system, which will provide electronic copies to any counsel of

record. Plaintiffs' Counsel will also send courtesy copies to attorneys at the Virginia Attorney

General's Office who have met with Plaintiffs' counsel regarding this matter.


<u>/s/ Shanna Ports</u>
Shanna Ports




**CERTIFICATE OF COMPLIANCE**

I certify that this memorandum conforms to the typeface and page limitations set out in Local

Civil Rule 7(F)(3).

<u>/s/ Shanna Ports</u>
Shanna Ports

**A-084**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 24-cv-01807 |
| COMMONWEALTH OF VIRGINIA; VIRGINIA STATE BOARD OF ELECTIONS; and SUSAN BEALS, in her official capacity as Commissioner of Elections, | |
| Defendants. | |

## OPPOSED MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff United States of America ("United States"), pursuant to Rule 65 of the Federal Rules of Civil Procedure, moves for entry of a preliminary injunction to remedy violations of the Quiet Period Provision, Section 8(c)(2) of the National Voter Registration Act, 52 U.S.C. § 20507(c)(2). On October 11, 2024, the United States filed a complaint in this Court alleging violations of the Quiet Period Provision arising from the ongoing implementation by the Commonwealth of Virginia, the Virginia State Board of Elections, and Susan Beals in her official capacity as the Commissioner of Elections (Virginia Defendants) of a "program" with "the purpose of . . . systematically remov[ing] the names of ineligible voters from the official lists of eligible voters" within 90 days of the November 5 federal General Election. 52 U.S.C. § 20507(c)(2)(A). Specifically, the Virginia Defendants violated the Quiet Period Provision by continuing to implement, pursuant to the Virginia Governor's Executive Order 35, a program intended to remove the names of ineligible voters from registration lists based on failure to meet initial eligibility requirements less than 90 days before a general election for federal office.

A-085

In support of its motion, the United States asserts that (1) it is substantially likely to prevail on the merits of its claim under the Quiet Period Provision, (2) unless enjoined, the Virginia Defendants' continued violation of the Quiet Period provision will irreparably harm the United States and qualified U.S. citizen Virginia voters, (3) the United States' interest in protecting the rights of qualified U.S. citizen Virginia voters outweighs any burden imposed on the Virginia Defendants, and (4) enjoining the Virginia Defendants' violation of the Quiet Period Provision will serve the public interest.

The basis for the United States' motion is set forth in the accompanying Brief in Support of the United States' Motion for a Preliminary Injunction, as well as supporting evidence. A proposed order also accompanies this filing.

Date: October 16, 2024

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

_/s/ Sejal Jhaveri_
R. TAMAR HAGLER
RICHARD A. DELLHEIM
SEJAL JHAVERI
KEVIN MUENCH
BRIAN REMLINGER
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W
Washington, D.C. 20530
(202) 305-5451
Sejal.Jhaveri@usdoj.gov

JESSICA D. ABER
United States Attorney
Eastern District of Virginia

_/s/ Steven Gordon_
STEVEN GORDON
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Ave.
Alexandria, VA 22314
(703) 299-3817
Steve.Gordon@usdoj.gov

CHRISTOPHER R. KAVANAUGH
United States Attorney
Western District of Virginia

_/s/ Christopher R. Kavanaugh_
United States Attorney
United States Attorney's Office
Western District of Virginia
255 West Main Street
Charlottesville, VA 22902
(434) 293-4283
Christopher.Kavanaugh@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2024, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.  I will send counsel for the state defendants this filing via email.

*/s/ Sejal Jhaveri*
Sejal Jhaveri
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 305-5451
Sejal.Jhaveri@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>  v.<br><br>COMMONWEALTH OF VIRGINIA; VIRGINIA STATE BOARD OF ELECTIONS; and SUSAN BEALS, in her official capacity as Commissioner of Elections,<br><br>     Defendants. | Case No. 24-cv-01807 |

**UNITED STATES' BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I.  Introduction .................................................................................................................. 1

II.  Background .................................................................................................................... 2

  A.  Statutory Background .................................................................................................. 2

  B.  Factual Background ...................................................................................................... 3

    1.  Implementation of the Program ................................................................................ 4

    2.  Impact of the Program ............................................................................................... 8

  C.  Procedural History ........................................................................................................ 9

III.  Legal Standard ............................................................................................................. 9

IV.  Argument ..................................................................................................................... 10

  A.  The Program Violates the Quiet Period Provision ..................................................... 10

    1.  The Program Is Subject to the Quiet Period Provision. ......................................... 11

    2.  The Program's Purpose Was to Remove Ineligible Voters from the Rolls. ............ 12

    3.  The Program Targeted Allegedly Ineligible Voters ............................................... 13

    4.  The Program Was Systematic. ................................................................................. 14

    5.  The Program Was Implemented During the Quiet Period. ...................................... 15

  B.  The United States and Eligible U.S. Citizens Will Be Irreparably Harmed Absent an
      Injunction. ............................................................................................................... 16

  C.  The Balance of Equities Favors Enjoining and Unwinding Quiet Period Violations. ...... 20

  D.  Compliance with Federal Law and Protecting the Right to Vote Are in the Public Interest.
      ................................................................................................................................ 23

V.  Conclusion ................................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Action NC v. Strach*, 216 F. Supp. 3d 597 (M.D.N.C. 2016) ...................................................... 18

*Air Evac EMS, Inc. v. McVey*, 37 F.4th 89 (4th Cir. 2022) ......................................................... 9

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008) ................................................................. 10

*Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) ............................................ passim

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ......................................... 16, 22

*Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791 (7th Cir. 1995) ............................ 16

*Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004) ......................................................................... 13

*Benisek v. Lamone*, 585 U.S. 155 (2018) ................................................................................. 10

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................................ 16

*Burroughs v. United States*, 290 U.S. 534 (1934) .................................................................... 16

*Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005) .......................... 18

*Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139 (S.D. Ind. 2018) .................................... 16

*Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) .................................. 21

*Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ............................................... 20

*Ex parte Yarbrough*, 110 U.S. 651 (1884) ............................................................................... 16

*Glossip v. Gross*, 576 U.S. 863 (2015) ..................................................................................... 21

*Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020) ........................................................ 16

*League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363 (11th Cir. 2022) ............. 22

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ........ 17, 18, 23

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................................... 16

*Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348 (M.D. Ga. 2020) ... 13

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) ............................................................................... 22

*Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 107 (D. Ariz. 2023) .............................. 11, 13, 14, 20

*N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16-cv-1274,
    2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) ........................................................................ 14

*N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16-CV-1274, 2016 WL
    6581284 (M.D.N.C. Nov. 4, 2016) ............................................................................... passim

*NAACP v. Cortes*, 591 F. Supp. 2d 757 (E.D. Pa. 2008) ............................................................ 23

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) ........................................................... 16

*Purcell v. Gonzales*, 549 U.S. 1 (2006) ................................................................. 17, 21, 22, 23

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016) ................. 10

*Reynolds v. Sims*, 377 U.S. 533 (1964) ............................................................................... 16, 19

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ............................................................... 21

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) .................................................................. 23

*Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018) ........................................................... 21

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350 (1989) .......................... 16

*Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200 (5th Cir. 2010) ............ 9

*Toure v. Hott*, 458 F. Supp. 3d 387 (E.D. Va. 2020) ...................................................................... 10

*U.S. Student Ass'n Found. v. Land*, 546 F.3d 373 (6th Cir. 2008) ................................................ 23

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012) ....................................... 15, 19, 21, 23

*United States v. Berks Cnty.*, 250 F. Supp. 2d 525 (E.D. Pa. 2003) ............................................ 19

*United States v. Raines*, 362 U.S. 17 (1960) ................................................................................. 23

*Voting Rts. Coal. v. Wilson*, 60 F.3d 1411 (9th Cir. 1995) ........................................................... 16

*Voto Latino v. Hirsch*, 712 F. Supp. 3d 637 (M.D.N.C. 2024) ..................................................... 17

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000) ............................ 15

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................................... 9

**Statutes**

52 U.S.C. § 20503 ............................................................................................................................. 2

52 U.S.C. § 20507 ...................................................................................................................... passim

52 U.S.C. § 20501 ........................................................................................................................ 2, 20

Va. Code § 24.2-1004 ................................................................................................................. 12, 20

Va. Code § 24.2-306 ........................................................................................................................ 18

Va. Code § 24.2-416 ........................................................................................................................ 17

Va. Code § 24.2-652 ........................................................................................................................ 18

Va. Code § 24.2-653 ........................................................................................................................ 18

Va. Code § 24.2-701 ........................................................................................................................ 17

Va. Code § 24.2-703.1 ..................................................................................................................... 18

Va. Code § 24.2-418 .................................................................................................................... 3, 14

**Legislative Materials**

H.R. Rep. No. 103-9 (1993) ......................................................................................................... 2, 3

S. Rep. No. 103-6 (1993) .............................................................................................................. 2, 3

## INTRODUCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the United States respectfully moves for a preliminary injunction against the Commonwealth of Virginia, the Virginia State Board of Elections, and Susan Beals in her official capacity as the Commissioner of Elections (Virginia Defendants) to address violations of the Quiet Period Provision, Section 8(c)(2) of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20507(c)(2).  The Quiet Period Provision requires states to complete systematic programs intended to remove the names of ineligible voters from registration lists no later than 90 days before federal elections, including efforts intended to remove noncitizens.  *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014).

Despite this bright-line rule, on August 7, 2024—90 days before the November 5, 2024, federal General Election—the Virginia Governor issued Executive Order 35 formalizing the Commonwealth's noncitizen voter registration removal program and requiring that program to be carried out each day (the Program).  This Program relies on unverified data from the Virginia Department of Motor Vehicles to flag individuals for removal from the voter rolls on an ongoing basis and in violation of the Quiet Period Provision.  There is no question that systematic list maintenance can be useful and that only U.S. citizens are eligible to vote in federal elections.  But evidence of widespread noncitizen voting is vanishingly rare in Virginia and the United States, and the risk that errors in systematic list maintenance will harm or even disenfranchise qualified voters increases as Election Day approaches.  In fact, the Program has resulted in the incorrect cancellation of registrations of qualified voters—the very scenario that Congress tried to prevent when it enacted the Quiet Period Provision.  Prompt relief is justified to address this Quiet Period violation and to ensure that these eligible voters may cast ballots unimpeded on

Election Day.  The United States respectfully requests that this Court exercise its equitable

discretion and judgment and enter the proposed preliminary injunction.

## BACKGROUND

### A.    Statutory Background

Enacted in 1993, the NVRA establishes uniform procedures and practices for voter

registration and voter registration list maintenance for federal elections.  *See* 52 U.S.C.

§§ 20501-11.[1]  The purposes of the Act are:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
> (3) to protect the integrity of the electoral process; and
> (4) to ensure that accurate and current voter registration rolls are maintained.

*Id*. § 20501(b).  Passage of the NVRA followed extensive hearings, which grounded Congress's

findings that

> (1) the right of citizens of the United States to vote is a fundamental right;
> (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and
> (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

*Id.* § 20501(a); *see also* S. Rep. No. 103-6, at 2-4 (1993) (Senate Report); H.R. Rep. No.

103-9, at 2-5 (1993) (House Report).

---

[1] The NVRA exempts some states based on practices in place on August 1, 1994, s*ee* 52 U.S.C. § 20503(b), but Virginia is not such a state.  *See* U.S. Dep't of Justice, *National Voter Registration Act of 1993 (NVRA): Questions and Answers*, https://perma.cc/UXM4-CQ2X.

Section 8 of the NVRA sets out requirements for the administration of voter registration for elections for federal office.  *See* 52 U.S.C § 20507.  Section 8(c)(2), the Quiet Period Provision, specifically directs that a "State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." *Id.* § 20507(c)(2)(A).  "It is intended by this requirement that the State outreach activity, such as the mailing of list verification notices or conducting a canvas, must be concluded not later than 90 days before an election."  Senate Report at 18-19; *see also* House Report at 16 ("This requirement applies to the State outreach activity such as a mailing or a door to door canvas and requires that such activity be completed by the 90-day deadline.").  This general prohibition does not preclude removal of names from official lists of voters at the request of the registrant, by reason of criminal conviction or mental incapacity, by reason of the death of the registrant or the correction of registration records pursuant to the NVRA.  *See id.* § 20507(c)(2)(B); *see also* Senate Report at 19; House Report at 16.  But the Quiet Period Provision does govern removals based on failure to meet initial eligibility criteria, including programs that attempt to remove noncitizens.  *Arcia*, 772 F.3d at 1343-48; *see also* Ex. 20 Preliminary Inj*., United States v. State of Alabama et al.*, No. 2:24-cv-01329 (N.D. Ala, October 16, 2024) (AL Preliminary Injunction) (enjoining Alabama's noncitizen removal process for violating the NVRA's Quiet Period Provision).

## B.    Factual Background

Every person who registers to vote in Virginia must affirm they are a United States citizen when they register to vote.  Va. Code § 24.2-418; *see also* Exhibit 1, *Va. Dep't of Elections*, GREB Handbook 2024,  Ch. 6, p. 5, https://perma.cc/27VJ-QKBF (Handbook)

(explaining that a person who indicates on their voter registration form that they are not a citizen, or who leaves the citizenship question blank, will not be registered to vote).  It is a crime for a noncitizen to vote.  *See* Va. Code § 24.2-1004(B)(iii); 18 U.S.C. § 611.

### 1.  Implementation of the Program

On August 7, 2024, 90 days before the November 5, 2024, federal General Election, the Virginia Governor issued Executive Order 35.  *See* Exhibit 2, Commonwealth of Va., Office of the Governor, Executive Order Number Thirty-Five: Comprehensive Election Security Protecting Legal Voters and Accurate Counting (Aug. 7, 2024), https://perma.cc/CK4L-PQ3K (Executive Order 35).  The Executive Order formalized the Program and announced that 6,303 individuals had been removed from the rolls pursuant to the same process between January 2022 and July 2024.  The Program requires that the Commissioner of Elections "certify" to the Governor that procedures were in place to provide "Daily Updates to the Voter List."  Those "Daily Updates" included both "[r]emov[ing] individuals who are unable to verify that they are citizens to the Department of Motor Vehicles from the statewide voter registration list" and "compar[ing] the list of individuals who have been identified as non-citizens to the list of existing registered voters and then [requiring] registrars notify any matches of their pending cancellation unless they affirm their citizenship within 14 days."  *Id.* at 3-4.

The Program identifies voters as possible noncitizens if they choose "No" in response to questions about their United States citizenship status on certain forms submitted to the DMV.  User error likely causes many U.S. citizens completing those forms to answer questions about U.S. citizenship incorrectly.  *See* Exhibit 3, Email from Eric Olsen, Director of Elections and General Registrar of Prince William County, to Keith Scarborough et al. (May 17, 2024) (Olsen

email).  The forms vary, but at least some paper forms have characteristics that cause individuals to make mistakes while completing the form.  *See id.*

The Virginia DMV sends the Department of Elections (ELECT) a list of purported noncitizens generated by the above process.  ELECT then attempts to match individuals on the list provided by the DMV to individuals on the voting rolls.  *See* Exhibit 4, *Va. Dep't of Elections*, Virginia Registration List Maintenance, Department of Motor Vehicles, Standard Operating procedure, at 12; *see also* Exhibit 5, Letter from Glenn Youngkin, Governor, Commonwealth of Va., to Gerald E. Connolly, Rep., U.S. House of Reps. (Oct. 10, 2024) ("ELECT matches [DMV information] to the list of existing registered voters, and any matches are provided to the appropriate general registrar.").  ELECT does no additional analysis of the list or research on the individuals on the list, even though each individual attested to their citizenship when they registered to vote.

ELECT regularly sends each local registrar the names of the purported noncitizens who appear on the voter roll in the registrar's jurisdiction.  Upon receipt of a list from ELECT, the local registrar is required to review each entry on the list and confirm that it matches a voter on their jurisdiction's voter rolls.  *See* Exhibit 6, Virginia Department of Elections, Hopper Processing and Information, at 5, 33.

The local registrar sends a Notice of Intent to Cancel to each voter identified by the Program who appears on their jurisdiction's voter rolls.  *See* Exhibit 7, Notice of Intent to Cancel; Exhibit 6, Virginia Department of Elections, Hopper Processing and Information, at 35-36.  That Notice reads:

> We have received information that you indicated on a recent DMV application that you are not a citizen of the United States.  If the information provided was correct, you are not eligible to vote.  If the information is incorrect and you are a citizen of the United States, please complete the Affirmation of Citizenship form and return it using the

enclosed envelope.  If you do not respond within 14 days, you will be removed from the list of registered voters.  If you believe this notice has been issued in error or have questions about this notification, please call the Office of General Registrar.

If the voter fails to respond within 14 days, the voter's registration is automatically removed from the voter rolls, and the voter is sent a Voter Registration Cancellation Notice.  *See* Exhibit 8, Voter Registration Cancellation Notice.  That notice informs the voter that the local registrar "has stricken [the voter's] name from the Voter Registration List" "on the basis of official notification from the Virginia Department of Elections that [the voter] failed to timely respond to a request to affirm [their] United States Citizenship with the 14 days allowed by the Code of Virgina (§24.2-427)."  The only action the Notice suggests a voter take if they "believe the removal of [their registration] from the Voter Registration List is incorrect" is to contact "this office."  The Notice ends with the statement that the voter has been "Declared Non-citizen," based on their failure to respond to the Notice of Intent to Cancel.  The Cancellation Notice does not include information on re-registering to vote, nor does it provide information on Virginia's Election Day voter registration process.  *Id.*

The Program has continued to operate during the Quiet Period, as Commissioner Beals confirmed when she testified before the Virginia House of Delegates Privileges and Elections Committee on September 4, 2024, and in a September 19 letter she sent to the Virginia Governor.  *See* Exhibit 9, Va. House of Delegates, Recording of House Privileges and Elections Comm. Mtg., at 3:09:10pm (Sept. 4, 2024), https://virginiageneralassembly.gov/house/chamber/chamberstream.php (testifying that the NVRA's Quiet Period Provision only applies to voters who have moved and that voter registration cancellations made based on "anything else that would make them ineligible to be registered, for example if they die, that can continue."); Exhibit 10, Letter from Susan Beals,

Comm'r of Elections, Commonwealth of Va., to Glenn Youngkin, Governor, Commonwealth of

Va. (Sept. 19, 2024) (confirming that daily updates to the voter lists include "[r]emoving

individuals who declare or provide documentation indicating non-citizenship status and who do

not respond to an affirmation of citizenship notice" and explaining that, "[t]o that end, DMV

now shares non-citizen data daily with [ELECT].").  The Virginia Governor also confirmed the

continuation of the program in a letter dated October 10, 2024, noting that DMV data is provided

to ELECT daily.  *See* Exhibit 5, Letter from Glenn Youngkin, Governor, Commonwealth of Va.,

to Gerald E. Connolly, Rep., U.S. House of Reps. (Oct. 10, 2024).

Local registrars thus continue:

- to receive lists of purported registered noncitizens from ELECT, *see* Exhibit 11, Loudoun
  County Electoral Board, Meeting Recording for September 12, 2024,
  https://lfportal.loudoun.gov/LFPortalInternet/Browse.aspx at 41:00-41:50 (explaining
  that the county continues to receive daily information regarding noncitizens and the
  registrar's staff is sending notices of intent to cancel to those individuals),

- to mail those individuals Notices of Intent to Cancel, *see id.* at 37:52-55, and

- to cancel the registrations of voters who do not respond to those Notices, *see* Exhibit 12,
  Loudoun County Electoral Board, Meeting Agenda for October 10, 2024 at 6,
  https://lfportal.loudoun.gov/LFPortalinternet/0/edoc/847739/10-10-
  2024%20LCEB%20Agenda%20Packet.pdf (noting that Loudoun County removed 90
  individuals identified as possible noncitizens in September 2024); Exhibit 13, Fairfax
  County Office of Elections, General Registrar's Report at 1 (Sept. 12, 2024),
  https://perma.cc/FD5V-38RF (noting that 28 voters identified by ELECT as purported

noncitizens were removed from the county's voter rolls between August 1, 2024, and August 31, 2024).

The Program as set out in Executive Order 35 does not require the DMV, ELECT, or local registrars to take any steps to confirm an individual's purported noncitizen status prior to mailing the individual a "Notice of Intent to Cancel."  *See* Exhibit 2, Executive Order 35.  In fact, local registrars lack any discretion under the Program to decline to send a Notice of Intent to Cancel, even when the registrar has strong reason to believe that the targeted voter is a United States citizen.  *See* Olsen Email; Exhibit 14, Prince William County Electoral Board, Meeting Recording for September 30, 2024 at 29:25-29:47, https://www.youtube.com/watch?v=Zr0LSt3xwCk (describing 42 individuals who were likely U.S. citizens but that the county registrar had to cancel "because of state protocol").

### 2.  Impact of the Program

The Program has resulted in the removal of U.S. citizens from the voter rolls.  *See* Olsen Email ("Anecdotally, we have a number of voters who have complained to our office about being cancelled because of this DMV process after decades of being registered and being citizens born in this country."); Exhibit 14, Prince William County Electoral Board, Meeting Recording for September 30, 2024 at 29:25-29:47, https://www.youtube.com/watch?v=Zr0LSt3xwCk (explaining at least 43 of the 162 individuals identified and subsequently removed before July 31, 2024, using the methodology formalized by the Program for failure to respond to the Notice of Intent to Cancel were likely U.S. citizens).  Indeed, U.S. citizens have been removed even when the local registrar has good reason to believe the voters are actually U.S. citizens and despite those citizens having previously attested to their U.S. citizenship when registering to vote.  *See id.*; Olsen Email ("[T]here is ample and consistent evidence that these individuals are

fully qualified U.S. citizens who have had their voter registration cancelled due to an honest mistake and poor form design.").  Jaqueline Britt, the registrar in Nelson County, was reported to have stated that she "has never encountered a case of a noncitizen on the voter rolls. She has received plenty of notices from the state over the years flagging alleged noncitizens on Nelson's rolls, but said they always turned out to involve legitimate voters checking the wrong box at the DMV."  Exhibit 15, Gregory Schneider & Laura Vozzella, *Youngkin stokes fears of vast noncitizen voting in Virginia. Records don't show it.*, Washington Post (Oct. 9, 2024), https://www.washingtonpost.com/dc-md-va/2024/10/09/youngkin-noncitizen-voters-virginia/. In addition, many of those who receive the Notice of Intent to Cancel do not respond, potentially because "the timeframe to respond is very short, they may not receive it, might ignore it, and/or may have language barriers that prevent understanding it."  Olsen Email.

### C.  Procedural History

On October 8, 2024, the United States notified Virginia officials of concerns that the Program may violate the Quiet Period Provision.  *See* Exhibit 16, Letter from R. Tamar Hagler, U.S. Dep't of Justice, to Susan Beals, Comm'r of Elections (Oct. 8, 2024).  The United States and Virginia officials conferred on October 10.

The United States filed suit on October 11, 2024.  Compl., *United States v. Virginia*, No. 1:24-cv-01807 (E.D. Va. Oct. 10, 2024), ECF No. 1.  The complaint alleges that ongoing implementation of the Program within 90 days of the November 5, 2024, federal General Election violated the Quiet Period Provision, 52 U.S.C. § 20507(c)(2).  Compl. ¶¶ 4-7, 60-61.

### LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 102-03 (4th Cir. 2022) (same).  If state action "is expressly preempted, a finding with regard to likelihood of success fulfills the remaining requirements." *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010).  Moreover, where the federal government seeks a preliminary injunction, the second and fourth factors—irreparable harm and the public interest—merge because "the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *Toure v. Hott*, 458 F. Supp. 3d 387, 408 (E.D. Va. 2020) (same).  Each preliminary injunction request requires this Court to exercise its "equitable discretion."  *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam).

## ARGUMENT

### A.      The Program Violates the Quiet Period Provision.

The United States is likely to succeed on the merits of its claim that the Virginia Defendants have violated the Quiet Period Provision, Section 8(c)(2) of the NVRA.  The Provision required Virginia to complete "any program" with "the purpose of . . . systematically remov[ing] the names of ineligible voters from the official lists of eligible voters" no "later than 90 days prior to the date of a primary or general election for Federal office."  52 U.S.C. § 20507(c)(2)(A).  But Virginia's Program requires registrars to cancel the voter registrations of purported noncitizens, based on alleged ineligibility, systematically and without individualized inquiry, on an ongoing basis and into the Quiet Period.

**1. The Program Is Subject to the Quiet Period Provision.**

The Program is subject to the Quiet Period Provision. During the Quiet Period, states may not conduct "*any program* the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A) (emphasis added). The phrase "any program" carries an "expansive meaning." *Arcia*, 772 F.3d at 1344 (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)); *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (same); Exhibit, 20 AL Preliminary Injunction at 1-2. The NVRA sets out only three categories of removals not subject to the Quiet Period Provision—those (1) at the request of the registrant, (2) because of a criminal conviction or mental incapacity, or (3) because the registrant has died. *See* 52 U.S.C. § 20507(c)(2)(B). Those categories are exclusive. *See Arcia*, 772 F.3d at 1345. "Noticeably absent from the list of exceptions" to the Quiet Period Provision "is any exception for removal of non-citizens." *Arcia*, 772 F.3d at 1345; *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1092-93 (D. Ariz. 2023) (same), *appeal pending*, No. 24-3188 (9th Cir.); Exhibit 22, Tr. Mot. Hr'g at 6, *United States v. State of Alabama et al.*, No. 2:24-cv-01329 (N.D. ALA, October 16, 2024) (finding because the Alabama program "modified voter lists on a basis, other than registrant's request for removal, criminal conviction, or mental incapacity, or death, the program was subject to the 90-day provision under 52 U.S.C. § 20507(c)(2)(b). Indeed, if the Secretary's process here is not a program within the meaning of the National Voter Registration Act, it's difficult for the Court to imagine what would qualify as a program.")

Nor are removals of voter registrations from the voter rolls the mere "correction of registration records" exempt from the Quiet Period Provision. 52 U.S.C. § 20507(c)(2)(B)(ii). The NVRA expressly provides for "correction of registration records," which does not include

removal.  *Compare* 52 U.S.C. § 20507(c)(2)(B)(i) (removal programs) *with id.*
§ 20507(c)(2)(B)(ii) (corrections).  The exception for the "correction of registration records"
allows only "correction . . . pursuant to this chapter."  52 U.S.C. § 20507(c)(2)(B)(ii).  Section 8
of the NVRA sets out several forms of "correction" that may be made to a voter registration
record.  *See, e.g.*, 52 U.S.C. § 20507(c)(1)(B)(i) (requiring registrars to "correct" the addresses of
voters who move intra-jurisdictionally); *id.* § 20507(d)(3) (requiring registrars to "correct an
official list of eligible voters . . . in accordance with change of residence information"); *id.* §
20507(e)(2) (discussing options for voters who have moved intra-jurisdictionally to "correct the
voting records and vote").  None of those "correction[s]" authorizes registration cancellation.
One provision, in outlining how registrars must treat certain voters who have moved intra-
jurisdictionally, makes clear that action taken to "correct" a voter's registration differs from a
"remov[al]" of such voter from the rolls.  *See id.* § 20507(f) ("In the case of a change of
address . . . of a registrant to another address within the same registrar's jurisdiction, the registrar
shall *correct* the voting registration list accordingly, and the registrant's name may *not be
removed* from the official list of eligible voters by reason of such a change of address except as
provided in subsection (d)." (emphasis added)).  Any broader reading of "correction of
registration records" would nullify the Quiet Period Provision.

## 2. The Program's Purpose Was to Remove Ineligible Voters from the Rolls.

The Program was intended to target allegedly ineligible voters for cancellation because of
their purported noncitizen status.  Executive Order 35 required the Commissioner of the
Department of Elections to "certify in writing . . . that the following election security procedures
are in place to protect voter lists."  Exhibit 2, Executive Order 35 at 3.  The removal provisions
specified that "individuals who are unable to verify that they are citizens" should be removed "in

accordance with federal and state law."  *Id.* at 4.  And programs like Virginia's that end in

removal are—from the start—subject to the Quiet Period Provision.  *See Arcia*, 772 F.3d at

1339-40 (describing notice-and-removal program held to violate the Quiet Period Provision);

*N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16-CV-1274, 2016 WL

6581284, at *5-*7 (M.D.N.C. Nov. 4, 2016) (explaining that voter's opportunity to contest

alleged lack of qualifications did not take challenged removal program out of the Quiet Period

Provision's ambit).

### 3.  The Program Targeted Allegedly Ineligible Voters.

The Program targeted alleged noncitizens for removal as "ineligible voters."  52 U.S.C.

§ 20507(c)(2)(A).  Only a "citizen of the United States" is eligible to vote in Virginia.  *See* Va.

Const. art. II, § 1; *see also Arcia*, 772 F.3d at 1344 (describing the NVRA as "premised on the

assumption that citizenship is one of the requirements for eligibility to vote"); Va. Code § 24.2-

1004(B)(iii) ("Any person who intentionally . . . votes knowing that he is not qualified to vote

where and when the vote is to be given . . . is to be given is guilty of a Class 6 felony."); 18

U.S.C. § 611 (establishing federal criminal liability for noncitizen voting in elections for federal

office).  And the Program did—and was intended to do—exactly that by targeting allegedly

ineligible voters for cancellation because of their purported noncitizen status.  Executive Order

35 required the Commissioner of the Department of Elections to "certify in writing . . . that the

following election security procedures are in place to protect voter lists," including the program

to remove "individuals who are unable to verify that they are citizens."  Exhibit 2, Executive

Order 35 at 3-4.  Thus, the Virginia Defendants' process to remove noncitizens was a program to

remove "'ineligible voters'" as contemplated by the Quiet Period Provision.  *Arcia*, 772 F.3d at

1344; *Mi Familia Vota*, 691 F. Supp. 3d at 1092-93.

### 4. The Program Was Systematic.

The Program is also "systematic" for purposes of the Quiet Period Provision. A removal program that proceeds without "any reliable first-hand evidence specific to the voters" targeted is "the type of 'systematic' removal prohibited by the NVRA." *N.C. Conf. of the NAACP*, 2016 WL 6581284, at *5; *see also Arcia*, 772 F.3d at 1344 (holding "a mass computerized data-matching process to compare the voter rolls with other state and federal databases, followed by the mailing of notices" and without any "individualized information or investigation" to be systematic for purposes of the Quiet Period Provision); *see also, e.g.*, *Bell v. Marinko*, 367 F.3d 588, 590 n.2, 592 (6th Cir. 2004) (setting out examples of individualized "investiga[ions] and examin[ations]"); *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348, 1355 (M.D. Ga. 2020) (contrasting systematic programs and "individualized inquiries").

The Program contained none of the rigorous individualized inquiry that minimizes the possibility of mistaken voter registration cancellations during the Quiet Period—the time "when the risk of disfranchising eligible voters is greatest." *Arcia*, 772 F.3d at 1346. Instead, the Program relies exclusively on unreliable data that cannot, absent meaningful individualized inquiry, be used to "remove the names of ineligible voters from the official lists of eligible voters" within 90 days of a federal election. 52 U.S.C. § 20507(c)(2)(A); *see also* Exhibit 22, Tr. Mot. Hr'g at 8, *United States v. State of Alabama et al.*, No. 2:24-cv-01329 (N.D. Ala, October 16, 2024) (finding the Alabama program a systematic removal process where it identified purported noncitizens on Alabama's voter rolls by comparing voter rolls against driver's license and ID card databases). At best, Virginia possesses two contradictory data points about the citizenship status of any registered voter snared by the Program. Meanwhile, every person who registers to vote in Virginia has attested on their voter registration form that they are a United

States citizen.  Va. Code § 24.2-418; *see also* Exhibit 1, Handbook ch.6, p.5 (explaining that a person who indicates on their voter registration form that they are not a citizen, or who leaves the citizenship question blank, will not be registered to vote).  But a voter is caught up in the Program when, despite having attested to U.S. citizenship when registering to vote, DMV data reflects that a person indicated on certain forms submitted to the DMV that the person is not a U.S. citizen.  Rather than conducting an individualized inquiry to determine which data point is accurate, the Commonwealth places the burden on the voter to affirm their citizenship within 14 days or have their registration cancelled.  *See* Exhibit 3, Olsen Email.  Congress has prohibited Virginia from doing so during the Quiet Period.  *Cf. N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16-cv-1274, 2018 WL 3748172, at *7 (M.D.N.C. Aug. 7, 2018) (explaining that requiring challenged voters to prove their eligibility during the Quiet Period "demonstrates precisely why Congress prohibited states from conducting systematic programs to remove ineligible voters within 90 days of a federal general election"); *Mi Familia Vota*, 691 F. Supp. 3d at 1085-86, 1092-94 (holding state statute requiring voter to affirm citizenship when county recorder "obtaine[ed] information" that the voter was a noncitizen violated the Quiet Period Provision).

Because the Program did not depend on "individualized information or investigation" to identify voters, to rectify conflicting information, or even to prevent misidentification, the Program is "systematic" and forbidden by the Quiet Period provision.  *Arcia*, 772 F.3d at 1344.

**5.  The Program Was Implemented During the Quiet Period.**

Finally, the Virginia Defendants implemented the Program within the statutorily protected 90-day window before a federal election.  For the November 5, 2024, general election, the last day for systematic list maintenance was August 7, 2024.  Executive Order 35 formalized

the Program that very day, directing "Daily Updates to the Voter List" as part of that

formalization.  Exhibit 2, Executive Order 35, 3.  Local Registrars have sent out Notices of Intent

to Cancel pursuant to the Program and during the Quiet Period.  *See supra* Part B.

> **B.**     **The United States and Eligible U.S. Citizens Will Be Irreparably Harmed**
> **Absent an Injunction.**

The United States continues to suffer an irreparable injury based on the Virginia

Defendants' violation of the Quiet Period Provision.  "The United States suffers injury when its

valid laws in a domain of federal authority are undermined by impermissible state" action.

*United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see also Vt. Agency of Nat. Res.*

*v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (recognizing that the United States

may suffer "injury to its sovereignty arising from violation of its laws"); Exhibit 22, Tr. Mot.

Hr'g at 12, *United States v. State of Alabama et al.*, No. 2:24-cv-01329 (N.D. Ala, October 16)

(finding that "harm to the United States is clear as a matter of law. Under controlling precedent,

the United States suffers an injury when its valid laws in a domain of federal authority are

undermined by impermissible State action").  The Elections Clause, U.S. Const. art. I, § 4, cl. 1,

provides, "The Times, Places and Manner of holding Elections for Senators and Representatives,

shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by

Law make or alter such Regulations, except as to the Places of chusing Senators."[2]  When

Congress exercises its authority to "alter" state regulations of federal elections, that authority "is

---

[2] The Elections Clause does not refer to presidential elections. However, Article II, Section 1,
which does address that subject, "has been interpreted to grant Congress power over Presidential
elections coextensive with that which Article I section 4 grants it over congressional elections."
*Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995) (citation
omitted); *see also Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976); *Burroughs v. United States*, 290
U.S. 534, 545 (1934); *Ex parte Yarbrough*, 110 U.S. 651, 662 (1884).

paramount, and may be exercised at any time, and to any extent which it deems expedient."
*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (quoting *Ex parte Siebold*, 100
U.S. 371, 392 (1880)).  Congress's preeminent power under the Elections Clause authorizes the
NVRA, including the Quiet Period Provision.  *See, e.g.*, *Voting Rts. Coal. v. Wilson*, 60 F.3d
1411 (9th Cir. 1995), *cert. denied*, 516 U.S. 1093 (1996).  Thus, Virginia's violation of the Quiet
Period Provision constitutes an ongoing and irreparable harm to the United States.  *See New
Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989); *see also, e.g.*,
*United States v. Texas*, No. 1:24-cv-8, 2024 WL 861526, at \*38-39 (W.D. Tex. Feb. 29, 2024)
(collecting cases), *stay denied*, 96 F.4th 797 (5th Cir. 2024).

Absent immediate injunctive relief to remedy the Quiet Period violation, eligible U.S.
citizens identified by the Program will suffer unreasonable burdens on their right to participate
on the same grounds as other voters during the November 5, 2024, federal general election and
risk disenfranchisement based on legitimate confusion, distrust, and deterrence.  The right to vote
is "the essence of a democratic society," meaning that "any restrictions on that right strike at the
heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).[3]  Thus,
"[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of
Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also Voto
Latino v. Hirsch*, 712 F. Supp. 3d 637, 679-80 (M.D.N.C. 2024); *N.C. State Conf. of the NAACP*,
2016 WL 6581284, at \*8.  In turn, the NVRA protects voters from systematic list maintenance

---

[3] *See also, e.g.*, *Jones v. Governor of Fla.*, 950 F.3d 795, 828-29 (11th Cir. 2020); *League of
Women Voters of U.S. v. Newby*, 838 F.3d 1, 9, 12-13 (D.C. Cir. 2016); *Obama for Am. v.
Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d
1139, 1154 (S.D. Ind. 2018) (collecting cases).

activities that are prone to creating voter confusion and deter participation at a time when errors are most likely to harm eligible voters.  *See Arcia*, 772 F.3d at 1346; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam).  The Quiet Period Provision recognizes that many "[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors" before an election and may not attempt to vote at all.  *Arcia*, 772 F.3d at 1346.

United States citizen voters whose registrations are cancelled by the Program are at risk of losing access to voting methods available only to registered voters.  In Virginia, voter registration closes 21 days before the November 5, 2024, federal General Election.  Va. Code § 24.2-416(A). Because only registered voters may vote absentee, Va. Code § 24.2-700, voters who are not registered 21 days before the November 5, 2024, election cannot request an absentee ballot online or through the mail, Va. Code § 24.2-701(A); *see also* Exhibit 21, Handbook, ch.7, p.19.  In other words, a voter who is unaware that their registration has been cancelled by the Program may attempt to request an absentee ballot online or through the mail, as they have in prior elections, only to find that they can no longer do so.  Compounding the problem, voters who have enrolled on the permanent absentee voter list simply will not receive a ballot without further notice, as cancellation of a voter's registration will also result in the voter's removal from the permanent absentee voter list. Va. Code § 24.2-703.1(D)(ii).[4]  And though Virginia does allow eligible persons to provisionally register in the twenty days preceding Election Day and on Election Day, those registration requests must be made in person at early voting sites (prior to Election Day) or at the person's polling place (on Election Day).  *See* Va. Code § 24.2-652(B); Exhibit 1, Handbook, ch.6, p.22.

---

[4]  Such voters also will not receive the notices mailed when polling places change close to an election.  See Va. Code § 24.2-306(B).

In practical terms, this means that a voter who relies on absentee voting because they have difficulty traveling to their polling place or their early voting site, and who expects to request and receive an absentee ballot, is at risk of disenfranchisement if their voter registration has been cancelled pursuant to the Program.  And, even if a voter whose registration has been so canceled does re-register in the twenty days preceding the Election or on Election Day, that voter is barred from casting a regular ballot.  They will instead be allowed only to cast a provisional ballot.  Va. Code § 24.2-653(A); Exhibit 1, Handbook, ch.6, p.22.  These denials of a voter's "right to participate in elections on an equal basis with other citizens in the jurisdiction," *League of Women Voters of N.C.*, 769 F.3d at 229 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)), constitute irreparable harm.  *See id.* at 243, 247-49 (holding, in a challenge under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, that denial of "voting mechanisms . . . that do not absolutely preclude participation" was nevertheless irreparable harm); *cf. Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) (finding a voter had standing based on a violation of the voter's "franchise-related rights" to cast a ballot in the correct precinct); *Action NC v. Strach*, 216 F. Supp. 3d 597, 615 (M.D.N.C. 2016).

Virginia's communications with qualified U.S. citizen voters swept up by the Program are also likely to cause irreparable harm by "discourag[ing] future participation by voters." *United States v. Berks Cnty.*, 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003).  When a Voter Registration Cancellation Notice is sent to voters who do not respond to a Notice of Intent to Cancel, it suggests only that a voter "believe[s] the removal of [their registration] from the Voter Registration List is incorrect" contact "this office" at a provided, but unlabeled, phone number. Exhibit 8, Voter Registration Cancellation Notice.  The Notice contains no information on whether the recipient is eligible to re-register to vote, any information on how the recipient might

19
**A-111**

re-register, or any information on Virginia's Election Day voter registration process.  The lack of information in the notice, combined with cancellation of the voter's registration, is likely to result in irreparable harm by "discourag[ing]" that voter's "equal participation in the democratic system."  *See Berks Cnty.*, 250 F.Supp.2d at 541.

### C.      The Balance of Equities Favors Enjoining and Unwinding Quiet Period Violations.

"The equities weigh in favor of enjoining [state actions] that are preempted by federal law."  *Alabama*, 691 F.3d at 1301.  Once state election procedures have been found to be unlawful, "it would be the unusual case in which a court would be justified in not taking appropriate action" before the next election.  *Reynolds*, 377 U.S. at 585.  In this case, the balance of equities favors a preliminary injunction that enjoins the violation of the Quiet Period Provision and requires tailored remedial measures to protect the rights of impacted eligible voters.

The Quiet Period Provision "is designed to carefully balance the[] four competing purposes [of] the NVRA," *Arcia*, 772 F.3d at 1346; *see also N.C. State Conf. of the NAACP*, 2016 WL 6581284, at *5 (same); 52 U.S.C. § 20501(b) (establishing purposes), and so the equities favor injunctive relief when the balance established by Congress is upset through noncompliance.  *See also Arcia*, 772 F.3d at 1346 ("At most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors.  In the final days before an election, however, the calculus changes."); *Mi Familia Vota*, 691 F. Supp. 3d at 1093 (same).  Although the "State indisputably has a compelling interest in preserving the integrity of its election process," *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989), that interest alone does not justify violating the NVRA and casting doubt on the validity of voter registration in the weeks before Election Day when eligible voters "will likely not be able to correct" errors, *Arcia*, 772

F.3d at 1346.  "This is why the [Quiet Period] Provision strikes a careful balance: it permits systematic removal programs at any time *except* for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest."  *Arcia*, 772 F.3d at 1346.  Thus, states may rely on both citizenship questions on registration forms, *see, e.g.,* Exhibit 17, Virginia Voter Registration Application, and timely systematic list maintenance to ensure that only U.S. citizens are registered to vote.  In the rare instance where noncitizens nonetheless vote, they are subject to prosecution.  *See* Va. Code § 24.2-1004(B)(iii); 18 U.S.C. § 611; *see also, e.g.*, Exhibit 18, Press Release, U.S. Att'y Office: N.D. of Ala., *Undocumented Individual Charged in Connection with Voting Fraud and Passport Fraud* (Sept. 5, 2024); s*ee generally* Exhibit 19, Stephen Ansolabehere et al., *The Perils of Cherry Picking: Low Frequency Events in Large Sample Surveys*, 40 Electoral Studies 409 (2015) ("[T]he likely percent of non-citizen voters in recent US elections is 0.").[5]

The Supreme Court's decision in *Purcell v. Gonzales*, 549 U.S. 1 (2006) (per curiam), does not stand in the way of immediate relief for Quiet Period Provision violations.  *Purcell* recognized that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls" and that "[a]s an election draws closer, that risk will increase."  *Id.* at 4-5.  However, the Quiet Period Provision rests upon similar concerns, albeit applied to systematic voter registration list maintenance.  *See Arcia*, 772 F.3d at 1345-46.  Thus, the equitable considerations articulated in

---

[5] On the other hand, Virginia has provided no evidence of harm in response to the United States' document requests.  There is "no harm from the state's nonenforcement of invalid" procedures. *Alabama*, 691 F.3d at 1301; *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (confirming that states "cannot suffer harm from an injunction that merely ends an unlawful practice").

*Purcell* favor relief for a Quiet Period violation which has unlawfully disturbed the status quo.

*See Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J.,

concurring) ("When an election is close at hand, the rules of the road should be clear and

settled.").  Moreover, a violation of the Quiet Period close to an election is the sole fault of the

offending jurisdiction.  *Cf. Glossip v. Gross*, 576 U.S. 863, 898 (2015) (Scalia, J., concurring)

(describing invocation of self-generated delay as "call[ing] to mind the man sentenced to death

for killing his parents, who pleads for mercy on the ground that he is an orphan").  To suggest

that *Purcell* precludes a remedy would effectively nullify the Quiet Period Provision because

violations of the Provision by definition occur shortly before an election.  *See, e.g.*, *Rubin v.

Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) ("[A] statute should be construed so that

effect is given to all its provisions." (internal citation omitted)); *see also Inter Tribal Council*,

570 U.S. at 15 ("There is no compelling reason not to read Elections Clause legislation simply to

mean what it says.").[6]

Systematic errors in the Program reinforce the equities favoring an injunction.  As

described above, the Program has resulted in the cancellation of the voter registrations of U.S.

citizens.  And, once the Program targets a voter for removal, local registrars cannot decline to

---

[6] No court has applied *Purcell* to enforcement of the Quiet Period Provision.  Outside of the
Quiet Period context, Justice Kavanaugh has proposed a four-part test for last-minute injunctions
impacting election administration, suggesting that *Purcell* might be overcome when "(i) the
underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer
irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the
complaint to court; and (iv) the changes in question are at least feasible before the election
without significant cost, confusion, or hardship."  *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022)
(Kavanaugh, J., concurring) (citations omitted); *see also League of Women Voters of Fla. v. Fla.
Sec'y of State*, 32 F.4th 1363, 1372 (11th Cir. 2022) (adopting first consideration).  Even if these
requirements were to apply to enforcement of the Quiet Period Provision—and they should
not—the equities would nonetheless continue to favor relief.

cancel their registration—even if the registrar believes the voter is a U.S. citizen.  This is particularly concerning given that Virginia appears to have increased cancellations carried out under the Program's terms.  *See* Exhibit 12, Loudoun County Electoral Board, Meeting Agenda for October 10, 2024 at 6, https://lfportal.loudoun.gov/LFPortalinternet/0/edoc/847739/10-10-2024%20LCEB%20Agenda%20Packet.pdf (showing 62 voter registrations cancelled on citizenship grounds between from January 2024 to August 2024 but 90 registrations cancelled on those grounds in September alone).  The errors that accompanied the Program demonstrate why Congress included the Quiet Period Provision in the NVRA.  *See Arcia*, 772 F.3d at 1346 ("At most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors.  In the final days before an election, however, the calculus changes."); *N.C. State Conf. of the NAACP*, 2016 WL 6581284, at \*5-\*6; *see also U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388 (6th Cir. 2008) ("Though the public certainly has an interest in a state being able to maintain a list of electors that does not contain any false or erroneous entries, a state cannot remove those entries in a way which risks invalidation of properly registered voters."); *cf. Purcell*, 549 U.S. at 4-5 (noting "[a]s an election draws closer," the risk that changes in election rules will result in voter confusion and deter participation "will increase").

### D.   Compliance with Federal Law and Protecting the Right to Vote Are in the Public Interest.

The public interest favors injunctive relief as well, principally because "the public undoubtedly has an interest in seeing its governmental institutions follow the law."  *Roe v. Dep't of Def.*, 947 F.3d 207, 230-32 (4th Cir. 2020) (quotation marks omitted); *see also Alabama*, 691 F.3d at 1301 ("Frustration of federal statutes and prerogatives are not in the public interest."). The public has a clear interest in the enforcement of federal statutes that protect constitutional

23
**A-115**

rights, including—and especially—voting rights. *See United States v. Raines*, 362 U.S. 17, 27 (1960). "By definition, 'the public interest favors permitting as many qualified voters to vote as possible.'" *League of Women Voters of N.C.*, 769 F.3d at 247 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) (cleaned up)); *see also Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (reiterating that the right to vote "rank[s] among our most precious freedoms"); *NAACP v. Cortes*, 591 F. Supp. 2d 757, 767 (E.D. Pa. 2008) (recognizing that protecting the right to vote "is without question in the public interest").

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its motion for a preliminary injunction and enter the attached proposed order granting immediate relief for the Quiet Period violations described herein.

Date:  October 16, 2024

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

*/s/ Sejal Jhaveri*
R. TAMAR HAGLER
RICHARD A. DELLHEIM
SEJAL JHAVERI
KEVIN MUENCH
BRIAN REMLINGER
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W
Washington, D.C. 20530
(202) 305-5451
Sejal.Jhaveri@usdoj.gov

JESSICA D. ABER
United States Attorney
Eastern District of Virginia

*/s/ Steven Gordon*
STEVEN GORDON
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Ave.
Alexandria, VA 22314
(703) 299-3817
Steve.Gordon@usdoj.gov

CHRISTOPHER R. KAVANAUGH
United States Attorney
Western District of Virginia

*/s/ Christopher Kavanaugh*
United States Attorney
United States Attorney's Office
Western District of Virginia
255 West Main Street
Charlottesville, VA 22902
(434) 293-4283
Christopher.Kavanaugh@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 16, 2024, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.  I will send counsel for state defendants this filing via email.

<span style="margin-left:5em">*/s/ Sejal Jhaveri*</span>
<span style="margin-left:5em">Sejal Jhaveri</span>
<span style="margin-left:5em">Civil Rights Division</span>
<span style="margin-left:5em">U.S. Department of Justice</span>
<span style="margin-left:5em">950 Pennsylvania Ave, NW</span>
<span style="margin-left:5em">Washington, DC 20530</span>
<span style="margin-left:5em">(202) 305-5451</span>
<span style="margin-left:5em">Sejal.Jhaveri@usdoj.gov</span>

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| VIRGINIA COALITION FOR<br>    IMMIGRANT RIGHTS, *et al.*,<br><br>    *Plaintiffs,*<br><br>v.<br><br>SUSAN BEALS,<br>*in her official capacity as Virginia<br>    Commissioner of Elections, et al.,*<br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 1:24-cv-1778 (PTG/WBP) |

\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>v.<br><br>COMMONWEALTH OF VIRGINIA, *et al.*,<br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 1:24-cv-1807 (PTG/WBP) |

## ORDER

This matter is before the Court on Defendants' Motion for Extension of Page Limit for a Consolidated Opposition Brief (Dkt. 74). For good cause shown, it is hereby

**ORDERED** that Defendants' Motion for Extension of Page Limit for a Consolidated Opposition Brief (Dkt. 74) is **GRANTED**. Defendants will submit a Consolidated Opposition Brief that will not exceed 45 pages.

Entered this 22nd day of October, 2024.
Alexandria, Virginia

/s/
Patricia Tolliver Giles
United States District Judge

**A-119**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **Virginia Coalition for Immigrant Rights, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 1:24-cv-01778** |
| **Susan Beals, in her official capacity as Virginia Commissioner of Elections, et al.,** | ) ) ) | |
| **Defendants.** | ) | |
| **The United States of America,** | ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 1:24-cv-01807** |
| **The Commonwealth of Virginia, et al.,** | ) ) ) | |
| **Defendants.** | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION**

Charles J. Cooper *(Pro Hac Vice)*
Joseph O. Masterman *(Pro Hac Vice)*
Bradley L. Larson *(Pro Hac Vice)*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
cooper@cooperkirk.com

*Counsel for Defendants Susan Beals, John O'Bannon, Rosalyn R. Dance, Georgia Alvis-Long, Donald W. Merricks, Matthew Weinstein, and Jason Miyares*

Jason S. Miyares
   *Attorney General*
Thomas J. Sanford (VSB #95965)
   *Deputy Attorney General*
Erika L. Maley (VSB #97533)
   *Solicitor General*
Graham K. Bryant (VSB #90592)
   *Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 4

   I.    Statutory Framework and Factual Background ................................................... 4

   II.   Procedural background ..................................................................................... 13

LEGAL STANDARD .................................................................................................... 15

ARGUMENT ................................................................................................................. 16

   I.    This Court Lacks Jurisdiction Over the Organizational Plaintiffs' Claims ..................... 16

      A.    The Organizational Plaintiffs Lack Article III Standing............................................16

      B.    Sovereign Immunity also Bars the Organizational Plaintiffs' Claims........................21

   II.   The United States and the Organizational Plaintiffs' Claims Under the NVRA Are Unlikely to Succeed ........................................................................................ 22

      A.    Defendants Did Not Violate the NVRA's 'Quiet Period' Requirements ...................23

           1.    The NVRA Does Not Restrict Removing Noncitizens and Other Persons Whose Registration Was Invalid *Ab Initio* ..................................................... 23

           2.    Defendants' Removal of Noncitizens Was "Individualized" and Not "Systematic" ............................................................................................. 30

      B.    Defendants' Process for Removing Noncitizens Is Nondiscriminatory .....................33

   III.  The United States and the Organizational Plaintiffs Cannot Satisfy the Remaining *Winter* and *Merrill* Factors for a Preliminary Injunction............................................ 36

      A.    Plaintiffs Will Not Be Irreparably Harmed..............................................................36

      B.    The Equities Favor the Defendants.............................................................................39

      C.    *Purcell* Does Not Allow an Injunction at This Point...................................................40

CONCLUSION.............................................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ................................................................34

*Arcia v. Detzner*,
   908 F. Supp. 2d 1276 (S.D. Fla. 2012) ...........................................27, 29

*Arcia v. Florida Sec. of State*,
   746 F.3d 1273 (11th Cir. 2014) (Jordan, J., concurring), *vacated by Arcia v.
   Florida Sec. of State*, 772 F.3d 1335 (11th Cir. 2014)................................ *passim*

*Arizona v. Intertribal Council of Ariz.*,
   570 U.S. 1 (2013) ....................................................................26

*Bell v. Marinko*,
   367 F.3d 588 (6th Cir. 2004) .....................................................28, 29

*Bland v. Roberts*,
   730 F.3d 368 (4th Cir. 2013) .........................................................21

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ..................................................................34

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ..................................................................17

*Crawford v. Marion County Election Board*,
   553 U.S. 181 (2008) ...............................................................35, 36

*Davidson v. United Auto Credit Corp.*,
   65 F.4th 124 (4th Cir. 2023) .........................................................23

*DeBauche v. Trani*,
   191 F.3d 499 (4th Cir. 1999) ......................................................21, 22

*Di Biase v. SPX Corp.*,
   872 F.3d 224 (4th Cir. 2017) .........................................................36

*DNC v. Wisconsin State Legis.*,
   141 S. Ct. 28 (2020)...............................................................1, 40

*Doe v. Virginia Dep't of State Police*,
   713 F.3d 745 (4th Cir. 2013) .........................................................17

*Edelman v. Jordan,*
    415 U.S. 651 (1974)................................................................21

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024)..........................................................19, 20

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000)................................................................17

*Green v. HM Orl-FL, LLC,*
    601 U.S. __ (statement of Kavanaugh, J.) (Slip op. ) (2023)................38

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982)..........................................................19, 20

*Husted v. A. Phillip Randolph Institute,*
    584 U.S. 756 (2018)...............................................1, 31, 33, 34

*La Union de Pueblo Entro v. Abbott,*
    -- F.4th __, 2024 WL 4487493 (Oct. 16, 2024)..............................43

*Lane v. Holder,*
    703 F.3d 668 (4th Cir. 2012) ........................................17, 19, 20

*League of Women Voters of Fla., Inc. v. Florida Sec. of State,*
    32 F.4th 1363 (11th Cir. 2022) ...........................................43

*League of Women Voters of N.C. v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014) .............................................37

*Lewis v. Casey,*
    518 U.S. 343 (1996).......................................................38

*Libertarian Party of Va. v. Judd,*
    718 F.3d 308 (4th Cir. 2013) .............................................16

*Lyons P'ship v. Morris Costumes Inc.,*
    243 F.3d 789 (4th Cir. 2001) .............................................40

*McBurney v. Cuccinelli,*
    616 F.3d 393 (4th Cir. 2010) .............................................22

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
    547 U.S. 71 (2006)........................................................26

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022)................................................. *passim*

*Mi Familia Vota v. Fontes*,
    691 F. Supp. 3d 1077 (N.D. Ariz. 2023)................................................................29, 32

*Moore v. Harper*,
    142 S. Ct. 1089 (2022)..................................................................................................40

*N. Carolina State Conf. of the NAACP v. Raymond*,
    981 F.3d 295 (4th Cir. 2020) ......................................................................................36

*Nken v. Holder*,
    556 U.S. 418 (2009)....................................................................................................39

*Outdoor Amusement Bus. Ass'n v. DHS*,
    983 F.3d 671 (4th Cir. 2020) ......................................................................................17

*Purcell v. Gonzales*,
    549 U.S. 1 (2006) (per curiam) ..................................................................................40

*RNC v. DNC*,
    140 S. Ct. 1205 (2020) (per curiam) ..........................................................................40

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) ......................................................................................17

*Sampson v. Murray*,
    415 U.S. 61 (1974)......................................................................................................36

*Short v. Brown*,
    893 F.3d 671 (9th Cir. 2018) ......................................................................................43

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)....................................................................................................16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)..............................................................................................17, 18

*Tenn. Conf. of the NAACP v. Lee*,
    105 F.4th 888 (6th Cir. 2024) (per curiam) ...............................................................19

*Thompson v. Dewine*,
    959 F.3d 804 (6th Cir. 2020) ......................................................................................43

*United Nuclear Corp. v. Cannon*,
    696 F.2d 141 (1st Cir. 1982).......................................................................................39

*United States v. Florida*,
    870 F. Supp. 2d 1346 (N.D. Fla. 2012)..........................................................25, 26, 29

*United States v. Smith*,
919 F.3d 825 (4th Cir. 2019) .................................................................23

*Winter v. NRDC*,
555 U.S. 7 (2008) ................................................................15, 36, 37

*Wise v. Circosta*,
978 F.3d 93 (4th Cir. 2020) (en banc) ...............................................36, 43

*Ex parte Young*,
209 U.S. 123 (1908) ................................................................................21

**Statutes**

18 U.S.C. § 611 ......................................................................................5

18 U.S.C. § 20503 ..................................................................................5

18 U.S.C. § 20504 ..................................................................................5

52 U.S.C. § 20501 ................................................................2, 4, 27, 28

52 U.S.C. § 20507 ........................................................................ *passim*

Va. Code Ann. § 24.2-104(A) ..............................................................22

Va. Code Ann. § 24.2-404 ...............................................................8, 9

Va. Code Ann. § 24.2-404.4 ..................................................................5

Va. Code Ann. § 24.2-410.1 ..........................................................6, 7, 11

Va. Code Ann. § 24.2-416 ...........................................................12, 21, 38

Va. Code Ann. § 24.2-420.1 ..........................................................11, 12, 36

Va. Code Ann. § 24.2-427 ...............................................................*passim*

Va. Code Ann. § 24.2-427(C) ..........................................................9, 10

Va. Code § 24.2-411.3 ............................................................................7

Va. Code § 24.2-1004(B)(iii) ..................................................................5

**Other Authorities**

2006 Va. Acts. chs. 926, ........................................................................6

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Text* (2012) ................................................................................24, 26

ELECT, 2023 Annual Virginia Election Retrospective & Look Ahead at 25–26 (Mar. 6, 2024), https://tinyurl.com/229x8z8u...........................................13

ELECT, *Same Day Voter Registration*, https://tinyurl.com/3t982f3t (last accessed Oct. 18, 2024) ............................................................................13

*Eligible*, (https://www.merriam-webster.com/dictionary/eligible) (last accessed Oct. 22, 2024) ..............................................................................24

H.R. Rep. No. 103-9 (1993)....................................................................28, 32

*Ineligible, supra* (https://www.merriam-webster.com/dictionary/ineligible) (last accessed Oct. 22, 2024) .............................................................................24

*Mailing*, Merriam-Webster, https://www.merriam-webster.com/dictionary/mailing (last visited Oct. 22, 2024)..................................................................32

S. Rep. 103-6 (1993) ...............................................................................28, 32

U.S. Const. art I, § 2.....................................................................................27

U.S. Const. art. III, § 2.................................................................................16

Va. Const. art. II, § 1.....................................................................................5

Virginia House of Delegates Privileges and Elections Committee Meeting, (Sept. 4 Comm. Meeting)(statement of Commissioner Beals), https://tinyurl.com/54fy6r5n ..............................................................12

*Voter*, Merriam-Webster (https://www.merriam-webster.com/dictionary/voter) (last accessed Oct. 22, 2024)............................................................24

**INTRODUCTION**

The 2024 presidential election is now 12 days away, and early voting has already commenced in Virginia. Yet the Plaintiffs in these consolidated cases—the United States and an assortment of advocacy organizations (Organizational Plaintiffs)—ask this Court to inject itself into the Commonwealth's election processes, demanding a preliminary injunction that, among other burdensome measures, orders State and county election officials to place back on the voter rolls people who were recently removed after *identifying themselves as noncitizens* in information they provided to the Virginia Department of Motor Vehicles (DMV).

These self-identified noncitizens were removed pursuant to longstanding Virginia law only after their local registrar sent each one of them notices informing them of the registrar's information about their noncitizenship status and advising them that they could remain on the voter rolls simply by returning an affirmation of their citizenship in a pre-addressed mailer, a process that the Supreme Court has said is a "simple and easy step" that any "reasonable person with an interest in voting" is likely to follow. *Husted v. A. Phillip Randolph Institute*, 584 U.S. 756, 779 (2018). Only if the individual failed to respond to the notice was her name removed from the rolls. Each individual who failed to respond was then sent a second notice and advising her of the removal, and that if the information was incorrect, the registrar would promptly correct the error.

The Plaintiffs' motions therefore fail, for the usual rules for granting preliminary injunctive relief, strict in any context, are much stricter when a federal court is being asked to "alter state election laws in the period close to an election," *DNC v. Wisconsin State Legis.*, 141 S. Ct. 28, 30 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay), and the so-called *Purcell* doctrine is especially strict when, as here, "voting had already begun." *Id.* at 31. The Plaintiffs can satisfy their burden under *Purcell* only by a clear showing that "(i) the underlying merits are

1

**A-127**

entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in grant of applications for stay). The Plaintiffs do not come close to satisfying any, let alone all, of these factors.

Plaintiffs purport to invoke the protections of the National Voter Registration Act of 1993, colloquially called the "Motor Voter" law, which sought to "enhance[] the participation of eligible *citizens* as voters in elections for federal office" and at the same time "ensure that accurate and current voter registration rolls are maintained" in every State. 52 U.S.C. § 20501(b) (emphasis added). To achieve its goal of citizen participation, the NVRA directed States to allow prospective voters to register to vote while signing up for a driver's license or similar permit, and it also imposed certain specific limits on the ability of States to remove previously eligible voters who became ineligible. Specifically, Plaintiffs' central claim is that Virginia's recent removal of noncitizens violated the NVRA's so-called "Quiet Period Provision," which prohibits states from "systematic[ally]" removing "ineligible voters" from the rolls within 90 days of a federal election, with exceptions for removals based on a voter's request, a voter's death, and a voter's felony conviction or mental incapacity. *Id.* § 20507(c)(2).

Virginia has long complied with the NVRA. The challenged law is no exception, having been enacted in 2006, precleared by the Department of Justice in the same year, and followed by Virginia election officials over multiple presidential and mid-term election cycles, including in the 90-day quiet period, without objection by the Plaintiffs or anyone else. Yet when Governor Youngkin issued an Executive Order reaffirming Virginia's commitment to following its own

longstanding election laws, the Organizational Plaintiffs, followed by the Department of Justice, sought to enjoin Virginia's reasonable statutory process to ensure that only citizens eligible to vote are on the rolls. And although the 90-day quiet period commenced on August 7, the Plaintiffs did not bring these actions until 60 days had already passed, an unconscionable delay given the imminent approach of the election. This last-minute attempt, premised on fatal factual misunderstandings and legal flaws, to obtain a preliminary injunction only two weeks before the 2024 presidential election must be rejected.

Start with jurisdiction. Plaintiffs have not identified a single injured citizen. Without an actual injured eligible voter, the Organizational Plaintiffs call upon, and stretch, standing theories that have been roundly rejected in this Circuit and the Supreme Court. And because this lawsuit came so late, the Defendants have already ceased their allegedly unlawful removal process, as they always planned to do, which means that there is no ongoing alleged violation that would allow the Organizational Plaintiffs to invoke the *Ex parte Young* exception to the Commonwealth's sovereign immunity in federal court.

Even apart from those hurdles, the NVRA provisions at issue simply do not apply to the removal of noncitizens from the rolls. The plain meaning of the text of the Quiet Period Provision, confirmed by the structure, purpose, and legislative history of the NVRA, demonstrates that there are no temporal restrictions on when States may remove noncitizens, as well as others who are not and cannot be "voters," such as minors and fictitious persons, whose registrations were invalid *ab initio*. The majority of federal judges to confront the scope of the NVRA have concluded that its removal provisions do not apply to noncitizens, and this fact alone answers whether "the underlying merits are entirely clearcut in favor of the plaintiff." *Merrill*, 142 S. Ct. at 881.

The problems continue. Virginia's noncitizen removal process is highly accurate and makes *individualized*, not "systematic," determinations on eligibility. Again, the people who are removed from the rolls are those who have self-identified as noncitizens, either by affirmatively stating that they are not citizens on DMV forms or by providing documentation to the DMV showing noncitizenship *and* being recently confirmed as noncitizens by the Department of Homeland Security's database. Virginia's process is individualized, nondiscriminatory, accurate, and lawful.

There is thus no overriding reason to visit on Virginia's election officials, and her voters, the enormous disruption and confusion that the burdensome measures sought by Plaintiffs would inescapably entail, especially less than two weeks before a presidential election. The Supreme Court has said time and again that the rules for elections need to be stable and knowable, and thus free of judicial intervention absent the most compelling reasons. The Plaintiffs waited to file these actions until the last, and worst, possible moment to challenge election procedures. The people of Virginia should not be forced to bear the cost of their strategic litigation choices, and the motions for a preliminary injunction should be denied.

## BACKGROUND

### I.    Statutory Framework and Factual Background

Based on its finding that "the right of *citizens of the United States* to vote is a fundamental right," Congress enacted the National Voter Registration Act, 52 U.S.C. §§ 20501 et seq. Among other things, the NVRA is intended to "enhance[] the participation of *eligible citizens* as voters in elections for Federal office," to "protect the integrity of the electoral process," and to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(a)(1), (b) (emphasis added). Noncitizens are not eligible to vote; under the Virginia Constitution and both

federal and Virginia law, the right to vote is limited to U.S. citizens. *E.g.*, Va. Const. art. II, § 1; Va. Code Ann. § 24.2-404.4; 18 U.S.C. § 611. Indeed, for a noncitizen to vote is a crime under Virginia and federal law. Va. Code § 24.2-1004(B)(iii); 18 U.S.C. § 611.

To promote eligible citizens' participation in federal elections, the NVRA requires "each State [to] establish procedures to register to vote . . . by application made simultaneously with an application for a motor vehicle driver's license." *Id.* § 20503(a)(1); *see generally id.* § 20504 (establishing procedures for "State motor vehicle authori[ties]" to implement for voter registration). At the same time, the NVRA imposes a duty on States to maintain "accurate and current voter registration rolls" and thus to make "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." *Id.* § 20507(a)(4).

The NVRA not only requires states to remove "ineligible voters" from the rolls—it also regulates the manner in which states do so. *Id.* The NVRA's General Removal Provision, *id.* § 20507(a)(3), declares that a person "may not be removed from the official list of eligible voters except" in four enumerated circumstances: voter request, death of the voter, voter felony conviction or mental incapacity, and change in voter residence (if certain procedures are followed), *id.* § 20507(a)(3), (4). In addition to the General Removal Provision's blanket ban on voter removals, which applies at all times, the NVRA also contains a special prohibition on removals close to federal elections. Section 20507(c)(2), the so-called Quiet Period Provision, prohibits states from "systematic[ally]" removing "ineligible voters" from the rolls within 90 days of a federal election, with exceptions for voter request, death of the voter, and voter felony conviction or mental incapacity. *Id.* § 20507(c)(2).

Seeking to harmonize its laws with the NVRA and other federal voting statutes, in 2006 Virginia's General Assembly passed, and then-Governor Timothy Kaine signed into law, new

obligations on Virginia's DMV and Department of Elections (ELECT). *See* 2006 Va. Acts. chs. 926, 940. The 2006 amendments required the DMV to ask each applicant for a motor-vehicle operator's license or renewal "if he is a United States citizen" and to "furnish monthly to the Department of Elections a complete list of all persons who have indicated a noncitizen status to the [DMV]." *Ibid.* (enacting new Virginia Code § 24.2-410.1). They further required the general registrar for each jurisdiction in Virginia to "promptly cancel the registration of . . . all persons known by him not to be United States citizens by reason of reports from the [DMV] pursuant to § 24.2-410.1." *Ibid.* (amending Va. Code § 24.2-427(B)).[1] In accordance with the then-prevailing preclearance regime of the Voting Rights Act, these amendments were submitted to the United States Department of Justice, which "did not interpose any objection" to Virginia's changes. October 22, 2024 Declaration of Graham K. Bryant, Ex. A (Bryant Decl.); October 22, 2024 Declaration of Steven L. Koski ¶ 4 (Koski Decl.). These requirements have been applied over the course of the past eight federal elections, including during the 90-day quiet period, and have never been challenged for noncompliance with the NVRA, by the United States or anyone else. October 22, 2024 Declaration of Ashley Coles ¶ 17 (Coles Decl.).

Consistent with these longstanding statutory obligations to ensure that only citizens are registered to vote, the DMV asks every applicant for most DMV "document[s], or renewal thereof," the question, "[a]re you a citizen of the United States?" Va. Code Ann. §§ 24.2-410.1(A), 24.2-411.3; Koski Decl. ¶¶ 5–6; see Bryant Decl. Exs. B–D. The DMV asks the citizenship question when issuing, renewing, or replacing a driver's license or identification card or when changing the address associated with such documents. Koski Decl. ¶¶ 5–6. All individuals

---

[1] A 2020 amendment requires voter-registration forms to be automatically presented to every applicant at the DMV unless they affirmatively decline. *See* Va. Code Ann. §§ 24.2-410.1; 24.2-427.

conducting one of these DMV transactions, whether in-person or online, are presented with the citizenship question, and given the option to decline to answer. Koski Decl. ¶ 7. The question is accompanied by a warning "that intentionally making a materially false statement during the transaction constitutes election fraud and is punishable under Virginia law as a felony." Va. Code § 24.2-411.3; Koski Decl. ¶ 7; Bryant Decl. Ex. D..

In addition to the citizenship question on these forms, all DMV customers are presented with an electronic voter-registration application. Va. Code § 24.2410.1. Because only citizens can vote, the application also asks about citizenship status. If a person answers that he is not a citizen, a second screen will pop up stating that citizens cannot vote and asking him a second time whether he is a citizen. Koski Decl. ¶ 11; Bryant Decl. Ex. D.

Virginia law requires the DMV to "furnish monthly to the Department of Elections a complete list of all persons who have indicated a noncitizen status" on a DMV form. Va. Code § 24.2-410.1(A). Contrary to some assertions, only persons who *affirmatively* state that they are not citizens are on the list sent to ELECT. Koski Decl. ¶¶ 12–14 If an applicant does not answer the citizenship question, his information is *not* passed along to ELECT. Koski Decl. ¶¶ 13–14.

In addition, the DMV obtains information about an individual's citizenship when he presents documentation of residency, such as when obtaining temporary or permanent identification cards. Koski Decl. ¶¶ 6, 15–16. Such legal presence documentation will show that the individual is not a citizen, such as federal documentation of a lawful permanent residence, asylum status, or a resident alien card. Koski Decl. ¶ 17. The DMV also transmits to ELECT information about individuals who affirm in recent DMV transactions that they are citizens, but whose legal presence documentation on file with the DMV indicates the opposite. Koski Dec. ¶ 18. Because the DMV does not require new residency documentation for most transactions, however,

individuals on this list may have subsequently become naturalized citizens. Koski Dec. ¶ 19. Knowing that there is potential for an innocent inconsistency, ELECT's policy is not to send information regarding these individuals on to local registrars, subject to one limited exception discussed below. Koski Dec. ¶ 19.

The information that the DMV sends to ELECT contains extensive data fields for each person that allow both ELECT and general registrars accurately to compare the individual to the list of registered voters. Coles Decl. ¶ 5. These data fields include, among other data, the person's full name, social security number, birth date, address, sex, DMV customer number, and transaction date. Coles Decl. ¶ 5; Koski Decl. ¶ 20.

When ELECT receives this information regarding self-declared noncitizens from the DMV, it compares the information for each self-declared noncitizen with voter information contained in ELECT's statewide voter registration system, the Virginia Election and Registration Information System (VERIS), to identify potential matches with registered voter records. Coles Decl. ¶ 6. ELECT then sends the records to the local registrar serving the individual's jurisdiction. Coles Decl. ¶¶ 3, 5, 7.

Although ELECT's general policy, as noted above, is to send local registrars only the records of persons who affirmatively and contemporaneously declared that they are not citizens on a DMV form, it did recently collaborate with the DMV to ensure that persons who engaged in DMV transactions between July 1, 2023, and June 30, 2024 and had noncitizen documents on file were not improperly on the voter rolls. Koski Decl. ¶ 21; Coles Decl. ¶ 22. To accurately ensure that noncitizens were not registered, ELECT asked the DMV to run these persons through the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) database. *See* Va. Code Ann. § 24.2-404(E) (requiring ELECT to use SAVE "for the purposes of

verifying that voters listed in the Virginia voter registration system are United States citizens"); Koski Decl. ¶ 22; Coles Decl. ¶ 23. The SAVE database can determine whether a noncitizen resident has subsequently obtained citizenship, ensuring that out-of-date data in the DMV files did not result in naturalized citizens being removed from the rolls. Coles Decl. ¶¶ 27–29. Only those persons registered to vote who had noncitizen documents on file with the DMV and also were confirmed as current noncitizens in a fresh SAVE search were transmitted to the local registrars for each jurisdiction to act upon. Koski Decl. ¶¶ 19, 22–23; Coles Decl. ¶ 24–25. ELECT's transmissions of individuals' information to the local registrars from this ad hoc process occurred in late August 2024. Coles Decl. ¶ 25. ELECT's individualized approach, which confirmed noncitizen status with a SAVE search within the previous 30 days, ensured that no naturalized citizens were removed from the voter rolls based on outdated DMV documents during the *ad hoc* process. Koski Decl. ¶¶ 19, 22; Coles Decl. ¶¶ 22–24; 30–31.

Virginia law requires "general registrars to delete . . . the name of any voter who . . . is known not to be a United States citizen by reason of" that person's self-declaration of noncitizen status or from information ELECT received from a SAVE verification. Va. Code Ann. § 24.2-404(A)(4); *see id.* §§ 24.2-427(C). Accordingly, the registrar manually reviews each potential match on an individual basis to confirm that the noncitizen and the registered voter identified in VERIS are the same person. Coles Decl. ¶ 7. The registrar has discretion in this process to correct any errors she spots. For instance, if after investigating the potential match, the registrar determines that the noncitizen and the registered voter identified in VERIS are different people, the registrar can reject the match. Bryant Decl. Ex. E at 12. The registrar can also refuse to initiate the removal process if she has information verifying citizenship that ELECT and the DMV did not possess. See Va. Code § 24.2-427(B) (registrar is to act based on information

"known by him"). The registrar can additionally note that further research is needed, which holds the potential match in the registrar's hopper pending further action. Bryant Decl. Ex. E at 12–13. If the registrar determines that the noncitizen and the registered voter are the same person, then the registrar will mail the individual a "Notice of Intent to Cancel" that individual's registration to vote. Va. Code Ann. § 24.2-427(C); Bryant Decl. Ex. F at 35.

This Notice of Intent to Cancel explains that ELECT "ha[d] received information that" the individual is "not a citizen of the United States" and that *if* this information "is correct," then the individual is "not eligible to register to vote." Bryant Decl. Ex. G at 1. The notice also instructs that if "the information is incorrect" and the individual is a citizen, the individual should complete an enclosed affirmation of citizenship and return it using a pre-addressed envelope that is enclosed with the notice. *Ibid.* The individual is not required to produce any documentation. Instead, an individual who is in fact a citizen need only complete and return by mail or in person the attestation form, which states: "Subject to penalty of law, I do hereby affirm that I am a citizen of the United States of America." *Id.* at 3. Virginia law allows the individual "to submit his sworn statement that he is a United States citizen within 14 days of the date that the notice was mailed." Va. Code Ann. § 24.2-427(C). The "general registrar shall cancel the registrations of such persons who do not respond." *Ibid*. By default, however, the VERIS system builds in a grace period and only cancels the registrations of individuals who do not confirm citizenship within 21 days. Bryant Decl. Ex. F at 36; Coles Decl. ¶¶ 10–11.

The local registrar then provides the individual a second opportunity to correct a mistake, sending a separate notice informing the individual of the cancellation of his registration. Bryant Decl. Ex. F at 36; Coles Decl. ¶ 12. This Notice of Cancellation explains that the general registrar has cancelled that individual's registration to vote for failing to respond with an affirmation of

citizenship, and it invites the individual to contact the registrar's office if the individual believes the removal "is incorrect." Bryant Decl. Ex. H. If, despite attesting to the DMV that he is not a citizen and then failing to respond to the registrar's notice, a removed individual is in fact a citizen, that person may simply re-register to vote. Coles Decl. ¶ 13. Before October 15, the person could reregister in the ordinary fashion. Coles Decl. ¶ 14. After October 15, he can same-day register while casting an early ballot or an in-person ballot on election day. Coles Decl. ¶ 14.; *see* Va. Code Ann. § 24.2-420.1. As with all voter registrations, the person must attest to his citizenship under penalty of perjury; there is no requirement to provide documentary proof of citizenship, nor is the prior removal from the rolls held against the individual in any way. Coles Decl. ¶ 15.

Executive Order 35, issued by Governor Youngkin on August 7, 2024, expressly recognized that the DMV and ELECT had been carrying out these statutory obligations since the Department of Justice granted preclearance during the Kaine Administration. Bryant Decl. Ex. I. Indeed, ELECT records demonstrate that it has consistently sent information about self-declared noncitizens who match VERIS records for registered voters to local registrars—including during the 90-day period before a primary or general election—since at least 2010. Coles Decl. ¶ 17.

Rather than establish new processes, Executive Order 35 required ELECT to certify to the Governor that it was following Virginia law. Bryant Decl. Ex. I at 2–4. DMV and ELECT also were instructed to increase the frequency of their communications under the procedures already in place. *Id.* at 4. DMV previously transmitted to ELECT a list of individuals who "indicated a noncitizen status" to the DMV on a "monthly" basis. Va. Code Ann. § 24.2-410.1(A). Executive Order 35 instructed the DMV to "expedite" this "interagency data sharing" by "generating a daily file of all non-citizens transactions." Bryant Decl. Ex. I at 4. Consistent with this directive, beginning with data for transactions occurring on August 19, 2024, the DMV began transmitting

data files to ELECT on a daily basis with information from the previous day's transactions. Coles Decl. ¶ 18. In addition, the DMV continued sending simplified monthly files of the same information. Coles Decl. ¶ 19.

Consistent with Virginia law and ELECT's longstanding practice of closing the standard voter registration process 21 days before an election, ELECT ceased transmitting information to local registrars regarding potential noncitizens on the voter rolls after October 14, 2024. *See* Va. Code Ann. § 24.2-416(A) (requiring registration records to "be closed during the 21 days before a primary or general election"); Coles Decl. ¶ 33. Back on September 4, 2024, Commissioner Beals testified to the Virginia House of Delegates Privileges and Elections Committee that only removals from the voter rolls based on death of the voter would be processed by ELECT after October 15. Virginia House of Delegates Privileges and Elections Committee Meeting, September 4, 2024 (Sept. 4 Comm. Meeting), at 3:10:46 pm (statement of Commissioner Beals), https://tinyurl.com/54fy6r5n. All other removals—including of noncitizens—would cease to be initiated by ELECT "after that deadline." *Id.*; *see* Va. Code Ann. § 24.2-427(b) ("The general registrar shall promptly cancel the registration of . . . all persons known by him to be deceased."). Thus, on October 16, 2024, ELECT issued guidance to registrars stating that "ELECT will not process any additional records to your hoppers until after the election, except for weekly death records as required by law." Bryant Decl. Ex. J at 1. Accordingly, ELECT is not currently forwarding to registrars any information regarding noncitizens on the voter rolls and will not resume doing so until after the November 2024 General Election.

Despite the closing of the rolls, eligible citizens may still register to vote—up to and including on Election Day—through same-day registration. *See* Sept. 4 Comm. Meeting, at 3:03:10 pm (statement of Commissioner Beals); Va. Code Ann. § 24.2-420.1. If there is any person

who was removed from the voter rolls pursuant to Virginia Code § 24.2-427(C) after failing to return the attestation of citizenship, but who is in fact an eligible citizen, then that person may attest to his citizenship by same-day registering in person at an early voting site or at the appropriate precinct on election day and can "immediately vote a provisional ballot." ELECT, *Same Day Voter Registration*, https://tinyurl.com/3t982f3t (last accessed Oct. 18, 2024); Bryant Decl. Ex. J at 1; Coles Decl. ¶¶ 13–14. The general registrar then researches the registrant's eligibility, and based on that research, the local electoral board determines whether the provisional ballot should be counted. Coles Decl. ¶¶ 34–35. In doing so, neither the general registrar nor the electoral board considers the registrant's prior removal from the rolls or prior self-declaration of noncitizenship—instead, the sole question is whether the registrant is an eligible voter in the precinct in which he cast the provisional ballot. Coles Decl. ¶¶ 36–37. If the electoral board determines that the registrant is qualified to vote, the ballot will be counted. *Same Day Voter Registration*, *supra*; Coles Decl. ¶ 38[2]

## II.    Procedural background

On October 7, 2024, the Virginia Coalition for Immigrant Rights, the League of Women Voters of Virginia, the League of Women Voters of Virginia Education Fund, and African Communities Together (collectively "Organizational Plaintiffs") filed a complaint challenging the legality of Virginia's longstanding noncitizen removal process used to ensure that only American

---

[2] Notably, ELECT's data from the 2023 General Election demonstrates that "98% or 18,088 of [provisional] ballots cast during the 2023 General Election were counted," and it is not even clear whether the two percent that did not count were disqualified for registration issues or other flaws in the ballot such as voting in the wrong place. ELECT, 2023 Annual Virginia Election Retrospective & Look Ahead at 25–26 (Mar. 6, 2024), https://tinyurl.com/229x8z8u. Again, a person's prior removal under Virginia Code § 24.2-427(C) would not be a reason for rejecting a provisional ballot, so long as the person attests on his voter registration under penalty of perjury that he is a citizen. Coles Decl. ¶ 13–16; 39.

citizens are registered and able to vote. *See* Amended Compl. ¶¶ 1–14 (ECF 23). The Organizational Plaintiffs allege that this individualized process for removing *self-declared* noncitizens from the voter rolls, as required by Virginia law to effectuate the Federal and State requirements limiting the right to vote to U.S. citizens, violates the NVRA by amounting to (1) "systematic voter list maintenance within 90 days preceding a federal election," (2) discrimination against naturalized citizens, and (3) a requirement that "voters . . . provide additional proof of U.S. citizenship" beyond that required in the NVRA Application or other publicly available applications to remain registered. Amended Compl. ¶¶ 14; see *id.* at 67–84.[3] They named as defendants Susan Beals, the Virginia Commissioner of Elections; members of the Virginia State Board of Elections including its chair, John O'Bannon, and members Rosalyn R. Dance, Georgia Alvis-Long, Donald W. Merricks, and Matthew Winstein; and Attorney General Jason Miyares. *Id.* ¶¶ 35–37. About a week after filing the complaint, on October 15, 2024, they moved for a preliminary injunction. Mem. in Supp. of Mot. for Prelim. Inj. (ECF 26-1); *see* Amended Compl. ¶¶ 14, prayer for relief at b.

The preliminary-injunction motion demands relief on only two of the four counts in the complaint. First, the Organizational Plaintiffs contend that Virginia's process for ensuring that only American citizens participate in elections violates the NVRA because it is a process that "systematically remov[es] voters from the rolls" during the NVRA's "90-day quiet period before the date of a general election." Amended Compl. ¶ 78 (quoting 52 U.S.C. § 20507(c)(2)(a)). Second, they claim that the process "identifies registered voters based on national origin and type of citizenship status" and consciously burdens naturalized citizens in contravention of the NVRA's

---

[3] The Organizational Plaintiffs also bring a claim that they are entitled to certain voting information under the NVRA *See* Amended Compl. ¶ 14.

requirement that voter list maintenance programs be "uniform" and "nondiscriminatory." *Id.* ¶¶ 81–84 (quoting 52 U.S.C. § 20507(b)(1)). For a remedy, the Organizational Plaintiffs ask this Court to order Defendants to immediately halt implementation of the noncitizen removal process, to affirmatively "place back on the rolls in active status" any person whose registration was previously cancelled as part of this process regardless of their citizenship status, and to undertake an assortment of burdensome public notice and other remedial measures days before a presidential election. Org. Pl. Proposed Injunction at 2 (ECF 26-25).

While this case was getting off the ground, the United States also sued the Commonwealth of Virginia, ELECT, and Susan Beals on October 11, 2024. Its complaint is narrower, alleging only that Virginia is violating the Quiet Period Provision by systematically removing noncitizens from the voter rolls within 90 days of an election. The two cases were consolidated, and the United States moved for a preliminary injunction on October 16, also requesting broad equitable relief on the eve of an election. The motions for preliminary injunctions have been scheduled for a hearing on Thursday, October 24, more than a month after the start of early voting.

## LEGAL STANDARD

Plaintiffs set forth the standard *Winter* four-factor test for granting a preliminary injunction. *See* U.S. Br. at 9-10; Org. Br. at 10 (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)). That test is daunting enough, and Plaintiffs cannot satisfy it. But it is not applicable here. The test for a preliminary injunction applicable here, in the context of an eleventh-hour challenge to a State's election procedures, is much stricter. To obtain the preliminary relief Plaintiffs seek, they must show that "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the

election without significant cost, confusion, or hardship." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in grant of applications for stay). As demonstrated below, they fall far short on every factor.

## ARGUMENT

Neither the Organizational Plaintiffs nor the United States are entitled to the preliminary injunctions they seek on the eve of the 2024 presidential election. No Plaintiff meets *any* of the *Merrill* factors, much less all four. As an initial matter, the Organizational Plaintiffs' case is doomed, twice, at the Court's doorstep, for they lack standing and their claims are barred by sovereign immunity. Even if federal jurisdiction existed over those claims, neither the Organizational Plaintiffs nor the United States could prevail on the merits because they fundamentally misread the scope of the NVRA and misunderstand the facts of this case. *See* pp. 22–35, *infra*. Additionally, no Plaintiff will suffer irreparable harm without a preliminary injunction, and in light of Plaintiffs' unconscionable delay in bringing these suits, the equities favor avoiding, and the *Purcell* doctrine precludes, federal intervention into an election that is already underway. *See* pp. 35–43, *infra*.

## I.     This Court Lacks Jurisdiction Over the Organizational Plaintiffs' Claims

### A.     The Organizational Plaintiffs Lack Article III Standing

None of the Organizational Plaintiffs may obtain injunctive relief because none has standing. "Standing is part and parcel of the constitutional mandate that the judicial power of the United States extend only to 'cases' and 'controversies.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting U.S. Const. art. III, § 2). To establish "the 'irreducible constitutional minimum' of standing," plaintiffs must show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Plaintiffs "bear the burden of . . . showing that the defendant's actual action has caused the substantial risk of harm," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013), and "[a]n injury . . . must result from the actions of the [defendant], not from the actions of a third party," *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013).

The same standing rules apply when membership organizations, such as the Organizational Plaintiffs, *see* Amended Compl. ¶ 12, attempt to invoke federal jurisdiction, *see Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012). An organization can establish Article III standing in two ways. It can show that at least one of its members has standing and that the organization can properly represent the member's interests ("associational standing"), or it can satisfy the traditional standing test itself ("organizational standing"). The Organizational Plaintiffs here establish neither.

The Organizational Plaintiffs lack associational standing. "An association has associational standing when at least one of its 'identified' members 'would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Outdoor Amusement Bus. Ass'n v. DHS*, 983 F.3d 671, 683 (4th Cir. 2020) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Thus, to establish associational standing, the Organizational Plaintiffs must specifically "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also, e.g.*, *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184–85 (4th Cir. 2013) (denying organizational standing when plaintiff "has failed to identify a single *specific member* injured by" the challenged action).

The Organizational Plaintiffs have not identified a single specific member who has allegedly been or will be harmed by Virginia's program to remove noncitizens from the voter rolls.

Without an injured member, there can be no plausible case for associational standing. The Organizational Plaintiffs attempt to generate associational standing by asserting that they have many members who are naturalized citizens, *see* Amended Compl. ¶¶ 29, 32, some of whom, Plaintiffs argue, could be erroneously removed from the voter rolls, s*ee*, *e.g.*, Ex. W ¶ 40 (declaration of Joan Porte) ("[T]he League's members include Virginians who are naturalized U.S. citizens who likely once received noncitizen identification numbers or identified themselves as noncitizens at the DMV."). This theory is not only based on pure speculation, but also simply a reprisal of the probabilistic-standing theory that the Supreme Court rejected in *Summers*. *See* 555 U.S. at 498. Even if there were a "statistical probability" that one of the organization's roughly 700,000 members would suffer an injury in fact, the Supreme Court still required the organization to "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id*.

The Organizational Plaintiffs are unable to identify a single member with standing because they are mistaken about how Virginia's voter-roll process actually works. ELECT has sent Notice of Intent to Cancel forms only to individuals (a) who have contemporaneously self-declared on a DMV form that they are *not* American citizens or (b) who have previously self-identified as noncitizens in documents on file with the DMV, and had their current noncitizen status confirmed by a new SAVE search. Koski Decl. ¶¶ 5, 12, 15, 18–19; Coles Decl. ¶¶ 4, 21, 24, 30–32. The process used by ELECT, in other words, is not causing naturalized citizens to be removed from the voter rolls as the Organizational Plaintiffs suggest. Nor, as the Organizational Plaintiffs allege, are people being removed from the voter rolls for "leaving pertinent citizenship documents blank when filling out DMV forms." Org. Pl. Br. at 18. When applicants leave citizenship questions on DMV forms blank or decline to answer, their information is not provided to ELECT. Koski Decl.

¶¶ 13–14.

The Organizational Plaintiffs likewise lack organizational standing. Organizations have standing "to sue on their own behalf for injuries they have sustained," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n. 19 (1982), but they still must satisfy the same standards for injury-in-fact, causation, and redressability that apply to individuals, *id.* at 378–379. Much like natural persons, "an organization may not establish standing simply based on" harm to its interests "or because of strong opposition to the government's conduct." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Likewise, "an organization . . . cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Ibid.*

The Complaint and accompanying declarations establish no more than abstract organizational interests and voluntary budgetary decisions based on those interests. The harm that the Organizational Plaintiffs repeatedly and commonly allege is that they were forced to "divert significant resources" away from voter-outreach and other community-building activities and "toward . . . attempting to mitigate the effects" of Virginia's removal of noncitizens from the voter rolls. Amended Compl. ¶ 21 (describing the changes made by the Virginia Coalition for Immigrant Rights); *id.* ¶ 26 (explaining that the League of Women Voters has expended resources to "rapidly understand the impact of E.O. 35 and its effect on Virginia voters"); *id.* ¶ 34 (asserting that African Communities Together diverted resources "by developing and producing new public education materials"). But the Fourth Circuit has long held that an organization's "own budgetary choices" concerning the allocation of funds, such as "educating members, responding to member inquiries, or undertaking litigation in response to legislation," are not enough to establish an injury in fact. *Lane*, 703 F.3d at 675; *see also Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 903 (6th Cir. 2024) (per curiam) (holding that "the decision to spend money to minimize the alleged harms" to

other parties caused by government action did not supply organizational standing). Likewise, the Supreme Court has recently reaffirmed that an organization cannot establish standing simply because it feels compelled "to inform the public" that the government's actions are allegedly harmful or illegal. *All. For Hippocratic Med.*, 602 U.S. at 395. Otherwise, every organization in the world could "spend its way into standing" to challenge every law that the organization opposed, and Article III's limitations on the power of the federal judiciary would be illusory. *Id.*; *see Lane*, 703 F.3d at 675.

Although the Organizational Plaintiffs fail to mention standing in their motion, their Complaint and declarations suggest that they intend to rely on *Havens Realty Corp.*, 455 U.S. at 368. But "*Havens* was an unusual case" that courts should not "extend . . . beyond its context," *All. For Hippocratic Med.*, 602 U.S. at 396, and it cannot rescue the Organizational Plaintiffs' deficient standing claims. The plaintiff in that case, a housing-counseling provider, sent employees commonly referred to as "testers" to determine whether a real estate company was falsely telling black renters that no units were available. *Havens Realty Corp.*, 455 U.S. at 366 & n.1, 368. The Supreme Court held that the plaintiff suffered an injury in fact because lies told to the plaintiff's employee testers "perceptibly impaired [the plaintiff's] ability to provide counseling and referral services." *Id.* at 379. As the Supreme Court explained, lies told to the plaintiff's employees "directly affected and interfered with [the plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *All. For Hippocratic Med.*, 602 U.S. at 395. *Havens* thus dealt with a unique type of business injury and does not stand for the proposition that the diversion of resources alone establishes organizational standing. Without an employee who suffered an injury that also harmed the Organizational Plaintiffs' "core business activities," they cannot establish standing under *Havens*. *Id.*

The Organizational Plaintiffs lack both organizational and associational standing, and thus this Court lacks jurisdiction to adjudicate their claims. Their motion for a preliminary injunction must therefore be denied.

### B.     Sovereign Immunity also Bars the Organizational Plaintiffs' Claims

Sovereign immunity also bars the Organizational Plaintiffs' claims. Sovereign immunity applies in full force to alleged past violations of law, even if an equitable remedy is sought. *See Edelman v. Jordan*, 415 U.S. 651, 666 (1974). The *Ex parte Young* exception to Defendants' constitutional immunity from suit can apply only to the extent that Plaintiffs seek "prospective, injunctive relief against . . . *ongoing* violations of federal law." *Bland v. Roberts*, 730 F.3d 368, 390 (4th Cir. 2013) (emphasis added); *see Ex parte Young*, 209 U.S. 123 (1908). Yet as Commissioner Beals publicly testified to the Virginia House of Delegates on September 4, 2024, the noncitizen removal program ended on October 15. *See* Beals Statement, *supra*, at 3:10:46 pm. As of that date ELECT officials, consistent with Virginia law, are no longer referring noncitizens to local registrars to begin the 21-day process of removing from local voter rolls those who fail to affirm their citizenship. *See* Va. Code Ann. § 24.2-416 (closing the registration process "during the 21 days before a primary or general election"). Defendants will not resume these referrals until after the election is over.

Thus, there is not an ongoing process to enjoin prospectively, and the only remaining conduct challenged by Plaintiffs—initiating the removal of self-declared noncitizens from the rolls for the upcoming election—"occurred entirely in the past." *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999). As a result, the preliminary injunctive relief that Plaintiffs request for that purported violation—an order that the Defendant ELECT officials take steps to return to the voter rolls persons removed through this process, along with individual notices, public announcements, and other associated measures—is all retrospective, not "prospective." *Bland*, 730 F.3d at 390. In

these circumstances, the *Ex parte Young* exception to sovereign immunity "does not apply." *DeBauche*, 191 F.3d at 505.

In any event, sovereign immunity necessarily bars the Organizational Plaintiffs' claims against the Attorney General, who has nothing to do with the challenged process. The *Ex parte Young* exception applies only to officials who bear a "special relation" to "the challenged statute" and who have "acted or threatened" to enforce the statute. *McBurney v. Cuccinelli*, 616 F.3d 393, 399, 402 (4th Cir. 2010) (quotation marks omitted). The Attorney General plays no role in the noncitizen removal process, which local registrars carry out based on directives from ELECT, prompted by information that ELECT receives from the DMV. The Attorney General thus has participated in no alleged violation of the NVRA, let alone an ongoing one. Plaintiffs recognize as much: their Prayer for Relief asks the Court to order "Defendants Beals and State Board of Election Members," not the Attorney General, "to instruct all Virgina county registrars" to undo removals effected through this process. Amended Compl. prayer for relief at d. The Attorney General does have the authority to prosecute people who vote illegally, *see* Va. Code Ann. § 24.2-104(A) (authority to enforce voting laws), but the legality of Virginia's criminal laws against noncitizen voting is not at issue here. The Court therefore lacks jurisdiction over Plaintiffs' claims against the Attorney General for this reason as well.

## II.    The United States and the Organizational Plaintiffs' Claims Under the NVRA Are Unlikely to Succeed

Neither the Organizational Plaintiffs nor the United States has shown a likelihood of success on their claims under the NVRA. As a threshold matter, the NVRA's Quiet Period Provision simply does not apply to the removal of noncitizens from the voter rolls, just as it does not apply to the removal of minors or fictitious persons. It only applies to the removal of *voters* who validly registered in the first place but who subsequently became ineligible, such as those

who have since been convicted of a felony or have changed their residence. Plaintiffs' Quiet Period claims also fail because Virginia's process for removing noncitizens is a highly individualized process to update voter rolls, not a "systematic" program. Far from the kind of bulk mailing and door-to-door canvassing that Congress contemplated as "systematic" programs, the Commonwealth's noncitizen removal process focuses narrowly on specific individuals who have declared themselves to be noncitizens and involves contacting each such individual—twice—to give the individual an opportunity to correct the record by affirming his citizenship. Finally, the Organizational Plaintiffs' "discrimination" claim, which the United States declined to bring, fails because the noncitizen removal process is facially neutral and does not discriminate against people based on national origin or naturalized citizenship.

### A.    Defendants Did Not Violate the NVRA's 'Quiet Period' Requirements

The United States and the Organizational Plaintiffs claim that Defendants violated the NVRA's Quiet Period Provision, which prohibits certain changes to the voter rolls within 90 days of an election. *See* 52 U.S.C. § 20507(c)(2). Their claims fail for at least two reasons.

### 1.    The NVRA Does Not Restrict Removing Noncitizens and Other Persons Whose Registration Was Invalid *Ab Initio*

The NVRA's Quiet Period Provision does not apply to the removal of persons who were never eligible to vote in the first place. When interpreting the NVRA, courts must start, as always, with the plain language of the text. *See Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 128 (4th Cir. 2023). To understand that language, courts look to the meaning of the words, informed by the context in which they are used, which "often provides invaluable clues to understanding the[ir] meaning." *United States v. Smith*, 919 F.3d 825, 837 (4th Cir. 2019).

The text of the NVRA's Quiet Period Provision requires States to "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the

purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). Like much of the NVRA, the Quiet Period Provision distinguishes between "eligible voters" and "ineligible voters." *Id*. A "voter" is a person who "votes or has the legal right to vote." *Voter*, Merriam-Webster, (https://www.merriam-webster.com/dictionary/voter) (last accessed Oct. 22, 2024). The adjectives "eligible" or "ineligible" then narrow the term "voters" to apply to two subsets of "voters." An "eligible voter" is a person who is "qualified to participate" in a given election. *Eligible*, *supra*, (https://www.merriam-webster.com/dictionary/eligible) (last accessed Oct. 22, 2024). On the other hand, an "ineligible voter" is a person who had "vote[d] or ha[d] the legal right to vote" but is "not qualified" in a given election. *Ineligible*, *supra*, (https://www.merriam-webster.com/dictionary/ineligible) (last accessed Oct. 22, 2024). For example, a voter could become ineligible because he has moved away, been convicted of a felony, or been declared mentally incapacitated. *See* 52 U.S.C. § 20507(a)(3)(B), (a)(4)(B). The key, then, is "voter."

The most natural reading of the Quiet Period Provision, therefore, is that it restricts programs with the "purpose" of "systematic[ally]" removing *voters*—those who "vote[d] or ha[d] the legal right to vote," but who are no longer "qualified" to vote. Indeed, the title of the subsection that houses the Quiet Period Provision is "*Voter* Removal Programs," which confirms that the provision concerns removing people who are or were bona fide voters and not persons who have never possessed the right to register to vote or cast a ballot. *Id.* § 20507(c)(2) (emphasis added); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Text*, 221 (2012) (explaining that titles are a permissive tool when interpreting a statute). The plain-text reading of the Quiet Period Provision therefore does not prohibit removing from the rolls persons who never could have validly registered in the first place because such persons were never "eligible

voters" or even "ineligible voters." 52 U.S.C. § 20507(c)(2)(A). They are not "voters" at all. Therefore, States are free to systematically remove noncitizens, minors, and fictitious persons within 90 days of an election without running afoul of the NVRA.[4]

The structure, purpose, and legislative history of the NVRA confirm what the plain text says: States may exclude noncitizens, minors, and fictitious persons from the voter rolls at any time. If this were not the case, then the blanket ban on removal of eligible voters in the NVRA's substantially similar General Removal Provision of the NVRA would necessarily prohibit states from *ever* removing noncitizens, minors, and fictitious persons. As the United States has conceded in the past, that interpretation simply cannot be correct. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1349 (N.D. Fla. 2012) (acknowledging the government's concession that states can "remov[e] an improperly registered noncitizen").

Because both provisions apply to the same grounds for removal (aside from change of residence), the Quiet Period Provision cannot logically be interpreted to apply to classes of persons who do not and cannot qualify as *voters*: noncitizens, minors, and fictitious persons. If it could apply to noncitizens, then the General Removal Provision would almost certainly be unconstitutional because it would prohibit States from *ever* removing noncitizens from its voter rolls. As the Supreme Court has emphatically explained, the "Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them," and forcing

---

[4] That the noun "voters" is modified by the adjective "ineligible" does not mean that it loses its basic definitional properties. Imagine that a cell-phone company is having a special deal for customers who have been with the company for at least five years. Aaron, who has been with the company for seven years, is an "eligible customer." Brian, who has been with the company for three years, is an "ineligible customer." Carl, who does not own a cell phone, is neither because he is not a customer at all. Both Brian and Carl are not "eligible" for the deal, but only Brian can be properly described as an "ineligible *customer*." Likewise, a noncitizen is "ineligible" to cast a ballot, but he is not an "ineligible voter" because he never entered the category of "voter" in the first place.

States to keep noncitizens on their voter rolls would cross the line into regulating "*who*" may vote in federal elections. *Arizona v. Intertribal Council of Ariz.*, 570 U.S. 1, 16 (2013). "Since the power to establish voting requirements is of little value without the power to enforce those requirements," it "would raise serious constitutional doubts if a federal statute precluded a state from" enforcing its voting requirements, such as citizenship. *Intertribal Council of Ariz.*, 570 U.S. at 17; *see also id.* at 28 (Thomas, J., dissenting) ("[T]he Voter Qualifications Clause gives States the authority not only to set qualifications but also the power to verify whether those qualifications are satisfied.").

Therefore, as a matter of traditional constitutional avoidance, the General Removal Provision's blanket prohibition on removing persons from the list of "eligible voters" must be intended to apply only to persons who were validly entered into the list in the first place. *See Florida*, 870 F. Supp. 2d at 1349. And because the Quiet Period Provision is part of the same Code section, uses the same term "list[] of eligible voters," and incorporates by reference three of the same exceptions to the General Removal Provision, it must be given the same meaning, reaching only individuals who at one time had the right to vote. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006); Scalia & Garner, *supra*, at 170; *see also Florida*, 870 F. Supp. 2d at 1349–50 (noting the "inescapable" conclusion that if the General Removal Provision "does not prohibit a state from removing an improperly registered noncitizen, then [the Quiet Period Provision] does not prohibit a state from systematically removing improperly registered noncitizens during the quiet period").[5]

---

[5] Further, although the Quiet Period Provision applies only in the three months preceding an election, the Constitution contains no clause that permits the federal government to place a time limit on a state's power to control who may vote as the election approaches. Indeed, that is the time the State most urgently needs to protect the ballot. Thus, the Quiet Period Provision should

No court has *ever* held that the General Removal Provision stops States from removing names from the voter rolls that were null on day one. And if the General Removal Provision cannot be read to apply to originally invalid registrations, then the textually adjacent Quiet Period Provision cannot either. *See Florida*, 870 F. Supp. 2d at 1349–50 (adopting this view); *see also Arcia v. Florida Sec. of State*, 746 F.3d 1273, 1286 (11th Cir. 2014) (Jordan, J., concurring), *vacated by Arcia v. Florida Sec. of State*, 772 F.3d 1335 (11th Cir. 2014); *Arcia v. Detzner*, 908 F. Supp. 2d 1276, 1284 (S.D. Fla. 2012). In the simplest of terms, the entire NVRA scheme is limited to the removal of once-valid registrations, and no part of it abrogates a State's authority to remove registrations that were void *ab initio*. Thus, while the statutory scheme is admittedly complicated, the takeaway is simple: States can systematically remove within 90 days of an election the same persons they can remove at any other time, except for those "registrants who become ineligible to vote based on a change in residence." *Arcia v. Detzner*, 908 F. Supp. 2d 1276, 1283 (S.D. Fla. 2012); *id.* § 20507(a)(3), (4), (c)(2).[6]

Statutory purpose, as enacted in the text of the NVRA itself, confirms that neither the General Removal Provision nor the Quiet Period Provision prohibit the removal at any time of inherently invalid registrations. The "Findings and Purposes" section of the statute declares that the goal of the NVRA is to "promote the exercise of" the "right of *citizens* of the United States to vote" and to "ensure that *accurate and current* voter registration rolls are maintained." 52 U.S.C. § 20501(a), (b) (emphases added). It is difficult to see how a statute that values "citizen[ship]" and "accura[cy]" would prohibit the removal at any time of noncitizens who cannot lawfully participate

---

not be interpreted to stop or inhibit States from removing noncitizens from the list of eligible voters, for if it is, it violates the Constitution. *See* U.S. Const. art I, § 2.

[6] States may also make "corrections" to their registration records within the 90-day timeframe. 52 U.S.C. § 20507(c)(2)(B)(ii).

in federal elections. *Id.* As the Sixth Circuit explained, the NVRA's constant references to "eligible voters" and the voting rights of "citizens" make clear that, "[i]n creating a list of justifications for removal, Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place." *Bell v. Marinko*, 367 F.3d 588, 591–92 (6th Cir. 2004).

Finally, the legislative history of the NVRA also indicates that the Quiet Period Provision applies only to the removal of originally valid registrations. The Senate Report described the Provision's goal as forcing "[a]ny program which the States undertake to verify addresses" to be "completed not later than 90 days before a primary or general election." *See* S. Rep. 103-6, at 18–19 (1993). The Report's concern was with systematic mailings and canvassing programs to address verification for previously eligible voters, not void registrations from noncitizens. Likewise, the House Report stated that the Quiet Period Provision simply "applies to the State outreach activity such as a mailing or a door to door canvas and requires that such activity be completed by the 90-day deadline." H.R. Rep. No. 103-9, at 16 (1993). Not only does the House Report's description only cover verification efforts for originally valid registrations through address verification, the Report goes out of its way to confirm that the NVRA "should not be interpreted in any way to supplant th[e] authority" of election officials "to make determinations as to [an] applicant's eligibility, such as citizenship, as are made under current law and practice." *Id.* at 8. Both reports make clear that the goal of the Quiet Period Provision, as reflected in the text, structure, and purpose of the NVRA, was to put a stop date on systematic programs to verify the continued residential eligibility of originally valid registrations, not to prohibit the removal of void, noncitizen registrations.

To be sure, courts have not uniformly interpreted the NVRA's Quiet Period Provision, and

some have held, erroneously, that the Provision bars removal of noncitizens from the rolls within the 90-day period. *See Arcia*, 772 F.3d at 1348 (majority adopting the view that the Quiet Period Provision covers the removal of noncitizens); *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1092–93 (N.D. Ariz. 2023) (same). But a majority of federal judges to address the scope of the NVRA have correctly concluded that "Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place." *Bell*, 367 F.3d at 591-92; *see Arcia*, 772 F.3d at 1348-49 (Suhrheinrich, J., dissenting) ("I would affirm the judgment of the district court for the reasons set forth in the district court's opinion, *see Arcia v. Detzner*, 908 F. Supp. 2d 1276 (S.D. Fla. 2012), as well as the reasoning of *United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012)").

None of the cases holding that the Quiet Period Provision prohibits the removal of noncitizens examined the plain meaning of the word "voter," and as previously demonstrated, noncitizens do not fall into that category. The NVRA, after all, "is premised on the assumption that citizenship" is necessary to register to vote. *Arcia*, 772 F.3d at 1344. Instead of engaging in a plain-text analysis, both the *Arcia* majority and the district court in *Mi Familia Vota* drew a negative inference from the existence of the three previously discussed exceptions to the Quiet Period Provision to conclude that no exception existed for noncitizens. *Id.* at 1345; *Mi Familia Vota*, 691 F. Supp. 3d. at 1093. This inference is unwarranted. Because noncitizens are not "voters" within the meaning of the Quiet Period Provision to begin with, there was no need for an exception allowing them to be removed, just as there is no exception for minors or fictitious persons. If anything, these courts should have drawn the opposite inference: If the NVRA creates mere procedural restrictions for the removal of persons who were at one point eligible to vote and are no longer, then it surely would not provide greater protection against removal of persons who were

*never* eligible to vote. Indeed, all three exceptions in the Quiet Period Provision allow for removal only of persons who would have been previously eligible to vote. Congress did not prohibit the removal of persons whose registrations were void *ab initio*; it left the issue to the States, where it previously resided.

### 2. Defendants' Removal of Noncitizens Was "Individualized" and Not "Systematic"

Even if this Court concludes that the NVRA's Quiet Period Provision applies to the removal of persons who were never eligible to vote, the Plaintiffs have still not shown a likelihood of success on their claim that Virginia is "purpose[fully]" conducting a "systematic" program to update its voter rolls. 52 U.S.C. § 20507(c)(2)(A).

The Quiet Period Provision prohibits States from operating any "program" whose "purpose" is to "systematic[ally]" remove voters from the rolls fewer than 90 days before the election. 52 U.S.C. § 20507(c)(2)(A). But the Quiet Period Provision allows removals during this 90-day period if the actions are performed on an individualized basis. *See* 52 U.S.C. § 20507(c)(2)(B); *see also Arcia*, 772 F.3d at 1348 ("[T]he 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90-day window."). This much is not in dispute. *See* Org. Pl. Br. at 16-17 (agreeing with *Arcia* on this point); *See* U.S. Br. at 14 (same).

Virginia's method for determining whether a person is a citizen clearly falls on the "individualized" side of the line. *Arcia*, 772 F.3d at 1348. As the declarations from Ashley Coles and Steve Koski set out in detail, DMV forwards the names of individual self-declared noncitizens to ELECT, which in turn forwards those self-declared noncitizens who appear on voter rolls to local registrars to begin the removal process. Coles Decl. ¶¶ 3–8; Koski Decl. ¶¶ 5, 12–20. There is another step of individualized review when the local registrar mails the Notice of Intent to Cancel

to each self-declared noncitizen, at which point he has an opportunity to correct any mistake in ELECT's records by mailing back within 14 days a pre-printed form affirming his citizenship. As the Supreme Court has noted with respect to this very type of procedure, "a reasonable person with an interest in voting is not likely to ignore notice of this sort," and thus can be expected to "take the simple and easy step of mailing back the pre-addressed" card. *Husted v. A. Phillip Randolph Institute*, 584 U.S. 756, 779 (2018). And if he does not return the pre-printed affirmation of citizenship, he is sent a Notice of Cancellation that invites him *a second time* to contact the local registrar to correct any mistake concerning his citizenship.

The process thus begins with a personal attestation of noncitizenship and ends in the removal of that person from the voter rolls only when he is sent two individualized letters offering opportunities for an individual corrective response. This is the very definition of an individualized process.

It is true that ELECT conducted a one-time *ad hoc* examination of certain individuals with recent DMV transactions who had legal presence documents indicating noncitizenship on file in DMV, coupled with a *fresh* search of the SAVE database. Coles Decl. ¶¶ 22–24, 29–31; Koski Decl. ¶¶ 21–22. But the *ad hoc* search—which was separate from the individualized process of removing self-declared noncitizens—was not "systematic," either. Simply having a residency document on file with the DMV that indicated noncitizenship was not enough for a person to have his name forwarded to the local registrar based on the one-time DMV search. Coles Decl. ¶¶ 23–24, 29–30; Koski Decl. ¶¶ 13–14, 19. Confirmation of noncitizen status through a new SAVE search was also required before ELECT sent a person's name to the registrar. Coles Decl. ¶ 24. Moreover, this process was a discrete exercise to ensure that noncitizens had not registered to vote, and ELECT completed it in late August 2024. Coles Decl. ¶ 25. It is not currently ongoing, and

ELECT has not sent any names to the general registrars over the last six weeks because of residency documents in the DMV's possession or a SAVE search. Coles Decl. ¶ 25; 33.

The programs in the cases cited by the United States and the Organizational Plaintiffs are far afield from Virginia's tailored inquiry into citizenship. For example, in *Aricia*, "the Secretary used a mass computerized data-matching process to compare the voter rolls with other state and federal databases, followed by the mailing of notices." 772 F.3d 1335, 1344 (11th. Cir. 2017). The process lacked contemporaneous, individualized information from each potential noncitizen, so it fell on the "systematic" side of the line. *Id.* In *Mi Familia Vota*, the defendants conceded that their program was systematic, and it was again unlike Virginia's process because it only required "reason to believe" that a person was not a citizen, not documentary evidence like Virginia requires. *See* 691 F. Supp. 3d. at 1087–92.

The legislative history of the NVRA further demonstrates that Virginia has not crossed the "systematic" line here, for it makes clear what Congress meant by the term "systematic." The Senate report explains: "Almost all states now employ some procedure for updating lists at least once every two years. . . . About one-fifth of the states canvass all voters on the list. The rest of the states do not contact all voters, but instead target only those who did not vote in the most recent election . . . . Whether states canvass all those on the list or just the non-voters, most send a notice to assess whether the person has moved." S. Rep. No. 103-6, at 46. The House Report likewise gives examples of prohibited activity such as a "mailing[7] or a door to door canvas" to verify addresses. H.R. Rep. No. 103-9, at 30. Both mailings and door-to-door canvasses involve mass communication that is not targeted at any one individual based on personalized data, such as an

---

[7] A "mailing" is not the sending of any piece of mail but "mail sent at one time to multiple addressees by a sender (as for promotional purposes)." *Mailing*, Merriam-Webster, https://www.merriam-webster.com/dictionary/mailing (last visited Oct. 22, 2024).

individual's recent attestation to the DMV that he is not a citizen.

### B.   Defendants' Process for Removing Noncitizens Is Nondiscriminatory

The Organizational Plaintiffs (but not the United States) also allege that Virginia's process for removing noncitizens does not qualify as "nondiscriminatory"[8] under the NVRA. 52 U.S.C. § 20507(b)(1). The Organizational Plaintiffs' theory is that the challenged actions violate the NVRA "by impermissibly classifying based on a registrant's national origin and placing discriminatory burdens on naturalized citizens." Org. Pl. Br. at 20. This theory is fatally flawed in multiple respects.

First, the Defendants are not classifying *anyone* based on that person's national origin or status as a naturalized citizen. A person is subject to the noncitizen removal process only when that person states contemporaneously on a DMV form that he is not an American citizen, or when his DMV documentation, confirmed by a fresh SAVE search, indicates a lack of citizenship. Coles Decl. ¶¶ 4–8, 22–25. Again, in either case ELECT sends the individual a form asking him to "take the simple and easy step," *Husted,* 584 U.S. at 779, of returning the preprinted affirmation of his citizenship to remain on the voter rolls.

Nothing in this process selects individuals on the basis of naturalized citizenship or national origin. If a natural-born citizen erroneously answers "no" to the citizenship question on a DMV form, he is treated exactly the same as a naturalized citizen who erroneously checks the "no" box. Both will receive a letter in the mail asking them to clarify their citizenship and will remain on the rolls if they respond to the letter confirming their citizenship status. Persons who were identified in the *ad hoc* program, those who had provided the DMV with documentation indicating

---

[8] Although their complaint alleges that the program is not "uniform," the preliminary injunction motion does not argue that the program fails the uniformity requirement, so this memorandum only focuses on the "nondiscrimination" requirement.

noncitizenship and for whom a fresh SAVE search confirmed ineligibility, were also subject to the same individualized process. Coles Decl. ¶ 23. Notably, because SAVE distinguishes naturalized citizens from noncitizens, naturalized citizens who were reviewed in this *ad hoc* process will not have received a Notice of Intent to Cancel. Coles Decl. ¶ 24.

Virginia's noncitizen removal process is thus facially "nondiscriminatory." What the Organizational Plaintiffs are really complaining about is an alleged disparate impact on naturalized citizens. But the NVRA requires discriminatory intent, not disparate impact alone, as the Supreme Court recently made clear in *Husted*. A majority of Justices rejected Justice Sotomayor's argument in dissent that Ohio's process for removing nonresidents from its voter rolls failed the NVRA's "nondiscriminatory" requirement because it "disproportionately burden[ed]" minorities and other disadvantaged communities. 584 U.S. at 806–10. The majority succinctly responded that there was no "evidence in the record that Ohio instituted or has carried out its program with discriminatory intent." *Id.* at 779.

The *Husted* Court's interpretation of the term "nondiscriminatory" follows a long line of precedent in the context of election law interpreting the term to mean "without discriminatory intent." Only a year before Congress enacted the NVRA, the Supreme Court determined the constitutionality of a statute that prohibited "write-in" votes. *See Burdick v. Takushi*, 504 U.S. 428, 430 (1992). There was no question that the statute had a disparate impact on certain groups, yet the Supreme Court applied the doctrinal test for politically "nondiscriminatory" regulations because the statute made no classifications on its face and was not enacted with discriminatory intent. *Id.*; *see also Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (equating "nondiscriminatory" with "generally applicable" in the election-law context). The Court has continued to use the term "nondiscriminatory" to reference intentional discrimination since then.

For example, in *Crawford v. Marion County Election Board*, 553 U.S. 181, 196-97, 206 (2008), both Justice Stevens's plurality and Justice Scalia's concurrence described Indiana's voter-ID law as "nondiscriminatory" because it was facially neutral, despite its disparate impact on those who were less likely to possess identification.

To be sure, these cases did not concern alleged discrimination on the basis of national origin, but the fact remains that the term "nondiscriminatory" has been consistently used in the election-law context to refer to policies that do not discriminate intentionally. Thus, when the Supreme Court opined in *Husted* that intentional discrimination was required in a challenge to NVRA's residential removal provisions, it was not merely interpreting the isolated term "nondiscriminatory" in the NVRA; it was drawing on the decades of practice that informed Congress' own usage of the term.

Finally, Plaintiffs present no evidence that Virginia's noncitizen removal program has a disparate impact in any event. There is no evidence that naturalized citizens are unusually likely to check a box misidentifying themselves as noncitizens. Additionally, the *ad hoc* program's utilization of DHS's SAVE database ensures that noncitizens are not at a disadvantage because of now-superseded documents on file with the DMV. Coles Decl. ¶¶ 23–24. Only those confirmed not to be citizens within the past 30 days are sent to the general registrars. The Organizational Plaintiffs cannot show that the SAVE process has a disparate impact because they simply misunderstand the process.

Absent any discrimination against naturalized citizens on the face of Va. Code Ann. § 24.2-427(C) or Executive Order 35, and without even an allegation of intentional discrimination, this claim must fail.

III.   **The United States and the Organizational Plaintiffs Cannot Satisfy the Remaining *Winter* and *Merrill* Factors for a Preliminary Injunction.**

A.   **Plaintiffs Will Not Be Irreparably Harmed**

Plaintiffs must show that "they are likely to suffer irreparable harm without an injunction." *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 302 (4th Cir. 2020). To that end, it is not sufficient that they show "just a 'possibility' of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 22). Indeed, the "possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

The United States contends that "eligible U.S. citizens" will be irreparably harmed because they "risk disenfranchisement." United States Motion at 17. But Virginia is not prohibiting a single eligible citizen from voting in the 2024 election. Any bona fide citizen who shows up to vote, even on election day itself, may still fill out a simple voter-registration form and vote that very day. *See* Va. Code Ann. § 24.2-420.1. Indeed, ELECT records indicate that same-day registration is an extremely effective way to vote, with nearly 100% of provisional ballots being counted. *See* footnote 2, *supra*. Casting a provisional ballot thus cannot be considered a "denial[] of a voter's 'right to participate in elections on an equal basis.'" United States Motion at 19. To the contrary, as Justice Stevens has explained, the ability "to cast a provisional ballot provides an adequate remedy for problem[s]" a person may encounter in the voting process. *Crawford v. Marion County Elec. Bd.*, 553 U.S. 181, 197-98 (2008) (opinion of Stevens, J.). Thus there is no irreparable harm to any citizen. *Cf. Wise v. Circosta*, 978 F.3d 93, 100, 103 (4th Cir. 2020) (en banc) (holding that there is no irreparable harm from a voting regulation that "does not in any way infringe upon a single person's right to vote: all eligible voters who wish to vote may do so on or before Election

Day"). In this case then, any potential harm is mitigated, if not eliminated, by same-day registration and voting, and there is no need for the extraordinary relief of an injunction.[9]

If anything, irreparable harm will occur to eligible voters in Virginia if this Court enters either of the proposed injunctions. Every illegal vote cancels out a valid vote. Both the United States and the Organizational Plaintiffs ask the Court to re-enroll self-identified noncitizens without any way to verify their citizenship. *See* Org. Pl. Proposed Order at 2 (ECF 26-25); U.S. Proposed Order ¶ 4 (ECF 9-24). In short, putting noncitizens back on the rolls and allowing them to vote dilutes the votes of actual citizens in an irreparable way. As this Circuit has explained, "there can be no do-over and no redress" for this injury to legal voters "once the election occurs." *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). The requested injunctive relief could also irreparably harm noncitizens who are re-enrolled, by confusing them into believing that they may vote, when doing so is actually a crime. *See* p. 5, *supra*.

Irreparable harm is also lacking for the Organizational Plaintiffs for largely the same reasons that they fail to show any concrete harm at all. Again, these plaintiffs have not identified a single member who is an eligible voter but is threatened with being unable to vote in the upcoming election; their alleged organizational injury is a voluntary redirecting of funds from

---

[9] Perhaps realizing that same-day registration is a perfectly valid way to cast a vote, the United States speculates that a citizen could have accidentally checked the wrong box at the DMV, missed both of the notices mailed to his house, and then remembered that he wants to vote absentee within 21 days of the election but cannot obtain a ballot because he is not registered, and is unavailable to head to the polling place in the three weeks that Virginia allows same-day in-person registration. United States Motion at 18-19. There is no evidence that this hypothetical scenario will happen to a single person, much less an identifiable one. It is black-letter law that "irreparable injury" must be "likely in the absence of an injunction," and speculative injuries do not count. *Winter*, 555 U.S. at 22. Fanciful hypotheticals are not "likely." *Id.* Further, as discussed below, changing Virginia's absentee ballot deadline at this late date would be highly burdensome, likely to lead to errors and confusion, and contrary to *Purcell*. *See infra*, Section III.C.

certain organizational goals to other concerns. *See generally* Amended Compl. ¶¶ 19-34. Tellingly, the Organizational Plaintiffs hardly even argue that the alleged diversion of resources is sufficiently irreparable to obtain a preliminary injunction.

There is another reason that the diversion-of-resources theory makes granting an injunction particularly inequitable: The only remedy the Organizational Plaintiffs ask for here is the most drastic one in a federal judge's toolkit, a universal injunction. *See Green v. HM Orl-FL, LLC*, 601 U.S. __ (statement of Kavanaugh, J.) (Slip op. at 1–3) (2023) (questioning the authority of district court to issue injunctions that prohibit enforcing the law against everyone). Universal injunctions are extremely disfavored, and the Organizational Plaintiffs should not be allowed to use the fact that they did not identify an injured member-voter to obtain one. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (concluding that only the actual persons suing are "the proper object of this District Court's remediation").

Finally, the process that Plaintiffs are suing to enjoin is not ongoing. As Commissioner Beals explained in her September 4 testimony, ELECT stopped sending self-identified noncitizens to local registrars on October 15, as it had planned all along. *See* Beals Statement, *supra*, at 3:10:46 pm. The reasons are two-fold. First, it typically takes a total of 21 days from the mailing of a Notice of Intent to Cancel until the person is actually removed from the registration. Coles Decl. ¶ 11. Therefore, notices sent by local registrars after October 15, 2024 would have no effect for the election. Second, the Virginia registration process is required by law to shut down 21 days before an election (aside from same-day registration). *See* Va. Code Ann. § 24.2-416. Because the challenged process has already concluded, Defendants are not engaged in any prospective conduct that a preliminary injunction could affect. *See* p. 21, *supra*. And the retrospective remedies they request are barred by both sovereign immunity, *ibid*, and the *Purcell* doctrine, see p. 39, *infra*.

The lack of ongoing conduct is especially relevant to the *ad hoc* process. ELECT not only stopped sending the names of people who failed a recent SAVE search in late August, but precisely because each person removed was verified as a noncitizen through a SAVE search, the only effect of an injunction would be to add noncitizens back to the voter rolls. None of these noncitizens can legally vote, so none of them has suffered an irreparable injury. With these facts in mind, enjoining the Defendants from continuing the process will not have real-world implications.

**B.    The Equities Favor the Defendants**

Nor can the Organizational Plaintiffs or the United States satisfy the last two *Winter* factors—the balance of equities and the public interest. The United States contends that these factors merge in its suit against the Defendants because it is presumed to be acting in the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). That may be the case in a lawsuit against a private party, but Virginia is also sovereign and has an equal claim to be acting in the public interest within its borders. *Cf. United Nuclear Corp. v. Cannon*, 696 F.2d 141, 144 (1st Cir. 1982) ("The state is charged with representing the public interest.").

Regardless of how the presumptions shake out, the balance of the equities and public interest favor the Defendants in these cases. Both the Organizational Plaintiffs and the United States delayed unconscionably in bringing their lawsuits. The law requiring Virginia to remove noncitizens from its voter rolls was signed by then-Governor Kaine, and precleared by the Justice Department, in 2006. Yet neither the Organizational Plaintiffs nor the United States challenged its operation in the many general elections since then. And they brought these suits two months into the three-month quiet period and just weeks before a presidential election.

Because of both groups' unjustified delay, this Court has been forced to resolve their motion for a preliminary injunction on an extremely short timetable with rushed briefing and discovery. "Equity aids the vigilant, not those who sleep on their rights" and then sprint for

emergency relief. *Lyons P'ship v. Morris Costumes Inc.*, 243 F.3d 789, 797 (4th Cir. 2001).

### C.    *Purcell* Does Not Allow an Injunction at This Point

Finally, an injunction under these circumstances would violate the *Purcell* doctrine, which counsels against judicially ordered changes to electoral processes on the eve of an election. *See Purcell v. Gonzales*, 549 U.S. 1 (2006) (per curiam). The Supreme "Court has repeatedly emphasized that federal courts ordinarily should not alter state election laws in the period close to an election." *DNC. v. Wisconsin State Legis.*, 141 S. Ct. 28, 30 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay). The rationale for the *Purcell* principle is straightforward: "When an election is close at hand, the rules of the road should be clear and settled . . . because running a statewide election is a complicated endeavor." *Id.* at 31. *Purcell* instructs courts to avoid "judicially created confusion," *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020) (per curiam), by declining to issue injunctions that would "alter state election laws in the period close to an election," *Moore v. Harper*, 142 S. Ct. 1089, 1089 (2022) (Kavanaugh, J., concurring in denial of application for stay).

As previously noted, *see* p. 15, *supra*, under *Purcell*, a federal court should enjoin state election officials close to an election only if the Plaintiffs satisfy four criteria that are stricter than the traditional *Winter* factors. They satisfy none of them.

First, the merits are not "entirely clearcut in favor of the plaintiffs," *Merrill*, 142 U.S. at 881 (opinion of Kavanaugh, J.), given that the majority of federal judges to confront the issue have concluded that the NVRA does not apply at all to void *ab initio* registrations. To the contrary, as demonstrated above, the merits are "in favor of" the Defendants.[10] Nor will Plaintiffs suffer

---

[10] From the Supreme Court's recent caselaw, it is clear that the "entirely clearcut" burden is a formidable one. For example, the Supreme Court granted a stay in *Merrill* on *Purcell* grounds but also granted certiorari and later affirmed the lower court. 142 S. Ct. at 879. The takeaway here is that *Purcell* does real work, even when a claim may be meritorious.

irreparable harm absent the requested injunction, for the reasons explained above: every single eligible citizen can cast a vote in Virginia, regardless of whether that person is on the rolls before election day.

The last two *Purcell* factors also cut against the Plaintiffs. Both the United States and the Organizational Plaintiffs could have brought their claims at the beginning of the 90-day quiet period, but both waited two months to initiate a lawsuit. Further, the Department of Justice precleared the noncitizen removal program in 2006, and records show removals of noncitizens during the so-called quiet period over at least the past 15 years. *See* Bryant Decl. Ex. A; Coles Decl. ¶ 17. Plaintiffs argue that the nature of the quiet period means that *Purcell* applies with less force, as the Quiet Period Provision only takes effect within 90 days of an election. But the time-limited nature of the quiet period is all the more reason for plaintiffs to file as soon as possible. And even if *Purcell* would not prohibit injunctions against ongoing conduct during the quiet period, there is no such ongoing conduct here. *See* p. 21, *supra*. The *Purcell* doctrine applies with full force to Plaintiffs' remaining requests for preliminary relief, which would require Virginia to alter its election laws significantly very shortly before the election. Among other things, the requested relief would require Virginia to make changes to its voter rolls after the state-law period for doing so has closed, see p. 12, *supra*, apparently require Virginia to provide absentee ballots past the state-law deadline for requesting such ballots, United States Proposed Injunction ¶ 5(c), and require ELECT to send widespread mailings and guidances not provided for by state law.

Such significant changes this late in the game will cause "significant cost, confusion, and hardship" on the Virginia election machinery. *Merrill*, 142 S. Ct. at 881 (opinion of Kavanaugh, J.). The Organizational Plaintiffs seek an injunction ordering Defendants to add back to the voter rolls every person removed for self-proclaiming noncitizenship or presenting legal presence

documents showing noncitizenship and failing a new SAVE search during the *ad hoc* process. *See* Org. Pl. Proposed Injunction at 2. Ordering such relief will inevitably require Virginia to place noncitizens on its voter rolls only two weeks before an election, thus diluting the votes of eligible citizens and potentially confusing noncitizens into thinking that they can vote, exposing them to criminal liability. They also seek a mandatory injunction instructing registrars to send out notices rescinding the prior notices that asked self-declared noncitizens to confirm citizenship. *Id.* Plaintiffs also want this Court to force the Defendants to send out additional mailings to potentially affected voters and "to issue guidance to county registrars in every local jurisdiction" concerning their ability to remove noncitizens. *Id.* As the Coles declaration explains, attempting to send such notices and to give last-minute guidance to general registrars will create confusion and make even-handed administration of the election much more difficult. Coles Decl. ¶¶ 44–46. And all of this would cause a massive influx of work in the registrars' offices and confusion among voters just days before a presidential election. Coles Decl. ¶¶ 44–46.

The injunction requested by the United States is narrower in some respects but still undeniably implicates *Purcell*. The United States asks for an injunction forcing the Defendants to place persons who indicated that they are not citizens back on the voter rolls without any means for verifying that they actually are citizens and removing them was a mistake, and it wants Virginia to conduct a last-minute mailing to these likely noncitizens. U.S. Proposed Order ¶ 4. It also requests an injunction that this mailing inform these persons that they "may cast a regular ballot through any other method, including requesting and voting an absentee ballot by mail." *Id.* ¶ 5(c). But the last day to request such an absentee ballot is October 25, leaving no time for any such person to do so without making highly burdensome last-minute changes to Virginia's election

process. Coles Decl. ¶ 42. This type of last-minute federal-court supervision of elections sows the chaos that *Purcell* is designed to avoid.

For just these kinds of reasons, the Fourth Circuit invoked *Purcell* in the last presidential election to deny an injunction of a state voting regulation when, as here, early voting was already underway. *Wise v. Circosta*, 978 F.3d 93, 98–99, 103 (4th Cir. 2020). And the other federal courts of appeals have similarly invoked *Purcell* to stay district-court injunctions of state election laws in the time leading up to an election. See, *e.g.*, *League of Women Voters of Fla., Inc. v. Florida Sec. of State*, 32 F.4th 1363, 1371 (11th Cir. 2022); *Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020); *Short v. Brown*, 893 F.3d 671, 680 (9th Cir. 2018). Just last week the Fifth Circuit invoked *Purcell* in granting a stay of an injunction issued against election officials. *See La Union de Pueblo Entro v. Abbott*, -- F.4th __, 2024 WL 4487493, at *3 (Oct. 16, 2024); *see also id.*, at *5 (Ramirez, J., concurring in the judgment).

In sum, "the balance of equities is influenced heavily by *Purcell* and tilts against federal court intervention at this late stage." *Wise*, 978 F.3d at 103.[11]

## CONCLUSION

For the foregoing reasons, this Court should deny the Motions for Preliminary Injunction.

---

[11] To the extent that the United States asserts that "local registrars cannot decline to cancel" the registration of someone sent to them is a reason to grant the injunction, it is mistaken. The Organizational Plaintiffs' own expert gives examples of registrars taking steps to ensure that the persons being sent a Notice of Intent to Cancel are actually noncitizens. *See* McDonald Declaration at 9; Va. Code § 24.2-427(B).

Dated: October 22, 2024

RESPECTFULLY SUBMITTED,

COMMONWEALTH OF VIRGINIA;
VIRGINIA STATE BOARD OF ELECTIONS;
SUSAN BEALS, in her official capacity as Virginia
Commissioner of Elections; JOHN O'BANNON,
in his official capacity as Chairman of the State
Board of Elections; ROSALYN R. DANCE, in her
official capacity as Vice-Chairman of the State
Board of Elections; GEORGIA ALVIS-LONG, in
her official capacity as Secretary of the State Board
of Elections; DONALD W. MERRICKS and
MATTHEW WEINSTEIN, in their official
capacities as members of the State Board of
Elections; and JASON MIYARES, in his official
capacity as Virginia Attorney General

By: ___*/s/ Charles J. Cooper*___

Charles J. Cooper (*Pro Hac Vice*)
Joseph O. Masterman (*Pro Hac Vice*)
Bradley L. Larson (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
cooper@cooperkirk.com

*Counsel for Defendants Susan Beals, John
O'Bannon, Rosalyn R. Dance, Georgia
Alvis-Long, Donald W. Merricks, Matthew
Weinstein, and Jason Miyares*

Jason S. Miyares
   *Attorney General*
Thomas J. Sanford (VSB #95965)
   *Deputy Attorney General*
Erika L. Maley (VSB #97533)
   *Solicitor General*
Graham K. Bryant (VSB #90592)
   *Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

**CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on October 22, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties of record.

    /s/ Charles J. Cooper
Charles J. Cooper (Pro Hac Vice)
 *Counsel for the Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| VIRGINIA COALITION FOR IMMIGRANT RIGHTS, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:24-cv-1778 |
| SUSAN BEALS, in her official capacity as Virginia Commissioner of Elections, *et al.*, | |
| *Defendants*. | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Case No. 1:24-cv-1807 |
| COMMONWEALTH OF VIRGINIA, *et al*., | |
| *Defendants*. | |

## <u>DECLARATION OF ASHLEY COLES</u>

I, Ashley Coles, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I currently serve as Senior Policy Analyst and Chief Records Officer at the Virginia Department of Elections (ELECT). I have served in this role since May 28, 2024. I began my employment at ELECT in the role of Policy Analyst on January 25, 2021.

2.      In my capacity as Senior Policy Analyst and Chief Records Officer at ELECT, I am familiar with ELECT's policies and practices, its relationships with both the Virginia Department of Motor Vehicles (DMV) and the local general registrars of each jurisdiction in Virginia, as well as the provisions of Virginia law governing Virginia's voter list.

**A-172**

3.      Pursuant to Virginia Code § 24.2-410.1, signed into law in 2006 by then-Governor Timothy Kaine, ELECT works with the DMV and general registrars to ensure that noncitizens are not registered to vote.

4.      ELECT receives from the DMV data listing information for all persons who declare that they are not citizens of the United States on DMV forms related to eligible transactions.

5.      The information that the DMV sends to ELECT for these persons contains extensive data fields for each individual that allow both ELECT and general registrars to accurately compare the individual to the list of registered voters. ELECT's records show that those data fields include, among other things, full name, full social security number, birth date, address, sex, DMV customer number, and transaction date.

6.      When ELECT receives this information from the DMV, it electronically compares the information for each self-declared noncitizen with voter information contained in ELECT's statewide voter registration system, the Virginia Election and Registration Information System (VERIS), to identify potential matches with registered voter records.

7.      In contrast to ELECT's electronic process for comparing the noncitizen information obtained from the DMV with VERIS records to identify potential matches, general registrars conduct a manual review of each potential match received from ELECT on an individual basis to confirm that the noncitizen and the registered voter identified in VERIS are the same person. If after reviewing the potential match, the registrar determines that the noncitizen and the registered voter identified in VERIS are different people, the registrar can reject the match.

8.      If the general registrar determines that the noncitizen and the registered voter are the same person, then the general registrar mails the individual a Notice of Intent to Cancel that individual's voter registration.

2

**A-173**

9.      A Notice of Intent to Cancel explains that the person recently indicated on a DMV form that he may not be a citizen and advises that if the information is incorrect, the person should sign an Affirmation of Citizenship form and return it within 14 days.

10.      The general registrar does not cancel the individual's registration to vote upon sending this Notice of Intent to Cancel. Instead, any individuals who receive a Notice of Intent to Cancel will only be removed from the voter rolls if they fail to respond to the registrar's request to correct an error in ELECT's information about their citizenship status within 14 days.

11.      By default, however, these cancellations are not effective in VERIS until 21 days have elapsed without receipt of the person's attestation of citizenship, thus allowing a seven-day grace period on top of the two weeks the individual has to respond.

12.      If a person does not respond and their voter registration is cancelled through VERIS, the registrar will send an additional notice advising that the person's registration has been cancelled. That notice again advises the person to contact the registrar if the removal was incorrect and provides a phone number to do so.

13.      If, despite attesting to the DMV that he is not a citizen and then failing to respond to the general registrar's notice, a removed individual is in fact a U.S. citizen, that person may re-register to vote using the same registration process as any other voter.

14.      If there is any person who was removed from the voter rolls pursuant to Virginia Code § 24.2 427(C) after failing to return the attestation of citizenship and who has not re-registered by the close of the ordinary registration period on October 15, but who is in fact an eligible citizen, then that person may same-day register in person at an early voting site during the early voting period or at the appropriate precinct on election day and may immediately vote a provisional ballot.

3

**A-174**

15.     As with all voter registrations, the person must attest to his citizenship under penalty of perjury.

16.     There is no requirement to provide documentary proof of citizenship, nor can the prior removal from the rolls due to noncitizenship be held against the individual in any way.

17.     ELECT records demonstrate that it has consistently sent information about noncitizens who match VERIS records for registered voters to local general registrars, including during the 90-day period before a primary or general election, since at least 2010.

18.     Pursuant to Executive Order 35, on August 19, 2024, ELECT began receiving from the DMV information from the previous day's transactions on a daily basis.

19.     In addition, the DMV continued sending de-duplicated monthly files of the same information.

20.     ELECT also receives information from the DMV, consistent with Virginia Code § 46.2-328.1(E), when a person who has declared that he is a citizen but has legal presence documentation on file with the DMV indicating that he is not. Legal presence documentation includes permanent resident cards, asylum status documents, employment authorization documents, and refugee travel documents.

21.     Such legal presence documentation may be outdated, unlike the contemporaneous information for people who declare noncitizenship on a DMV form relating to an eligible transaction. Accordingly, it is ELECT's general policy not to conduct any comparisons of these names with voter information contained in VERIS unless ELECT has received verification of an individual's current immigration status or naturalized or derived citizenship status through the Department of Homeland Security as provided under Virginia Code § 24.2-404(E) within the last

4

**A-175**

30 days before conducting a comparison. No actions are taken to remove these people from the voter rolls without said verification.

22.     Although the DMV information for individuals whose legal presence documentation on file indicates noncitizenship usually does not reach the general registrars, to comply with Virginia Code § 24.2-404(A)(4)(v) ELECT collaborated with the DMV on a one-time, *ad hoc* basis to analyze DMV transactions that occurred between July 1, 2023, and June 30, 2024, in which individuals indicated that they were U.S. citizens but their legal presence documentation on file with the DMV indicated noncitizen status.

23.     To individually verify citizenship during this search, the DMV determined each person's current citizenship status through the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) database, which can determine whether a noncitizen has been naturalized.

24.     Only persons who had a SAVE verification confirming noncitizen status within the preceding 30 days had their information passed along to the registrars in the *ad hoc* process.

25.     ELECT ultimately identified 1,274 potential matches between individuals identified as noncitizens in the SAVE database and registered voter records in VERIS, which ELECT then transmitted to general registrars on August 28, 2024, for each jurisdiction to act upon, as detailed above.

26.     Conducting a SAVE verification involves an electronic query inputting an individual's full name, date of birth, and document number that indicates legal presence into the SAVE database.

27.     SAVE electronically verifies immigration status or naturalized or derived citizenship and provides a verification response with the applicant's current immigration status or naturalized or derived United States citizenship information.

28.     The SAVE verification results will either confirm that the person is a citizen, confirm that the person is not a citizen, or state that additional verification is required.

29.     ELECT only sent information to general registrars on individuals with a verification status that affirmatively showed the person is a noncitizen in this *ad hoc* process.

30.     ELECT did not take any action, or send any individual's name or information to general registrars, based on information from the DMV pertaining to any individual's legal presence documentation unless the individual's current legal citizenship status had been verified within the last 30 days through the SAVE database.

31.     ELECT's individualized approach to SAVE verification means that no person is removed from voter rolls based solely on potentially outdated legal presence records on file with the DMV.

32.     Just as with individuals that self-declare noncitizenship, any individuals identified through SAVE verification are provided a Notice of Intent to Cancel and by default afforded a total of 21 days—the standard 14 days plus the 7-day grace period before the cancellation becomes effective in VERIS—to submit an Affirmation of Citizenship form to the general registrar. These individuals are also provided with the additional cancellation notice if they fail to respond to the Notice of Intent to Cancel.

33.     ELECT ceased transmitting any information to general registrars regarding potential noncitizens on the voter rolls after October 14, 2024, the day before the statutory deadline to register to vote in the ordinary course.

**A-177**

34.     When a same-day registrant votes a provisional ballot, the general registrar researches the individual's eligibility to register and to vote in their jurisdiction.

35.     Based on that research, the local electoral board determines whether the provisional ballot should be counted.

36.     In determining whether to count such a provisional ballot, neither the general registrar nor the electoral board considers the registrant's prior removal from the rolls due to noncitizenship.

37.     The general registrar and the electoral board consider only whether the registrant is an eligible voter in the precinct in which he cast the provisional ballot.

38.     If the electoral board determines that the registrant is qualified to vote, the ballot will be counted.

39.     A person's prior removal under Virginia Code § 24.2 427(C), or prior declaration or submission of documents to DMV of noncitizen status, is not a reason to reject a provisional ballot, so long as the person attests on the voter registration form under penalty of perjury that the person is a citizen.

40.     The period immediately preceding a general election is critical, with ELECT working at full capacity in conjunction with general registrars to ensure that the election is carried out fairly and accurately. To enable an orderly general election, ELECT imposes deadlines on the registration and voting process in the days leading up to the general election.

41.     For the November 2024 General Election, those deadlines include the last day to register to vote or update an existing registration on October 15, 2024. By law, see Virginia Code § 24.2-416(A), the registration records are closed 21 days before an election, and ELECT ceases

to transmit voter citizenship information, or any other basis for voter removal other than death, to general registrars at this time.

42. The last day to apply to receive an absentee ballot by mail is on October 25, 2024.

43. Likewise, the period immediately following the general election includes a carefully choreographed series of deadlines to ensure rapid, accurate counting of votes prior to the State Board of Election's certification of the November 2024 General Election results on December 2, 2024. Among these deadlines are the November 8, 2024, deadline for absentee ballots properly returned by mail to be received by general registrars for counting, and ELECT's internal deadline of November 27, 2024, to verify the November 2024 General Election results.

44. Given these deadlines and the importance of clarity in counting votes and ultimately certifying the election results, along with my understanding of ELECT's resources and obligations regarding the November 2024 General Election, I believe that new court-ordered changes to those deadlines or impositions of the new requirements requested by the Plaintiffs in this case may substantially burden ELECT at a time when its limited resources are already wholly allocated to meet existing requirements and deadlines. For instance, a requirement to develop and distribute new guidance to local general registrars on short notice may work a substantial hardship on ELECT, which would have to reallocate already stretched resources to create that guidance and would create a significant risk of confusion and miscommunication at the general registrar level.

45. Similarly, a requirement to alter the voter rolls by reinstating voter registrations outside the same-day registration process, which is already available to all eligible voters who are not currently registered to vote, after the October 15, 2024, deadline for changes to the voting rolls would require substantial ELECT resources that would have to be reallocated from existing election-critical assignments while also increasing the risk that ineligible voters are erroneously

added to the voter list. In addition, a requirement that reinstated individuals be able to request absentee ballots by mail after the October 25, 2024 deadline for requesting them has passed would work a substantial hardship on the local general registrars who send ballots.

46.     Finally, a requirement to send a new mailing to a subset of Virginia residents providing new guidance about their ability to participate in the November 2024 General Election—and to share the information included in this mailing through a public website and the press—would substantially burden ELECT by requiring reallocation of resources to develop the mailing and public statements while creating a marked risk of voter confusion when the general election is imminent.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on October 22, 2024

Ashley Coles
Senior Policy Analyst and Chief Records Officer
Virginia Department of Elections

9

**A-180**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| VIRGINIA COALITION FOR IMMIGRANT RIGHTS, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>SUSAN BEALS, in her official capacity as Virginia Commissioner of Elections, *et al.*,<br><br>    *Defendants*. | Case No. 1:24-cv-1778 |
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff*,<br><br>v.<br><br>COMMONWEALTH OF VIRGINIA, *et al.*,<br><br>    *Defendants*. | Case No. 1:24-cv-1807 |

<u>**DECLARATION OF STEVEN L. KOSKI**</u>

I, Steven L. Koski, pursuant to 28 U.S.C. § 1746, declare as follows:

1.　　I currently serve as Legal and Compliance Advisor at the Virginia Department of Elections (ELECT). I have served in this role since June 10, 2024. I began my employment at ELECT in the role of Policy Analyst on June 10, 2022.

2.　　In my capacity as Legal and Compliance Advisor at ELECT, I am familiar with ELECT's policies and practices, its relationship with the Virginia Department of Motor Vehicles (DMV), and the provisions of Virginia law governing Virginia's voter list.

3.　　The National Voter Registration Act requires every state motor vehicle authority to have in place procedures such that a person applying for a motor vehicle driver's license can

A-181

simultaneously register to vote in the same transaction. This process is known as "motor voter," and when conducted online or via electronic terminal in-person at a DMV customer service center, it is known as "electronic motor voter" (EMV).

4.     In 2006, the Virginia legislature passed, then-Governor Timothy Kaine signed, and the Department of Justice precleared, amendments to the Virginia Code that streamlined implementation of the National Voter Registration Act.

5.     The DMV asks all persons who apply for any document, or a renewal of a document, issued pursuant to the provisions of Chapter 3 of Title 46.2 of the Code of Virginia—except for applicants for identification privilege cards or driver privilege cards—to attest whether they are citizens of the United States. The DMV also provides the option to decline to answer and to decline to have this information transmitted to ELECT for voter registration purposes. Individuals applying for identification privilege cards or driver privilege cards must attest that they are not citizens of the United States as part of the application for those credentials.

6.     The DMV asks the citizenship question when issuing, renewing, replacing, or changing the address associated with a driver's license or identification card.

7.     All individuals conducting a motor voter-eligible transaction, whether in-person at a customer service center or online on the DMV website, are presented with the citizenship question and given the option to decline to answer.

8.     Individuals who respond to the citizenship question by indicating that they are citizens also receive a warning that intentionally making a materially false statement during the transaction constitutes election fraud and is punishable under Virginia law as a felony.

9.     Unless a person engaging in one of these eligible transactions affirmatively declines, everyone conducting such a transaction is also presented with a voter registration application.

10.     Because one must be a citizen to vote, the voter registration application asks about citizenship.

11.     If a person inputs that he is not a citizen, a second screen appears stating that noncitizens cannot vote and asking the person to confirm that he is not a citizen.

12.     Virginia law requires the DMV to "furnish monthly to the Department of Elections a complete list of all persons who have indicated a noncitizen status" during an eligible motor voter transaction. Va. Code § 24.2-410.1(A).

13.     This list does not include individuals who decline to respond to the citizenship question or leave it blank.

14.     Rather, the list includes only people who have affirmatively indicated that they are not U.S. citizens.

15.     The DMV also transmits to ELECT information about individuals who apply for a driver privilege card or an identification privilege card because as part of the application for those credentials, the applicant must attest that he is not a citizen of the United States.

16.     In addition, the DMV obtains information about individuals' legal presence status when they submit documentation of their residency when applying for certain credentials, such as learner's permits or driver's licenses.

17.     Some documentation of residency will indicate that the individual is not a citizen, such as documentation of lawful permanent residence, asylum status, or a resident alien card.

**A-183**

18.     The DMV also transmits to ELECT information about individuals who engage in an eligible transaction and affirm that they are citizens but whose documentation on file with the DMV indicates that they are not citizens.

19.     The DMV does not require new legal presence documentation for many transactions subsequent to the initial driver's license/identification card transaction, although DMV still provides to ELECT information concerning individuals who conduct these transactions and previously provided a document indicating noncitizen status. Therefore, individuals on this list may have become citizens since first providing that documentation to the DMV and initially having it verified through the Department of Homeland Security Systematic Alien Verification for Entitlements (SAVE) database. Recognizing this possibility, ELECT does not take any action based on legal presence information the DMV has on file that is inconsistent with an attestation of citizenship unless the individuals' current legal status has been recently—within 30 days or fewer before any action—verified through the SAVE database.

20.     Based upon ELECT's records, the list DMV provides to ELECT includes data fields for the full name, social security number, birth date, address, sex, DMV customer number, EMV transaction timestamp, DMV legal presence code, full response sent to DMV by SAVE, verification/case number returned from the SAVE database for that individual, and types of documents used to prove legal presence.

21.     ELECT collaborated with the DMV to analyze DMV transactions that occurred between July 1, 2023, and June 30, 2024, in which individuals indicated that they were U.S. citizens but had documentation on file with the DMV indicating noncitizen status.

22.     The DMV conducted new SAVE verifications to obtain the most recent citizenship information for those individuals.

**A-184**

23.    ELECT ultimately identified 1,274 potential matches between individuals identified in this analysis and registered voter records, which ELECT then provided to the local general registrar for each potentially matched individual's jurisdiction.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on October 22, 2024

Steven L. Koski
Legal and Compliance Advisor
Virginia Department of Elections

5

**A-185**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| VIRGINIA COALITION FOR IMMIGRANT RIGHTS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> SUSAN BEALS, in her official capacity as Virginia Commissioner of Elections, *et al.*, <br><br> *Defendants*. | Case No. 1:24-cv-1778 |
| UNITED STATES OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> COMMONWEALTH OF VIRGINIA, *et al.*, <br><br> *Defendants*. | Case No. 1:24-cv-1807 |

## <u>DECLARATION OF GRAHAM K. BRYANT</u>

I, Graham K. Bryant, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am Deputy Solicitor General in the Office of the Virginia Attorney General. I am a member in good standing of the Virginia bar. I am admitted to practice in this Court.

2.     I make this declaration based upon my personal knowledge, including facts ascertained through consultation with executive personnel in the Virginia Department of Elections (ELECT) and the Virginia Department of Motor Vehicles (DMV) who have assisted me in gathering this information and these materials. I make this declaration in support of Defendants' opposition to the Plaintiffs' motions for preliminary injunctions.

3.      Attached as Exhibit A is a true and correct copy of the December 14, 2006 letter from John Tanner, then chief of the Voting Section of the Civil Rights Division of the United States Department of Justice, regarding preclearance of 2006 Va. Acts. ch. 926 under Section 5 of the Voting Rights Act.

4.      Attached as Exhibit B are true and correct copies of the DMV's current applications for a driver's license, learner's permit, identification card, and commercial driver's license; change of address form; and voter registration questionnaire.

5.      Attached as Exhibit C is a true and correct copy of the DMV's current application for a driver privilege card or an identification privilege card.

6.      Attached as Exhibit D is a document first depicting true and correct copies of the screens presented to DMV customers completing an electronic motor voter transaction online on the DMV's website, and then depicting true and correct text representations of the screens presented to DMV customers completing an electronic motor voter transaction in person using credit card terminals at DMV customer service centers.

7.      Attached as Exhibit E is a true and correct copy of ELECT's current Standard Operating Procedure, Voter Registration List Maintenance, Department of Motor Vehicles: Full SBE & Non-Citizen Files (revised Aug. 8, 2024), with minimal redactions to protect personal information of DMV employees and confidential information regarding DMV's internal computer systems.

8.      Attached as Exhibit F is a true and correct copy of ELECT's publication, Hopper Processing and Information (revised Oct. 5, 2023), containing redactions necessary to protect the confidentiality of ELECT's internal computer systems.

9.      Attached as Exhibit G is a true and correct copy of a Notice of Intent to Cancel and accompanying Affirmation of Citizenship form mailed by Fairfax County's general registrar on September 3, 2024, redacted to protect personal information.

10.     Attached as Exhibit H is a true and correct copy of a voter registration cancellation notice sent by Arlington County's general registrar, redacted to protect personal information.

11.     Attached as Exhibit I is Executive Order 35 issued by Governor Glenn Youngkin on August 7, 2024.

12.     Attached as Exhibit J is a true and correct copy of an official advisory that ELECT issued to the general registrars for each locality on October 16, 2024 with the subject "Updated List Maintenance Calendar and Close of Books—Start of Same Day Registration."

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on October 22, 2024 in Richmond, Virginia.

GRAHAM K. BRYANT (Va. Bar #90592)
*Deputy Solicitor General*



**U.S. Department of Justice**

Civil Rights Division

JKT:MSR:ER:jdh
DJ 166-012-3
2006-6674

*Voting Section - NWB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

RECEIVED
DEC 19 2006
COMMERCIAL & REAL LAW

December 14, 2006

J. Jasen Eige, Esq.
Senior Assistant Attorney General
900 East Main Street
Richmond, Virginia 23219

Dear Mr. Eige:

This refers to the Department of Motor Vehicles' procedures for implementing Chapter 926 (2006) for the State of Virginia, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your submission on October 30, 2006.

The Attorney General does not interpose any objection to the specified change. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change. Procedures for the Administration of Section 5 of the Voting Rights Act (28 C.F.R. 51.41).

Sincerely,

John Tanner
Chief, Voting Section

**A-189**

**Completion of this section is requested but not required to apply for a driver's license or ID Card. (Virginia Code §2.2-3806)**

## INFORMATION FOR THE DEPARTMENT OF ELECTIONS

| Mail In / DMV Connect Only - Are you a citizen of the United States of America? | Mail In / DMV Connect Only - Do you want to register to vote or change your voter registration address? |
|---|---|
| YES (INITIAL BOX)    NO (INITIAL BOX) | YES (INITIAL BOX)    NO (INITIAL BOX) |

## INFORMATION FOR THE VIRGINIA TRANSPLANT COUNCIL

☐ Yes, I would like to become an organ, eye and tissue donor.

**DMV**

Virginia Department of Motor Vehicles
Post Office Box 27412
Richmond, Virginia 23269-0001
www.dmv.virginia.gov

# DRIVER'S LICENSE AND IDENTIFICATION CARD APPLICATION

DL 1P  (07/01/2024)

LOG #

**Purpose:** Use this form to apply for a driver's license, learner's permit, or identification card.

**Instructions:** Submit completed application to any DMV Customer Center. Complete front and back of this application.

## APPLICATION TYPE

**REAL ID:** ID requirements for domestic air travel and access to secure federal facilities change May 7, 2025. A REAL ID meets these requirements.

**Would you like to apply for a REAL ID license/identification card?** *(Not applicable if applying for a Motorcycle Learner's Permit)*

☐ Yes - I would like to use my license/identification card as ID to board a domestic flight or enter a secure federal facility or military base on or after May 7, 2025. View the documents you'll need at dmvNOW.com/REALID or ask for a brochure.

☐ No - I acknowledge my license/identification card will display "Federal Limits Apply" and I will need another form of ID to board a domestic flight or enter a secure federal facility or military base on or after May 7, 2025.

| | | |
|---|---|---|
| ☐ Driver's License | ☐ Motorcycle Learner's Permit (classification not applicable) | ☐ Identification (ID) Card |
| ☐ Learner's Permit and Driver's License | ☐ Driver's License with School Bus Endorsement (to carry less than 16 passengers) | ☐ Hearing Impaired ID Card |
| ☐ Driver's License with Motorcycle (complete Motorcycle Classification section below) | ☐ Driver's License Testing for Foreign Diplomats | ☐ Emancipated Minor ID Card |
| ☐ Motorcycle Only License (complete Motorcycle Classification section below) | *Commercial Driver's License (CDL) applicants must complete the CDL Application (DL2P) | |

**Motorcycle Classification**

☐ Maintaining current Virginia Motorcycle Classification

☐ Add, Upgrade or Transfer Motorcycle Classification or obtain Motorcycle Only License. Additional testing may be required. Check applicable box below.

    ☐ M 2 (2 wheels)      ☐ M 3 (3 wheels)      ☐ M (both 2 and 3 wheels)

**Replacement License or Identification Card** (check one of the following): ☐ I am surrendering my current license or ID card.

I certify I cannot surrender my current license or ID card because it is: ☐ Lost ☐ Stolen ☐ Destroyed

## APPLICANT INFORMATION

NOTE: YOUR ADDRESS BELOW MUST BE CURRENT. THE U.S. POSTAL SERVICE WILL NOT FORWARD YOUR LICENSE OR ID CARD.

| FULL LEGAL NAME (last, first, middle, suffix) | SOCIAL SECURITY NUMBER (SSN) | ☐ I HAVE NOT BEEN ISSUED A SSN. |
|---|---|---|

| BIRTHDATE (mm/dd/yyyy) | PHONE NUMBER (optional) | SEX (check one) ☐ MALE ☐ FEMALE ☐ NON-BINARY | WEIGHT LBS. | HEIGHT FT. IN. | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|---|

| STREET ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|

| MAILING ADDRESS (if different from above - this will show on your license/permit/ID) | CITY | STATE | ZIP CODE |
|---|---|---|---|

| IF YOUR NAME HAS CHANGED, PRINT YOUR FORMER NAME HERE | EMAIL ADDRESS (optional) | NAME OF CITY OR COUNTY OF RESIDENCE ☐ CITY ☐ COUNTY OF |
|---|---|---|

| | | |
|---|---|---|
| 1. Do you wear glasses or contact lenses to operate a motor vehicle?............................................................ | ☐ YES ☐ NO |
| 2. Do you have a physical or mental condition/impairment which requires that you take medication? If yes, please list the condition(s) and the name of the medication(s)......................... | ☐ YES ☐ NO |
| 3. Have you ever had a seizure, blackout, or loss of consciousness?............................................................. | ☐ YES ☐ NO |
| 4. Do you have a physical condition/impairment which requires you to use special equipment to drive?.................... | ☐ YES ☐ NO |
| 5. Has your license or privilege to drive ever been suspended, revoked, or disqualified in this state or elsewhere? (NOTE: You do not need to disclose if your suspension, revocation or disqualification is due to a criminal conviction that has been expunged, or not subject to public disclosure.) ............ | ☐ YES ☐ NO |

If you answered YES to any of the above provide an explanation here.

| Do you currently hold or have you ever held a: (check all that apply) | ☐ Driver's License | ☐ ID Card | ☐ Learner's Permit | ☐ CDL |
|---|---|---|---|---|

| If so, provide the following: | LICENSE/ID CARD NUMBER | ISSUE DATE (mm/dd/yyyy) | EXPIRATION DATE (mm/dd/yyyy) | STATE/COUNTRY |
|---|---|---|---|---|

## FOR DMV USE ONLY — DO NOT WRITE BELOW THIS LINE

| REQUIRED TESTS | PASS | FAIL | CUSTOMER NUMBER | TRANSACTION TYPE | FEE |
|---|---|---|---|---|---|
| VISION | | | | ☐ ORIGINAL    ☐ REISSUE | |
| DL ROAD SIGNS EXAM | | | | | |
| DL KNOWLEDGE EXAM | | | | ☐ DUPLICATE    ☐ RENEWAL | |
| DL SKILLS | | | | | |
| MC KNOWLEDGE | | | | | |
| MC SKILLS M2 | | | CSR SIGNATURE | CSR LOGON ID | |
| MC SKILLS M3 | | | | | |

**A-190**

## OPTIONAL SPECIAL INDICATORS

OPTIONAL - Select relevant indicators below to show on your license, permit or ID card.

### MEDICAL INDICATORS

☐ Insulin-dependent diabetic*          ☐ Speech impairment*          ☐ Hearing impairment*          ☐ Traumatic brain injury (DL 145 required for license or permit. A physician statement required for ID card.)

☐ Autism spectrum disorder (ASD)*      ☐ Blind or vision impairment (ID card only)*      ☐ Intellectual disability (IntD)*

* Must submit required physician statement

### VETERAN INDICATOR

☐ Add or keep the veteran indicator on my driver's license or identification card. ☐ Remove the veteran indicator on my driver's license or identification card.
You must complete a Virginia Veteran Military Service Certification (DL 11) form and provide an acceptable veteran service proof document to add the veteran indicator, unless you have already done so.

### BLOOD TYPE INDICATOR

☐ Add or keep my blood type on my driver's license or ID card.          ☐ Remove my blood type from my driver's license or ID card.

Select one:   ☐ A+   ☐ B+   ☐ AB+   ☐ O+
              ☐ A-   ☐ B-   ☐ AB-   ☐ O-

The blood type designation displayed on a Virginia DMV issued credential shall not create any liability on the part of the Commonwealth of Virginia. Any person or entity that takes action based on the blood type designation displayed shall indemnify and hold harmless the Commonwealth of Virginia pursuant to Va Code §§ 46.2-342, 46.2-345, 46.2-345.2, and 46.2-345.3.

## PARENT OR LEGAL GUARDIAN CONSENT

**Check applicable box, review certification statement, print your name and sign where indicated.**

☐ **I authorize issuance of a learner's permit/driver's license.** I certify that the applicant is a resident of Virginia. I certify that the applicant is attending school regularly and is in good academic standing, but if not, I authorize issuance of a learner's permit/driver's license. I certify that this applicant will operate a motor vehicle for at least 45 hours (15 of which will occur after sunset) while holding a learner's permit.

If the applicant attends public school, I authorize the principal or designee of the public school attended by the applicant to notify the juvenile and domestic relations district court (within whose jurisdiction the applicant resides) when the applicant has had 10 or more unexcused absences from school on consecutive school days.

If a Special Indicator Request is checked on this application, I request on behalf of the applicant that it be shown on the learner's permit/driver's license. I certify that the statements made and the information submitted by me are true and correct.

☐ **I authorize issuance of an ID card.** I certify that the applicant is a resident of Virginia. If a Special Indicator Request is checked on this application, I request on behalf of the applicant that it be shown on the identification card.
I certify that the statements made and the information submitted by me are true and correct.

| PARENT/LEGAL GUARDIAN NAME (print) | PARENT/LEGAL GUARDIAN SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|
| | | |

**APPLICANT UNDER AGE 18** Have you ever been found not innocent of any offense in a Juvenile and Domestic Relations Court in this or any other state? ☐ YES ☐ NO
If you answered YES, the court making the adjudication of "not innocent" or a court within the jurisdiction where the juvenile's parent/legal guardian resides must provide court consent below. **COURT CONSENT** In my opinion the applicant's request for a learner's permit/driver's license ☐ should be granted. ☐ should not be granted.
REMARKS:

| JUDGE NAME (print) | JUDGE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|
| | | |

## SELECTIVE SERVICE

All males under the age of 26 are required to check one of the following.  Failure to provide a response will result in denial of your application.

☐ I am already registered with Selective Service.

☐ I am a lawful non-immigrant on a current non-immigrant visa or a seasonal agricultural worker (H-2A Visa) and not required to register.

☐ I authorize DMV to forward to the Selective Service System personal information necessary to register me with Selective Service.

By signing this application, I consent to be registered with Selective Service, if required by federal law.  If under age 18, an appropriate adult must complete and sign below: I authorize DMV to send information to Selective Service which will be used to register applicant when he is 18 years old.

SIGNATURE (check one and sign)   ☐ **PARENT / GUARDIAN**   ☐ **JUDGE, JUVENILE DOMESTIC RELATIONS COURT**   ☐ **EMANCIPATED MINOR**

## GOVERNMENT EMPLOYEES - (Fee waiver certification)

I certify that I am employed by the: ☐ Commonwealth of Virginia or  ☐ City of   ☐ County of   ☐ Town of
to operate a motorcycle solely in the course of this employment, and because of such employment, I am entitled to the waiver of the motorcycle class endorsement fee, provided I have paid for and hold a valid Virginia driver's license or have made application for such.

## NOTICE

Va. Code §§46.2-323 and 46.2-342 require that you provide DMV with the information on this form (including your social security number).  Your personally identifiable information is being collected for record keeping purposes and will be disseminated only in accordance with Va. Code §§46.2-208, 46.2-209, and the Driver's Privacy Protection Act, 18 USC §2721.  Persons convicted of certain sexual offenses (as listed in Va. Code §9.1-902) must register or re-register with the Virginia Department of State Police as provided in Va. Code §§9.1-901, 9.1-903, and 9.1-904.  If you provide a non-Virginia residence/home address or non-Virginia mailing address, your application for a driver's license or permit may be denied.  Upon issuance of a driver's license, commercial driver's license or identification card in the Commonwealth of Virginia, any driver's license, commercial driver's license or identification card previously issued by another state must be surrendered and will be cancelled by the issuing state.

## CERTIFICATION

I certify and affirm that I am a resident of Virginia, that all information presented in this application is true and correct, that any documents I have presented to DMV are genuine, and that my appearance, for purpose of my DMV photograph, is a true and accurate representation of how I generally appear in public.  I make this certification and affirmation under penalty of perjury and understand that making a false statement on this application is a criminal violation.  By signing this form, I authorize DMV to verify the information on this application, as required to determine eligibility.

| APPLICANT NAME (print) | APPLICANT SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|
| | | |

**A-191**

**Completion of this section is requested but not required to apply for a driver's license or ID Card. (Virginia Code §2.2-3806)**

## INFORMATION FOR THE DEPARTMENT OF ELECTIONS

| Mail In / DMV Connect Only - Are you a citizen of the United States of America? | Mail In / DMV Connect Only - Do you want to register to vote or change your voter registration address? |
|---|---|
| **YES** (INITIAL BOX) | **NO** (INITIAL BOX) | **YES** (INITIAL BOX) | **NO** (INITIAL BOX) |

## INFORMATION FOR THE VIRGINIA TRANSPLANT COUNCIL

☐ Yes, I would like to become an organ, eye and tissue donor.

**DMV**

Virginia Department of Motor Vehicles
Post Office Box 27412
Richmond, Virginia 23269-0001
www.dmv.virginia.gov

DL 2P (07/01/2024)

## COMMERCIAL DRIVER'S LICENSE (CDL) APPLICATION

LOG #

**Purpose:** Use this form to apply for a commercial driver's license or commercial learner's permit.

**Instructions:** Submit completed application to any DMV Customer Center. Complete front and back of this application.

### APPLICATION TYPE

REAL ID: ID requirements for domestic air travel and access to secure federal facilities change May 7, 2025. A REAL ID meets these requirements.

**Would you like to apply for a REAL ID license?** *(Not applicable if applying for a Motorcycle Learner's Permit)*

☐ Yes - I would like to use my license as ID to board a domestic flight or enter a secure federal facility or military base on or after May 7, 2025. View the documents you'll need at https://www.dmv.virginia.gov/licenses-ids/real-id or ask for a brochure.

☐ No - I acknowledge my license will display "Federal Limits Apply" and I will need another form of ID to board a domestic flight or enter a secure federal facility or military base on or after May 7, 2025.

☐ Commercial Driver's License (CDL)   ☐ Commercial Learner's Permit (CLP)   ☐ Motorcycle License (indicate class below)

Check ONE **if applicable:** ☐ Motorcycle Learner's Permit   ☐ "M" class (2 and 3 wheels)   ☐ "M2" class (2 wheels)   ☐ "M3" class (3 wheels)

☐ Replacement License (also check ONE):   ☐ I am surrendering my current license/permit.
I certify I cannot surrender my current license/permit because it is: ☐ LOST   ☐ STOLEN   ☐ DESTROYED

| Add Endorsement(s) | Remove Endorsement(s) |
|---|---|
| ☐ H - Hazardous Materials  ☐ S - School Bus (16 or more passengers) | ☐ H - Hazardous Materials  ☐ S - School Bus (16 or more passengers) |
| ☐ N - Tank  ☐ T - Double/Triple Trailer | ☐ N - Tank  ☐ T - Double/Triple Trailer |
| ☐ P - Passenger Carrying Vehicle (16 or more passengers)  ☐ X - Tank and Hazardous Materials | ☐ P - Passenger Carrying Vehicle (16 or more passengers)  ☐ X - Tank and Hazardous Materials |

### APPLICANT INFORMATION

**NOTE:** YOUR ADDRESS BELOW MUST BE CURRENT. THE U.S. POSTAL SERVICE WILL NOT FORWARD YOUR LICENSE.

FULL LEGAL NAME (last, first, middle, suffix)          SOCIAL SECURITY NUMBER (SSN)   ☐ I HAVE NOT BEEN ISSUED A SSN.

BIRTHDATE (mm/dd/yyyy) | PHONE NUMBER (optional) | SEX (check one) ☐ MALE ☐ FEMALE ☐ NON-BINARY | WEIGHT ___ LBS. | HEIGHT ___ FT. ___ IN. | EYE COLOR | HAIR COLOR

STREET ADDRESS          APT NO.   CITY          STATE   ZIP CODE

IF YOUR NAME HAS CHANGED, PRINT YOUR FORMER NAME HERE | NAME OF CITY OR COUNTY OF RESIDENCE ☐ CITY ☐ COUNTY OF

MAILING ADDRESS (if different from above - this address will show on your license/permit) APT NO.   CITY          STATE   ZIP CODE

EMAIL ADDRESS (optional)

| | YES | NO |
|---|---|---|
| 1. Do you wear glasses or contact lenses to operate a motor vehicle?.................................................. | ☐ | ☐ |
| 2. Do you have a physical or mental condition/impairment which requires that you take medication? If yes, please list the condition(s) and the name of the medication(s)........................................... | ☐ | ☐ |
| 3. Have you ever had a seizure, blackout, or loss of consciousness?.................................................. | ☐ | ☐ |
| 4. Do you have a physical condition/impairment which requires you to use special equipment to drive?....................... | ☐ | ☐ |
| 5. Has your license or privilege to drive ever been suspended, revoked, or disqualified in this state or elsewhere? (**NOTE:** You do not need to disclose if your suspension, revocation or disqualification is due to a criminal conviction that has been expunged, or not subject to public disclosure.)............ | ☐ | ☐ |

If you answered YES to any of the above provide an explanation here.

### FOR DMV USE ONLY — DO NOT WRITE BELOW THIS LINE

| REQUIRED TESTS | PASS | FAIL | REQUIRED TESTS | PASS | FAIL | REQUIRED TESTS | PASS | FAIL |
|---|---|---|---|---|---|---|---|---|
| VISION | | | SCHOOL BUS | | | DOUBLE/TRIPLE | | |
| CDL GENERAL KNOWLEDGE | | | PASSENGER | | | MOTORCYCLE KNOWLEDGE | | |
| COMBINATION | | | TANKER | | | MOTORCYCLE SKILLS M2 | | |
| AIR BRAKES | | | HAZMAT | | | MOTORCYCLE SKILLS M3 | | |

CUSTOMER NUMBER ☐☐☐☐☐☐☐☐☐☐ | TRANSACTION TYPE ☐ ORIGINAL ☐ REISSUE ☐ DUPLICATE ☐ RENEWAL | FEE

CSR SIGNATURE          CSR LOGON ID

**A-192**

DL 2P (07/01/2024)

## VEHICLE OPERATION AND ADDITIONAL APPLICANT INFORMATION

I want to be licensed to operate the type of vehicle(s) checked below:

- ☐ A - Combination vehicle with GVWR or GCWR of 26,001 lbs. or more
- ☐ B - Single vehicle with GVWR of 26,000 lbs. or more, or towing a vehicle less than 10,000 lbs. GVWR.
- ☐ C - Any vehicle that does not fit the definition of a Class A or Class B vehicle and is either used to transport hazardous materials or designed to carry 16 or more passengers, including the driver.

**BRAKES**   ☐ Full Air Brakes   ☐ No Air Brakes (L restriction)   ☐ Air Over Hydraulic Brakes (Z restriction)

**TRANSMISSION**   ☐ Automatic Only (E restriction)   ☐ Manual (includes automatic)

Have you been issued any license or ID Card in Virginia or another jurisdiction within the past 10 years?   ☐ Yes   ☐ No

If yes, identify any jurisdiction(s) in which you held a license or ID Card. Use the Supplemental Driver's Licensing History Sheet, form DL 2PA if additional space is needed.

List all driver licenses issued to you during the past 10 years.

| | JURISDICTION | LICENSE NUMBER | LICENSE ISSUE DATE | LICENSE EXPIRATION DATE |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

**PLACE OF DOMICILE -** Your place of domicile may or may not be the same as your place of residence.  Your place of residence is where you currently live and your place of domicile is where your true, fixed and permanent home and principal residence is and to which you intend to return whenever you are absent.  My place of domicile is:

- ☐ Virginia
- ☐ Outside of Virginia/Active Duty U.S. Military (Active Duty Common Access Card (CAC) Required)
- ☐ Another U.S. state/territory or Canada/Mexico (not eligible - must apply in place of residence)
- ☐ A country other than the U.S.  (unexpired EAD or foreign passport and I-94 required for a non-domiciled CLP/CDL)

|  | INTERSTATE DRIVER | INTRASTATE DRIVER (K restriction) |
|---|---|---|
| (Check the box for the qualification category that applies) | ☐ NON-EXCEPTED - I meet the qualification requirements under 49 CFR Part 391 of the Federal Motor Carrier Safety Regulations. (Medical examiner's certificate required) | ☐ NON-EXCEPTED - I meet the qualification requirements under Title 19 § 30-20-80 of the VA Administrative Code. (Medical examiner's certificate required) |
| | ☐ EXCEPTED - I am exempt from the qualification requirements under 49 CFR Part 391 of the Federal Motor Carrier Safety Regulations. (No medical examiner's certificate required) | ☐ EXCEPTED - I am exempt from the qualification requirements under Title 19 § 30-20-80 of the VA Administrative Code. (No medical examiner's certificate or state-approved letter required) |

## GOVERNMENT EMPLOYEES - (Fee waiver certification)

I certify that I am employed by the:  ☐ Commonwealth of Virginia or  ☐ City of  ☐ County of  ☐ Town of

to operate a motorcycle or commercial motor vehicle solely in the course of this employment, and because of such employment, I am entitled to the waiver of the motorcycle class and/or commercial  motor vehicle endorsement fee, provided I have paid for and hold a valid Virginia driver's license or have made application for such.

## SELECTIVE SERVICE

All males under the age of 26 are required to check one of the following.  Failure to provide a response will result in denial of your application.

- ☐ I am already registered with Selective Service.
- ☐ I am a lawful non-immigrant on a current non-immigrant visa or a seasonal agricultural worker (H-2A Visa) and not required to register.
- ☐ I authorize DMV to forward to the Selective Service System personal information necessary to register me with Selective Service.

By signing this application, I consent to be registered with Selective Service, if required by federal law.

## OPTIONAL SPECIAL INDICATORS

**VETERAN INDICATOR**

☐ Add or keep the veteran indicator on my commercial driver's license/permit.   ☐ Remove the veteran indicator on my commercial driver's license/permit.

You must complete a Virginia Veteran Military Service Certification (DL 11) form and provide an acceptable veteran service proof document to add the veteran indicator, unless you have already done so.

**BLOOD TYPE INDICATOR**

☐ Add or keep my blood type on my commercial driver's license/permit.   ☐ Remove my blood type from my commercial driver's license/permit.

Select one:  ☐ A+   ☐ B+   ☐ AB+   ☐ O+

☐ A-   ☐ B-   ☐ AB-   ☐ O-

The blood type designation displayed on a Virginia DMV issued credential shall not create any liability on the part of the Commonwealth of Virginia. Any person or entity that takes action based on the blood type designation displayed shall indemnify and hold harmless the Commonwealth of Virginia pursuant to Va Code §§ 46.2-342, 46.2-345, 46.2-345.2, and 46.2-345.3.

## NOTICE

Va. Code §§46.2-323 and 46.2-342 require that you provide DMV with the information on this form (including your social security number).  Your personally identifiable information is being collected for record keeping purposes and will be disseminated only in accordance with Va. Code §§46.2-208, 46.2-209, and the Driver's Privacy Protection Act, 18 USC §2721. Persons convicted of certain sexual offenses (as listed in Va. Code §9.1-902) must register or re-register with the Virginia Department of State Police as provided in Va. Code §§9.1-901, 9.1-903, and 9.1-904.  If you provide a non-Virginia residence/home address or non-Virginia mailing address, your application for a driver's license or permit may be denied. Upon issuance of a driver's license, commercial driver's license or ID card in the Commonwealth of Virginia, any driver's license, commercial driver's license or ID card previously issued by another state must be surrendered and will be cancelled by the issuing state.

## CERTIFICATION

I certify and affirm that I am a resident of Virginia, that all information presented in this application is true and correct, that any documents I have presented to DMV are genuine, and that my appearance, for purpose of my DMV photograph, is a true and accurate representation of how I generally appear in public. I make this certification and affirmation under penalty of perjury and understand that knowingly making a false statement on this application is a criminal violation. By signing this form, I authorize DMV to verify the information provided on this application, as required to determine eligibility.

| APPLICANT NAME (print) | APPLICANT SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|
| | | |

A-193

**Completion of this section is requested but not required. (Virginia Code §2.2-3806)**

## INFORMATION FOR THE DEPARTMENT OF ELECTIONS - Mail In / DMV Connect / DMV Select Only

| Are you a citizen of the United States of America? | | Do you want to register to vote or change your voter registration address? | |
|---|---|---|---|
| **YES** (INITIAL BOX) | **NO** (INITIAL BOX) | **YES** (INITIAL BOX) | **NO** (INITIAL BOX) |

**DMV** *www.dmvNow.com*

Virginia Department of Motor Vehicles
Post Office Box 27412
Richmond, Virginia 23269-0001

# ADDRESS CHANGE REQUEST

ISD 01 (07/01/2020)

**Purpose:** Use this form to report a change of address to the Virginia Department of Motor Vehicles.

**Instructions:** Complete this form and submit it to DMV. The Virginia Department of Motor Vehicles is able to capture and store three different addresses (residence, mailing, and vehicle registration). It is very important to DMV that we capture your correct address(es).
You may also update your records immediately by changing your address online at www.dmvNOW.com.

## CUSTOMER INFORMATION

| CUSTOMER NUMBER (as it appears on your driver's license or identification card) | CUSTOMER BIRTH DATE (mm/dd/yyyy) |
|---|---|

FULL LEGAL NAME (last, first, middle, suffix)

| REASON FOR ADDRESS CHANGE (check one) | ADDRESS FIELD EFFECTIVE DATE (mm/dd/yyyy) |
|---|---|
| ☐ MOVED   ☐ CORRECTION (typographical error, new 911 address, etc.) | |

## NEW RESIDENCE/HOME ADDRESS

- Enter the address where you actually live. Do not enter a post office box number. Virginia law requires you to provide this address to DMV.
- If you change either your residence/home address or mailing address to a non-Virginia address, your driver's license and/or photo identification (ID) card may be canceled.

| STREET ADDRESS (no P.O. Box) | CITY | STATE | ZIP CODE |
|---|---|---|---|
| RESIDENCE LOCATION (city or county in which you live) | COUNTRY | | |

## NEW MAILING ADDRESS

- The address shown on your driver's license may be either a post office box, business or residence address in Virginia.
- If you choose to have a mailing address that is different from your residence address, DMV will send all of your documents to the mailing address.
- If you change your residence/home address or mailing address to a non-Virginia address, your driver's license and/or photo identification (ID) card may be canceled.

| MAILING ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|

## VEHICLE REGISTRATION MAILING ADDRESS

- Use this section if you own a vehicle that is not located at your residence address and you want DMV to mail the vehicle registration renewal notice to an address different from those recorded above or if you want to notify DMV of a vehicle that is garaged somewhere other than where you live.
- If you need to change the address of more than two vehicles, use the additional space on the back of this form

**VEHICLE 1**

| VEHICLE MAKE | TITLE NUMBER | LAST FOUR DIGITS OF VEHICLE IDENTIFICATION NUMBER (VIN) |
|---|---|---|
| MAILING ADDRESS | CITY | STATE   ZIP CODE |
| COUNTRY | GARAGE JURISDICTION (city, county, or town where your vehicle is located) | DATE VEHICLE FIRST LOCATED HERE (mm/dd/yyyy) |

**VEHICLE 2**

| VEHICLE MAKE | TITLE NUMBER | LAST FOUR DIGITS OF VEHICLE IDENTIFICATION NUMBER (VIN) |
|---|---|---|
| MAILING ADDRESS | CITY | STATE   ZIP CODE |
| COUNTRY | GARAGE JURISDICTION (city, county, or town where your vehicle is located) | DATE VEHICLE FIRST LOCATED HERE (mm/dd/yyyy) |

**To record additional vehicles, complete the reverse side of this form**

## CERTIFICATION

I certify and affirm that all information presented in this form is true and correct, that any documents I have presented to DMV are genuine, and that the information included in all supporting documentation is true and accurate. I make this certification and affirmation under penalty of perjury and I understand that knowingly making a false statement or representation on this form is a criminal violation.

| SIGNATURE | DATE (mm/dd/yyyy) | DAYTIME TELEPHONE NUMBER ( ) |
|---|---|---|

A-194

ISD 01 (07/01/2020)

## ADDITIONAL VEHICLE REGISTRATION MAILING ADDRESS

**VEHICLE 3**

| VEHICLE MAKE | TITLE NUMBER | LAST FOUR DIGITS OF VEHICLE IDENTIFICATION NUMBER (VIN) | | |
| --- | --- | --- | --- | --- |
| MAILING ADDRESS | | CITY | STATE | ZIP CODE |
| COUNTRY | GARAGE JURISDICTION (city, county, or town where your vehicle is located) | | DATE VEHICLE FIRST LOCATED HERE (mm/dd/yyyy) | |

**VEHICLE 4**

| VEHICLE MAKE | TITLE NUMBER | LAST FOUR DIGITS OF VEHICLE IDENTIFICATION NUMBER (VIN) | | |
| --- | --- | --- | --- | --- |
| MAILING ADDRESS | | CITY | STATE | ZIP CODE |
| COUNTRY | GARAGE JURISDICTION (city, county, or town where your vehicle is located) | | DATE VEHICLE FIRST LOCATED HERE (mm/dd/yyyy) | |

**VEHICLE 5**

| VEHICLE MAKE | TITLE NUMBER | LAST FOUR DIGITS OF VEHICLE IDENTIFICATION NUMBER (VIN) | | |
| --- | --- | --- | --- | --- |
| MAILING ADDRESS | | CITY | STATE | ZIP CODE |
| COUNTRY | GARAGE JURISDICTION (city, county, or town where your vehicle is located) | | DATE VEHICLE FIRST LOCATED HERE (mm/dd/yyyy) | |

**VEHICLE 6**

| VEHICLE MAKE | TITLE NUMBER | LAST FOUR DIGITS OF VEHICLE IDENTIFICATION NUMBER (VIN) | | |
| --- | --- | --- | --- | --- |
| MAILING ADDRESS | | CITY | STATE | ZIP CODE |
| COUNTRY | GARAGE JURISDICTION (city, county, or town where your vehicle is located) | | DATE VEHICLE FIRST LOCATED HERE (mm/dd/yyyy) | |

**VEHICLE 7**

| VEHICLE MAKE | TITLE NUMBER | LAST FOUR DIGITS OF VEHICLE IDENTIFICATION NUMBER (VIN) | | |
| --- | --- | --- | --- | --- |
| MAILING ADDRESS | | CITY | STATE | ZIP CODE |
| COUNTRY | GARAGE JURISDICTION (city, county, or town where your vehicle is located) | | DATE VEHICLE FIRST LOCATED HERE (mm/dd/yyyy) | |

**VEHICLE 8**

| VEHICLE MAKE | TITLE NUMBER | LAST FOUR DIGITS OF VEHICLE IDENTIFICATION NUMBER (VIN) | | |
| --- | --- | --- | --- | --- |
| MAILING ADDRESS | | CITY | STATE | ZIP CODE |
| COUNTRY | GARAGE JURISDICTION (city, county, or town where your vehicle is located) | | DATE VEHICLE FIRST LOCATED HERE (mm/dd/yyyy) | |

**VEHICLE 9**

| VEHICLE MAKE | TITLE NUMBER | LAST FOUR DIGITS OF VEHICLE IDENTIFICATION NUMBER (VIN) | | |
| --- | --- | --- | --- | --- |
| MAILING ADDRESS | | CITY | STATE | ZIP CODE |
| COUNTRY | GARAGE JURISDICTION (city, county, or town where your vehicle is located) | | DATE VEHICLE FIRST LOCATED HERE (mm/dd/yyyy) | |

**VEHICLE 10**

| VEHICLE MAKE | TITLE NUMBER | LAST FOUR DIGITS OF VEHICLE IDENTIFICATION NUMBER (VIN) | | |
| --- | --- | --- | --- | --- |
| MAILING ADDRESS | | CITY | STATE | ZIP CODE |
| COUNTRY | GARAGE JURISDICTION (city, county, or town where your vehicle is located) | | DATE VEHICLE FIRST LOCATED HERE (mm/dd/yyyy) | |

**VEHICLE 11**

| VEHICLE MAKE | TITLE NUMBER | LAST FOUR DIGITS OF VEHICLE IDENTIFICATION NUMBER (VIN) | | |
| --- | --- | --- | --- | --- |
| MAILING ADDRESS | | CITY | STATE | ZIP CODE |
| COUNTRY | GARAGE JURISDICTION (city, county, or town where your vehicle is located) | | DATE VEHICLE FIRST LOCATED HERE (mm/dd/yyyy) | |

**A-195**

**VOTER REGISTRATION QUESTIONNAIRE**

DMS 17 (07/01/2020)

*www.dmvNow.com*
Virginia Department of Motor Vehicles
Post Office Box 27412
Richmond, Virginia 23269-0001

**Purpose:** Use this form if you were unable to complete the voter registration questions electronically on the credit card terminal to determine if a paper voter registration application is needed. Completion of this form is requested but not required to apply for a driver's license or ID card. (Virginia Code §2.2-3806)

**Instructions:** Answer the questions below and return this completed form to the customer service representative.

| CUSTOMER INFORMATION | |
|---|---|
| CUSTOMER NAME (print) | CUSTOMER NUMBER |
| | |

| Are you a citizen of the United States of America? | The information on your application will be used to update your voter registration or register you to vote unless you initial NO to decline. |
|---|---|
| **YES** (INITIAL BOX)    **NO** (INITIAL BOX) | **NO** (INITIAL BOX) |

**A-196**

| Completion of this section is requested but not required to apply for a driver privilege card. (Virginia Code §2.2-3806) |
|---|
| **Information for the Virginia Transplant Council** ☐ Yes, I would like to become an organ, eye and tissue donor. |



**Virginia Department of Motor Vehicles**
Post Office Box 27412
Richmond, Virginia 23269-0001
www.dmv.virginia.gov

DL 10 (08/01/2024)

# DRIVER AND IDENTIFICATION PRIVILEGE CARD APPLICATION

LOG #

**Purpose:** Non-US citizens may use this form to apply for a Driver Privilege Card or Identification Privilege Card.

**Instructions:** Complete front and back of this application. Submit completed application and all required documents to any DMV Customer Service Center (CSC).

## APPLICATION TYPE

☐ Driver Privilege Card *

☐ Learner's Permit and Driver Privilege Card *

☐ Identification Privilege Card

☐ Driver Privilege Card with Motorcycle Class (complete Motorcycle Classification section below)

☐ Motorcycle Only Driver Privilege Card (complete Motorcycle Classification section below)

☐ Motorcycle Learner's Permit (classification not applicable)

**Motorcycle Classification**

☐ Maintaining current Virginia Motorcycle Classification

☐ Add, Upgrade or Transfer Motorcycle Classification or obtain Motorcycle Only Privilege Card. Additional testing may be required. Check applicable box below:
☐ M 2 (2 wheels)   ☐ M 3 (3 wheels)   ☐ M (both 2 and 3 wheels)

| **Road Skills Test Acknowledgement (Required for Driver Privilege Card and Permit Applicants):** I acknowledge and understand that if I am required to complete a road skills test, I must successfully complete it at a DMV customer service center and that completion of a driver education course through a public or private school or at a driver training school will **not** waive this requirement. | Applicant's Initials: |
|---|---|

**Replacement Driver Privilege or Identification Card** (check one of the following): ☐ I am surrendering my current Driver/Identification Privilege Card.

I certify I cannot surrender my current Driver/Identification Privilege Card because it is: ☐ Lost ☐ Stolen ☐ Destroyed

## APPLICANT INFORMATION

**Note:** Your address must be current. The U.S. Postal Service will NOT FORWARD your Driver Privilege Card or Identification Privilege Card.

FULL LEGAL NAME (last, first, middle, suffix)

SOCIAL SECURITY NUMBER (SSN) OR INDIVIDUAL TAXPAYER IDENTIFICATION NUMBER (ITIN) | BIRTHDATE (mm/dd/yyyy)

PHONE NUMBER (optional) | SEX (check one) ☐ MALE ☐ FEMALE ☐ NON-BINARY | WEIGHT ___ LBS. | HEIGHT ___ FT. ___ IN. | EYE COLOR | HAIR COLOR

STREET ADDRESS | CITY | STATE | ZIP CODE

IF YOUR NAME HAS CHANGED, PRINT YOUR FORMER NAME HERE | NAME OF CITY OR COUNTY OF RESIDENCE ☐ CITY ☐ COUNTY OF ___

MAILING ADDRESS (if different from above - this will show on your card/permit/ID) | CITY | STATE | ZIP CODE

EMAIL ADDRESS

1. Do you wear glasses or contact lenses to operate a motor vehicle? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ YES ☐ NO

2. Do you have a physical or mental condition/impairment which requires that you take medication? If yes, please list the condition(s) and the name of the medication(s) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ YES ☐ NO

3. Have you ever had a seizure, blackout, or loss of consciousness? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ YES ☐ NO

4. Do you have a physical condition/impairment which requires you to use special equipment to drive? . . . . . . . . . . . . . . ☐ YES ☐ NO

5. Has your license or privilege to drive ever been suspended, revoked, or disqualified in this state or elsewhere? (**NOTE:** You do not need to disclose if your suspension, revocation or disqualification is due to a criminal conviction that has been expunged, or not subject to Public disclosure.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ YES ☐ NO

If you answered YES to any of the above provide an explanation here.

Do you currently hold or have you ever held a: ☐ Driver's License/Privilege Card   ☐ ID Card   ☐ Learner's Permit   ☐ CDL

| If so, provide the following: | LICENSE/ID CARD NUMBER | ISSUE DATE (mm/dd/yyyy) | EXPIRATION DATE (mm/dd/yyyy) | STATE/COUNTRY |
|---|---|---|---|---|

## FOR DMV USE ONLY — DO NOT WRITE BELOW THIS LINE

| REQUIRED TESTS | PASS | FAIL | CUSTOMER NUMBER | TRANSACTION TYPE | FEE |
|---|---|---|---|---|---|
| VISION | | | | ☐ ORIGINAL ☐ REISSUE | |
| DL ROAD SIGNS EXAM | | | | | |
| DL KNOWLEDGE EXAM | | | | ☐ DUPLICATE ☐ RENEWAL | |
| DL SKILLS | | | | | |
| MC KNOWLEDGE | | | CSR SIGNATURE | | CSR LOGON ID |
| MC SKILLS M2 | | | | | |
| MC SKILLS M3 | | | | | |

A-197

## OPTIONAL SPECIAL INDICATORS

OPTIONAL - Select relevant indicators below to show on your license, permit or ID card.

**MEDICAL INDICATORS**

☐ Insulin-dependent diabetic*      ☐ Speech impairment*      ☐ Hearing impairment*      ☐ Traumatic brain injury (DL 145 required for license or permit. A physician statement required for ID card.)

☐ Autism spectrum disorder (ASD)*      ☐ Blind or vision impairment (ID card only)*      ☐ Intellectual disability (IntD)*

* Must submit required physician statement

**VETERAN INDICATOR**

☐ Add or keep the veteran indicator on my driver's license or identification card.      ☐ Add or keep the veteran indicator on my driver's license or identification card.

You must complete a Virginia Veteran Military Service Certification (DL 11) form and provide an acceptable veteran service proof document to add the veteran indicator, unless you have already done so.

**BLOOD TYPE INDICATOR**

☐ Add or keep my blood type on my driver's license or ID card.      ☐ Remove my blood type from my driver's license or ID card.

Select one:   ☐ A+   ☐ B+   ☐ AB+   ☐ O+
              ☐ A-   ☐ B-   ☐ AB-   ☐ O-

The blood type designation displayed on a Virginia DMV issued credential shall not create any liability on the part of the Commonwealth of Virginia. Any person or entity that takes action based on the blood type designation displayed shall indemnify and hold harmless the Commonwealth of Virginia pursuant to Va Code §§ 46.2-342, 46.2-345, 46.2-345.2, and 46.2-345.3.

## PARENT OR LEGAL GUARDIAN LICENSE CONSENT

Check applicable box, review certification statement, print your name and sign where indicated.

☐ **I authorize issuance of a learner's permit/driver privilege card.** I certify that the applicant is a resident of Virginia. I certify that the applicant is attending school regularly and is in good academic standing, but if not, I authorize issuance of a learner's permit/driver privilege card. I certify that this applicant will operate a motor vehicle for at least 45 hours (15 of which will occur after sunset) while holding a learner's permit.

If the applicant attends public school, I authorize the principal or designee of the public school attended by the applicant to notify the juvenile and domestic relations district court (within whose jurisdiction the applicant resides) when the applicant has had 10 or more unexcused absences from school on consecutive school days.

If a Special Indicator Request is checked on this application, I request on behalf of the applicant that it be shown on the learner's permit/driver privilege card. I certify that the statements made and the information submitted by me are true and correct.

☐ **I authorize issuance of an identification privilege card.** I certify that the applicant is a resident of Virginia. If a Special Indicator Request is checked on this application, I request on behalf of the applicant that it be shown on the identification card. I certify that the statements made and the information submitted by me are true and correct.

| PARENT/GUARDIAN NAME (print) | PARENT/GUARDIAN SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|
| | | |

**APPLICANT UNDER AGE 18** Have you ever been found not innocent of any offense in a Juvenile and Domestic Relations Court in this or any other state? ☐ YES  ☐ NO
If you answered YES, the court making the adjudication of "not innocent" or a court within the jurisdiction where the juvenile's parent/guardian resides must provide court consent below.
**COURT CONSENT** In my opinion the applicant's request for a learner's permit/driver privilege card ☐ should be granted.  ☐ should not be granted.

| JUDGE NAME (print) | JUDGE SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|
| | | |

REMARKS:

## SELECTIVE SERVICE

All males under the age of 26 are required to check one of the following.  Failure to provide a response will result in denial of your application.

☐ I am already registered with Selective Service.

☐ I am a lawful non-immigrant on a current non-immigrant visa or a seasonal agricultural worker (H-2A Visa) and not required to register.

☐ I authorize DMV to forward to the Selective Service System personal information necessary to register me with Selective Service.

By signing this application, I consent to be registered with Selective Service, if required by federal law.  If under age 18, an appropriate adult must complete and sign below: I authorize DMV to send information to Selective Service which will be used to register applicant when he is 18 years old.

SIGNATURE (check one and sign)      ☐ **PARENT / GUARDIAN**      ☐ **JUDGE, JUVENILE DOMESTIC RELATIONS COURT**      ☐ **EMANCIPATED MINOR**

## NOTICE

Va. Code §§46.2-323 and 46.2-342 require that you provide DMV with the information on this form (including your social security number). Your personally identifiable information is being collected for record keeping purposes and will be disseminated only in accordance with Va. Code §§46.2-208, 46.2-209, 46.2-328.3 and the Driver's Privacy Protection Act, 18 USC §2721. Persons convicted of certain sexual offenses (as listed in Va. Code §9.1-902) must register or re-register with the Virginia Department of State Police as provided in Va. Code §§9.1-901, 9.1-903, and 9.1-904. If you provide a non-Virginia residence/ home address or non Virginia mailing address, your application for a driver's license or permit may be denied. Upon issuance of a driver's license, driver privilege card, commercial driver's license or identification card in the Commonwealth of Virginia, any driver's license, driver privilege card, commercial driver's license or identification card previously issued by another state must be surrendered and will be canceled by the issuing state.

## CERTIFICATION

I certify and affirm that I am not a citizen of the United States and that I am a resident of Virginia, that all information presented in this application is true and correct, that any documents I have presented to DMV are genuine, and that my appearance, for purpose of my DMV photograph, is a true and accurate representation of how I generally appear in public.  I make this certification and affirmation under penalty of perjury and understand that making a false statement on this application is a criminal violation.  By signing this form, I authorize DMV to verify the information provided on this application, as required to determine eligibility.

| APPLICANT NAME (print) | APPLICANT SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|
| | | |

**A-198**

If you are an eligible Virginia resident, the following process will register you to vote or update your current voter registration.

Select "Continue" to complete this process.

Select "No" to stop and return to the DMV process.

Your answer will not affect your ability to obtain a driver's license or ID card.

| Continue | No | Back |
|----------|-----|------|

If user selects "Continue", they are shown screen 2.
If user selects "No", the EMV process ends.
If user selects "Back", they are taken to the DMV screen
immediately before the EMV process begins.

1

Your answer will be provided only to the Department of Elections and does not affect your ability to obtain a driver's license or identification card.

Are you a citizen of the United States?

| Yes | No | No Response | Back |
|-----|-----|-----|-----|

If user selects "Yes, they are shown screen 5.
If user selects "No", they are shown screen 3.
If user selects "No Response", they are shown screen 4.
If user selects "Back", they are shown screen 1.

**A-200**

2

You have selected that you are not a U.S. citizen. You must be a citizen of the United States to register to vote.

Is this correct?

| Yes | No | Back |
|-----|-----|------|

If user selects "Yes", the EMV process ends.
If user selects "No" or "Back", they are shown screen 2.

**A-201**

3

You have chosen not to respond to the citizenship question. As a result, no voter information update will be submitted to the Department of Elections.

Is this correct?

| Yes | No | Back |

If user selects "Yes", the EMV process ends.
If user selects "No" or "Back", they are shown screen 2.

**A-202**

4

**WARNING:** INTENTIONALLY VOTING MORE THAN ONCE IN AN ELECTION OR MAKING A MATERIALLY FALSE STATEMENT ON THIS FORM CONSTITUTES THE CRIME OF ELECTION FRAUD, WHICH IS PUNISHABLE UNDER VIRGINIA LAW AS A FELONY. VIOLATORS MAY BE SENTENCED TO UP TO 10 YEARS IN PRISON, OR UP TO 12 MONTHS IN JAIL AND/OR FINED UP TO $2,500.

Do you accept the above warning statement?

| Yes | No | Back |
|-----|-----|------|

If user selects "Yes", they are shown screen 6.
If user selects "No", the EMV process ends.
If user selects "Back", they are shown screen 2.

**A-203**

**Privacy Act Notice:** Article II, Section 2 of the Constitution of Virginia (1971) requires that a person registering to vote provide his or her social security number, if any. Therefore, if you do not provide your social security number, your application for voter registration will be denied. Section 7 of the Federal Privacy Act (Public Law Number 93-579) allows the Commonwealth to enforce this requirement, but also requires that you be advised that state and local voting officials will use the social security number as a unique identifier to ensure that no person is registered in more than one place. This registration card will only be open to inspection by the public if the social security number is removed. Your social security number will appear on reports produced only for official use by voter registration and election officials, and for jury selection purposes by courts, and all lawful governmental purposes.

Do you accept the above Privacy Act Notice?

| Yes | No | Back |
|-----|-----|------|

If user selects "Yes", they are shown screen 7.
If user selects "No", the EMV process ends.
If user selects "Back", they are shown screen 6.

**A-204**

6

This is the DMV address that will be sent to the Department of Elections to use for your voter registration. You must provide a residence address in Virginia to vote.

Is the DMV address displayed below correct?

**DMV Address:**

| | |
|---|---|
| Street: | 299 STANLEY AVE |
| City: | SHENANDOAH |
| State: | VA |
| Zip Code: | 22849-4211 |
| Residence Locality: | PAGE |

| Yes | No | Back |
|-----|-----|------|

If user selects "Yes", they are shown screen 8.
If user selects "No", the EMV process ends.
If user selects "Back", they are shown screen 6.

**A-205**

7

Please provide your phone number and email address. (optional)

Phone Number:

example: 1234567890

Email Address:

example: abc123@123.com

The telephone number and email address is for Department of Elections use only.

**Continue**

**Back**

If user selects "Continue", they are shown screen 9.
If user selects "Back", they are shown screen 7.

**A-206**

8

Have you ever been convicted of a felony or judged mentally incapacitated and disqualified to vote?

| Yes | No | Back |
|-----|-----|------|

If user selects "Yes", they are shown screen 10.
If user selects "No", they are shown screen 11.
If user selects "Back", they are shown screen 8.

**A-207**

9

Have your voting rights been restored?

| Yes | No | Back |

If user selects "Yes" or "No", they are shown screen 11.
If user selects "Back", they are shown screen 9.

**A-208**

10

Are you an active duty uniformed services member, qualified spouse or dependent; or do you reside overseas?

| Yes | No | Back |

If user selects "Yes" or "No", they are shown screen 12.
If user selects "Back", they are shown screen 9 or 10, depending on how they responded to 9.

**A-209**

11

A protected voter must be or share a household with a judge; law enforcement official; election official or their employee; Commonwealth elector; person with a protective order; person in fear for personal safety from being threatened or stalked by another person; or approved to be a foster parent. If you are a protected voter, you must have provided an alternative post office box mailing address in Virginia.

Do you qualify as a protected voter?

| Yes | No | Back |

If user selects "Yes", they are shown screen 12.
If user selects "No", they are shown screen 15.
If user selects "Back", they are shown screen 11.

**A-210**

12

Select one of the reason codes below

1. **LEO**: active or retired law enforcement officer, judge, magistrate, U.S. or Virginia Attorney General attorney;

2. **CPO**: have a court issued protective order for your benefit;

3. **ACP**: registered with the Virginia Attorney General's Address Confidentiality Program;

4. **TSC**: in fear for personal safety from being stalked or threatened by another person;

5. **AFP**: approved to be a foster parent;

6. **PEO**: current or former state or local election official, their employee, or a Commonwealth elector for President and Vice President;

| |
|---|

| Continue | | Back |
|---|---|---|

If user selects "Continue", they are shown screen 14.
If user selects "Back", they are shown screen 12.

**A-211**

13

Enter your Virginia P.O. Box address. (required)

P.O. Box:            Enter your P.O. Box number

City:                Enter your City

State:               Virginia

Zip Code:            Enter your Zip Code

[Continue]        [Back]

If user selects "Continue", they are shown screen 15.
If user selects "Back", they are shown screen 13.

**A-212**

14

Are you currently registered to vote in another state or territory?

| Yes | No | Back |
|-----|-----|------|

If user selects "Yes", they are shown screen 16.
If user selects "No", they are shown screen 17.
If user selects "Back", they are shown screen 12 or 14, depending on how they answered 12.

**A-213**

15



If user selects "Continue", they are shown screen 17.
If user selects "Back", they are shown screen 15.

**Acknowledgement:**

I swear/affirm, under felony penalty for making willfully false material statements or entries, that the information provided for voter registration is true. I authorize the cancellation of my current registration and I have read the Privacy Act Notice.

| Accept | Decline | Back |
|--------|---------|------|

If the user selects "Accept" or "Decline", the EMV process ends and they are returned to the DMV transaction.
If the user selects "Back", they are shown screen 15 or 16, depending on how they answered 15.

**A-215**

17

# Screen 1

Name:
Date of Birth:
Last 4 of SSN:


Is this information correct?


Yes                    No

## Screen 2

Residence address (where you live):

Mailing address:

Is this information correct?

Yes    No

Registered voters who mark "Yes" move to Screen 3.  Non-registered voters who mark "Yes" move to screen 4. "No" returns control to CSR to correct information.

# Screen 3

This is your current voter registration information from the Department of Elections.

Name:
Residence/Street Address(where you live):

Military Status:

If the above information is incorrect, you will be able to change it on the next screen.

Back          Next

# Screen 4

If you are an eligible Virginia resident, the following process will register you to vote or update your current voter registration.

Select "Continue" to complete this process.

Select "No" to stop and return to the DMV process.


Your answer to this question does not affect your ability to obtain a driver's license or identification card.

Back                    Continue                              No

# Screen 4a

You have chosen not to register to vote or make any changes to your current registration today.

Press "Confirm" if correct, or "Back" if incorrect.

Confirm                    Back

# Screen 5

Back

Are you a citizen of the United States?

Your answer will be provided only to the Department of Elections and does not affect your ability to obtain a driver's license or identification card.

Yes        No        No Response

## Screen 5a

You must be a citizen of the United States to register to vote.  You have indicated that you are not a US citizen.

Is this correct?

Yes                                No

# Screen 5b

You have chosen not to respond to the US citizenship question.

As a result, no voter registration application or voter information update will be submitted to the Department of Elections.

Is this correct?

Yes                                    No

# Screen 6

WARNING:  INTENTIONALLY VOTING MORE THAN ONCE IN AN ELECTION OR MAKING A MATERIALLY FALSE STATEMENT ON THIS FORM CONSTITUTES THE CRIME OF ELECTION FRAUD, WHICH IS PUNISHABLE UNDER VIRGINIA LAW AS A FELONY.  VIOLATORS MAY BE SENTENCED TO UP TO 10 YEARS IN PRISON, OR UP TO 12 MONTHS IN JAIL AND/OR FINED UP TO $2,500.

Continue                                    End

# Screen 7

Privacy Act Notice:  Article II, Section 2 of the Constitution of Virginia (1971) requires that a person registering to vote provide his or her social security number, if any.  Therefore, if you do not provide your social security number, your application for voter registration will be denied. Section 7 of the Federal Privacy Act (Public Law-Number 93-579) allows the Commonwealth to enforce this requirement, but also requires that you be advised that state and local voting officials will use the social security number as a unique identifier to ensure that no voter is registered in more than one place. This registration card will only be open to inspection by the public if the social security number is removed.  Your social security number will appear on reports produced only for official use by voter registration and election officials, and for jury selection purposes by courts and all lawful governmental purposes.

Continue          End

# Screen 8

Do you wish to provide your phone number to the Department of Elections?  Providing a phone number is optional but may be helpful if needed to clarify information on your application.

Yes        No

## Screen 8a

Enter 10-digit Telephone number:

(\_\_\_\_) \_\_\_\_-\_\_\_\_\_

Keypad here for entering telephone number

# Screen 9

Back

Have you ever been convicted of a felony or judged mentally incapacitated and disqualified to vote?

Yes                              No

# Screen 9a

Back

Have your voting rights been restored?

Yes                     No

This screen only shows if customer said they were a convicted felon.  "Yes" or "No" moves to Screen 10.  "Back" returns to Screen 5.

# Screen 10

Back

Are you an active duty uniformed services member, a qualifying spouse or dependent; or do you reside overseas?

Yes                                    No

# Screen 11

A protected voter must be or share a household with a judge; magistrate; law enforcement official; election official or their employee; Commonwealth elector; person with a protective order; person in fear for personal safety from being threatened or stalked by another person; or approved to be a foster parent.

Press Continue to indicate your protected status.  Press Skip if you are not a protected voter.

Back       Continue       Skip

# Screen 11a

Back

Are you or a household member an active or retired law enforcement officer, judge, magistrate, U.S. or Virginia Attorney General attorney?

Yes                    No

# Screen 11b

Back

Have you or a household member had a court issued protective order for your benefit?

Yes                              No

# Screen 11c

Back

Are you or a household member registered with the Virginia Attorney General's Address Confidentiality Program?

Yes                                    No

# Screen 11d

Back

Are you or a household member in fear for personal safety from being threatened or stalked by another person?

Yes                    No

# Screen 11e

Back

Are you or a household member been approved to be a foster parent?

Yes                    No

## Screen 11f-New

Back

Are you or a household member a current or former state or local election official, their employee, or a Commonwealth elector for President and Vice President.

Yes                    No

# Screen 12

You must select a protected status to be a protected voter.

OK

# Screen 13

Back

Are you currently registered to vote in another state or territory?

Yes                              No

# Screen 14

2-letter State abbreviation where you are registered to vote:

Keypad down here for entering two letters….

Move on to Screen 15

# Screen 15

I swear/affirm under penalty for making willfully false material statements or entries, that the information provided for voter registration is true.  I authorize the cancellation of my current registration and I have read the Privacy Act Notice.

Back                          Affirm                          Decline

# Screen 16

You have chosen not to register to vote or make any changes to your current registration today.

Press "Confirm" if correct or "Back" if incorrect?

**Confirm**             **Back**

## Screen 17

DMV has sent your voter registration application to the Department of Elections.

Your local registrar will notify you when your application is processed.  Be sure to read the Voter Registration.
Acknowledgement form provided at the end of your visit to DMV.

OK

## Screen 17a

DMV has sent your voter registration application to the Department of Elections.

Your local registrar will process any changes to your voter information.  Be sure to read the Voter Registration Acknowledgement form provided at the end of your visit to DMV.

OK



# Voter Registration List Maintenance

## Department of Motor Vehicles: Full SBE & Non-Citizen Files

## Standard Operating Procedure

Version:     V 0.1
Author:      E-B Davis
Rev:         Revision Date 2024-08-08

## Document Control

Document Information

| Type | Description |
|---|---|
| Document Owner: | |
| Publish Date: | |
| File Name: | LMSOP_DMV Full SBE and Non Citizen.docx |

Revision History

| Version | Date | Author | Description |
|---|---|---|---|
| 0.1 | 2013-11-08 | Julie Gaulding | Initial draft |
| 0.2 | 2015-09-02 | David Allen | Replaced Quest with ELECT Ops |
| 0.3 | 2019-10-03 | David Allen | Added new record type "P" \| Removed frequency diagram |
| 0.4 | 2019-03-18 | David Allen | Updated Non-Citizen process |
| 0.5 | 2019-11-12 | Michael Gilbert | |
| 0.6 | 2020-04-22 | E-B Davis | Update & Validate – Initial Draft |
| 0.7 | 2023-08-09 | Shantha Jeyasankar | Updated |
| 0.8 | 2024-08-08 | Shantha Jeyasankar | DMV Transaction File new file format |

*Confidentiality Disclosure*

*The information contained within this document constitutes a standard operating procedure of the Department of Elections. Be advised that the content of this document may contain confidential and/or sensitive information, which may be regulated by multiple state and federal laws. Any disclosure of this document or information contained in this document shall be approved in writing by the Commissioner of the Department of Elections or by the Information Security Officer of the Department of Elections.*

i

## *Acronym List*

This table provides a comprehensive list of acronyms used in this document.

| Acronym | Description |
|---------|-------------|
| BSA | Business Systems Analyst |
| DBA | Database Business Administrator |
| DMV | Department of Motor Vehicles |
| DOB | Date of Birth |
| ELECT | Department of Elections |
| ERIC | Electronic Registration and Information Center |
| ETA | Estimated Time of Arrival |
| GR | General Registrar |
| ISO | Information Security Officer |
| IT | Information Technology |
| LMSOP | List Maintenance Standard Operating Procedure |
| MOU | Memorandum of Understanding |
| NVRA | National Voter Registration Act |
| PPBL | Post Production Bug List |
| SBE-IT | Email group for ELECT Information Services team |
| sFTP | Secure File Transfer Protocol |
| SQL | Structured Query Language |
| SSIS | SQL Server Integration Services |
| SSN | Social Security Number |
| TEMP | Temporary |
| US | United States |
| VERIS | Virginia Election and Registration Information System |
| VITA | Virginia Information Technology Agency |
| | |

Case 1:24-cv-01778-PTG-WBP   Document 92-8   Filed 10/22/24   Page 4 of 22 PageID# 953

STANDARD
OPERATING
PROCEDURE

Voter Registration List Maintenance
Department of Motor Vehicles: Full SBE & Non-Citizen
Files

## Federal and State Code Citation

The following federal and state code dictates how the Virginia Department of Elections (ELECT) conducts its list maintenance activity:

- 42 USC §1973gg.
- VA CODE §24.2-404.4.
- VA CODE §24.2-410.1.
- VA CODE §24.2-427 (B1).

## Other References

The following files and information served as sources for this List Maintenance Standard Operating Procedure (LMSOP).

- VSO206 DMV Non-Citizen
- DMV Non Citizen Procedures Ver3_0._FNL
- VS0064, Amendment 24
- Business Use – Case Specification: 1.1.36 Process DMV Out of State Notices, Version 1.1
- IF-1.1 Technical Interface Specification – DMV – Process DL Surrender File, Version 1.3
- IF-1.2 Technical Interface Specification - DMV – Process DL Surrender File, Version 1.4

STANDARD
OPERATING
PROCEDURE

Voter Registration List Maintenance
Department of Motor Vehicles: Full SBE & Non-Citizen
Files

# Contents

1   Description ........................................................................................................................... 1

1.1   Monthly Extract ........................................................................................................... 1

1.2   Full SBE Data Extract ................................................................................................... 2

1.3   Contacts ....................................................................................................................... 3

1.4   Frequency ..................................................................................................................... 4

1.5   Security ........................................................................................................................ 4

1.6   Memorandum of Understanding ................................................................................. 4

2   Process Flow ......................................................................................................................... 5

2.1   Monthly Process .......................................................................................................... 5

2.1.1   Non-Citizen file .................................................................................................... 5

2.1.2   Full SBE Data Extract ........................................................................................... 6

3   Data Elements ...................................................................................................................... 6

3.1   Dataset Name .............................................................................................................. 6

3.2   Data Element Descriptions .......................................................................................... 7

4   Process Steps ...................................................................................................................... 12

4.1   Non-Citizen Process ................................................................................................... 12

4.2   Full DMV Extract Process ........................................................................................... 14

STANDARD
OPERATING
PROCEDURE

Voter Registration List Maintenance
*Department of Motor Vehicles: Full SBE & Non-Citizen
Files*

# Figures

Figure 2-1: — Non-Citizen CD Process Flow ................................................................................. 5

Figure 2-2: — Full SBE Data Extract Process Flow ...................................................................... 6

Figure 4-1: — Example of Monthly File Email from DMV ............................ **Error! Bookmark not defined.**

Figure 4-2: — Example of Monthly File Email from DMV ............................ **Error! Bookmark not defined.**

STANDARD
OPERATING
PROCEDURE

Voter Registration List Maintenance
*Department of Motor Vehicles: Full SBE & Non-Citizen
Files*

# Tables

Table 1-1: — DMV Contact List ................................................................................................ 3

Table 1-2: — DMV Extracts Frequency .................................................................................... 4

Table 3-1: — DMV Extract Names ........................................................................................... 6

Table 3-2: — Monthly Extraction for ELECT Record Layout.......................... **Error! Bookmark not defined.**

Table 3-3: — DMV to VERIS Mapping for Non-Citizen Record Layout.................................... 9

Table 4-1: — GR Decision/Result Matrix ................................................................................ 12

# 1   Description

The National Voter Registration Act of 1993 (NVRA), also known as The Motor Voter Act, requires state governments to provide the opportunity to register to vote when a person applies for or renews their driver's license, changes the address on their driver's license, or applies for social services.  Additionally, Virginia Election Law §24.2 – 410.1 requires the Virginia Department of Motor Vehicles (DMV) to include with the voter registration information a statement asking the applicant to declare if he or she is a United States (US) citizen.  In accordance with these federal and state laws, the Department of Elections (ELECT) uses the data provided by DMV to perform list maintenance activities.

ELECT receives two data files from DMV.  The files are the:

- **Monthly Extraction for SBE (DB195)** that includes data for the previous month all address change records, driver's license surrender records, and records for anyone registering to vote through DMV and indicating to DMV he or she is not a US Citizens.
- **Full SBE Data Extract for (195)** that includes all DMV customer records less any DMV customers under the age of 17.

## 1.1   Monthly Extract

Once DMV extracts the monthly data, DMV uploads the dataset to the DMV secure file transfer protocol (sFTP) server and notifies both ELECT and the Virginia Election and Registration Information System (VERIS) vendor that the data is available.  The Elect DBA  compares the file to the static voter file and loads matching records into each locality's Non-Citizen hopper.

ⓘ   The following information was requested from DMV on April 10, 2019

**Question from Elect:** Does DMV perform any validation if the customer enters conflicting information.  For example, If the customer enters 'No' on the paper DMV application and 'Yes' on the kiosk to citizenship question, do we get this customer in the monthly file and visa versa?

**Answer from DMV:**  DMV does not validate customer answers to determine if they are conflicting.  However, a "no" answer submitted in any method will be captured on the monthly file.  An imaging software runs daily to ensure we capture any "no" answers that were submitted on paper, and the monthly file also pulls from the EMV data and the data submitted on mail-in applications.

**Question from Elect:** If the customer enters 'No' on both paper and the kiosk, do you only send one record or both?

STANDARD
OPERATING
PROCEDURE

Voter Registration List Maintenance
*Department of Motor Vehicles: Full SBE & Non-Citizen
Files*

**Answer from DMV:** Before the file is sent to you it eliminates the duplicate customer entries. I believe it is the last response date that remains on the file, but I can check on that if you need to know.

## 1.2 Full SBE Data Extract

As with the Monthly Extraction for SBE (DB195), DMV uploads the Full SBE Data Extract for (195) dataset to the DMV sFTP server and notifies SBE-IT that the data is available. DMV deletes the extract file after 5 days. A structured query language (SQL) job retrieves the Full Extract file and prepares it for loading and transformation into VERIS. ELECT uses this data to provide other states in the Electronic Registration and Information Center (ERIC) program with Virginia registered voter information for comparison to the other state's records. Refer to the LMSOP for Voter and DMV Upload to ERIC for details on that process.

STANDARD
OPERATING
PROCEDURE

Voter Registration List Maintenance
*Department of Motor Vehicles: Full SBE & Non-Citizen*
*Files*

## 1.3   Contacts

The following table contains contact information for DMV.

Table 1-1: — DMV Contact List

| Contact Name | Contact Phone Number | Contact Email Address |
|---|---|---|
| Penny Lavely | ██████████ | Penny.Lavely@dmv.virginia.gov |
| David Pierce | ██████████ | David.Pierce@dmv.virginia.gov |
| Patricia Pringle | ██████████ | Patricia.Pringle@dmv.virginia.gov |
| David Carrie | ██████████ | David.Carrie@dmv.virginia.gov |
| David Leahy | ██████████ | David.Leahy@dmv.virginia.gov |
| Stefan Yssel | ██████████ | Stefan.Yssel@dmv.virginia.gov |
| Margaret Robinson | ██████████ | Margaret.Robinson@dmv.virginia.gov |
| Matthew Martin | | matthew.martin@dmv.virginia.gov |

## 1.4   Frequency

The following table provides frequency information for each of the DMV Extract files.

Table 1-2: — DMV Extracts Frequency

| Frequency | Received | Method |
|---|---|---|
| Monthly Extract | 11th of the month* | Manual |
| Full Extract—Monthly | 1st of the month* | Manual |
| Daily Non-citizen File | Everyday | Manual |

* When the actual date is on a weekend DMV makes the extract available on the next business day.

## 1.5   Security

ELECT IS maintains the login and password for the DMV Extract and Non-Citizen Excel files in a Microsoft OneNote password protected document on a shared drive with limited access to reduce chance of compromising the data.  The Information Security Officer (ISO) determines who has access to the passwords.  The ISO, Deputy ISO, and Applications Senior Database Architect have access to the passwords.  ELECT IS does not currently encrypt the password information but may change to an encrypted password keeper application in the future.

## 1.6   Memorandum of Understanding

The Memorandum of Understanding (MOU) between ELECT and DMV details the agreement for DMV to provide personal information for individuals with or applying for a Virginia driver's license.  More specifically, the purpose of this MOU is to establish the terms and conditions under which, pursuant to Code of Virginia §§ 46.2-208(B)(9) and 46.2-208.1, DMV provides certain data to ELECT.  This MOU also establishes that ELECT requires this data to conduct its official duties, and the terms and conditions under which ELECT will receive, use, and protect the data provided by DMV.

STANDARD
OPERATING
PROCEDURE

*Voter Registration List Maintenance*
*Department of Motor Vehicles: Full SBE & Non-Citizen*
*Files*

## 2   Process Flow

### 2.1   Monthly Process

#### 2.1.1   Non-Citizen file

This diagram illustrates the detailed process flow for the monthly Non-Citizen CD.  It includes actions taken by DMV, ELECT, VERIS, and the local GR.

**Figure 2-1: — Non-Citizen CD Process Flow**

VIRGINIA
DEPARTMENT *of* ELECTIONS

STANDARD
OPERATING
PROCEDURE

*Voter Registration List Maintenance*
*Department of Motor Vehicles: Full SBE & Non-Citizen*
*Files*

### 2.1.2  Full SBE Data Extract

This diagram illustrates the detailed process flow for the Full SBE Data Extract.  It includes actions taken by DMV, ELECT, VERIS, and the SQL server.

*Figure 2-2: — Full SBE Data Extract Process Flow*



## 3   Data Elements

## 3.1   Dataset Name

*Table 3-1: — DMV Extract Names*

| File Owner | Frequency | File Name | File Location |
|---|---|---|---|
| DMV | Monthly | ███████████ | ████████ |
| DMV | Monthly | ██████████████ | ████████ |
| ELECT | Monthly | █████████████ | █████████████████ |

| File Owner | Frequency | File Name | File Location |
|---|---|---|---|
| ELECT | Monthly | ██████████ | ████████████████ |
| ELECT | Daily | ██████████ | ████████████████ |

## 3.2   Data Element Descriptions

This table identifies the data elements that make up the Monthly Extraction for the ELECT record layout originating from DMV.

**DMV transaction file layout:**

- 7 new Columns in blue were added by DMV to the monthly file for August 2024. They are expected in the Daily Non-Citizen file.

**Table 3-3: — Monthly Extraction for ELECT Record Layout**

| Data Elements (Field Name) | Format | Max. Length (Number of Characters) | Order | File Location |
|---|---|---|---|---|
| Record Type | Text | 1 | 1 | Valid values include: S = Surrender, A = Address Change, N = Non Citizen, P = Paper Application Non-Citizen |
| Social Security Number | Numeric | 9 | 2 | Applicants social security number |
| Last Name | Text | 90 | 3 | Applicants last name |
| First Name | Text | 33 | 4 | Applicants first name |
| Middle Name | Text | 31 | 5 | Applicants middle name |
| Date of Birth | Numeric | 7 | 6 | Valid values include: CYYMMDD, C = 1 = 19, C = 2 = 20 |

STANDARD
OPERATING
PROCEDURE

Voter Registration List Maintenance
Department of Motor Vehicles: Full SBE & Non-Citizen
Files

| Data Elements (Field Name) | Format | Max. Length (Number of Characters) | Order | File Location |
|---|---|---|---|---|
| Gender | Text | 1 | 7 | Valid values include: M = Male, F = Female |
| Address1Street | Alpha-numeric | 35 | 8 | Address1 = mailing address * Address2 = residential address * |
| Address1Street-2 | Alpha-numeric | 35 | 9 | Address1 = mailing address * Address2 = residential address |
| Address1City | Text | 22 | 10 | Address1 = mailing address * Address2 = residential address * |
| Address1State | Text | 2 | 11 | Address1 = mailing address * Address2 = residential address * |
| Address1Zip | Text | 9 | 12 | Address1 = mailing address * Address2 = residential address * |
| Jurisdiction | Text | 4 | 13 | Typically, first letter and last three letters of the jurisdiction. System will match code to DMV provided descriptions from lookup table in VERIS. |
| Address2Street | Alpha-numeric | 35 | 14 | Address2 = residential address * |
| Address2Street-2 | Alpha-numeric | 35 | 15 | Address2 = residential address * |
| Address2City | Text | 22 | 16 | Address2 = residential address * |
| Address2State | Text | 2 | 17 | Address2 = residential address * |
| Address2Zip | Text | 9 | 18 | Address2 = residential address * |
| Declaration Date | Numeric | | 19 | Date DMV applicant declared themselves not a US citizen |
| Customer Number | Alpha-numeric | 12 | 20 | Voter's unique DMV customer number |
| LP Code | Alpha-numeric | 2 | 21 | Legal Presence Code |
| CUST-VERIFICATION-NO-SAVE | Alpha-numeric | 25 | 22 | Verification number returned from SAVE for the customer |
| CUST-UPDT-DTE-SAVE | Text | 8 | 23 | Date of the most recent SAVE update |

Case 1:24-cv-01778-PTG-WBP   Document 92-8   Filed 10/22/24   Page 17 of 22 PageID# 966

STANDARD
OPERATING
PROCEDURE

Voter Registration List Maintenance
*Department of Motor Vehicles: Full SBE & Non-Citizen Files*

| Data Elements (Field Name) | Format | Max. Length (Number of Characters) | Order | File Location |
|---|---|---|---|---|
| DOC-DESC1 | Alpha-numeric | 3 | 24 | Document provided to prove legal presence |
| DOC-NO1 | Alpha-numeric | 15 | 25 | Document number from document used to prove legal presence |
| DOC-DESC2 | Alpha-numeric | 3 | 24 | Document provided to prove legal presence |
| DOC-NO2 | Alpha-numeric | 15 | 25 | Document number from document used to prove legal presence |
| DOC-DESC3 | Alpha-numeric | 3 | 24 | Document provided to prove legal presence |
| DOC-NO3 | Alpha-numeric | 15 | 25 | Document number from document used to prove legal presence |
| NAME-SUFFIX | Alpha-numeric | 5 | 26 | The suffix for an individual's name |

*DMV provides only one address, it is residential; if multiple addresses, 1st = mailing address, 2nd = residential.

This table identifies the record layout for VERIS.  The asterisk (*) following the field name indicates the data comes from the DMV Monthly Extraction for SBE (DB195) file.

**Table 3-2: — DMV to VERIS Mapping for Non-Citizen Record Layout**

| Data Elements (Field Name) | Format | Max. Length (Number of Characters) | Order | File Location |
|---|---|---|---|---|
| Notifying Agency | Text | 50 | 1 | DMV |
| Agency Identifier | Text | 50 | 2 | Unique identifier |
| Update Type * | Text | 1 | 3 | N = DMV Non-Citizen |

★ VIRGINIA ★
DEPARTMENT *of* ELECTIONS

| Data Elements (Field Name) | Format | Max. Length (Number of Characters) | Order | File Location |
|---|---|---|---|---|
| Effective Date * | MMDDYYYY | 8 | 4 | Declaration Date |
| First Name * | Text | 50 | 5 | First Name |
| Middle Name * | Text | 50 | 6 | Middle Name |
| Last Name * | Text | 50 | 7 | Last Name |
| Name Suffix | Text | 3 | 8 | |
| DOB * | MMDDYYYY | 8 | 9 | Date of Birth |
| Gender * | Text | 1 | 10 | Gender |
| Street * | Alpha-numeric | 50 | 11 | Residence Address: # Street |
| Street-2 * | Alpha-numeric | 50 | 12 | Residence Address: # Street-2 |
| City * | Text | 20 | 13 | Residence Address: City |
| State * | Text | 2 | 14 | Residence Address: State |
| Country * | Text | 2 | 15 | Residence: Country |
| Zip * | Numeric | 5 | 16 | Residence: ZIP |
| ZipPlus4 * | Numeric | 10 | 17 | Residence: Zip plus 4 |
| SSN | Numeric | 9 | 18 | Social Security Number |
| Locality Code | Numeric | 3 | 19 | From Jurisdiction table map |
| Aliases | | | | |
| SSN2 | Numeric | 9 | 20 | |
| SSN3 | Numeric | 9 | 21 | |
| SSN4 | Numeric | 9 | 22 | |
| Alias First Name | Text | 50 | 23 | |
| Alias Middle Name | Text | 50 | 24 | |
| Alias Last Name | Text | 50 | 25 | |
| Alias Name Suffix | Text | 3 | 26 | |
| Comment | Text | 255 | 27 | Format will be: <Field1>=<Value1>, ... <FieldN>=<ValueN>. For example, "Jurisdiction Code=ARIA." |

Case 1:24-cv-01778-PTG-WBP   Document 92-8   Filed 10/22/24   Page 19 of 22 PageID# 968

STANDARD
OPERATING
PROCEDURE

Voter Registration List Maintenance
*Department of Motor Vehicles: Full SBE & Non-Citizen
Files*

## 4   Process Steps

### 4.1   Non-Citizen Process

For a step-by-step guide to downloading and processing, please refer to
**LMSOP_StepbyStep_DMV NonCitizen.docx**.

1. The LM Data Analyst initiates the SSIS job ███████████ – PreProcess DMV Non Citizen Monthly File

2. The process executes the file, parsing and validating all records in the same order as received to preload into a temporary staging area in an agency non-citizen temporary table.

3. During preprocessing the following match criteria to our voters list is considered to move records to staging

    SSN + DOB + first three letters of first name + first three letters of last name

4. Once the process loads the records into the agency non-citizen table, the process:

    a. Executes the Matching to VERIS Voters stored procedure that compares all active and inactive status voter registrations to the records in the non-citizen table using a standard confidence factor algorithm of a 65% or greater match.

    b. At a minimum, one of the following sets of criteria must be the same:

        i. Full social security number
        ii. First and Last name
        iii. Last name and date of birth

5. VERIS records potential matches in the Declared Non-Citizen Hopper.

6. The GR reviews the match to determine if the non-citizen and registered voter identified by VERIS is the same person.

7. The GR updates the record and VERIS takes the corresponding action:

*Table 4–1: — GR Decision/Result Matrix*

| GR Update | VERIS Action |
|---|---|
| Citizenship Confirm | Removes pending Non-Citizen Affirmation flag |
| Cancel Voter | Cancels the voter and generates a Cancellation Notice to the cancelled voter |
| Match Rejected | Deletes the match from the Hopper |
| Notify voter | Generates the Notice of Intent to Cancel and provides instructions for proving citizenship |

★ VIRGINIA ★
DEPARTMENT *of* ELECTIONS

STANDARD
OPERATING
PROCEDURE

Voter Registration List Maintenance
*Department of Motor Vehicles: Full SBE & Non-Citizen
Files*

| GR Update | VERIS Action |
|-----------|--------------|
| Research Needed | Holds the match in Hopper until GR takes follow up action |

Case 1:24-cv-01778-PTG-WBP   Document 92-8   Filed 10/22/24   Page 22 of 22 PageID# 971

STANDARD
OPERATING
PROCEDURE

*Voter Registration List Maintenance*
*Department of Motor Vehicles: Full SBE & Non-Citizen*
*Files*

## 4.2    Full DMV Extract Process

DMV and ELECT perform the following list maintenance steps using the Full DMV Monthly Extract. For a step-by-step guide to downloading and processing, please refer to **LMSOP_StepbyStep_DMV Full SBE.docx**.

1.  The DMV FULL Monthly Pre-Process SSIS Job (████████████ DMV FULL Monthly on 2nd at 10:15 PM) runs AUTOMATICALLY every month on the 2nd day at 10:15 pm.

    ⓘ    DMV includes all DMV customer records with the exception of records for individuals under the age of 17.

2.  DMV deletes the full extract from the server location after 5 calendar days from the date DMV posted it.

3.  The SSIS package performs the following steps:

    a.  Retrieves the file from DMV via sFTP and copies to the server

    

    b.  Truncates the file name to ████████████

    c.  Loads the full file into ████████

    d.  Truncates the temporary (TEMP) table

    e.  Loads the following columns into the TEMP table ████████████

    - ████████████████
    - ████████████
    - ████████
    - ██████████
    - ██████████

    f.  Removes all SSN records

    g.  Removes all duplicate SSN records

    h.  Updates temp table with ID number

    i.  Truncates table ████████████

    j.  Loads new records that do not exist in ████████████

    k.  Execute SQL task



# Hopper Processing and Information

# Step by Step Instructions

Author: Kim Minor
Rev. 10/05/2023 by Divya Gautam and Vaidehi Maddireddy

# Contents

General Hopper Information ...................................................................................................................... 3

Hopper Master List ................................................................................................................................... 4

Viewing Voter Matches ............................................................................................................................ 5

Processing Hopper Records ...................................................................................................................... 6

    Processing DMV and Paper OAB (Online Absentee Ballot) Hopper Records ....................................... 6

    Processing In-Person Absentees Hopper Records ............................................................................... 7

    Processing DMV Registration Hopper Records .................................................................................... 8

    Processing DMV and Paper OVR Applications Hopper Records ........................................................... 9

    Processing Felony Convictions Hopper Records ................................................................................ 10

    Processing Duplicates Hopper Records ............................................................................................. 10

    Processing Incomplete Registrations Hopper Records ...................................................................... 12

    Processing Transfers Hopper Records ............................................................................................... 13

    Processing Death Hopper Records .................................................................................................... 14

    Processing Reinstate Voters Hopper Records ................................................................................... 15

    Processing Felony Reinstatements Hopper Records ......................................................................... 16

    Processing Mentally Incapacitated Hopper Records ......................................................................... 17

    Processing DMV Out of State Hopper Records ................................................................................. 18

    Processing Scanned Document Images Hopper Records ................................................................... 31

    Processing Declared Non-Citizen Hopper Records ........................................................................... 33

    Processing Batch Reports Hopper Records ....................................................................................... 37

    Processing SSIS Packages Hopper Records ........................................................................................ 38

    Processing NCOA Matches Hopper Records ..................................................................................... 39

    Processing Notifications Hopper Records ......................................................................................... 40

## General Hopper Information

In VERIS, the term "hopper" refers to a repository of specific record types that require attention from the user. The hoppers allow the user to easily access these records directly from the VERIS home page instead of having to locate the records individually.



The active hoppers are visible in the Hopper Pane, an area located on the right side of the VERIS home page. The Hopper Pane is expanded by default and may be collapsed by clicking the small triangle located in the Hopper Pane heading.

Only those hoppers with pending records are displayed in the Hopper Pane. If a there are no records of a certain type, that hopper will not be displayed in the Hopper Pane.

There are two main objects located in the Hopper Pane: the hopper name and hopper URL. The left side of the pane contains a listing of hopper names with pending records and the right side contains a URL that corresponds to the hopper name. The URL also lists the number of pending records for that particular hopper.

## Hopper Master List

The following is a list of all of the hoppers that can be found in VERIS. They are listed in the order in which they display in VERIS.

1. DMV OAB Applications
2. Paper OAB Applications
3. Paper OAB - Expired
4. In-Person Absentees
5. DMV Registrations
6. DMV OVR Applications
7. Paper OVR Applications
8. Felony Convictions
9. Duplicates
10. Incomplete Registrations
11. Transfers
12. Death
13. Reinstate Voters
14. Felony reinstatements
15. Mentally Incapacitated
16. DMV Out of State
17. Scanned Document Images
18. Declared Non-Citizen
19. Batch reports
20. Queued reports
21. SSIS Packages
22. NCOA Matches
23. Notifications

**A-270**

## Viewing Voter Matches

To view the records for a specific hopper, click the URL that corresponds to the hopper that you wish to view.



*Note:* The URL shows the number of pending records for that particular hopper.

The Hopper Search page for the hopper that you selected will be displayed with all pertinent records shown in the data grid.



**A-271**

## Processing Hopper Records

This section of the Hopper Processing and Information Step-by-Step document contains information about how to process records in various Hoppers. You may find additional information about many of the Hoppers shown in this document in the specific Step-by-Step Document for that area of VERIS. The documents are referenced when possible.

The order of the processes listed below corresponds to the order in which the hoppers display in VERIS. See the **Hopper Master List** section of this document to see the order.

### Processing DMV and Paper OAB (Online Absentee Ballot) Hopper Records



This procedure applies to the following hopper(s):

1. DMV OAB Applications
2. Paper OAB Applications
3. Paper OAB - Expired

The procedure for processing DMV and Paper OAB hopper records is described in the **Online Absentee Ballot Processing Step-by-Step** document.

**A-272**

## Processing In-Person Absentees Hopper Records



This procedure applies to the following hopper(s):

      In-Person Absentees

The procedure for processing In-Person Absentee records is described in the **Absentee Step-by-Step** document.

A-273

## Processing DMV Registration Hopper Records



This procedure applies to the following hopper(s):

DMV Registrations

The procedure for processing DMV Registrations records is described in the **Add-Update Voter Step-by-Step** document.

## Processing DMV and Paper OVR Applications Hopper Records



This procedure applies to the following hopper(s):

1. DMV OVR Applications
2. Paper OVR Applications

The procedure for processing DMV and Paper OVR Applications records is described in the **OVR Processing Step-by-Step document.**

## Processing Felony Convictions Hopper Records



This procedure applies to the following hopper(s):

Felony Conviction

The procedure for processing Felony Conviction records is described in the **Add-Update Voter Step-by-Step** document.

## Processing Duplicates Hopper Records



This procedure applies to the following hopper(s):

Duplicates

1. Click on the "Duplicates" Hopper.

**A-276**

2. "Duplicate Search" page is displayed.



3. If the voter, you search does not display on the list then Enter the "Last name" and click "Search".

4. Click on the link in the % column to match that you wish to process.
   The "Duplicate view page" is displayed.

There are no other duplicate matches available.

A-277

5.   Perform one of the following:

| If... | Then... |
|---|---|
| The voter match is approved, the duplicate Voter Record merge as single record. | Select **Merge Approve** from the **Action** drop-down list box.<br><br>*Note:* When you click the **Save** button, a pop-up shows for conformation of merger. Click "ok", the system Merge the Duplicate record as single record, removes the name of the voter from the "Duplicates" Hopper. |
| The voter match is not accepted, then Duplicate Voter Record remains the same. | Select **Merge Rejected** from the **Action** drop-down list box.<br><br>*Note:* When you click the **Save** button, the system only rejects the record as Duplicate Record, the record will be removed from the "Duplicates" hopper but remain as individual record. |
| Further research is needed to determine if the Hopper record matches. | Select **Research Needed** from the **Action** drop-down list box.<br><br>*Note:* When you click the **Save** button, the system keeps in the hopper to be processed later and set 'R' flag to "Yes". |

## Processing Incomplete Registrations Hopper Records



This procedure applies to the following hopper(s):

Incomplete Registrations

The procedure for processing Incomplete Registrations records is described in the **Add-Update Voter Step-by-Step** document.

## Processing Transfers Hopper Records



This procedure applies to the following hopper(s):

Transfers

The procedure for processing Transfers records is described in the **Add-Update Voter Step-by-Step** document.

**A-279**

## Processing Death Hopper Records



This procedure applies to the following hopper(s):

     **Death**

The procedure for processing Death records is described in the **Add-Update Voter Step-by-Step** document.

## Processing Reinstate Voters Hopper Records



This procedure applies to the following hopper(s):

     Reinstate Voters

The procedure for processing Reinstate Voters records is described in the **Add-Update Voter Step-by-Step** document.

**A-281**

### Processing Felony Reinstatements Hopper Records



This procedure applies to the following hopper(s):

       Felony Reinstatements

The procedure for processing Felony Reinstatements records is described in the **Add-Update Voter Step-by-Step** document.



## Processing Mentally Incapacitated Hopper Records



This procedure applies to the following hopper(s):

Mentally Incapacitated

The procedure for processing Mentally Incapacitated records is described in the **Add-Update Voter Step-by-Step document.**

**A-283**

## Processing DMV Out of State Hopper Records



This procedure applies to the following hopper(s):

DMV Out of State

1.  Follow the procedure for **Viewing Voter Matches** to view the DMV Out of State Hopper.

    The DMV Out of State Matches page is displayed with the data grid populated.



2.  Click the link in the % column that corresponds to the match that you wish to process.

    The **Hopper** View page is displayed.

**A-284**



3.  Perform one of the following:

| If... | Then... |
|-------|---------|
| The voter match is approved, the voter registration status is marked 'Cancelled' and cancellation notices should be generated for the voter. | Select **Match Approved** from the **Action** drop-down list box. <br><br> *Note:* When you click the **Save** button, the system changes the registration status of the voter's current Voter Registration record to "Cancelled", change the NVRA Status Reason to "DMV Surrender Out Of State", set Comment on "Comment Detail Page" to "Status was changed to Cancelled on {Date, Time}. Reason: DMV Surrender out of state.", remove the out of state record from the OOS Hopper and generate correspondence notices as ENG_Cancellation Letter, VA Registration Mailing Address and ENG_Cancellation Letter, Out of State Address. |

**A-285**

| If... | Then... |
|---|---|
| The voter match is not accepted, and the record is removed from the hopper. | Select **Match Rejected** from the **Action** drop-down list box.<br><br>*Note:* When you click the **Save** button, the system only removes the voter from the hopper. |
| Further research is needed to determine if the Hopper record matches. | Select **Research Needed** from the **Action** drop-down list box.<br><br>*Note:* When you click the **Save** button, the system keeps in the hopper to be processed later and set 'R' flag to true. |

4. Enter additional information in the **Comments** field as necessary.

5. Click the **Save** button.

   The information is saved to the database.

   *Note:* You may click the **Return** button to return to the Hopper Search page without saving.

6. Click Home, Voter, Voter Search, enter First and Last name, choose Registration Status as Cancelled and click Search.

7.   Select the matching voter and land on Overview page.

8.

ENG_Cancellation Letter, VA Registration Mailing Address will display.

**A-287**

9.   Click magnify glass for each letter to see the actual letter or click the printer to print the letters.

**MADISON COUNTY**
Office of Voter Registration
PO Box 267
Madison, VA 22727-0267

E-mail:   registrar@madisonco.virginia.gov          Phone:   540-948-6533
Website:   https://www.madisonco.virginia.gov/registrar   Fax:

TO:                                    DATE:  9/11/2023

**Voter Registration Cancellation Notice**

This office has determined that ▮▮▮▮▮▮▮▮▮▮ is no longer entitled
to be registered to vote in the Commonwealth of Virginia because you have moved to another state. Therefore, as
permitted by §24.2-427 of the Code of Virginia, this office has stricken your name from the Voter Registration
List of MADISON COUNTY.

If you have not registered to vote in the state in which you currently reside, you may apply to register to vote by
contacting the voter registration office near you for the voter registration application of your state or by
accessing the Election Assistance Commission website at www.eac.gov to obtain the federal voter registration
application.

If you believe the removal of ▮▮▮▮▮▮▮▮▮ from the Voter
Registration List is incorrect, please contact this office at 540-948-6533.

LAUREN Y. EANES

---

**MADISON COUNTY**
Office of Voter Registration
PO Box 267
Madison, VA 22727-0267

E-mail:   registrar@madisonco.virginia.gov          Phone:   540-948-6533
Website:   https://www.madisonco.virginia.gov/registrar   Fax:

TO:                                    DATE:  9/11/2023

**Voter Registration Cancellation Notice**

This office has determined that ▮▮▮▮▮▮▮▮▮▮ is no longer entitled
to be registered to vote in the Commonwealth of Virginia because you have moved to another state. Therefore, as
permitted by §24.2-427 of the Code of Virginia, this office has stricken your name from the Voter Registration
List of MADISON COUNTY.

If you have not registered to vote in the state in which you currently reside, you may apply to register to vote by
contacting the voter registration office near you for the voter registration application of your state or by
accessing the Election Assistance Commission website at www.eac.gov to obtain the federal voter registration
application.

If you believe the removal of ▮▮▮▮▮▮▮▮▮ from the Voter
Registration List is incorrect, please contact this office at 540-948-6533.

LAUREN Y. EANES
General Registrar
Madison County Voter Registration Office

**A-288**

**Processing the DMV Out of State Cancellation Letters from batch report:**

To access the DMV OOS cancellation letters from the batch report, perform the following steps:

1. In VERIS Homepage, move the cursor to "Report" > "Batch Reporting".
2. The Batch Reporting page is displayed. It contains both "Cancellation letter Out of State Address" and "Cancellation Letter VA Registration Mailing Address" in Spanish as well as English.



3. For ENG_Cancellation Letter, Out of State Address
   Click on ENG_Cancellation Letter, Out of State Address. It will display the list of all the cancelled voter.



4. For ENG_Cancellation Letter, VA Registration Mailing Address.
   Click on ENG_Cancellation Letter, VA Registration Mailing Address. It will display the list of cancelled voters with VA Mailing Address.

**A-289**



**Generating the Cancellation – Out of State Report:**

1. In VERIS Homepage, move cursor to Select Report > Report Library.
2. Select "Voter" from the Categories drop down menu.



3.
4. Select "Cancellation-Out of State" from the list.

**A-290**



5.  Report Library page for Cancellation- Out of state report is displayed.



6.  Fill the information along with the "Start date" and "End date" of the batch to be generated.



If the Start Date and End Date is not entered, then it generates the list of all the cancelled voters till date.

7. Report is set to PDF by default.
8. Click on View/ print.

**A-292**



9.  To schedule the report to run at a specific day and time frame. Click the 'Scheduled Report' check box.
10. Select the desired time form the given options.



11. Click View/ print report.
12. Report will be processed in Queue.



## Viewing the Cancelled Out of State Report:

1. In VERIS Homepage, go to the "Schedule & Queued Report" section.
2. Click on the report that has the recent date and time of the generated report.



3. Report is generated.
   a. When entered Start date and End date.

**A-294**

| Locality: 113 | **COMMONWEALTH OF VIRGINIA** | **Start Date: 09/11/2023** |
|---|---|---|
| Precinct: ALL | **DEPARTMENT OF ELECTIONS** | **End Date: 09/11/2023** |
| District: ALL | **Cancellation - Out of State** | |

## 113 - MADISON COUNTY

### DMV Surrender Out Of State

**September 2023**

| PCT | Name<br>Address | Registration ID<br>Email Address | Cancel<br>Date | Cancel Type |
|---|---|---|---|---|
| 0001 | HANDWORK, MELISSA D. | 145790079 | 9/11/2023 | Active Cancel - DMV<br>Surrender Out Of State |
| | 1540 Meander Run Rd - Locust Dale, VA  22948-4813 | | | |

### DMV Surrender Out Of State Total:  1

b.   When Start date and End date is not entered.

**A-295**

<table>
<tr><td>

**Locality: 113**
**Precinct: ALL**
**District: ALL**

</td><td>

**COMMONWEALTH OF VIRGINIA**
**DEPARTMENT OF ELECTIONS**
**Cancellation - Out of State**
**113 - MADISON COUNTY**

</td><td>

**Start Date: N/A**
**End Date: N/A**

</td></tr>
</table>

**DMV Surrender Out Of State**

**August 2023**

| PCT | Name<br>Address | Registration ID<br>Email Address | Cancel<br>Date | Cancel Type |
|-----|-----------------|----------------------------------|----------------|-------------|
| 0006 | HAINES, MEAGAN A.<br>111 Florence Ln - Stanardsville, VA 22973-2192 | 082997316 | 8/30/2023 | Active Cancel - DMV<br>Surrender Out Of State |

**September 2023**

| PCT | Name<br>Address | Registration ID<br>Email Address | Cancel<br>Date | Cancel Type |
|-----|-----------------|----------------------------------|----------------|-------------|
| 0001 | HANDWORK, MELISSA D.<br>1540 Meander Run Rd - Locust Dale, VA 22948-4813 | 145790079 | 9/11/2023 | Active Cancel - DMV<br>Surrender Out Of State |

**DMV Surrender Out Of State Total:  2**

**A-296**



Processing Scanned Document Images Hopper Records



This procedure applies to the following hopper(s):

Scanned Document Images

1. Follow the procedure for **Viewing Voter Matches** to view the Scanned Document Images Hopper.

   The Scanned Document Matches page is displayed with the data grid populated.

**A-297**



2. Perform one of the following:

| To... | Then... |
| --- | --- |
| View a scanned document image... | Click the name of the document that you wish to view in the Document Type column. |
| Delete a scanned document image... | Click the delete icon ✖ that corresponds to the document that you wish to delete. |

*Note:* The data grid may be sorted by clicking on the various headers.

*Note:* The data grid may be filtered by User or Batch Name by using the filter drop down menus above the data grid.

**A-298**

## Processing Declared Non-Citizen Hopper Records



This procedure applies to the following hopper(s):

   Declared Non-Citizen

1.  Follow the procedure for **Viewing Voter Matches** to view the Declared Non-Citizens Hopper.

    The Declared Non-Citizens Matches page is displayed with the data grid populated.



2.  Click the link in the % column that corresponds to the match that you wish to process.

    The Hopper View page is displayed.

**A-299**



**A-300**

3.  Perform one of the following:

| If... | Then... |
|---|---|
| The existing registration and the declared non-citizen record match and you have not yet notified the voter... | Select **Notify Voter** from the **Action** drop-down list box.<br><br>*Note:* When you click the **Save** button, the system retains the record in the Hopper and creates correspondence to notify the voter of his or her non-citizen status. |
| The voter confirmed his or her citizenship by completing, signing, and returning the Affirmation of United States Citizenship form within 14 days of notification... | Perform one of the following:<br><br><table><tr><td>**If...**</td><td>**Then...**</td></tr><tr><td>The voter returned the barcoded form...</td><td>Scan the barcode on the Affirmation of United States Citizenship form.<br><br>The system marks the record as citizenship confirmed, removes the record from the Hopper, and generates correspondence history to indicate correspondence was received from the voter.</td></tr><tr><td>The voter did not return the barcoded form...</td><td>Select **Citizenship Confirmed** from the **Action** drop-down list box.<br><br>*Note:* When you click the **Save** button, the system removes the record from the Hopper and generates correspondence history to indicate correspondence was received from the voter.</td></tr></table> |
| The existing registration and the declared non-citizen record do not match... | Select **Match Rejected** from the **Action** drop-down list box.<br><br>*Note:* When you click the **Save** button, the system removes the record from the Hopper. |

**A-301**

| If... | Then... |
|---|---|
| If you notified the voter of his or her non-citizen status and the voter did not confirm his or her citizenship by completing, signing, and returning the Affirmation of United States Citizenship form within 14 days of notification... | The System will automatically cancel the voter 21 days after notification if the voter has not confirmed citizenship.<br><br>**OR**<br><br>The voter can be cancelled manually if the you need to cancel the voter immediately after the 14-day window.<br><br>Select **Cancel Voter** from the **Action** drop-down list box.<br><br>*Note:* When you click the **Save** button, the system generates a cancellation notice to notify the voter that their voting privileges have been revoked. |
| Further research is needed to determine if the Hopper record matches... | Select **Research Needed** from the **Action** drop-down list box.<br><br>*Note:* When you click the **Save** button, the system removes the declared non-citizen record from the Declared Non-Citizens Hopper and adds it to the Incomplete Registrations Hopper. |

4.  Enter additional information in the **Comments** field as necessary.

5.  Click the **Save** button.

    The information is saved to the database.

    *Note:* You may click the **Return** button to return to the Hopper View page without saving.

**A-302**

### Processing Batch Reports Hopper Records



This procedure applies to the following hopper(s):

Batch Reports

The procedure for processing Batch Reports records is described in the **Voter Correspondence Step-by-Step** document.

**A-303**

## Processing SSIS Packages Hopper Records



This procedure applies to the following hopper(s):

SSIS Packages

1. Follow the procedure for **Viewing Voter Matches** to view the SSIS Packages Hopper.

   The Declared Non-Citizens Matches page is displayed with the data grid populated.



   *Note:* The data grid may be sorted by clicking on the various headers.

   *Note:* The data grid may be filtered by User, Package, or Status by using the filter drop down menus above the data grid.

2. Perform one of the following:

| To... | Then... |
|---|---|
| View details for a SSIS Package... | Click the name of the SSIS Package that you wish to view in the Package Name column. |
| Delete a SSIS Package... | Click the delete icon ✖ that corresponds to the SSIS Package that you wish to delete. |
| Give a SSIS Package a priority status... | Select the checkbox ☑ in the PS (Priority Status) column. |

## Processing NCOA Matches Hopper Records



This procedure applies to the following hopper(s):

     NCOA Matches

The procedure for processing NCOA Matches records is described in the **NCOA Processing Step-by-Step** document.

**A-305**

## Processing Notifications Hopper Records





This procedure applies to the following hopper(s):

Notifications

1. Follow the procedure for **Viewing Voter Matches** to view the Notifications Hopper.

   The Hopper Notifications Summary page is displayed with the data grid populated.



*Note:* Unread Hopper Notifications appear bolded in the data grid. Notifications that have already been read are not bolded.

*Note:* The data grid may be filtered by using the filter fields above the data grid.

**A-306**

2. Perform one of the following:

| To... | Then... |
|---|---|
| View Hopper Notification Detail... | Click the date of the Hopper Notification that you wish to view in the Date column. |
| Mark a Hopper Notification as read... | 1. Select the Hopper Notification that you wish to mark as read by selecting the checkbox ☑ that corresponds with it. |
| | 2. Select **Mark as Read** from the **Select Action** drop down menu. |
| | 3. Click the **Update** button. |
| Mark a Hopper Notification as unread... | 1. Select the Hopper Notification that you wish to mark as read by selecting the checkbox ☑ that corresponds with it. |
| | 2. Select **Mark as Unread** from the **Select Action** drop down menu. |
| | 3. Click the **Update** button. |
| Delete a Hopper Notification... | 1. Select the Hopper Notification that you wish to mark as read by selecting the checkbox ☑ that corresponds with it. |
| | 2. Select **Delete** from the **Select Action** drop down menu. |
| | 3. Click the **Update** button. |
| Mark all Hopper Notifications as read... | Click the **Mark All Read** button. |
| Send a Hopper Notification to another user or users... | 1. Click the **New Message** button. |
| | 2. Select the user to whom you wish to send a message by clicking them in the **Available** field. |
| | 3. Click the **Select** button to add the user to the **Selected** field. |

**A-307**

|  | *Note:* You may remove users from the notification by selecting their username in the Selected field and clicking the Remove button.<br><br>4. Repeat steps 2 and 3 until all desired users are included.<br><br>5. Enter your message into the **Message** field.<br><br>6. Click the **Send** button.<br><br>*Note:* Click the Cancel button to return to the Hopper Notifications Summary screen without sending a message. |
|---|---|

**A-308**

**FAIRFAX COUNTY**
Office of Voter Registration
PO Box 10161
Fairfax, VA  22038-8061

E-mail:   voting@fairfaxcounty.gov

Website:   http://www.fairfaxcounty.gov/elections

Phone:   703-222-0776

Fax:   703-324-2205

ÌVR*Vthn5/+nRHWqMJjmadr6Vw`Î

**TO:** ▮▮▮▮▮▮▮

**DATE:**  9/3/2024

# NOTICE OF INTENT TO CANCEL

We have received information that you may not be a citizen of the United States based on information from a recent Virginia Department of Motor Vehicles (DMV) application or from information received through the U.S. Department of Homeland Security's (DHS) Systematic Alien Verification for Entitlements (SAVE) Program. If this information is correct, you are not eligible to register to vote.

If the information is incorrect and you are a citizen of the United States, please complete the Affirmation of Citizenship form and return it using the enclosed envelope. If you do not respond within 14 days, you will be removed from the list of registered voters.

If the information is incorrect and you have an account with the DHS U.S. Citizenship and Immigration Services (USCIS), please review your citizenship record for any necessary corrections. To obtain your records you may submit a request online at:
https://www.uscis.gov/records/request-records-through-the-freedom-of-information-act-or-privacy-act

If you need a replacement of your Naturalization Certificate or Certificate of Citizenship, or believe the information obtained from the DHS through the SAVE Program did not provide accurate information about your citizenship status and you need to make corrections to your citizenship record, please contact USCIS by using one of the following methods:

1. File a Form N-565 to obtain a replacement of your Naturalization Certificate or Certificate of Citizenship. The Form N-565 and instructions for filing can be found at:
   http://www.uscis.gov/files/form/n-565.pdf and
   https://www.uscis.gov/sites/default/files/document/forms/n-565instr.pdf .

Cancel-ELECT410.1

2. Schedule an appointment for an in-person interview at a local USCIS office to correct your record. You may call the National Customer Service Center at 1-800-375-5283.

3. Submit a request in writing to correct your record to the Freedom of Information Act/Privacy Act (FOIA/PA) Office at the following address:

   Privacy Act Amendment
   U.S. Citizenship and Immigration Services
   National Records Center
   FOIA/PA Office
   P.O. Box 648010
   Lee's Summit, MO 64064-8010

If this notice presents any additional questions, please contact the Office of the General Registrar for your county or city.

_____

ERIC SPICER
General Registrar
Fairfax County Office of Elections

ELECT-410.1

**A-310**

ÌVR*Vthn5/+nRHWqMJjmadr6Vw`Î

COMMONWEALTH OF VIRGINIA
# AFFIRMATION OF CITIZENSHIP
### § 24.2-410.1 of the Code of Virginia

**SUBJECT TO PENALTY OF LAW, I DO HEREBY AFFIRM THAT I AM A CITIZEN OF THE UNITED STATES OF AMERICA**

_____

SIGNATURE OF VOTER

PRINTED NAME
OF VOTER:
_____

| | |
|---|---|
| Date of birth: | |
| Current address: | Street/P.O. Box/Apt.#<br>City/Town/State/Zip |
| Mailing address [if different]: | Street/P.O. Box/Apt.#<br>City/Town/State/Zip |
| Daytime telephone number: | |
| Email address: | |

**>  INTENTIONALLY MAKING A MATERIALLY FALSE STATEMENT ON THIS FORM IS A FELONY.  THE PUNISHMENT IS UP TO TEN YEARS IN PRISON AND A FINE UP TO $2,500.  YOU ALSO LOSE YOUR RIGHT TO VOTE.**

IF YOU ARE A CITIZEN, PLEASE RETURN COMPLETED FORM TO:

### Fairfax County Office of Elections
Office of Voter Registration
PO Box 10161
Fairfax, VA  22038-8061

Cancel-ELECT410.1

**A-311**

# Voter Registration Cancellation Notice

This office has cancelled the voter registration of ███████████████████████ (date of birth ██████████). That action was taken on the basis of official notification from the Virginia Department of Elections that you failed to timely respond to a request to affirm your United States Citizenship within the 14 days allowed by the Code of Virginia (§24.2-427).  Therefore, this office has stricken your name from the Voter Registration List of ARLINGTON COUNTY.

If you believe the removal of ████████████████████████ from the Voter Registration List is incorrect, please contact this office at 703-228-3456.

Declared Non-citizen



*Commonwealth of Virginia*
*Office of the Governor*

# *Executive Order*

### NUMBER THIRTY-FIVE (2024)

### COMPREHENSIVE ELECTION SECURITY PROTECTING
### LEGAL VOTERS AND ACCURATE COUNTING

By virtue of the authority vested in me as Governor, I hereby issue this Executive Order to protect the casting of legal ballots by legally eligible voters in Virginia's elections, including with stringent ballot security, complete and thorough counting machine testing, and best-in-the-nation voter list maintenance.

**<u>Importance of Initiative</u>**

In Virginia, we have established a comprehensive approach and continuous improvement process for election security, which is necessary to ensure that individuals cast legal votes. The Virginia model for securing elections has proven itself over the past few years despite the significant expansion of voting days and locations and the lingering effects of the pandemic on state and local governments. Under my Administration, Virginia has made unprecedented strides in improving the accuracy of our voter list including substantial updates for removal of deceased voters and protection against non-citizen registration.

Recent improvements we have made include establishing comprehensive data-sharing agreements with seven states and receiving additional data from 42 states.

We conducted multiple National Change of Address mailings over the past two years and will continue to conduct them.  This process identifies individuals who no longer reside in Virginia.  The streamlined process for eliminating deceased voters includes accessing a national death record database and conducting a comprehensive audit.  This resulted in us removing 79,867 deceased voters in 2023.

Virginia is one of only three states in the nation that require those registering to vote to provide their full 9-digit social security number for registration. Over ninety percent of voters in Virginia submit electronic registration applications online through the Department of Elections (ELECT), which requires a valid Department of Motor Vehicles (DMV) credential, or submit registration applications when conducting transactions with DMV.

DMV requires applicants to submit proof of identity and legal presence for those that do not yet hold a valid Virginia credential. When issuing a credential such as a driver's license, DMV verifies applicants' proof of identity and legal status with the Department Homeland Security Systematic Alien Verification for Entitlements (SAVE) database and the Social Security Administration database.

All data collected by the DMV that identifies non-citizens is shared with ELECT, which uses it to scrub existing voter rolls and remove non-citizens who may have purposefully or accidentally registered to vote. According to data from ELECT, between January 2022 and July 2024, records indicate we removed 6,303 non-citizens from the voter rolls.

Executive Order 31 reinforced the need for timeliness of interagency data. The multi-agency data sharing protocols and standards developed by the working group called for in the Executive Order ensure the accuracy, reliability, privacy, and timeliness of the data used for list maintenance.

The audits we conduct of Virginia's list maintenance practices have not only been effective but have also earned national recognition for robust list maintenance improvements and new initiatives. This recognition is a testament to the fairness, transparency, and legality of Virginia's voting process, which includes:

- 100% paper ballots which provide a physical record of the voter's intent
- Use of paper ballot counting machines, not voting machines
- Strict chain of custody for ballots with daily reconciliation during early voting
- Application required to receive a mail ballot - no mass mailing of ballots
- Counting machines tested prior to every election
- Counting machines not connected to the internet
- Drop boxes under 24/7 monitoring

As we continue to make improvements, the Commonwealth will remain steadfast in its efforts to provide Virginians with the confidence they deserve in their elections. Our election security model is designed to prevent illegal votes and guarantee legal votes are accurately counted. However, security procedures can only be as strong as the state and federal law which governs voting. Further strengthening of Virginia's election security system will rely on strengthening state and federal law.

**Directive**

Accordingly, pursuant to the authority vested in me as the Chief Executive Officer of the Commonwealth, and pursuant to Article V of the Constitution of Virginia and the laws of the Commonwealth, I hereby direct all relevant Secretariats and Agencies to take the following actions:

**Certification of Election Security Procedures**

In order to maintain the collaboration and coordination between internal and external parties necessary to maintain the highest level of security, the Commissioner of the Department of

2

**A-314**

Elections shall certify annually in writing to the Governor that the following election security procedures are in place, including the training of registrars regarding these critical procedures, and that the Commonwealth's system of checks and balances to maintain secure elections is functioning optimally.

1. Ballot Security:
    a. There is a documented chain of custody for paper ballots with daily reconciliation during early voting.
    b. Ballots are tracked through every step of the process.
    c. In precincts on election day and during early voting, ballots cast are reconciled against the number of voters checked in and number of ballots distributed to voters.
    d. Absentee ballots must be requested by a registered voter before being mailed.
    e. Marked absentee ballots may not be counted until the last four digits of a voter's social security number and year of birth provided on the envelope are matched to the voter's record in the statewide voter registration system.
    f. Use of provisional ballots for the Same Day Registration process, which requires that these ballots are not counted in the precinct but go back to the registrar's office for determination of eligibility and adjudication by the Electoral Board.
    g. 100% paper ballots are used in Virginia and are retained by clerks of court for 22 months.

2. Counting Machine Testing and Certification
    a. Virginia does not use "voting machines" just paper ballot counting machines.
    b. No ballot counting machines are connected to the internet.
    c. All counting machines are certified to state and federal standards.
    d. Every piece of equipment utilized in the voting and counting process, such as electronic pollbooks, is tested before use in a polling place.

3. Triple-Check of Election Result Accuracy
    a. Officers of election check election results at the precinct level on election night.
    b. Electoral Boards check elections results at the locality level in the post-election canvass.
    c. Department of Elections staff check elections results at the state level through results review and audits prior to certification.

**Certification of Accuracy of Voter Lists**

The Commissioner of the Department of Elections shall certify in writing to the Governor that the following election security procedures are in place to protect voter lists:

1. Daily Updates to the Voter List to:
    a. Add new eligible voters.
    b. Remove voters who have moved in accordance with federal and state law.
    c. Remove deceased voters.

    d.  Remove ineligible voters, including felons and mentally incapacitated.

    e.  Remove individuals who are unable to verify that they are citizens to the Department of Motor Vehicles from the statewide voter registration list, should that individual either intentionally or unintentionally attempt to register to vote, in accordance with federal and state law.

    f.  The Department of Elections compares the list of individuals who have been identified as non-citizens to the list of existing registered voters and then registrars notify any matches of their pending cancellation unless they affirm their citizenship within 14 days.

2.  When issuing a credential such as a driver's license, DMV verifies applicants' proof of identity and legal status with the Department Homeland Security Systematic Alien Verification for Entitlements (SAVE) database and the Social Security Administration database.

**Referral for False Claims of Citizenship**

The Department of Motor Vehicles shall expedite the interagency data sharing with the Department of Elections of non-citizens by generating a daily file of all non-citizens transactions, including addresses and document numbers.

In accordance with the *Code of Virginia* § 24.2-429, all registrars are required to cancel the registrations of non-citizens who have registered to vote in a local, state, or federal election by falsely claiming that they are a citizen, including the forging of documentation or any other means of improper registration. *Code of Virginia* § 24.2-1019 additionally requires said registrars to immediately notify the Commonwealth's Attorney for their jurisdiction of this alleged unlawful conduct. Additionally, the Office of the Attorney General has full authority to enforce election laws pursuant to *Code of Virginia* § 24.2-104.

**Awareness Campaign for Election Security**

The Department of Elections shall encourage and provide information to all general registrars to post or provide to voters directly regarding election-related offenses and their punishments (Title 24.2, Chapter 10 of the *Code of Virginia*), including:

- § 24.2-1000. Intimidation and threats toward election officials; penalty.
- § 24.2-1002.1. Unlawful disclosure or use of social security number or part thereof.
- § 24.2-1004. Illegal voting and registrations.
- § 24.2-1009. Stealing or tampering with ballot containers, voting or registration equipment, software, records or documents.
- § 24.2-1007. Soliciting or accepting bribe to influence or procure vote.
- § 24.2-1016. False statements; penalties.

All state agencies that register individuals to vote shall post the aforementioned information in a conspicuous place or provide it to applicants directly.

4

**A-316**

Given under my hand and under the Seal of the Commonwealth of Virginia this 7th day of August, 2024.



Glenn Youngkin, Governor

Attest:

Kelly Gee, Secretary of the Commonwealth

5

**A-317**

★ VIRGINIA ★

# DEPARTMENT *of* ELECTIONS

**Official ELECT Advisory**

**DATE:** October 16, 2024

**SUBJECT:** Updated List Maintenance Calendar and Close of Books - Start of Same Day Registration

**WHY THIS IS NEEDED:** 24.2-420.1. Extended time for certain persons to register in person.

A. Notwithstanding the provisions of § 24.2-416, any person who is qualified to register to vote shall be entitled to register in person up to and including the day of the election at the office of the general registrar in the locality in which such person resides or at the polling place for the precinct in which such person resides.

**HOW THIS AFFECTS YOU:** **Due to the close of books, voters who are not registered will begin using Same Day Registration on October 16, 2024.** It may also be important to note that Early Voting ends on November 2 and all SDR-EV voter registration applications must be entered into VERIS before you prepare your pollbook.

**ACTION ITEMS:**
1. **Updated List Maintenance Calendar**
   a. Please review the attached List Maintenance Calendar. **All statutorily required list maintenance records from state agencies, including noncitizens and felons, have been processed to registrars' hoppers as of October 14, 2024.** Per Virginia Code, the regular registration deadline has now passed, as such, ELECT will not process any additional records to your hoppers until after the election, except for weekly death records as required by law. Please check your hoppers to ensure records are timely reviewed so pollbooks are up to date as SDR begins.
2. **SDR Basics**
   a. Please read the guidance released on FormsWarehouse and in advisories related to Same Day Registration (SDR). Many of your questions are likely answered in those documents.
   b. **SDR is an in-person process only** and cannot be done with a mailed, electronic or third-party voter registration application.
   c. All same-day registrants **may only cast a provisional ballot.** Ballots cast by same-day

**A-318**

registrants cannot be voted on the machine or counted until they have been adjudicated by the Electoral Board. There are no exceptions.

d. The **five-day wait period does not apply to SDR**.
- The five-day wait period does not apply to mail ballots regardless of SDR.
- The 5-day wait period still applies to voters registering before the voter registration deadline on October 15, 2024. Nothing has changed about the 5-day wait period before the close of books.

e. All forms of acceptable ID apply for same-day registrants. If a same-day registrant does not have any of those forms of ID, they may sign the ID Confirmation Statement.

f. Same-day applications from early voting need to be entered into VERIS before you pull your pollbook so voters show up appropriately. It is advisable to enter these throughout early voting so records are updated promptly.

g. **SDR happens in the precinct or early voting site in which the voter's current address makes them eligible.**

h. The deadline to enter same-day applications received on Election Day *was extended this year* to **Monday, November 11, 2024 at 5:00 PM**.
- Please bear in mind that Monday, November 11 is a federal holiday. This **deadline will not move** to the subsequent Tuesday to accommodate for the holiday. **If your office will be closed on that Monday, you should have same-day applications processed by Sunday, November 10, 2024.**
- The Duplicate Report will be emailed to general registrars on **Tuesday, November 12, 2024.**

3. For more detailed information regarding SDR, you may choose to view a recording of the SDR Webinar and associated materials on the internal Learning Management System (LMS).

**CRITICAL DIRECTIVE: This SDR training webinar was li mited to those with VERIS/2FA OKTA access. DO NOT share or forward the recording to those without VERIS permission as the presentation contains proprietary information and sharing would be a violation of our privacy policy.**

i. **To watch the recording:** Log in to ELECT's Learning Management System (LMS), go to "My

Courses," and choose "Same Day Registration Webinar (8-31-22)."

ii. **To view SDR related documents and materials:** https://www.elections.virginia.gov /formswarehouse/election-management/

CONTACT:   **For technical matters:**   Submit a JIRA ticket to the System Support team for all VERIS-related issues

**For Election Admin:**   EA@elections.virginia.gov

**For all other matters:**

Region 1 (Tidewater)       Viki Mainwaring   804-593-2274  victoria.mainwaring@elections.virginia.gov

Region 2 (South Central)   Viki Mainwaring   804-593-2274  victoria.mainwaring@elections.virginia.gov

Region 3 (North Central)   Monique Semple 804-774-4694  monique.semple@elections.virginia.gov

Region 4 (South Western)  Tanya Pruett       804-864-8931  tanya.pruett@elections.virginia.gov

Region 5 (Northern)       Matthew Norcutt 804-801-6435  matthew.norcutt@elections.virginia.gov

Region 6 (Western)       Conrad Faett       804-774-4700  conrad.faett@elections.virginia.gov

Region 7 (Southern)       Viki Mainwaring   804-593-2274  victoria.mainwaring@elections.virginia.gov

ADVISORY NUMBER:   ⚠ **COMM-765** - LM Calendar and SDR  PUBLISH ADVISORY

<u>ROUGH DRAFT</u>

October 24, 2024

VIRGINIA COALITION FOR IMMIGRANT RIGHTS, et al.,

v.

SUSAN BEALS, et al.,

Case Number: 1:24-cv-01778-PTG-WBP

1    <u>**THURSDAY MORNING SESSION, OCTOBER 24, 2024**</u>

2    (10:03 a.m.)

3        THE COURTROOM CLERK:  The Court calls *Virginia Coalition*

4    *For Immigrant Rights, et al. versus Susan Beals, et al.*, Case

5    Number 1:24-cv-1778.

6        May I have appearances please first for the Plaintiffs?

7        MR. FERGUSON:  Brent Ferguson, Your Honor, for the Private

8    Plaintiffs.

9        MR. GORDON:  Good morning, Your Honor.  Steve Gordon on

10   behalf of the United States.  I also have counsel here from the

11   Civil Rights Division of the Department of Justice, and I'm going

12   to let her introduce herself.

13       MS. JHAVERI:  Good morning, Sejal Jhaveri for the United

14   States.

15       THE COURT:  Good morning.

16       MR. DANJUMA:  Good morning, Your Honor.  Orion Danjuma on

17   behalf of the United States.

18       MR. POWERS:  Good morning, Your Honor.  John Powers on

19   behalf of the Private Plaintiffs.

20       MS. SNOW:  Good morning, Your Honor.  Ryan Snow on behalf

21   of the Private Plaintiffs.

22       THE COURT:  Good morning.  And we have three in the jury

23   box.

24       MS. LEEPER:  Good morning.  Simone Leeper for the Private

25   Plaintiffs.

1      MS. PORTS:  Good morning, Your Honor.  I'm Shanna Ports on

2 behalf of the Private Plaintiffs.

3      MS. LANG:  Good morning, Your Honor.  Danielle Lang on

4 behalf of the Private Plaintiffs.

5      THE COURT:  Good morning to all of you.

6      MR. COOPER:  Good morning, Your Honor.  Charles Cooper on

7 behalf of the Defendants in the case.  With me are two of my

8 colleagues, Mr. Joe Masterman and Mr. Brad Larson.

9      THE COURT:  Good morning.

10      MR. COOPER:  And we are all mindful, Your Honor, that

11 we're here with the Court's permission.  We're grateful for that

12 and we're honored.  Thank you.

13      THE COURT:  Good morning.  Happy to have you give here.

14      MR. JAMES:  Good morning, Your Honor, Chuck James for the

15 Defendants.

16      MR. SANFORD:  Good morning, Your Honor.  Thomas Sanford

17 for the Defendants.

18      THE COURT:  Good morning.  Good morning to everyone in the

19 courtroom as well.  We're on today for motions for preliminary

20 injunctions.  We have the motion that was filed by our Private

21 Plaintiffs, as well as the motion that was filed by the United

22 States.

23      And as the parties are aware, I consolidated the cases

24 because I found that there were common issues in law, and I

25 thought that that made sense to consolidate.

1    I also expedited our briefing schedule, and I thank

2 counsel for complying with that and the quality of your briefing.

3 I've reviewed everything including the Private Plaintiffs reply

4 that was filed late last night.

5    That being said, our first course of business today will

6 be for -- to determine the order of things.  And first I need a

7 sense of whether or not you're just relying on the evidence that

8 you have attached to your briefing or whether or not you

9 anticipate offering additional evidence or witnesses this

10 morning, and I'm going to start first with our Private

11 Plaintiffs.

12    MR. FERGUSON:  Sure.  Good morning, Your Honor.  As of

13 now, we plan to call one witness, and that's Dr. Michael McDonald

14 who's submitted an expert report.  As Your Honor has seen, we

15 have moved to have him testify electronically.  He is available,

16 as we've discussed with the Court, at 11:15 this morning.  We

17 would propose, Your Honor, that the both sets of Plaintiffs, the

18 United States and Private Plaintiffs, make legal argument first

19 and then call Dr. McDonald after that.

20    THE COURT:  In terms of -- so you're relying on all of the

21 exhibits that you have attached to there -- first to your initial

22 motion, as well as there was one declaration attached to your

23 reply brief?

24    MR. FERGUSON:  That's right, Your Honor.  We've submitted

25 two other evidentiary issues.  We've submitted additional

1    declarations this morning.  We have copies of all of those

2    declarations for the Court and for defense counsel.

3         We also --

4         THE COURT:  What are those declarations?  Are they

5    attached to something?

6         MR. FERGUSON:  They are supplemental declarations,

7    exhibits to our reply brief from last night.

8         Your Honor, we received a production from Defendants on

9    Tuesday evening.  And as the -- as the declarations make clear,

10   after that time, after Plaintiffs learned of the purge list, the

11   voters who are taken off the rolls, they have contacted members

12   and other Virginians who were taken off the rolls, and these

13   declarations relate to that.

14        In addition, Your Honor, I'd like to move to admit the

15   list of purged voters with personal information redacted, which

16   we have for you on a flash drive and we have paper copies as well

17   with those redactions.

18        THE COURT:  Okay.  Can I see the paper copy, and have you

19   provided that to --

20        MR. FERGUSON:  We can provide it right now.

21        THE COURT:  Okay.  As well as the declarations, because I

22   only saw one declaration actually attached to the reply, and so

23   you're talking about additional declarations?

24        MR. FERGUSON:  That's correct, Your Honor.

25        THE COURT:  And so for these declarations, they should be

1  marked as Plaintiffs' 1 and so on.  Okay?  So for anything

2  that -- everything that you all have filed attached to a

3  pleading, we will just use the exhibit numbers or the docket

4  numbers --

5      MR. FERGUSON:  Okay.

6      THE COURT:  -- so that it's clear what we are

7  referencing --

8      MR. FERGUSON:  Sure.

9      THE COURT:  -- and not to overcome complicate things with

10  new numbers today.

11      With respect to the exhibits that are attached to

12  Plaintiffs' motions, are there any objections to those?

13      If you'd have a seat.

14      I believe it's Mr. Cooper.

15      MR. COOPER:  Your Honor, you're speaking about the

16  exhibits that include the one attached last night to the reply

17  brief and the ones that have just been --

18      THE COURT:  No.  I'm first speaking -- because they're

19  relying on everything that they have provided to the Court to

20  date, so with respect to what's attached to, I believe, it's

21  their exhibit -- it's Docket Number 26, all of those exhibits.

22      MR. COOPER:  Well, Your Honor, with respect to the

23  exhibits that were originally attached to their motion papers --

24      THE COURT:  Yes.

25      MR. COOPER:  -- we would have no objection to those.

1    THE COURT:  Okay.  And so all of those will be received.

2    (Plaintiffs' Exhibits admitted into the record.)

3    MR. COOPER:  I'm not at all sure that we won't have

4    objections with respect to the ones that came in last night on

5    the reply brief and the one that's just been handed up.  We've

6    not had a chance really to take a look at those.

7    THE COURT:  And neither has the Court, so I'm going to

8    look at the one on the reply brief late last night but not the

9    additional ones, and so we'll all take a look at those so I

10   understand.

11   What -- with respect to the exhibits that are attached to

12   the government's motion, do you have any objection to any of

13   those?

14   MR. COOPER:  No.  Oh, no, Your Honor.  To --

15   THE COURT:  Thank you.

16   MR. COOPER:  No, no.

17   THE COURT:  And I'll ask the United States:  Do you intend

18   on calling any witnesses today?  If you could come to the podium.

19   MS. JHAVERI:  No, Your Honor.  We intend to rely on the

20   evidence attached to our papers.

21   THE COURT:  Okay.  Thank you.  And with respect to the

22   Defendants, Mr. Cooper, will you be calling --

23   MR. COOPER:  We will not be calling witnesses, no, Your

24   Honor.  Thank you.

25   THE COURT:  The first thing I want to do is give them an

1 opportunity, as well as the Court, to review the new declarations

2 because we've not had an opportunity to see those. We'll

3 determine if there are any objections to those, and after that we

4 will then proceed to legal arguments with both sides. Okay? So

5 if you could pass those up.

6     (Brief pause in proceedings.)

7     THE COURT: Thank you. And you provided the redacted list

8 to them as well so they have that?

9     MR. FERGUSON: I believe so, Your Honor.

10     MS. LEEPER: Your Honor, the fax we went to this morning

11 ran out of toner, so we actually only found one copy of the

12 redacted list, and so --

13     THE COURT: Okay. We'll make copies.

14     MS. LEEPER: -- that information is information that was

15 provided to us by the Defendants, just absent the columns except

16 for the --

17     THE COURT: The Court will make the copy.

18     MS. LEEPER: Okay.

19     THE COURT: Thank you. And so we're going to take a brief

20 recess to give them an opportunity to review it. The Court will

21 review it as well, and then I'll take the bench again. We're in

22 recess.

23     (Thereupon, a recess in the proceedings occurred from

24 10:12 a.m. until 10:41 a.m.)

25     THE COURT: Okay. For purposes of the record, just so

1    we're clear what we're talking about, the Private Plaintiffs'

2    exhibits are BB, CC, and DD.  The list that I received didn't

3    have a label on it, so we will label it EE.  Okay?

4         And so, Mr. Cooper, I will hear from you with respect to

5    your position on the exhibits.

6         MR. COOPER:  Thank you, Your Honor.  I'm sorry, I've not

7    saved the cover sheet, so I'm going to have to speak from the

8    document number, if I may.

9         THE COURT:  You can.

10         MR. COOPER:  Document 108.

11         THE COURT:  Okay.

12         MR. COOPER:  Can we just speak to these one at a time,

13    then?  I have three exhibits.

14         THE COURT:  Okay.

15         MR. COOPER:  And --

16         THE COURT:  And -- and 108, just for the record, that it's

17    clear, is Exhibit BB.

18         MR. COOPER:  Okay.

19         THE COURT:  Okay?  So go ahead.

20         MR. COOPER:  Thank you.  And this is a supplemental

21    declaration of GiGi Traore, if I've got to the pronunciation

22    right.

23         THE COURT:  Yeah.

24         MR. COOPER:  Your Honor, these exhibits, you know, go to

25    the question of standing, and I'm -- they've been submitted for

1   that purpose.  This one deals with three anonymous members.

2   They're not identified, and their circumstances are described by

3   an official of the organization of which they are members.  But,

4   Your Honor, we do object to declarations from anonymous people.

5   There's no way that we can consult any records that the State has

6   with respect to an anonymous person to see if there's --

7           THE COURT:  Okay.  I'm going to be clear, though.  It's

8   not -- the declaration is not for an anonymous person.  The

9   declaration is from Ms. -- and I'm not sure of the pronunciation

10  of the name either -- Traore, but it does indicate that they have

11  reached out to the organization and staff and volunteers have

12  reached out to three individuals.

13          MR. COOPER:  Right.

14          THE COURT:  And those are the -- the individuals are who

15  you're saying are anonymous?

16          MR. COOPER:  That's right.  And these are people that are

17  represented to be members.  And I don't mean in any way to -- for

18  this to carry a negative connotation, but we believe we are

19  entitled to have the identities of members that on whom the

20  organization or organizations will pin their standing for --

21  associational standing, so that we can check any records that we

22  have connected with them to see if there are any additional

23  information that may bare on the experience that is described in

24  these declarations.

25          There may be other information that, Your Honor, we would

1     want to bring to the Court's attention with respect to them.

2         So an anonymous member, Your Honor, we don't believe can

3     satisfy the requirement that a specifically identified person is

4     necessary for associational standing.

5         Now, if on receiving the identity -- and we would

6     certainly do so pursuant to any kind of protective order that the

7     Plaintiffs might want to -- might want to secure, but upon

8     receiving them, we might withdraw this objection, Your Honor, if

9     there's no additional information that we thought was necessary.

10    And we would consult with counsel for the Plaintiffs, perhaps, to

11    develop additional information not in our records with respect to

12    anonymous members.

13        So that's my objection with respect to that.  And, Your

14    Honor, that objection also pertains, as well, to the declaration

15    that was attached to the reply brief that came in last night

16    around 11:00 or so, which it falls into that same bucket of an

17    organization official describing the experience of an anonymous

18    member.

19        May I proceed to 108-1?

20        THE COURT:  Yes.

21        MR. COOPER:  All right.  Thank you.  And that is CC, I

22    see.  This is a declaration of Carolina Diaz Tavera, and this

23    is -- to my grasp of what is before us, the only declaration from

24    an actual identified voter, but this person -- I see nothing in

25    this declaration to suggest that Ms. Tavera is a member of any of

1      the organizations.  There's no allegation of membership here.

2          THE COURT:  So this doesn't have to just go to the

3      standing issue, does it, this declaration?  I don't know if

4      that's the purposes that this was provided or not.  You can get

5      clarification on that.

6          MR. COOPER:  Well, Your Honor, I guess then -- then let me

7      refine my objection.  To the extent that it goes to some other

8      issue, I'd like to know from Plaintiffs' counsel what it is to

9      determine if we might not have an objection for that, but I'm --

10     my understanding, my grasp of these papers is that they're going

11     to the question of associational standing.

12         THE COURT:  Okay.

13         MR. COOPER:  And finally, with respect to -- I'm sorry --

14     108 -- 108-2, this is a declaration of Anna Dorman.  Anna Dorman

15     being one of the lawyers for the Plaintiffs' side.  And this is,

16     as I say, an attorney declaration.  There are two identified

17     impacted voters here, but there's no allegation that I see in

18     this either of membership.

19         Now, we're not -- we're not going to object to the

20     admissibility of this, I guess, Your Honor, but we certainly will

21     argue that a nonmember does not provide associational standing

22     for the Plaintiffs.

23         THE COURT:  Thank you.

24         MR. COOPER:  And my colleague, Mr. James, would like to

25     offer an objection now to their expert witness.

```
 1        THE COURT:  With respect to the list, there is no

 2   objection?

 3        MR. SANFORD:  Your Honor, if I could just ask Plaintiffs

 4   how many --

 5        THE COURT:  If you could come to the podium, and then also

 6   if you could state your name again.

 7        MR. SANFORD:  Thomas Sanford.  If I could just ask the

 8   Plaintiffs how many rows were on this list to make sure that --

 9   multiple spreadsheets were sent over to them, and I want to

10   confirm which of the spreadsheets this was.

11        MS. LEEPER:  Your Honor, I didn't memorize the exact --

12        THE COURT:  And your name, if you could say it.

13        MS. LEEPER:  Yes, Simone Leeper for the Plaintiffs.  I've

14   not memorized the number of rows --

15        THE COURT REPORTER:  Say that one more time.

16        MS. LEEPER:  I have not memorized the number of rows, but

17   I can confirm that this is the list of removed voters based on

18   alleged non-citizenship.

19        MR. SANFORD:  So you think it's like 1,600 roughly?

20        MS. LEEPER:  Yes.

21        MR. SANFORD:  Thank you.  No objection.

22        THE COURT:  And 1,600 rows means 1,600 individuals, just

23   to be clear?

24        MR. SANFORD:  Your Honor, I believe it would be 1,600

25   instances of a cancellation.  There can be duplicates on the
```

1   rows.

2           THE COURT:  Thank you.  With respect to the expert?

3           MR. JAMES:  Good morning, Your Honor.  Chuck James for the

4   Defendants here.  One friendly amendment.  My counsel --

5   co-counsel here referenced earlier no objections.  That is true

6   for all of the pleadings and the attachments as to the lay

7   witnesses and to those various attestations.  There is an

8   exception, however, for Dr. McDonald who is the government's --

9   I'm sorry, who is the Plaintiffs' party cutetive expert.  We will

10  have an objection both to that expert as well as to his

11  declaration.  I wanted to note that is an exception to the

12  default rule.

13          THE COURT:  Understood.  And we'll take that up at the

14  appropriate time.

15          MR. JAMES:  Thank you.

16          THE COURT:  Do you want to respond to the objection?

17          MR. FERGUSON:  Sure, Your Honor.  Greg Ferguson for the

18  plaintiff Plaintiffs.

19          In general, Your Honor, I'd like to say that the

20  objections made are not evidentiary.  They largely go to the

21  weight that this Court should afford this evidence, and I think

22  the Court can make its own decision there.

23          Building off of what you pointed out, Your Honor, these

24  declarations go to various elements.  So we have to show for the

25  preliminary injunction, I would say, the irreparable harm

1    showing, principally, but also showing that people are

2    systematically removed from the rolls, and they also can go to

3    standing.

4         I can respond to counsel's points about an anonymous

5    member.  I think that's an argument on the merits that I'm happy

6    to address at any point.  I don't think it's really appropriate

7    here for whether these declarations are let in.

8         I'll just note for Your Honor that of course the

9    evidentiary rules at a preliminary injunction hearing are

10   relaxed.

11        THE COURT:  Understood.  Anything else?

12        MR. FERGUSON:  That's all.

13        THE COURT:  Okay.  All right.  So I'm going to take your

14   objections under advisement.  I'll consider them prior to issuing

15   my ruling on the ultimate issue, let you know how I decide with

16   respect to your objections to the declarations.

17        MR. COOPER:  Thank you, Your Honor.

18        THE COURT:  Um-hmm.  Let's proceed to argument with

19   respect to -- you said you wanted to start with your legal

20   arguments, Mr. Ferguson?

21        MR. FERGUSON:  Yes, Your Honor, could I make one --

22   address one other housekeeping matter first?  As I mentioned, we

23   planned to call one expert witness today.  For the Court's

24   information, the reason we're calling one witness is that we

25   attempted to subpoena two other witnesses, and we don't believe

1    they're in the courtroom.  I believe Mr. Snow can address that in

2    more detail, but we just wanted to clarify with the Court and

3    confirm that they have not arrived.

4          MR. SNOW:  Thank you, Your Honor.  Ryan Snow with the

5    Private Plaintiffs.  Further to Your Honor's question earlier,

6    the Private Plaintiffs did attempt to serve subpoenas on two

7    third-party witnesses.  That would be Prince William County

8    general registrar Eric Olsen, whose public statements in an

9    e-mail are present in the Court's record through our briefing.

10          And the second witness would have been director of data

11    for the Virginia Department of Motor Vehicles, Matthew Martin.

12    We had substantial difficulties serving either of them their

13    subpoenas, despite being in touch directly with Mr. Martin as

14    recently as Tuesday, would not accept electronic service, and our

15    process server was not able to find somebody at his office to

16    accept service on his behalf.  We did want to just note that for

17    Your Honor's information.  We don't believe they're in the

18    courtroom, but to the extent that they are, we would ask to be

19    able to take their testimony today.

20          THE COURT:  Okay.  And so is there a Mr. Matthew Martin or

21    a Mr. Eric Olsen present in the courtroom?  If so, please

22    identify yourself by standing.

23          (No response.)

24          THE COURT:  No one is standing, so it appears that --

25          MR. SNOW:  Thank you, Your Honor.

1          THE COURT:  -- they're not here.

2          MR. SNOW:  Thank you.

3          THE COURT:  You may proceed.

4          MS. JHAVERI:  May it please the Court.  My name is Sejal

5     Jhaveri for the United States.  While Virginia can carry out

6     uniform and nondiscriminatory systematic list maintenance

7     procedures most days of a year, it cannot do so in the 90 days

8     before a federal election, but Virginia has done just that.  And

9     absent an injunction from this court, the United States and

10    Virginia voters will be irreparably harmed.

11         United States has also shown that it's likely to succeed

12    on the merits, and that the balance of equities in public

13    interest also weigh in favor of issuing a preliminary injunction

14    in this case.

15         I plan to address each of the preliminary injunction

16    factors but can also start with the Court's questions.

17         THE COURT:  Why don't you get started, and then I'll

18    interrupt with my questions.

19         MS. JHAVERI:  Yes, Your Honor.

20         THE COURT:  You may proceed.

21         MS. JHAVERI:  I'll begin by looking at the likelihood of

22    success on the merits.  First, I want to note what is not in

23    contention.  Virginia has admitted that it has continued a

24    program of removing voters through this -- through its program,

25    through the 90 days before the federal election.  As recently per

1    the exhibit that Plaintiffs just introduced -- I apologize, I

2    think it's marked EE -- there are removals occurring as recently

3    as October 21st, which I believe is the day that the list was

4    produced or created.  So, there's no disagreement about that.

5         Defendants argue that their process is not systematic.

6    The NVRA precludes systematic list maintenance procedures from

7    occurring in the 90 days before a federal election because those

8    procedures are more likely to have errors.  This was a policy

9    decision by Congress, and it is for that reason to protect voters

10   who might be removed accidentally or by mistake during that

11   period.  That's the purpose of this provision, and it looks at

12   systematic list maintenance procedures.

13        Virginia argues that the procedure is individualized and

14   not systematic.  That is not the case here.  First, as the 11th

15   Circuit in *Arcia* said, the language of the NVRA is broad.  It

16   says any program which has expansive meaning.

17        THE COURT:  Let's start with what your understanding of

18   what their program is --

19        MS. JHAVERI:  Yes, Your Honor.

20        THE COURT:  -- because as I've worked through and read

21   through the declarations and even looked at the maintenance

22   handbook, voter maintenance list handbook, it is somewhat

23   unclear.  But is it that the DMV does a search based on whatever

24   transactions that they were to determine who may have -- may not

25   be a citizen?

1    MS. JHAVERI:  So, the starting point is the DMV data of

2    individuals who have indicated in some way or another a

3    noncitizen status through a variety of forms that I believe the

4    State attached to their briefing.

5    That data is then aggregated and then transferred to the

6    Department of Elections.  And this data transfer is one of the

7    characteristics of a systematic process, which is similar to what

8    happened in *Arcia* where it was a data transfer from I believe the

9    Department of Homeland Security SAVE program.  And also just one

10   week ago a court in Alabama found a program was systematic where

11   it was based on information from the Department of Labor and also

12   I believe SAVE.

13   So, to start that, as I understand it, that's the first

14   part of the process.  There is a transfer from -- of data from

15   the DMV to the Department of Elections.

16   At that point the Department of Elections matches the

17   individual, and I believe it's -- they refer to it in the

18   declaration as an electronic matching process to the voter rolls.

19   And that's to identify that the person who is referenced from the

20   DMV is the same person as on the voter rolls.  There's no further

21   analysis of whether that person is a noncitizen or a U.S.

22   citizen.

23   Then my understanding is that the Department of Elections

24   looks to see where that person lives and sends the information to

25   the appropriate general registrar in that county or city.

1    That general registrar, upon receiving it, does an

2 additional match to make sure that it is the person that is on

3 their rolls -- again, only checking for that particular piece of

4 information -- that it is the same identity as the person on

5 their rolls, and they send an auto-created notice called a Notice

6 of Intent to Cancel.  This is something that's created in the

7 VERIS system, which is the statewide registration system.

8    That automatic notice is then mailed out by the general

9 registrar.  The notice directs the person that they have 14 days

10 to respond and complete -- there's an attached attestation of

11 citizenship.

12    THE COURT:  And that goes back to the registrar?

13    MS. JHAVERI:  And, yes, that -- if the person completes

14 it, they are asked to send that back to their local general

15 registrar.

16    THE COURT:  Um-hmm.

17    MS. JHAVERI:  And that -- those notices are auto-created.

18 It's a form notice which the Northern District of Alabama found

19 just last week is another indicator that this is a systematic

20 process.  These are notices created through the VERIS system.

21 They have 14 days to respond.  If they don't respond within 14

22 days, per the executive order, the voter is cancelled from the

23 voter rolls.

24    As I understand the process to be, the automatic

25 cancellation actually occurs at 21 days, though, per the

1    handbook, the local registrars can manually cancel that person at

2    14 days.

3         THE COURT:  Understood.

4         MS. JHAVERI:  So, to go back to the systematic element of

5    this, as we discuss the process, you can see that the case law

6    identifies a few factors that show systematic.  The first, as I

7    mentioned, is database matching.  So we clearly have database

8    matching here.  It's Department of DMV to the Department of

9    Elections.  Virginia points out that all of this starts with an

10   individual transaction.  That is correct, but that does not

11   change that this is -- that does not alter the fact that this is

12   database matching.  All data initially starts out as an

13   individual input.

14        THE COURT:  But it's an individual transaction that

15   occurred at the DMV, right, just by this person handling business

16   that day?

17        MS. JHAVERI:  That's right.  It is an individual

18   transaction that occurs at the DMV, but another factor that maybe

19   helps illustrate how this is data, is that they're not passing

20   over the form, right?  They're not passing over the actual form

21   that the person filled out or anything like that.  They're

22   passing over a list of information, which I believe is outlined

23   in one of the declarations the State submitted.  And that list is

24   what's getting matched to the information at the Department of

25   Elections.

1    This is sort of the classic data matching that the NVRA

2    was contemplating.

3        And, again, I want to note --

4        THE COURT:  Well, they refer to it as data fields.  You

5    know, it's data fields.  It's not the forms itself.  What the DMV

6    sends to electric -- and I'm reading from the declaration of I

7    believe it's Ms. Boyles -- Ms. Coles -- that it's a -- they send

8    extensive data fields for each individual.

9        MS. JHAVERI:  Yes, Your Honor.  And I believe that that is

10   exactly the type of database matching that is referenced in the

11   11th Circuit's decision in *Arcia*, and that the Northern District

12   of Alabama also recently found to be systematic in nature.  And

13   it makes sense.  What the -- what the 90-day time period

14   provision is about is to prevent harm of having eligible voters

15   removed off the rolls in that period where it's hard to remedy

16   the removal.

17       Other days of the year, this is not an issue.  As I

18   started with, Virginia can continue to do nondiscriminatory and

19   uniform systematic list maintenance throughout the year.  We have

20   a very limited claim here, and it's related to the 90 days before

21   a federal election.

22       And so, additional -- in addition to the database

23   matching, there's a lack of reliable firsthand evidence specific

24   to the voters.  Um, for example, they're getting this transfer of

25   data, but all of these individuals, per Virginia law, must have

attested to citizenship in order to be on the rolls in the first place, so at best these are conflicting data points.

As I touched on earlier, another factor that the Northern District of Alabama found relevant in its hearing last week was the mailing of these form notices. That, again, is what we have here. These are notices that are created through the automated VERIS system. The general registrar does mail them, but what they're doing is that administerial task of printing and validating.

And we know that they're not doing any further investigation here. Attached to our original preliminary injunction papers, we identified Prince William County board meeting as well as an e-mail that talks about the same issue where the County registrar there had looked -- and I want to be clear, these are individuals before the Quiet Period, but this is the same process -- had looked at the 43 individuals who had voting records that were removed off the rolls in Prince William County, and each of them, once looking in their records, had indicia that they were U.S. citizens, all 100 percent of the individuals that they looked at, but the Prince William County registrar believed, per the State's policy, that those voters must be canceled from the rolls.

So, despite the State's contention that this is an individualized process, the evidence that we produced, as well as the State's own description of what is occurring, shows that this

1    is a systematic process.

2           I think one place where it's distilled very clearly that

3    this is a systematic process is in that Virginia Department of

4    Elections handbook.  And I would refer to 8.37, which is -- and I

5    apologize.  I can get you the exact cite to our papers, but it

6    was attached to our reply brief.

7           THE COURT:  Okay.

8           MS. JHAVERI:  I believe it was Exhibit B to our reply

9    brief.  And in there, the language notes the requirements here.

10   Each month the DMV is required to furnish to Elect, Elect will

11   transmit the information to the appropriate registrar.

12          The general registrar is required to mail a notice of

13   pending cancellation, and VERIS will automatically cancel the

14   registration of any voter who does not respond to the notice

15   within 21 days.

16          THE COURT:  In Ms. Coles' declaration she says there is an

17   individualized determination at the registrar, but what you're

18   saying is this handbook contradicts that?

19          MS. JHAVERI:  It contradicts that.  And to the extent that

20   Ms. Coles is saying that there is an individualized

21   determination, that determination is simply to determine that the

22   person that's produced on the list from the Department of

23   Elections is the person that is on the local registrar's rolls.

24   It doesn't mean that there's any individualized assessment of the

25   citizenship of that person, any review of other documentation

1   they might have, anything like that.

2           Does that address your question, Your Honor?

3           THE COURT:  It does.

4           MS. JHAVERI:  Okay.  And, Your Honor, you referenced the

5   data sort of aspect of a data field, and I think that one thing I

6   would note and -- is that that actually -- the fact that these

7   fields exist, and that there's a memorandum of understanding of

8   the data format, is a further indicator that this is a database

9   matching process.  This is not an individualized assessment.

10          So, based on the case law and based on this process, the

11  evidence the United States has provided shows that this is a

12  systematic process covered within the Quiet Period Provision.

13          I'll next address the statutory arguments that the

14  State -- that the Commonwealth makes.

15          I think it is simplest to address this by looking first at

16  the statutory text.  And it says -- Section 8C, the Quiet Period

17  Provision, specifically directly that -- and this is the text --

18  "A state shall complete, not later than 90 days prior to the date

19  of a primary or general election for federal office, any program,

20  the purpose of which would systematically remove the names of

21  ineligible voters from the official list of eligible voters."

22          That has a simple and clear understanding as the 11th

23  Circuit indicated in its decision in *Arcia*.  The Congress made a

24  policy decision about these types of systematic removals

25  happening in the 90 days before an election, and it clearly

1    stated out three exceptions.  It wrote out three exceptions.  It

2    knew how to write out exceptions.  It did not write for

3    non-citizenship as one of the exceptions.

4         So, the Commonwealth's argument confuses a number of

5    different provisions in order to make an argument about what is

6    fairly clear language in the Quiet Period Provision.

7         And as a broader point, because the Quiet Period Provision

8    is only in effect for the 90 days before the general -- federal

9    election, it makes sense that it has a broader reach as well,

10   that it affects programs that may be perfectly legal at other

11   points of the year.

12        The other provisions that the Commonwealth's brief touches

13   on are discussing general processes that occur at other times

14   during the process, not in these 90 days right before the

15   election.

16        So the textual equivalency that the Commonwealth's brief

17   makes between, you know, Section 8D1 and the quiet period is just

18   one that doesn't exist because the purposes of those provisions

19   are different.  And what makes the most sense is to follow the

20   plain language of those provisions as the 11th Circuit did in

21   *Arcia*, as the Northern District of Alabama did just last week,

22   and find that Congress had a policy goal in mind here.  It knew

23   how to write its exceptions.  It did not include non-citizenship

24   as an exception to the 90-day provision.

25        I also just want to briefly touch -- the Commonwealth in

1    their brief referenced that a majority of federal judges have

2    found otherwise.  That is a misleading statement.  The citations

3    made, first, are to a dissenting judge in *Arcia*, so it's not the

4    law of the 11th Circuit.

5         The second is to the District Court in *Arcia* that was

6    overruled by the 11th Circuit division.

7         And the third is to the reasoning in *United States v.*

8    *Florida*, which was also -- that reasoning is overruled by

9    their -- by the decision in *Arcia*.

10        And finally they cite *Bell v. Marinko*, and that case is

11   not about the Quiet Period Provision.

12        So I just want to touch on that case law.

13        And I'll just make one more point about likelihood of

14   success on the merits.  The State in its option noted that the

15   United States had precleared the statutory precedent to this

16   program.  That -- as we noted in our reply yesterday, that has no

17   import in this analysis.

18        The preclearance analysis under Section 5 of the Voting

19   Rights Act, when it was in effect, has a completely different

20   standard.  The standard is, "The purpose of or will have the

21   effect of diminishing the ability of any citizen of the United

22   States on account of race or color."

23        And the letter -- it's the one the Defendants attached --

24   clearly says that it does not -- Section 5 expressly provides

25   that, "The failure of the Attorney General to object does not bar

1    subsequent litigation to enjoin the enforcement of the changes."

2          And, again, our challenge here is focused on the 90-day

3    Quiet Period Provision -- violation of the 90-day Quiet Period

4    Provision.

5          We have -- we can have additional cites that are included

6    in our reply brief of case law that supports this point as well.

7          THE COURT:  Have you reviewed the documents that were

8    provided pursuant to the motion for expedited discovery?

9          MS. JHAVERI:  I have --

10          THE COURT:  The list.

11          MS. JHAVERI:  I -- Private Plaintiffs provided me with the

12    documents.  I believe it was yesterday.  And I've had some chance

13    to look at the list, including the one that is marked as

14    Exhibit EE, but I don't know that I can answer every question

15    about it.

16          THE COURT:  No.  Of these individual -- I just want to

17    know whether or not -- and I understand that these were -- even

18    though this information was requested earlier pursuant to the

19    public disclosures provision, I want to get a sense of whether or

20    not there's been any analysis of the individuals who have been

21    removed.  I know that different plaintiff organizations -- and

22    this may be a question for them once they start their argument,

23    but I want to get a sense of how many of these individuals --

24    whether there's been any determination beyond what I see in these

25    declarations that these are U.S. citizens or that they're U.S.

1  citizens.

2       MS. JHAVERI:  Your Honor, I'll also let my colleagues, the

3  Private Plaintiffs' counsel, answer this question.  My

4  understanding is they're not -- aside from making phone calls to

5  determine --

6       THE COURT:  And I want to be clear, that is not a

7  requirement for me to decide with respect to looking at the

8  90-day provision, but it is something that I would like -- the

9  Court would like to know.

10      MS. JHAVERI:  Yes, Your Honor, and that's exactly right.

11  The 90-day provision doesn't require -- we know U.S. citizens

12  have been removed based on other evidence.

13      THE COURT:  It doesn't have to -- it doesn't require an

14  error.  The purpose of the 90-day provision is to prevent.

15      MS. JHAVERI:  Yes.  Yes, Your Honor.  And of the lists, I

16  believe there are about 1,650, as my colleague noted, occurrences

17  of cancellations.

18      I do not believe that there is a way, at least for the

19  Plaintiffs, including the United States, to determine the

20  citizen -- the actual citizenship of all of those individuals.

21      THE COURT:  Thank you.

22      MS. JHAVERI:  And I think that brings us to talking about

23  the harm here.

24      THE COURT:  Um-hmm.

25      MS. JHAVERI:  As we've noted in our preliminary injunction

1   papers, there's harm to the United States.  The United States

2   suffers an injury when its valid laws in a domain of federal

3   authority are undermined by a state, in this case.  And, again,

4   this -- we briefed this a little more extensively, but this is a

5   continuing violation in the 90-day period which has harm to the

6   United States.  In fact, the Northern District of Alabama found

7   that harm to the United States is clear as a matter of law.

8        Second, we do know that U.S. citizens are being caught in

9   this program.  We know that in a couple of different ways.  But

10   before I get to those ways, I do want to note:  The right to vote

11   is the essence of a democratic society, meaning that any

12   restriction on that right strikes at the heart of representative

13   government.  And that's from *Reynolds v. Sims*.

14        So, we know that U.S. citizens are being caught in this

15   process because we've seen that there are -- the Prince William

16   County example that I just gave you earlier.

17        We also know -- we attached some documents from Loudoun

18   County to our reply brief.  There, of those individuals who were

19   removed during the quiet period, eight have reregistered.  Three

20   produced an affirmation of citizenship, again, showing that these

21   are U.S. citizens.  And, indeed, one of the voter applications of

22   a removed individual says the words "new citizen" on them, which

23   is common for voter registration applications at naturalization

24   ceremonies.

25        So, we know that there is harm to voters here, and we

1    proposed a remedy that is narrowly tailored to remedy this harm

2    but not create extensive burden for the State -- for the

3    Commonwealth.

4         I can touch more on remedy --

5         THE COURT:  I want you to walk through these exhibits that

6    are attached to your reply brief --

7         MS. JHAVERI:  Yes.  Yes, Your Honor.

8         THE COURT:  -- because it's -- there is -- the declaration

9    from Ms. Brown, who is the general registrar --

10        MS. JHAVERI:  Yes.

11        THE COURT:  -- in Loudoun County, but it doesn't

12   necessarily indicate what the records are.  She -- it indicates

13   these are all official records within the custody of their

14   elections office, but --

15        MS. JHAVERI:  Yes, Your Honor.  If you give me one moment

16   to get to the proper documents -- my binder -- I am happy to walk

17   through them.  And we did redact them sort of heavily because

18   there was so much PII.  If you would prefer something filed under

19   seal, we can do that as well.

20        THE COURT:  I don't know if we need that for the purposes

21   of this hearing --

22        MS. JHAVERI:  Sure.

23        THE COURT:  -- unless, Mr. Cooper, do you have a position

24   on that, with respect to using just these redacted documents

25   from -- I don't think it matters.

1      MS. JHAVERI:  Sure.

2      THE COURT:  Mr. Cooper?

3      MR. COOPER:  I don't believe that it matters either, Your

4  Honor.

5      THE COURT:  Okay.  So I think the redacted copies are

6  fine.  It just removes their name and address but the

7  registration IDs are there to show that these are individuals.

8      MS. JHAVERI:  Yes, exactly.

9      And so, the first document, which is attachment Exhibit C

10  to our preliminary injunction reply papers, includes -- in the

11  first instance the declaration --

12      THE COURT:  And for the purposes of the record, that is --

13  it's at Docket Number 100-3.

14      MS. JHAVERI:  Yes, Your Honor.  And so, starting on ECF

15  page 4, which is USA-Loudoun 0001, this is the list of removed

16  voters in Loudoun County per this noncitizen removal process

17  between August 7th, 2024 and October 16th, 2024.  And those dates

18  are identified at the top of the page on the right side.

19      THE COURT:  Okay.

20      MS. JHAVERI:  And the next document, Exhibit D, which is

21  document -- ECF Number 100-4 -- again, it begins with the

22  declaration from Ms. Brown, but if we look at USA-Loudoun 00024,

23  this is the voter registration application I was just referring

24  to that says "New Citizen."  And you can see that about a third

25  of the way down on the right side.  The stamp is there.

1    And then Exhibit E, which is ECF Number 100-5, again,

2    starts with the declaration from Ms. Brown and moves on starting

3    at USA-Loudoun 0009.  These are the individuals who produced an

4    attestation of citizenship in response to receiving the notice of

5    intent to cancel.  It give additional voter registration

6    information for these individuals.

7    And then on Exhibit F, which is document 100-6, again,

8    begins with the declaration of Ms. Brown.

9    And then E, voter registration applications, are those

10   individuals who were removed pursuant to this process in the

11   quiet period but reapplied and reregistered to vote.

12   And I believe those are all the exhibits, Your Honor,

13   unless there's another one that I've missed.

14   THE COURT:  No.

15   MS. JHAVERI:  Okay.

16   THE COURT:  Thank you.

17   MS. JHAVERI:  I want to quickly touch on the public

18   interest and the balance of the equities, which both weigh in

19   favor of issuing an injunction in this case.

20   We -- we all, of course, agree that allowing noncitizens

21   to vote is not in the public interest, and that's not what this

22   case is about.  It's about enforcing the 90-day provision that

23   prevents systematic removal and not denying U.S. citizens who are

24   qualified to vote the right to vote in Virginia.

25   Um, I --

1    THE COURT:  You know, before we move on to the public

2    interest --

3    MS. JHAVERI:  Yes.

4    THE COURT:  -- I want to go back to the issue of the

5    balance of the equities, because one of the arguments raised in

6    the opposition is that Plaintiffs have in some way slept on their

7    rights and waited two months into the, you know, the 90-day

8    provision in order to bring this lawsuit.

9    MS. JHAVERI:  Your Honor, as you've just referenced, I

10   think the first point to make is that these lawsuits are

11   time-limited.  The violation -- and, again, we only have one

12   allegation in our complaint.  The violation is limited to the 90

13   days before the federal election.  And when we became aware of

14   the violation in this case, we acted as swiftly as we could.

15   We don't believe that this is a reason to -- that the

16   weighing of -- that this does not weight against granting an

17   injunction in this case.  We did move as swiftly as we could once

18   we found out about the violation, and there's -- there is -- the

19   harm to the United States and to Virginia voters outweighs that.

20   Your Honor, I -- the United States has established that it

21   is likely to succeed on every factor of the preliminary

22   injunction factors.  And we've proposed a remedy that's narrowly

23   tailored to remedy the harm with as little burden to the

24   Commonwealth as possible.

25   The Commonwealth raises one other argument that I would

1    like to address, and that is that it is too late to achieve

2    remedy for this violation under the Purcell principle.

3         I want to start by saying Purcell has never been applied

4    to a quiet period violation, and that makes sense.  The goals at

5    the heart of Purcell, the dual goals of maintaining the status

6    quo and preventing voter confusion, are the same goals that are

7    the heart of the Quiet Period Provision.  And so it's Virginia

8    that would have -- with its actions, has upset that status quo.

9    And so the remedy we seek is simply to remedy that.  *Purcell* and

10   the quiet period work hand in hand.  They are not antagonistic in

11   this analysis.  And, again, that's why no other -- no court has

12   ever applied the *Purcell* principle to the Quiet Period Provision.

13        So, Your Honor, if you have no further questions --

14        THE COURT:  Did you skip -- I may have, because I asked a

15   question and I interrupted you.  Did you touch on the public

16   interest?

17        MS. JHAVERI:  Oh, Your Honor, I -- I'm sorry.  I did also

18   skip it in my notes.  I started to talk about that noncitizens

19   voting is not in the public interest, but that's not what this

20   case is about.  The public interest is harmed every time eligible

21   U.S. voters are denied their franchise or weight is placed on

22   their franchise.

23        In addition, where the United States is a party in this

24   suit, the public interest and the balance of equities merges and

25   the harm to the U.S., as we discussed earlier, it is continuing

1   with these ongoing violations.

2        If you have no further questions --

3        THE COURT:  I do not.

4        MS. JHAVERI:  The United States asks that you enjoin

5   Virginia from continuing this program within the 90 days before a

6   federal election.  I will pass it on to my colleague.

7        THE COURT:  Okay.  Thank you.

8        MR. FERGUSON:  Good morning.  Excuse me.  Good morning,

9   Your Honor.  Once again, Brent Ferguson for the Private

10  Plaintiffs.  I'll be addressing the preliminary injunction motion

11  in general and also go into some specifics about the 90-day

12  provision.  My colleague, Mr. Danjuma will address the uniform

13  and nondiscriminatory claim that we've made as well.

14       Your Honor, a preliminary injunction in this case is not

15  only appropriate but it's vital.  Virginia's actions here violate

16  the NVRA.  They will cause Virginia voters and Plaintiffs

17  irreparable harm.

18       I'd like to start off by giving some background here and

19  answer two questions that Your Honor asked to the United States.

20  And those two questions were about how this program actually

21  operates, and then the timing of this purge program and the

22  timing of this lawsuit.

23       So, as you know, the governor's executive order was issued

24  on August 7th.  That's exactly 90 days before the election coming

25  up in a couple of week.

1       Since that time, it's been exceedingly difficult to get

2  information about how this program is operating, to learn which

3  voters are affected, and who they are, including whether they

4  include members of plaintiff organizations.

5       Now, since Tuesday evening, about 36 hours ago, when we

6  got discovery from Defendants, we know a little bit more.  We

7  know that over 1,600 people have been purged just in this 90-day

8  period.

9       THE COURT:  Okay, well there's some --

10      MR. FERGUSON:  Sorry.

11      THE COURT:  I think there's some dispute there, because

12  what they're indicating is there are 1,600 instances of

13  cancellation, but each cancellation does not necessarily indicate

14  an individual or do you know of something else?

15      MR. FERGUSON:  Sure, Your Honor.  So, again, we've had

16  this information for very little time, and --

17      THE COURT:  I understand.

18      MR. FERGUSON:  -- I can't verify what the State says

19  there.  My initial understanding is that I think there were 1,649

20  people on this list, and there are at least a couple dozen where

21  it involved multiple transactions where people could be listed a

22  couple of times.  I think my best understanding right now is that

23  it's just over 1,600 that have been taken off and have not gotten

24  back on.

25      I also believe that it doesn't include people who were

1  taken off and then reregistered under this program.  That's my

2  understanding right now.

3  So, Your Honor, Defendants' theme, as you mentioned, is

4  delay.  They've claimed that Plaintiffs didn't move quickly

5  enough in this lawsuit.  But as we talked about in our papers and

6  as we talked about on Monday before Judge Porter, the Plaintiffs

7  took action immediately after EO35 was issued.  That includes six

8  days after EO35 plaintiff sent the first letter to the State

9  asking for more information about operation of this program and

10  raising the possibility that this program violated the NVRA.

11  That was followed up by an August 20 letter -- 20th letter, and

12  then several meetings between Plaintiffs and representatives of

13  Defendants trying to figure out how this program operated.

14  In large part, those letters and those meetings led to

15  nothing.  As you know, Your Honor, we got no meaningful

16  information about the program's operation until 36 hours ago.

17  What the Plaintiffs did do, when they were stonewalled by

18  Defendants, was start attending county board of registrar's

19  meetings and talking to counties to see how this program was

20  operating.

21  THE COURT:  Hold on.  The -- the voter maintenance

22  handbook that was I believe attached to the government's reply

23  brief, did that come out of the discovery that you received on --

24  MR. FERGUSON:  That -- so, that was not the discovery we

25  received on Tuesday.

1    THE COURT:  Okay.

2    MR. FERGUSON:  That -- I believe that's, yeah, attached to

3    one of Defendants' papers.  I'm not sure exactly --

4    THE COURT:  No, it's a different one, but I'll reask that

5    question later, because there are two different handbooks that

6    I've seen.  There's a handbook that was attached to government's

7    reply brief.  Let me see here.  It's Docket Number 100.2.  It

8    says, "The Handbook, Chapter 8, List Maintenance."

9    And then there was a handbook, I believe, attached to the

10   opposition.  It looks a little differently.  Let's see here.

11   Yes.  Well, this is part -- I guess the standard operating

12   procedure for voter registration list maintenance.  That was

13   attached to defendant's -- it's at Docket Number 92-8.

14   MR. FERGUSON:  Sure.

15   THE COURT:  I'm just trying to figure out, because they're

16   slightly different, and I wanted to -- but I'll ask that question

17   of Mr. Cooper.

18   MR. FERGUSON:  Okay.  Your Honor, so stepping back a

19   little bit.  It was on August 7th that Plaintiffs learned just

20   how this program might operate, and that Defendants were likely

21   to try to implement it in some way during the 90-day quiet

22   period.

23   When Plaintiffs started attending these meetings that I

24   mentioned -- and that's in -- largely in September -- they

25   started seeing that people were going off of the rolls, and those

1     are in exhibits -- especially Exhibits K and J to our preliminary

2     injunction motion.  They started seeing that, and they started

3     seeing comments, including from the Prince William registrar who

4     we've mentioned earlier that we tried to call, showing that under

5     the program that the -- Virginia was operating, dozens of people

6     were being purged, that the counties had no discretion in whether

7     they could keep those people on the rolls even though those

8     people had provided affirmations of citizenship.

9          And so Plaintiffs were doing all this in September,

10    gathering evidence, making sure that this program was actually

11    violating the law.

12         And just one final point on this that I don't think

13    Defendants acknowledge, is that under the NVRA there's a

14    requirement to send a notice letter of violation, and then

15    there's a waiting period.  And so that waiting period only gets

16    lifted 30 days before the election.  And our complaint was filed

17    on October 7th, which was the very first day available to us

18    after that waiting period was lifted.

19         So, Your Honor, that evidence that I've been talking about

20    that we've gotten in the short time exemplifies the flaws with

21    this program and why it's systematic.

22         Now, I want to point out the declarations that were

23    submitted last night and this morning.  As Your Honor knows,

24    these were put together within 24 hours of receiving the first

25    set of documents for the State.

1    In those declarations, collectively, along with the one

2    that the United States mentioned about the voter who had the new

3    citizen stamp on his application, that's 18 people that the

4    Plaintiffs have identified just in that very short time period

5    that are citizens and were removed within this period.

6    We now know that when the Department of Motor Vehicles

7    provides data to the Department of Elections on the checkbox

8    issue -- and, Your Honor, we'll get into this, but the Defendants

9    claim that people are checking the box to say they're not U.S.

10   citizens and they're removing those people.

11   When the Department of Motor Vehicles provides that

12   information, they don't also send whether that applicant has

13   previously provided proof of citizenship, like a passport.  They

14   don't include that information.  And that's one of the reasons

15   that a lot of citizens are being drawn into this program.

16   Now --

17   THE COURT:  In there, did you see that in the declaration

18   from Ms. Coles and Mr. Koski, that the Defendants attached to

19   their opposition, they said that they don't forward those

20   check -- unchecked box cases, but --

21   MR. FERGUSON:  So I --

22   THE COURT:  -- your -- the one declaration we received

23   this morning contradicts that.

24   MR. FERGUSON:  I believe it -- I had to -- my -- here's my

25   understanding, based solely on these declarations, which, again,

1  we received just a few days ago.  My understanding is Defendants'

2  representation is that for the wrong checkbox issue, they are

3  forwarding those onto the Department of Elections.  And there is

4  a separate issue where people have provided some kind of

5  documentation that would indicate legal presence but not

6  citizenship.  And then the Commonwealth recognizes that it's

7  possible that those people have later naturalized as citizens.

8  And so in large part they're saying they don't forward those onto

9  the Department of Elections, but then there's this big caveat

10  that says for one year about on an ad hoc basis they did forward

11  that information after running a SAVE check.  And I'm happy to

12  get all into that, Your Honor.  I would say for purposes of the

13  90-day provision, none of that is really relevant here because,

14  clearly, as Virginia has acknowledged, they're doing this program

15  with regard to both sets of those people within the 90-day

16  period.

17      Your Honor, I'd like to move to the merits of the 90-day

18  provision.  Now, my colleague with the United States focused

19  mainly on whether this program is systematic, and I can address

20  that.

21      I will focus more on whether citizenship status itself is

22  completely exempted from the 90-day provision as Defendants

23  argue.

24      But more generally, Your Honor, the NVRA prevents any

25  program, the purpose of which is to systematic remove names of

1      ineligible voters from the rolls within the 90-day window.

2              And so I want to highlight just once again that the

3      prevailing case law here is very clear.  That's from the 11th

4      Circuit in *Arcia*.  That's from the Northern District of Alabama

5      just seven days ago issued a very comprehensive opinion about a

6      system that's almost identical to this one.  And all the

7      Defendants can do in response is cite to dissents and count the

8      number of judges who have been overruled that had a different

9      understanding.

10             So a couple of points closer to the facts on this program.

11     So, Defendants acknowledge that this program involves data from

12     the DMV.  And they also, as I mention, highlight that at least a

13     portion of these voters are run through a SAVE check.  That's the

14     Systematic Alien Verification for Entitlements.  *Arcia* addressed

15     both of these issues and said that even when a county -- whether

16     the state uses SAVE, that's a systematic program and it violates

17     the law.  And that was true in *Arcia*, even when the Secretary of

18     State there instructed county officials to do their own

19     investigation before removing people.  And as you've seen, Your

20     Honor, that's not true in this case.

21             And *Arcia* also highlighted just the purpose of the 90-day

22     provision.  It said that Congress told states to be more cautious

23     within the 90-day window, and the evidence we're getting in just

24     in the last couple of days shows why that's super important.

25             Now, Your Honor, the same was true in *ACIJ* from just a

week ago.  That was a similar program.  The court said it found
no trouble finding harm to voters and that it violated the 90-day
provision.

Now, when we go through the plain text of the statute,
there's a few terms that courts look at to decide whether a
program complies with the law.  The first is the term "any
program," and of course that's broad language that Congress used.
It's -- indicates that Congress wanted to prevent any type of
program that would purge voters from the rolls.

The statute also looks at what the purpose of the program
is.  And as EO35 issued from the governor shows, the purpose of
the program is to remove noncitizens.  That's what they say, and
that makes it fall under the statute.

Now, as I mentioned, Your Honor, Defendants make two
statutory arguments here:  One is whether the program is
systematic; and the second one is whether this provision applies
to citizenship at all.

I'll address the second one, as I mentioned.  So,
basically what Defendants are trying to do is engage in a
tortured reading of a very broadly-worded law.  As I said, the
statute prevents any program that systematically removes voters.
So Defendants' brief spends several pages getting to the result
that they prefer, that this broadly-worded provision actually
only prevents programs that involve some kind of change of
address, but the statute applies to any program.

1    And then it has specific exceptions where such programs

2 can exist, and that involves people who have died in that 90-day

3 period.  So that would just be an extremely roundabout way of

4 Congress saying that all they wanted to prevent was purges

5 related to change of address.

6    Now, *Arcia* made this point at page 1348 of that opinion.

7 This interpretation that Defendants are putting forward would

8 functionally eviscerate the phrase "any program" from the

9 statute, and that's why courts have rejected that interpretation.

10    Now, if we were to get beyond that consideration -- which

11 I think is dispositive -- and we were to follow Defendants down

12 this road of trying to parse the exact meaning of the phrase

13 "ineligible voter," which is really the core of the argument in

14 their brief, what they want the term "ineligible voter" to mean

15 is, "Someone who is eligible once but has since become

16 ineligible."

17    Congress didn't say that when it wrote the statute.  It

18 said "ineligible voters" and, of course, we would all agree that

19 noncitizens are ineligible voters.

20    Now, what Defendants also do is they somehow try to define

21 the term "voter" in the statute only as someone who's eligible to

22 vote, not someone who actually does vote.  And if you look at the

23 dictionary definition, even the one that they provide in their

24 brief, the definition of "voter" includes someone who votes,

25 whether they're eligible or not.  And there's no question that

1    there are people on this list that vote, that have voted in the

2    past and continue to vote, and this program purges many of those

3    people.  So even on Defendants' own terms that dictionary

4    definition fails them.

5         And I want to make just one final point about the way that

6    they try to categorize this.  And so, their theory, essentially,

7    that the statute only applies to people who were once eligible

8    and then have become ineligible, doesn't even hold up, because

9    they use -- one example could be people who've been convicted of

10   a felony, and then can't vote because of that.

11        But they assume that anyone convicted of a felony was

12   originally eligible when they registered and then became

13   ineligible because of that felony.  But what's true in fact is

14   that many people have committed felonies at some point in time

15   and then they try to register after that.  That would mean they'd

16   be ineligible the whole time.  So this kind of statutory parsing,

17   it's inappropriate in this situation, due to the words "any

18   program," but it also just doesn't work on its own terms.

19        Your Honor, I just want to very quickly address a couple

20   of points on whether the program is systematic.  I think that's

21   been well covered by my colleague with the United States and in

22   our brief, but a couple of points.

23        One is a point I mentioned at the top.  If you look at the

24   declarations just submitted a few days ago, they address these

25   two categories of people that we talked about:  One is people who

1  check the non-citizenship box when they apply at the DMV; and the

2  other one is people who have provided documents indicating

3  permanent residence.

4       Now, as I said, the declarations show that when the DMV is

5  transferring that data over about the people who have checked the

6  box "non-citizenship," they're not transferring over citizenship

7  documentation if they have it, which could include a passport.

8  And the very fact that they're not trying to do that shows why

9  this is a systematic program.  It's just moving a list of people

10 from the DMV to Elect, and then generating template letters and

11 requiring registrars to send them.

12      Second is that, in defendant's brief, a big thing that

13 they rely on to say that this program isn't systematic is that

14 they have done some kind of double-check on a portion of these

15 voters through the SAVE program.  But, as we've talked about, the

16 SAVE program is a systematic program itself.  So the fact that

17 that's being used actually just helps show more why this is

18 systematic.  And that was in front of the Court in *Arcia,* and

19 they talked about it specifically how it's a systematic check.

20 SAVE is just another database that doesn't get Defendants out of

21 this problem, and, of course, it can be faulty as well.

22      THE COURT:  What is your understanding of when the SAVE

23 check occurs?  It's clear that it occurred during the ad hoc

24 period because that's what was acknowledged in the declarations,

25 but outside of the ad hoc period, what is your understanding?

1          MR. FERGUSON:  That's a great question, Your Honor, and I

2     wish I knew.  I think that from Defendants' papers and

3     declarations, this ad hoc period lasted -- I think it was some

4     point in 2023 to 2024.  And then I believe they were trying to

5     conduct SAVE checks on all of those people within some certain

6     amount of time, but I don't know the answer.

7          And I would say that, of course, SAVE has its own accuracy

8     issues, but with regard to the 90-day period, what we know is

9     that all of these people, regardless of when the SAVE check was

10    run, they were purged in late August, I think the defense says,

11    and that's within the 90-day period.  So the program has to be

12    complete by the 90-day period, so running the SAVE check before

13    then doesn't solve any statutory problem here.

14         Your Honor, I'd like to move on to irreparable harm.  And

15    I think, as my colleague with the United States said, there's no

16    question here that voters and Virginians will be harmed and that

17    plaintiff groups will be harmed.  And we know that from the case

18    law, courts routinely deem restrictions on voting rights

19    irreparable injury.  And the evidence thus far that we've gone

20    over a little bit today just confirms that.  We know, for

21    example, that the 43 voters mentioned by the Prince William

22    County registrar were people who had affirmed citizenship

23    sometimes multiple times.  We have the declarations submitted

24    just in the last couple of days showing how Plaintiffs have

25    identified members and identified quite a few people in that

1   short time who have been affected by this program.  And I will

2   say people who didn't know that they were even removed from the

3   rolls, and so would likely be surprised by that if they showed up

4   to vote.  And then, if they tried to vote an absentee ballot for

5   sure.

6        The opinion from the Court in *ACIJ* just a week ago in the

7   Northern District of Alabama is instructive.  The Court there

8   said "had no difficulty finding that those who were inaccurately

9   inactivated or remain referred for investigation have been

10  harmed."

11       Now, the same is true, not just to voters, but of

12  plaintiff groups here.  As we can see in the last couple of days,

13  the Plaintiffs have spent time and resources trying to identify

14  not only their numbers, but Virginia voters who are wrongfully

15  harmed, they've spent thousands of dollars sending communication

16  to those voters and other Virginians trying to make sure people

17  are aware of this and are able to stay on the rolls if they are

18  eligible.  They spent hours training their staff to help do this

19  when they're registering voters.  And all of that is lost time on

20  get out the vote and registering voters.  And that's the core of

21  what these organizations do, especially with regard to new

22  citizens.  And they're unable to do that because of this program.

23  The bottom line here is that fewer voters harms the plaintiff

24  groups.

25       I want to address one main point that the defense has made

1    in regard to this harm argument, and they basically say that

2    because Virginia has a same-day registration system, that there's

3    essentially no harm, even if people are removed from the rolls

4    unlawfully.

5         There are several reasons why that doesn't add up. The

6    first is a problem with absentee ballots. Absentee ballot voters

7    can't do the same-day registration process and show up and

8    register. And I think the state's response to this is basically

9    by speculating that this won't affect a lot of people, because

10   they -- you know, they think that probably someone would know and

11   then take care of this before trying to submit an absentee

12   ballot, but that's just what it is. It's speculation. It fails

13   to acknowledge that a lot of people in Virginia vote absentee.

14   And if we look at the numbers just from the last few elections,

15   that can be millions of people in a presidential election and

16   close to a million in a midterm election. So just saying that

17   this probably won't affect many people isn't a very effective

18   response.

19        It also just fails to acknowledge the huge looming problem

20   with Defendants' argument, is that sending these letters to

21   people who are new U.S. citizens is intimidation, and

22   Dr. McDonald will testify about this and has already put in a

23   declaration about this. But if someone's a new American who

24   plans to vote and they receive a letter from the state saying

25   they're being purged from the rolls and that they -- know that

1  they might be investigated or prosecuted if they try to vote,

2  evidence just shows that that makes people more likely to vote.

3  That harms those voters.

4      And then finally, Your Honor, just I think a factual point

5  on whether provisional ballots will be counted.  So Defendants

6  submit statements saying that in reality almost all provisional

7  ballots are counted.  They've also put in the Coles declaration

8  at paragraph 37 that when election boards decide whether to count

9  provisional ballots, they will not consider whether someone has

10  been purged under this program.

11      Now, a couple of responses to all of that.  First of all,

12  even if most provisional ballots are counted, that's not all of

13  them and that certainly affects some people.  The factual

14  statements in the Coles declaration are unsupported by any

15  citation or any assurance that local boards of elections will not

16  take into account that someone's just been purged when they're

17  trying to decide whether a provisional ballot will be counted.

18      If you look at the Virginia Code on this, that's 24.2-416,

19  and then the board's website itself, it says that, "The board

20  determines the validity of someone's vote based on whether

21  they're eligible."  That's certainly no solace for people who

22  are -- have been purged and just want to show up to vote.  I

23  don't think they can count on the fact that it will be counted.

24      A final point on this, Your Honor, is that Defendants'

25  position here just undercuts the purpose of the program.  What

1  they will get up and say here is that there are actually a lot of

2  noncitizens on the rolls, and this program started 90 day

3  before -- 90 days before the election is really vital to make

4  sure that noncitizens don't vote.

5       Now, of course, for the reasons we've stated, we don't

6  think that's true.  But even if it were true, then under

7  Defendants' argument here, what they're doing is they're purging

8  people from the rolls and then saying, "Okay.  But if you got

9  purged and didn't reregister, you can just show up on election

10  day and there is no additional check of your citizenship and you

11  can just vote and that will counted without any other review."

12       Your Honor, very quickly before I end, I just want to

13  highlight the points on the Purcell argument that the United

14  States mentioned.  So the Purcell doctrine is applicable in

15  certain circumstances where it counsels against court

16  intervention when that intervention might cause some confusion.

17  I will note that in Defendants' opposition brief they write the

18  whole brief using this four-factor framework that they say that

19  Purcell requires.  That's something from a two justice

20  concurrence in a state order from a few years ago.  That's not

21  the law.  That's something that they want to apply to this case

22  and isn't applicable.

23       And as my colleague mentioned, Congress passed the 90-day

24  provision with the specific intent of reducing confusion and

25  chaos before an election.  That's the same thing that *Purcell* is

1     intended to do, and that's why the Defendants can't point to any

2     case where Purcell would be used to prohibit litigation on this

3     90-day provision.

4         Your Honor, if you have no further questions, I'll save my

5     remaining argument for rebuttal and pass it and to Mr. Danjuma.

6         THE COURT:  Okay.  Thank you.

7         MR. DANJUMA:  Thank you.  Good morning, Your Honor, Orion

8     Danjuma on behalf of the Private Plaintiffs.  So, what I'd like

9     to address is the NVRA requirement that the removal process is

10    instituted by a state be uniform and nondiscriminatory.

11        Now, we certainly appreciate the Court's compliments to us

12    and the State for the rapid briefing.  We've certainly been up

13    very late trying to complete that, and obviously we appreciate

14    the Court considering this so swiftly and taking these matters up

15    so quickly, but I want to make sure that we don't miss aspects of

16    this independent claim that the Private Plaintiffs have brought.

17        First let me -- before I start on some of these

18    clarifications, I want to note that the clarifications I'm making

19    about this system do not affect the Private Plaintiffs or the

20    government's 90-day claim.  The 90-day claim is based on a very

21    clear statute.  We've outlined that in the brief.  The

22    defendant -- the Defendants have simply misunderstood or

23    misinterpreted the statute, and ignorance of the law is no

24    defense.

25        As for the uniform and nondiscriminatory claim, I'd like

1    to make three clarifications.  First, the timeframe.  That's

2    applicable here.

3        Second, to discuss the systems that we have initial

4    information from defense counsel, the way the State is applying

5    the pertinent systems.

6        And then, third, talk to the Court about some potential

7    solutions to the problems that we've been seeing.

8        So, first on the timeframe, I want to clarify that, while

9    this discussion has pertained largely to the 90-day period, our

10   claims for relief go beyond removal --

11       THE COURT:  That's understood.

12       MR. DANJUMA:  Got it.  And then the second issue is the

13   scope of the programs that we're discussing.  And the Defendants

14   have represented that there are at least two routes by which

15   individuals become perjured pursuant to their programs.  This is

16   obviously our initial understanding.

17       But one is this box check issue on DMV transactions, and

18   the second is based on documents, documents that an individual

19   has on file demonstrating their birth abroad.

20       So, in the DMV checkbox scenarios what we're dealing with

21   is inconsistent statement the State has about citizenship.  A

22   person has said they're a citizen on their voter registration

23   form, but there's something different that's indicated in the DMV

24   transaction.

25       The document comparison is different.  And as confirmed by

1   the Coles' declaration, the Defendants initiate a process of

2   removal when a citizen has indicated that they -- sorry, when an

3   individual indicates and affirms that they're a citizen both DMV

4   transactions and on the voter registration application.  It's at

5   that point -- so, those representations are consistent, but the

6   Defendants are doing a search below that, those affirmations.

7   And I think those two routes could be illustrative to discussing

8   components of this claim because I think they may function in

9   different ways.

10          The use of a document check through the SAVE database is a

11  classification based on national origin because it intrinsically

12  demonstrates based on national origin.  You can only run a SAVE

13  check or a SAVE database search on someone with an A number.  It

14  is not possible to use that method to do any search on a natural

15  born citizen.  And for that reason, courts who have reviewed

16  similar programs have found that a system that relies on this

17  method is intrinsically discriminatory.  So in the *Mi Familia*

18  *Vota* case, the Court said that naturalized citizens will always

19  be at risk of election officials' decision to further investigate

20  those voter citizenship status based on this policy, and that

21  that will never apply to native born citizens.

22          The Defendants talk to some extent about the concern of

23  disparate impact, but I want to be clear here that when we're

24  talking about the underlying documents, we're talking about a

25  classification.  This is a classification that only applies to

1    individuals who are born abroad, and that is the touchstone of

2    national origin discrimination.

3         And I think that's important because, as we've seen just

4    from this initial set of records that we've received from the

5    State, there can be a lag in voter registration.  There could

6    even be indications on the voter registration application itself

7    that a new citizen stamp has been made, for instance.  That might

8    not be something that a SAVE database match will be able to pick

9    up initially.

10        And the state election officials in those cases are being

11   forced to ignore this direct evidence that they have of someone's

12   citizenship.

13        Now, let's talk about the DMV checkbox issue because I do

14   think that is different, although I want to emphasize that it

15   does not immunize the State against this issue.

16        The existence of a checkbox is not the same as a

17   classification by virtue of underlying agency record documents in

18   the way that this separate policy is that uses a SAVE check.

19        However, it can still effectively act as an unlawful

20   classification, a discriminatory classification, in the way that

21   courts have reviewed this issue.  And the reason why that is the

22   case is that we do not have from the Defendants at this point a

23   representation about the timeframe in which they are observing

24   this DMV checkbox issue.  And so, for instance, in the *United*

25   *States v. Florida* case, the Court in that case observed that the

1    state was essentially sending these large lists of individuals

2    that they had thought to be noncitizens, and it turned out that a

3    large majority of them were, in fact, citizens, and they

4    evaluated the evidence to show that there would be this average

5    sort of three-year period of naturalization for the many citizens

6    in Florida.  And we do not know from the declarations, or at

7    least I have not been able to receive it, and of course we

8    haven't had a chance to depose, although we have sought

9    depositions and to subpoena individuals from the state, we don't

10   know the timeframe in which we're looking at these individuals.

11        So, in other words, if the State is, in fact, relying on

12   very stale DMV checkbox representations, that, I would say, is in

13   effect a classification that would -- that would discriminate on

14   the basis of natural --

15        THE COURT:  And I understand the limitations you've had

16   with respect to discovery, but, you know, the fact that we're,

17   you know -- you're phrasing this as if that, then it's stale and

18   then there's a classification issue, speaks volume to me for

19   where we are today.

20        MR. DANJUMA:  True.  And what I'll say, Your Honor -- and

21   I think that maybe dovetails exactly to the next idea that I

22   have, which is some solutions for the Court on this issue about

23   where we are today.

24        And I will say that the -- the -- the concerns that we

25   have on the 90-day provision are very clear on the record at the

1    point -- at this moment, and so there's a clear way for the Court

2    to issue relief on those claims, and that is, I think, entirely

3    proper, but I also want to emphasize that there are relevant

4    forms of relief on this claim as well.

5          So, as to the SAVE database matching provision, as -- the

6    State has said that there's this one instance of SAVE matches

7    that they've used recently in August on this issue.

8          Now, that is within the quiet period, so that's covered

9    by -- that is both a problem under the uniform discriminatory

10   prong, and it's also a problem under the 90-day period.  So, if

11   that is the only time that they've used a database match of this

12   form, the injunction in that period would cover that.  But I

13   don't read them to be saying that it's the only time they've used

14   these documents to -- these documents, even when a citizen is

15   affirming -- when an individual is affirming their citizenship.

16         And so what I would say is, an order from the Court

17   enjoining the use of these matches from any point since the last

18   five years, if that is not occurring, if they're not doing that,

19   then that order is fine.  It wouldn't provide a burden on the

20   State, but it would cover people beyond the 90-day period that

21   we're talking about.

22         And then in addition, a checkbox -- an injunction to deal

23   with the issue of the checkbox.  If the State is using checkboxes

24   with stale data from more than three years ago, an injunction

25   would ensure that those aren't being used as the basis for

1    removal.  And if they are not using those as a basis to remove

2    citizens, then such an order has no impact on the State.

3        So those are my -- those are -- that's what I have to say

4    on this issue.  Does the Court have any questions for me?

5        THE COURT:  I do not.  Thanks.

6        MR. DANJUMA:  Thank you.

7        THE COURT:  Anything else from our Plaintiffs at this

8    point?  I know there is the issue with the witness, who I

9    understand is in the Zoom room.  This may be the time we take up

10   the objection with respect to that, but why don't we have a

11   break.  Let's give ourselves 15 minutes, and then we'll come

12   back.

13       (Thereupon, a recess in the proceedings occurred from

14   12:04 p.m. until 12:25 p.m.)

15       THE COURT:  Okay.  I think we were going to -- is this

16   regarding our expert witness?

17       MR. JAMES:  Yes.

18       THE COURT:  Okay.  I think we're going to take up the

19   objection first for Mr. James.

20       MR. JAMES:  Thank you for this opportunity, Your Honor.

21   Good afternoon.  I am again Chuck James representing the

22   Defendants.  We're asking this Court to strike the testimony as

23   well as the declaration of Dr. McDonald.

24       The basis for that is essentially threefold, Your Honor.

25       He -- his proposed testimony does not meet the *Daubert*

1    standards, and we'll begin with that.  First and foremost, Your

2    Honor, we should be mindful of what the burdens are.  The burden

3    here is on the moving party to establish that this individual is,

4    in fact, an expert, and in the field and has the appropriate

5    training and experience.  We don't believe that they'll meet that

6    burden, Your Honor.

7         In fact, they essentially are going to -- we believe will

8    fail for three main reasons.  Let's start with the timing of

9    this, Your Honor.  I think it's important to note that the

10   organizational Plaintiffs in this matter filed this action on

11   October the 7th.  That was with ECF Number 1, of course.  That's

12   the impetus of this entire case.

13        And it wasn't until their -- they designated or retained

14   Mr. McDonald and filed his declaration, which was executed on

15   October 11th and then filed on October the 15th.

16        But even then it wasn't clear that they intended to offer

17   him as a witness.  That actually came up almost after the fact

18   when talking about needing to have him appear remotely when they

19   made the reference --

20        THE COURT:  It wasn't clear when they attached his

21   declaration to their filing?

22        MR. JAMES:  It wasn't clear how they intended to use him.

23   They didn't make a formal declaration.  They didn't designate him

24   as an expert appropriately.  They simply said, "We have this

25   person.  Here's his declaration," and they sent it but it wasn't

1    entirely clear how they were going to use him, Your Honor.

2         THE COURT:  Okay.  Because this is a preliminary

3    injunction.

4         MR. JAMES:  Yes, Your Honor.

5         THE COURT:  And so the normal rules of evidence don't

6    apply.

7         MR. JAMES:  Understood.

8         THE COURT:  And so if you want to talk to me about his

9    qualifications or about deficiencies in his opinions, I'm open to

10   hearing those.

11        MR. JAMES:  Yes, Your Honor.  I'll move on to those.

12        So, we would be prejudiced, Your Honor.  We, the

13   Defendants, would be prejudiced in this matter, Your Honor.

14        I would note that, if you look at his testimony, his

15   proposed testimony, what it actually says is it is replete

16   with --

17        THE COURT:  Hold on.  Hold on, because I have so many

18   binders for me to --

19        MR. JAMES:  I'm actually flipping and doing the same.

20        THE COURT:  Okay.

21        MR. JAMES:  I'll take the opportunity as well, Your Honor.

22   Thank you.

23        THE COURT:  Okay.  It's -- they're Docket 26-2.

24        MR. JAMES:  That's correct, Your Honor, filed October I

25   believe that's the 15th.

1     So, his proposed testimony fails for three reasons, Your

2     Honor:  First it is irrelevant; second, it is unreliable; and

3     third, for the reasons I just mentioned, and we'll get into in

4     more detail, it's procedurally improper.

5     It has to be relevant to the task at hand.  And if you

6     look at the stated purpose of his report, it is actually

7     inconsistent with the goals of this hearing.

8     Very early in his declaration he states that his

9     assignment is, "Plaintiffs' lawyers asked me to review the

10    Commonwealth of Virginia citizenship verification procedure."

11    THE COURT:  Where are you reading from, which page and

12    paragraph?

13    MR. JAMES:  This is page 3 of document 26 --

14    Document/Docket Entry 26-2, Your Honor.

15    THE COURT:  Okay.

16    MR. JAMES:  It's the bolded paragraph about two-thirds of

17    the way down the page, "my assignment."

18    THE COURT:  Yes.  Thank you.

19    MR. JAMES:  And he says, "This is what I'm here to do.

20    This is what I plan to offer to this Court."  And it speaks

21    to procedure -- the procedures as amended and to opine on the

22    potential consequences of the policies on registrants.

23    He's not talking about the quiet period.  He's not talking

24    about the NVRA.  He's not talking about those things that I would

25    argue are most relevant for this Court's consideration and have

1    been the subject matter of most of the argument here today.

2         He makes a couple of significant admissions as well, Your

3    Honor.  He simply doesn't know whether these policies have, in

4    fact, impacted the citizens.  His very goal was to do this.  But

5    if you actually skip to the following page, Your Honor, page 4,

6    again, Docket 26.2, and you look at his six opinions, I would

7    call them assignments of error almost --

8         THE COURT:  And just so the record is clear, the page

9    numbers you are giving correspond to the page number at the

10   bottom of the page and not the header.

11        MR. JAMES:  You're right, and I will switch and make -- be

12   consistent.  I will speak then -- if it's okay with the Court,

13   I'll speak to the docket entry as well as the ECF page.

14        THE COURT:  Okay.

15        MR. JAMES:  So we're talking Docket Entry 26.2, Your

16   Honor, page 5 of 32.

17        THE COURT:  Okay.

18        MR. JAMES:  Those are his six opinions, and each of them

19   says some form of may:  "Citizens may have to affirm," number

20   two.  Number three, "Natural born citizens may be subjected."

21   Number six, second line, "They may suffer immediate harms."

22        This is not a case where a scholarly individual has, based

23   on their training and experience, come to definitive conclusions

24   and said, "Based on this, I opine that."  Even his opinions are

25   couched and caveated.

1    He admittedly doesn't know how Virginia uses the SAVE

2    database and how that would avoid removing naturalized citizens

3    from the rolls.  He says, and I quote, "I do not have access to

4    Virginia's MOU at DHS regarding the use of the SAVE database."

5    He goes on and says, "I do not know if Virginia is subject

6    to these provisions, and if so, is compliant with them."  That's

7    at page 5, Your Honor, and I want to ensure that that's page 5 of

8    32 -- I'm sorry, that's actually page 6 of 32.

9    He goes on and says, Your Honor, he doesn't know whether

10   any person removed from the rolls, because they failed to affirm

11   their citizenship is, in fact, a citizen.

12   This is not a question that he reviewed.  His declaration

13   doesn't even mention the option of same-day voter registration

14   and how that might be applicable here and impact the alleged

15   long-term and significant irreparable harm that is caused by the

16   policies in place here from their position.

17   As a result of that, his testimony cannot help this Court

18   assess the impact of the challenge process on anyone in Virginia.

19   In fact, a large portion of his article of his declaration speaks

20   about his training and experience and testimony in other states.

21   And that's not to diminish that.  It's not to diminish his

22   scholarship.  But what you may have done under Georgia law --

23   THE COURT:  Well, he said he used an audit I thought.

24   MR. JAMES:  He did, Your Honor.  He makes -- he makes

25   reference to that early on, and he mentioned that he was on a

1    bipartisan commission.

2        THE COURT:  For the Virginia Department of Elections.

3        MR. JAMES:  He did.  And yet the analysis that he offers,

4    the things that he says -- and we'll point to some of these

5    things here momentarily -- repeatedly go, "Based on my experience

6    in Georgia or Florida or Kansas or Arizona, I believe X, Y, and Z

7    may be happening in Virginia," but he doesn't base that on

8    documents in Virginia.  He doesn't seemingly base that on

9    analysis or investigation that he has done.  He repeatedly says,

10   "Based on what I have done in other states," and then he jumps

11   and makes those leaps as they relate to Virginia.

12       And he does so without making a reliable foundation.  He

13   doesn't state anything about his methods.  Notably missing from

14   his declaration is a portion that says "This is how I conducted

15   my work.  These are the documents that I looked at.  This is the

16   way that I analyzed it."

17       He makes reference to some -- to some documents, but he

18   doesn't say, "This is my methodology.  This is the accepted

19   science in this field."

20       What he does, instead, is simply skip over that.  And in

21   contrast to his own practice, we've seen that in other places he

22   has testified and provided reports where he does include a

23   methodology, but it's not present here.

24       I would also point out to the Court that he talks at some

25   length about the cancellation of noncitizen voters in other

1   states, and he concludes this -- this is page 9, Your Honor, and

2   I believe, because it's page 9 it's actually going to be page 10

3   of 32 for purposes of the docket -- he says, "If the experience

4   of other states serve as a guide, the many voters flagged" --

5           THE COURT:  Wait.  What part of the page?

6           MR. JAMES:  That would be -- let me see.

7           (Brief pause in proceedings.)

8           MR. JAMES:  It is here, Your Honor.  Bear with me.

9           THE COURT:  Take your time.

10          (Brief pause in proceedings.)

11          THE COURT:  What was the first part of the sentence,

12  please?

13          MR. JAMES:  The beginning of the sentence was, "If the

14  experiences of other states serve as a guide."  5.2, Your Honor,

15  which can be found --

16          THE COURT:  All right.  I have that, 5.2.

17          MR. JAMES:  That is page 9, Your Honor.  I apologize.  I

18  told the right cite, page 9, which is 10 through -- page 10 of 32

19  for purposes of the docket entry.

20          THE COURT:  Okay.

21          MR. JAMES:  The point here being that he stresses -- he

22  stresses "if."  His -- his -- he repeatedly bases his analysis on

23  other states indicating that if this is true, then I presume this

24  is what's happening in Virginia.

25          And as I noted before, if you look at all of his opinions,

1    each of them are couched in that way.

2         You combine this, Your Honor, with the unreliability.  You

3    add to that the procedural nature of this.  He filed his

4    declaration.  We have not had an opportunity to explore that

5    sufficiently with him.  I get where we are at this early stage of

6    the investigation of the -- of the litigation, Your Honor, but

7    under the local rules -- sorry, Rule 26, "Experts must normally

8    be disclosed well before a hearing," and it certainly would have

9    been appropriate to make an explicit declaration of that prior to

10   the hearing, Your Honor.

11        I'll rest there.

12        THE COURT:  Okay.  Thank you.  But I will say this:

13   Considering that it is attached to the motion, I don't find this

14   untimely.  Okay?

15        MR. JAMES:  Understood, Your Honor.

16        MR. POWERS:  Good afternoon, Your Honor.

17        THE COURT:  For the record, your name again.

18        MR. POWERS:  John Powers for the Private Plaintiffs.

19        THE COURT:  Good morning or good afternoon, Mr. Powers.

20        MR. POWERS:  Good afternoon.  Your Honor, I would suggest

21   that we start by suggesting that Dr. McDonald's expertise and

22   experiences evaluating citizenship verification procedures

23   employed around the country is a strength, allows him to

24   contextualize Virginia's practices and better understand, you

25   know, for example, we're talking about interaction with SAVE and

1    federal databases.  You know, he's -- you know, and I'm happy to

2    lay a foundation with him, you know, to the extent it'd be

3    helpful, but, you know, having served as an expert in cases

4    challenging citizenship verification procedures in Georgia,

5    Kansas, and in Arizona, I would put Dr. McDonald in a good

6    position.  I would suggest he's actually one of the foremost

7    experts on citizenship verification procedures.

8         THE COURT:  I don't doubt his expertise, but my question

9    is whether or not I need this here, because what he is doing is

10   also, you know, summarizing some of the information that

11   Mr. Olsen provided, the general registrar from Prince William

12   County about what he perceived as a lack of discretion and him --

13   citizens being removed through this process.  And given, in

14   light, what I have forecasted with my comments to your prior

15   colleague, I really do think my focus here is on this 90 days.

16   What is he --

17        MR. POWERS:  Yes.

18        THE COURT:  And my question is:  Do I need that?  Does the

19   Court need it, because an expert is to assist the fact finder.

20        MR. POWERS:  Of course.  Of course, Your Honor.

21        THE COURT:  And in this instance, that -- you know, that

22   is me.  And I don't know if I need mister -- or Dr. MacDonald in

23   order to make the assessment based on I have the evidence you

24   have submitted.  I have the evidence from the United States, as

25   well as the evidence from the Defendants, so I just don't know if

1  it is necessary.

2      MR. POWERS:  Yes, Your Honor.  Dr. McDonald's -- the

3  description and his declaration of the processes that Virginia is

4  employing I think go to the question of whether the inquiry is

5  systematic or individualized.  Dr. McDonald has also reviewed the

6  filings from the State on Tuesday, including the declarations of

7  Mr. Koski and Ms. Coles.  He's prepared to opine those practices

8  as they've been described and addressed.  The question of the

9  systematic versus individualized inquiries.  He's also reviewed

10  the data.

11      THE COURT:  I know.  And see, I anticipate that will be a

12  bone of contention.  Once he starts opining based on the

13  opposition that has come, because then those are new opinions

14  that then -- that he would then be making.  It would be

15  additional into what has been already disclosed.  Okay?

16      MR. POWERS:  Yes.  Yes, Your Honor.  And, you know, to the

17  extent Your Honor has questions, for example, about the number of

18  folks affected, you know, the exact number of impacted folks, the

19  length of time they've been registered, Dr. McDonald can also

20  offer testimony relevant -- relevant to that.

21      THE COURT:  What, did he look at that list?  Is this what

22  he had received?  Is he going to explain this?

23      MR. POWERS:  Yes, Your Honor.

24      THE COURT:  But I don't know if I need that in order to

25  make my ruling with respect to the 90 days.

1        MR. POWERS:  We certainly --

2        THE COURT:  I don't want to create an issue that I don't

3   need to create.

4        MR. POWERS:  I understand.  Your Honor, the --

5        THE COURT:  Let me -- before we call him or -- I'm going

6   to reserve ruling on this.  Okay.  And understand I'm going to do

7   something.  I'm going to allow them to make their legal arguments

8   and reserve ruling on it and then revisit.  Okay?  Do you

9   understand?

10       MR. POWERS:  Sorry, so -- okay.

11       THE COURT:  Yes, yes.  I'm going to reserve ruling on the

12  issue of whether or not to allow your expert.  Okay?

13       MR. POWERS:  Um-hmm.

14       THE COURT:  I'm going to allow them to proceed with their

15  legal arguments, and then I will consider and rule on that.

16  Okay?

17       MR. POWERS:  All right.

18       THE COURT:  Thank you very much.

19       Was there anything else before we -- for you all outside

20  of the expert before I move on to the Commonwealth?

21       MR. FERGUSON:  No, Your Honor.

22       THE COURT:  Thank you.  Mr. Cooper?

23       MR. COOPER:  Thank you, Your Honor, and may it please the

24  Court again.  Charles Cooper for the Defendants.  I have a lot to

25  work through here, and I very much appreciate all of us to ensure

1    your indulgence and patience thus far.  I hope I will not try it,

2    but we do have a lot to --

3         THE COURT:  You will not.

4         MR. COOPER:  -- work through.

5         THE COURT:  You will not.

6         MR. COOPER:  Okay.  Thank you.  I want to start, Your

7    Honor, by stating the obvious.  We're now only ten days away from

8    the 2024 presidential election.  And I am not going to trudge

9    through all of the measures that the Plaintiffs are asking you to

10   do in their proposed order, but I would like to highlight that

11   they're asking you to restore to the rolls all -- all of the

12   self-identified noncitizens removed from the rolls since August

13   7, and the Plaintiffs I think are correct when they say that's

14   roughly 1,600 people.  I don't have the exact number, but it's --

15   that's very close.

16        And they'd like you to advise them or order that they be

17   advised by mail and that the public and that the election workers

18   and everybody else be advised that they may cast a ballot in the

19   same manner as other eligible voters.

20        Now, Your Honor, a request for the kind of relief that is

21   before you now, and the kind of disruptive impact that that would

22   have on the election machinery just days before a presidential

23   legislation, can be justified, we would submit, only by the most

24   compelling and urgent need, and if at all.

25        And, Your Honor, on this score, we do submit to you that

1    the *Purcell* doctrine is the applicable doctrine for you to

2    reference as you consider the order that you're being asked to

3    enter.

4         THE COURT:  If I accepted that position, though, when

5    would there ever be an appropriate challenge to the 90-day

6    provision?  Because it's always going to come on the eve of an

7    election --

8         MR. COOPER:  That's true.

9         THE COURT:  -- because it's within the 90 days.

10        MR. COOPER:  Your Honor.

11        THE COURT:  And it does resonate with me that the *Purcell*

12   doctrine and the 90-day provision have the same goal.

13        MR. COOPER:  Your Honor, I think that is a fair point to

14   an extent --

15        THE COURT:  Okay.

16        MR. COOPER:  -- but within that 90-day period, within that

17   90-day period it was 60 days before the Plaintiffs brought their

18   suit, 61 or 2 days -- Private Plaintiffs, 61 or 2 before the

19   Department of Justice brought their suit.

20        THE COURT:  But it was not 60 days to their action,

21   correct?  Because they were making attempts to gain information

22   from the Commonwealth.  And then there's also the notice

23   provision and the waiting provision before you file a lawsuit,

24   correct?

25        MR. COOPER:  Your Honor, I've got to address those points.

1          THE COURT:  Okay.

2          MR. COOPER:  First of all, they didn't need any additional

3    information other than what was in Virginia law and has been

4    there since 2006.  And the Virginia law that has -- that has

5    required this very process for at least 15 years, many general

6    election cycles and during the 90-day period, so this is not

7    something that's new in this state.

8          And beyond that, you know, on --

9          THE COURT:  Okay.  Let me -- because I do have a question

10   about that.  The fact that something isn't new doesn't mean that

11   it's not known or it doesn't mean that it is known.  So, what

12   evidence -- because you say that this law has been in effect for

13   a long time; however -- and that this was going on, according to

14   you, at other times during this 90-day provision with respect to

15   other elections, but that doesn't mean that they had notice of

16   it.  And even if they didn't have -- even if they did have notice

17   of it, it's a suit now.

18         MR. COOPER:  Your Honor, fair point, but they did have

19   notice of it on August 7th --

20         THE COURT:  Okay.

21         MR. COOPER:  -- certainly, when the executive order was

22   signed.  That was 90 days before the -- before the election.

23   That was the beginning, if it's applicable -- and we'll get into

24   why we don't believe that it is, Your Honor, at all -- but that

25   the 90-day period began.  And, Your Honor, they certainly knew

1    the executive order.  They -- we -- there doesn't appear to be a

2    dispute about that.  And the executive order was unequivocal in

3    what it would require.  And it's clear that if they're right

4    about how they read the 90-day provision, but their claim was

5    ripe then and there.  They didn't know -- they didn't need to

6    know another thing except that the State of Virginia was on --

7    now on a daily basis rather than a monthly basis going to send to

8    -- the DMV was going to send to Elect, on a daily basis, the

9    information about people who represented themselves on DMV forms

10   as noncitizens, something that was happening before that, and you

11   know, almost two decades before that on a monthly basis.

12           So the thing that changed, Your Honor, in the executive

13   order was that it became on a daily basis, but that was the

14   moment when nobody can say, "Hey, we didn't" -- excuse me -- "we

15   didn't know."

16           And so, then the question becomes:  Okay.  When could they

17   have brought their case?  They cite this statute -- you've

18   mentioned it -- and they're making a fair point, but they're

19   riding it way too hard, Your Honor, because the applicable

20   statute says -- and this is Section 52 -- title 52 U.S.C. 20510

21   that they've cited, Section B2, I would submit is the applicable

22   provision -- "If the violation is not corrected" -- may I proceed

23   and read it?

24           THE COURT:  Yes.

25           MR. COOPER:  "If the violation is not corrected within 90

1  days after receipt of a notice under paragraph 1, or" -- and

2  here's the pertinent language -- "or within 20 days after receipt

3  of the notice that the violation occurred within 120 days before

4  the date of an election for federal office."

5      So that's the provision we're in.  The violation, if

6  violation there was, of a 90-day period, took place within 120

7  days before the date of the election.

8      So, they -- that had a 20-day period for notice before

9  they would argue they could have brought a lawsuit at all,

10  although they certainly could have brought their discrimination

11  claim, as opposed to their 90-day claim prior to that.

12      But, Your Honor, so notice could have been provided

13  contemporaneously, essentially, with the executive order.  20

14  days go by and that's when they could have brought this lawsuit.

15  That's 40 days, essentially, in that range, give or take a day,

16  before they actually brought the suit.  And so, instead of now

17  having ten days -- if the Court had put us on the same breakneck

18  schedule that you had us on -- instead of ten days to the

19  election, we'd have had 50 days to the election.

20      And so this is my point.  And this is why *Purcell* isn't

21  just out the window, as they would say.  And the -- and the

22  important element of *Purcell*, and, Your Honor, of the balance of

23  equities, that a plaintiff's delay in bringing the suit is

24  relevant to.

25      So, Your Honor, I submit to you that *Purcell* is -- remains

1    a relevant consideration.  And I guess I would also say, how

2    could it not be, if we are in front of an election and the

3    request before you is judicial intervention in the election

4    machinery?  Yeah, sometime that is warranted.  Sometimes it's --

5    it is -- it's unavoidable, but all we're saying is the courts

6    require a preliminary injunction analysis that takes that into

7    account and raises the burden on the Plaintiffs above the

8    standard for part -- the plaintiff -- PI test that they've been

9    advocating.

10          Now, Your Honor, I don't believe they satisfy that test,

11   but I do believe that the Court has to be sensitive to the

12   *Purcell* issue, and we would submit -- apply that what we believe

13   is the correct analysis.  And, yes, it comes from Justice

14   Kavanaugh in the opinion and then the --

15          THE COURT:  It's not --

16          MR. COOPER:  -- analysis we're giving you.

17          THE COURT:  It's not that it comes from Justice Kavanaugh,

18   it's that it's in, you know, a concurring opinion.

19          MR. COOPER:  Yes.  Yes, it's an concurring opinion.

20          THE COURT:  So that's not the test.  It's not the law.

21          MR. COOPER:  Well, Your Honor, we would submit to you

22   this.

23          THE COURT:  You want me to adopt it, though?

24          MR. COOPER:  Well, what we're saying is, it's a fair and

25   accurate and careful distillation of the case law governing the

1    *Purcell* doctrine.  That's what we -- that's what we think Justice

2    Kavanaugh is saying.

3         We think he's right, and we think that that distillation

4    of the -- of the -- of the wealth of precedent cautioning federal

5    courts about measures that are disruptive to elections on the eve

6    of elections, has to be -- has -- the Court has to be sensitive

7    to that, and we think that's the test that governs.

8         I guess the other thing I want to say is, it's true that,

9    you know, we don't have a Supreme Court case that says, "This is

10   it."  Again, we think that Justice Kavanaugh's analysis and

11   distillation is a fair -- we would say accurate representation of

12   what the cases really say and mean.

13        But the Fourth Circuit in a very recent decision did treat

14   with Justice Kavanaugh's four point test in a case.  And I want

15   to apologize to my friends for the Plaintiffs.  I didn't have

16   this from my associate until late last night, but it's a Fourth

17   Circuit case called Pierce against North Carolina Board of

18   Elections, 97 F.4 194.  And the Court there, the Fourth Circuit

19   there at page 220 actually treats with Justice Kavanaugh's test.

20        And so, while I'm going to focus my argument for the Court

21   on that test, again, I believe everything I'm going to say also

22   would -- would establish, Your Honor, that the Plaintiffs don't

23   meet the traditional four-part *Winter* test.  Okay?

24        So, with that -- with that, Your Honor, the first part of

25   that test -- I'm just going to go through it one-by-one if I

1    may -- is the merits, the question of the merits.  And so under

2    the, what I would say, is the *Purcell* distilled test, the

3    Plaintiffs have to show not just the likely to succeed, Your

4    Honor, but that as well that the merits are clear-cut, entirely

5    clear-cut in their favor.

6        And I guess I want to back up for just a minute because

7    Justice Kavanaugh advanced this test as a, "relaxed version of

8    *Purcell*."

9        He discussed how *Purcell* is not absolute, notwithstanding

10   the fact that some have advanced it as an absolute rule.  It's

11   not absolute, and certainly we're not suggesting to the Court

12   that it's absolute.  But he thought this was a relaxed version of

13   *Purcell*, and so the merits, Your Honor, the Plaintiffs have to

14   satisfy the burden that the merits are clear-cut, entirely

15   clear-cut in their favor, but at a minimum they have to show --

16   as they admit and we all know.  At a minimum they have to show a

17   likelihood of success.

18       And, Your Honor, I do believe that we've properly

19   suggested to the Court that a majority of the judges who have --

20   who have looked at the scope, who have actually opined on the

21   scope of the removal provisions of the NVRA have come to the

22   conclusion that we are suggesting to you is the correct

23   conclusion, and that we are advocating.  A majority of them have.

24   Certainly they've --

25       THE COURT:  What's the majority?

1    MR. COOPER:  I'm sorry?

2    THE COURT:  Are you talking about the people who were

3    overruled?

4    MR. COOPER:  I beg your pardon?

5    THE COURT:  Are you talking about the judges that were

6    overruled?

7    MR. COOPER:  I am talking -- yes, Your Honor.  I am just

8    counting heads here.  I'm just counting heads.  And they've got

9    two judges in *Arias* -- I mean *Arcia*, and I've got three.  And,

10   Your Honor, the one thing that -- and, Your Honor, on top of

11   that, I've got three Sixth Circuit judges in the *Bell* case,

12   which, it's true, it wasn't a 90-day case, but we think it -- it

13   can't be -- its ruling cannot be stopped at the 90-day provision.

14   But, just in counting heads, I at least have a wash.

15       And, Your Honor, if that's the case, how can it be said

16   that the merits are clear-cut favorable to the Plaintiffs?  This

17   isn't just, you know, counsel for the Defendants.  These are

18   federal judges who've looked specifically at this case.  And,

19   Your Honor, I'm going to walk through why I submit to you they

20   are right and the majority in *Arcia* was wrong.

21       And there's nothing in this circuit to bind you.  You are

22   here on a tabula rasa to decide this case on however you see the

23   merits, except that, again, the burden is on them to show they're

24   likely to succeed at least, and I would say entirely clear-cut in

25   this Purcell circumstance.

1     And, Your Honor, I want to submit to you again, I think

2  the majority of federal judges have said that -- and I'm quoting

3  from the *Bell* case now -- "Congress did not intend to bar the

4  removal of names from the official list of eligible voters of

5  persons with" -- excuse me -- "persons who were ineligible and

6  improperly registered in the first place."

7     So, somebody who couldn't lawfully register in the first

8  place can't be -- there is no limitation under the removal

9  provisions on removing that person from the list.  That's -- the

10 bottom line is that, with respect to that class of people -- and

11 it obviously includes --

12     THE COURT:  But don't I then have to assume that everyone

13 on that list then is, in fact, a noncitizen?  Even if I were to

14 accept your position, you're assuming it from the outset of the

15 investigation or from the outset -- from the moment the process

16 starts, right?

17     MR. COOPER:  Well, Your Honor --

18     THE COURT:  Because if you all get an attestation form

19 back, then that's good enough.

20     MR. COOPER:  Yes, Your Honor, but --

21     THE COURT:  But you're -- then you are assuming from the

22 very outset that the person that -- and if I accept your reading

23 of the statute, that this provision was never meant to cover

24 individuals who were not ineligible --

25     MR. COOPER:  That's right.

1          THE COURT:  -- or were ineligible from the beginning --

2          MR. COOPER:  That is right.

3          THE COURT:  -- everyone on the list -- because we have now

4     evidence in this record -- because even if I didn't consider

5     every person that they have -- you know, the people who were the,

6     what you call -- refer to as the anonymous ones, there is an

7     individual in here for which they have provided a declaration

8     that is a United States citizen.

9          MR. COOPER:  Your Honor, we're not here to defend the

10    proposition that United States citizens should be or can properly

11    be removed from the rolls.  We will acknowledge that.  And the

12    whole process acknowledges the possibility that somebody who has

13    self-identified to the State that they are noncitizen, that there

14    may have been a mistake made.  And the whole process is designed

15    to try to individually -- and we'll come back to that --

16    individually examine into the -- into the conflict in the -- in

17    the documentation and resolve it correctly, resolve it correctly.

18    And, yes, to provide an individualized opportunity, two of them,

19    for the individual -- for the person who is the self-identified

20    noncitizen to correct it.

21         But, Your Honor, this process is designed to ensure that

22    noncitizens who are not, never were, and cannot be voters are not

23    on the rolls.  That is an obligation that the State has under the

24    NVRA, as well as state law, and this is a process designed to do

25    that.

1     So the question really is, Your Honor, does -- I think

2  even counsel would agree, for the Plaintiffs' side, that if I'm

3  right and what I believe to be a majority of the federal judges

4  to look at this are right, then this -- then this process is

5  not -- is not prohibited, is not touched by either removal

6  provision:  The general removal provision, which we're going to

7  trudge through unfortunately; and the 90-day removal provision.

8     THE COURT:  But the statute includes exceptions, correct?

9  And non-citizenship was not one of your exceptions.

10     MR. COOPER:  That is true.

11     THE COURT:  So how do you respond to that?

12     MR. COOPER:  May I -- may I do that?

13     THE COURT:  Yes.

14     MR. COOPER:  And to do that, there's no shortcuts.

15     THE COURT:  Okay.

16     MR. COOPER:  We have to trudge through the provisions,

17  Your Honor, that I think bear on that question.  And I think, we

18  would submit, brought at least several judges, putting the

19  majority not side -- several judges to the conclusion that I'm

20  advancing here, that it just doesn't reach it.

21     And so, Your Honor -- sorry -- let's start obviously, and

22  the Court has heard now what the 90-day provision is, the C2, and

23  so let me share it with you a third time.

24     The 90-day provision, Your Honor, the so-called Quiet

25  Period Provision, prohibits states from, I'm quoting now,

1   "Removing the names of ineligible voters from the official list

2   of eligible voters."

3          Now, to understand, Your Honor, what the scope of that is,

4   I would like to start with a different provision, the general

5   removal provision.  And that is a 3.  But, Your Honor, I would

6   even like to begin, so that we understand what A-3 means, with

7   A-1, and so I would ask the Court, if you have the statute before

8   you --

9          THE COURT:  I do.

10         MR. COOPER:  All right.  Start at A-1 or A.

11         "In the administration of voter registration for electors

12  for federal office, each state shall, one, ensure that any

13  eligible applicant is registered to vote in an election under

14  Section 20504 of this title" -- excuse me -- "In an election" --

15  I beg your pardon.  I misread it.

16         "In an election, what?  A, in the case of registration

17  with a motor vehicle application, under Section 20504 of this

18  title, if the valid voter registration of the applicant is

19  submitted to the appropriate state motor vehicle authority not

20  later than," et cetera, et cetera.

21         So, Your Honor, the State has an obligation only to

22  register an eligible applicant who has provided to the State the

23  valid voter registration form, a valid voter registration form.

24         The next provision, B, says the same thing.  In the case

25  of registration by mail, under Section 20505 of this title, if

1    the valid voter registration form of the applicant is postmarked,

2    et cetera, et cetera.  D has the same language.  C has the same

3    language.  D has the same language.  The whole point of A1, Your

4    Honor, is that th estates have to register only valid, eligible

5    applicants who present valid registration forms.

6         Now we skip down to the general removal provision, 3.  And

7    it too keys off the first sentence of A, "In the administration

8    of voter registration for elections for federal office, the state

9    shall, 3, provide that the name of a registrant may not be

10   removed from the official list of eligible voters except" -- and

11   then they list the very exceptions or at least the exceptions

12   that you just mentioned earlier:  Somebody who has requested

13   removal; someone who's committed a felony, been convicted; mental

14   incapacity.  And then jumping down to 4, someone who has passed

15   away or there's been a change of address.  Four exceptions under

16   the general removal provision.

17        But I want to focus now on the -- on the opening line.

18   "Provide that the name of a registrant may not be removed from

19   the official list of eligible voters except..."

20        What is a registrant?  Well, Your Honor, we know what a

21   registrant is from everything that precedes it.  It's someone who

22   is an eligible applicant who's presented a valid voter

23   registration form.  If he's not done those things, he can't be a

24   registrant, because he can't be registered.  The State has no

25   obligation to register, and it shouldn't register him.

1    So, Your Honor, the -- and here's where the exclusio point

2    becomes, you know, Your Honor, very important.  If these

3    exceptions had not been listed, then the State would not be able

4    to remove any of them, Your Honor, because they were valid

5    registrants when they registered.  So they were registrants, but

6    the -- but the statute had to provide an exception because

7    otherwise the blanket prohibition that provide that the name of a

8    registrant may not be removed from the official list of eligible

9    voters would have permitted the removal of them from that list of

10   eligible voters.  So an exception, Your Honor, had to be made.

11   Now, does that mean those exceptions -- the presence of

12   those exceptions, that they're the only exceptions, Your Honor,

13   and that -- and, therefore, no other removals in the -- can take

14   place under from the general -- under the general removal

15   provision, this one?  That can't be right.  That would mean

16   that -- and this was what the courts that I'm suggesting have

17   gotten this right, and what the Court in *Bell* said in terms that

18   I opened my argument with.  It would -- it would mean, you know,

19   that noncitizens, minors, and even fraudulent fictitious people

20   could not be removed because they're not listed here.  They're

21   not -- they're not an exception, and if -- but why is it that

22   they can be removed, I would submit to you.  And by the way, that

23   would be absurd.  The Court has to do its best to reject an

24   absurd result.  Congress couldn't possibly have intended to

25   prohibit in this blanket removal ban, removing from the list --

1   the list of eligible voters, people who were never eligible in

2   the first place, people who were on the rolls void ab initio from

3   the beginning, and that's the -- and that's the point that the

4   courts are making.

5         They -- so, Your Honor, they weren't registrants.  They're

6   not prevented -- the State isn't prevented from removing

7   noncitizens and the others because they never were legitimately

8   registrants in the first place.  Their registration was void

9   *ab initio.*

10        And, Your Honor, now moving forward to the -- to the Quiet

11  Period Provision.  The same analysis, Your Honor, has to obtain.

12        But before we do, Your Honor, please note that the removal

13  is from -- in the general provision, is, Your Honor, from the

14  official list of eligible voters.  Two points:  One, someone

15  whose registration was not from an eligible applicant and

16  therefore was void *ab initio* and couldn't become a resident, also

17  could not become a voter, couldn't become a voter, couldn't be on

18  the list of voters, and that's -- and that's the point we made,

19  and I'm, admittedly, making this point more elaborately here than

20  we were able with the time we had to make it in our briefing, but

21  the key term, then, in the Quiet Period Provision, C2, is -- is

22  voter.

23        The -- Your Honor, the person can't be a registrant also

24  cannot be a voter, cannot be on the list of eligible voters

25  because they're not a voter, just as they weren't a registrant.

1       And, Your Honor, that same provision, the Quiet Period

2   Provision, has three of the four exceptions, and it is the

3   Plaintiffs, Justice Department, and the Private Plaintiffs'

4   argument that because noncitizens aren't listed there, they can't

5   be within -- they -- the State cannot remove them during the

6   90-day period because they're not listed there and the exceptions

7   are exclusive.  We're saying, yes, the exceptions are exclusive,

8   true, but there's another reason, a different reason why

9   noncitizens, minors, fictitious people can be removed, and that's

10  because they're not covered.  They're not covered by the general

11  provision, and they're not covered by the 90-day provision,

12  because if they were, they wouldn't be able to be removed ever,

13  not in 90 days, not 91-plus days.

14      Your Honor, and that's what I mean by we have to trudge

15  through this.  I admit this is not the clearest statute, but I

16  commend to you the analysis of the judges that we submit to you

17  have gotten this right.

18      And with respect to the majority in *Arcia*, the ones that

19  didn't get it right, that we're -- so that's, Your Honor, our

20  submission on the text and the structure.  The structure -- the

21  structure being the notion that these listed exceptions have to

22  be exclusive, and that because they're exclusive, no one else,

23  noncitizens, can't be removed.  Your Honor, that can't be right.

24  And, in fact, the Department of Justice admitted in one of the

25  Florida cases -- I don't remember which one -- yeah, that can't

1  be right.

2      And so, unless you decide, as the majority in *Arcia* did,

3  that the same word in two different adjacent statutes mean

4  different things and have different results, then, Your Honor,

5  again, we submit to you that the -- that the district judges that

6  got overruled and the dissent in *Arcia* have it right.

7      And if we're right about that, then they have no

8  likelihood of success.  But whether we're right about it or not,

9  given the respectable Federal Court judge support for this

10  thinking and this interpretation, they certainly don't have an

11  entirely clear-cut case.

12      Let me --

13  THE COURT:  That is if I accept that ruling, that it has

14  to be entirely clear-cut instead of the normal way preliminary

15  injunctions are considered.

16  MR. COOPER:  I'm sorry?

17  THE COURT:  Unless I consider during the normal course of

18  a preliminary injunction, and since this is a mandatory

19  injunction, I think it is a higher standard in some respects,

20  maybe it's not, in some respects it is a higher standard, but I

21  don't know if it has to be clear-cut in the way that you are

22  describing it in the sense of no other judge out there could have

23  ever seen something differently, and, you know, we have this

24  dissent over there, and this person over here, because I want to

25  look at the plain meaning of the statute, and --

1          MR. COOPER:  That's what I'm arguing to you, Your Honor.

2          THE COURT:  I know.

3          MR. COOPER:  That's my submission to you.

4          THE COURT:  And I -- and I'm glad that you took the time

5     to walk through your reading of it.

6          MR. COOPER:  Yeah.

7          THE COURT:  I don't know if I agree with the whole -- with

8     your reading of it.  I need to -- I need to take a look.

9          MR. COOPER:  Sure.

10         THE COURT:  But I'm glad that you walked through it in the

11    way that you did.  One thing that they pointed out in the reply

12    brief -- and I don't know if you've had an opportunity to really

13    read that.

14         MR. COOPER:  It came in at 11:00 last night, Your Honor,

15    I -- with heavy eyelids --

16         THE COURT:  Then I won't --

17         MR. COOPER:  -- I tried to quickly breeze through it.

18         THE COURT:  I won't ask the question.  Go on with your

19    argument.

20         MR. COOPER:  I appreciate that, letting me off that hook.

21         Your Honor, then --

22         THE COURT:  Let's move ahead and talk about, if I do read

23    it, the statute, and it applies to this process, I want you to

24    walk through the process and --

25         MR. COOPER:  Yes, sure.

1         THE COURT:  -- show how it is individualized.

2         MR. COOPER:  And that's my next item.

3         THE COURT:  Maybe, since it's 1:20 we should take our

4   lunch break, I'm thinking, and then we'll resume at 2:20, and

5   then we'll pick up there.

6         MR. COOPER:  Very well, Your Honor.  Thank you.

7         THE COURT:  I usually take it at 1:00, the lunch break,

8   and we're a little late.  We'll do that and then we'll resume.

9   We'll resume at probably 2:25.

10        MR. COOPER:  Very well, Your Honor.

11        THE COURT:  We're in recess.

12        (Thereupon, a luncheon recess was had beginning at

13  1:23 p.m.)

14              **AFTERNOON SESSION, OCTOBER 24, 2024**

15  (2:35 p.m.)

16        THE COURT:  Mr. Cooper.

17        MR. COOPER:  Good afternoon again, Your Honor.

18        THE COURT:  Good afternoon.

19        MR. COOPER:  Charles Cooper for the Defendants.  The

20  question is systematic.  Your Honor, we're not completely without

21  resources to understand what Congress meant by that term.  In

22  fact, we've got some very useful guides in the legislative

23  history.  The Senate report in particular is revealing, and I

24  want to share a passage with you from it, which I believe

25  reflects what Congress had in mind when it was talking about a

1    systematic program and why it is dramatically distinguishable

2    from the program or the process that the Commonwealth of Virginia

3    is using.

4        The Senate report explains this:  "Almost all states now

5    employ some procedure for updating lists at least once every two

6    years.  About one fifth of the states canvass all voters on the

7    list.  The rest of the states do not contact all voters, but

8    instead target only those voters who did not vote in the most

9    recent election.  Whether states canvass all those on the list or

10   just nonvoters, most send a notice to assess whether the person

11   has moved."

12       Your Honor, nothing could be farther from that.  And by

13   the way, that's not the only passage that is reflective.  Many

14   passages or some passage -- additional passages in both the

15   Senate report and the House report talk about this type of mass

16   mailing, this type of canvassing.  In fact, they talk about

17   door-to-door canvassing, what could be less individualized than

18   these items that the legislative history speaks of.  And nothing

19   could be farther from that than the Commonwealth's process.

20       And so let's begin at the beginning.  It starts, Your

21   Honor, with an individual who does self-declare or who has

22   otherwise provided documentation that identifies that individual

23   as a noncitizen.

24       So it begins with that individual -- on that individual

25   basis.  And then, yes, the Plaintiffs are correct, the --

1    THE COURT:  But the focus is on not -- in the statute not

2   on the individual, but what the particular state, in this case,

3   the Commonwealth, is doing, what the Commonwealth's process is.

4    MR. COOPER:  Yes, Your Honor.

5    THE COURT:  And what is the Commonwealth's process once

6   they have that information.

7    MR. COOPER:  Well, that's true, but I guess the point I

8   would make is this isn't the State kind of canvassing generally,

9   not knowing what it will find in terms of citizens versus

10   noncitizens, or in that instance, in terms of people who are

11   still residents versus people who are no longer residents.

12    This is the State receiving an individual's information

13   that that individual is a noncitizen.  The State can't just

14   ignore that.  It can't ignore that.  It has a responsibility to

15   ensure that that's -- that person is not on its rolls, if that is

16   in truth a noncitizen.

17    THE COURT:  I don't know if that -- the states need to

18   investigate that or look into that bears on whether or not it is

19   systematic or not.

20    MR. COOPER:  Well, and the State knows -- Your Honor, the

21   State, we would submit to you, has no better way to investigate

22   it than to go to the individual him or herself, and that's what

23   they seek to do, is go to the individual.  There's a conflict,

24   yes.  And I'll get back to the next step in the process, but a

25   conflict in the state's information has surfaced, at least when

1   that noncitizen information is collected, and, as the statute --

2   Virginia statute requires, goes to Elect.  And, yes, Elect then

3   runs that individual's information through the so-called VERIS

4   database.  That certain is true.

5       And that database basically serves as a screening device

6   to see if the individuals who have self-identified as a

7   noncitizen are on the rolls.  And that system isn't perfect, but

8   it's -- but it is -- it has been designed with the algorithm or

9   whatever to ensure that false positives, if you will, don't

10  happen or are kept to a minimum.

11      But that process, Your Honor, using a database for

12  screening purposes, the Plaintiffs and the Department of Justice

13  say, "Well, that's it.  We win.  It's not individualized.  It's

14  systematic."  That can't be right, Your Honor, that fact that

15  there's a -- the introduction in this system in this process

16  early on that uses computer databases to -- as a screening device

17  can't eliminate the possibility that it is individual and that

18  individualized steps that make the process individual take place

19  after that.  And that's our -- that's our submission.

20      Let's -- and let's analogize this to something that we're

21  all very familiar with here.  The discovery process, document

22  production.  What happens?  You ask the other side for these

23  documents.  Then you agree on search terms.  Search terms to do

24  what?  To use a database to cull from the universe of documents

25  ones that match, ones that respond to those search terms.  But

1   what happens after that?  They are reviewed individually,

2   typically, and in that review process, Your Honor, the culling

3   takes place.  Well, this isn't responsive, so this individual

4   document doesn't go.  This document is responsive, so it does go.

5   This one's responsive but its privileged.  It doesn't go.  We're

6   going to keep that out.  What would be more individualized than

7   that with, you know, countless documents, as we've all been

8   through?  That is an individual process, but yes, it uses

9   computer at the front end.  That's what this process does, Your

10  Honor, because once the information from the data match in the

11  computer, the search process, if you will, yields its results of

12  apparent matches.  Those are sent to the individual registrars in

13  the -- throughout the Commonwealth, and the individual registrars

14  are required to manually review the data from the individual

15  that's come over from DMV.

16          THE COURT:  I've seen it, how they're reviewed.  Is it the

17  name?

18          MR. COOPER:  I'm sorry?

19          THE COURT:  Is it the name?  Is it those data points --

20          MR. COOPER:  Yes, that's --

21          THE COURT:  -- the name, social security?

22          MR. COOPER:  That's exactly it, yes.  And --

23          THE COURT:  And so -- let me make sure that I have the

24  process right.

25          MR. COOPER:  Yes.

1      THE COURT:  So the DMV collects its information, and at

2  this point within this 90-day process or 90-day provision, they

3  are daily sending over these files of names, and the information

4  in there is potentially:  First name; last name; social security,

5  in certain instances; date of birth.  Is address?

6      MR. COOPER:  Your Honor, I believe it is, and --

7      THE COURT:  I know for sure it's the full name -- full

8  social -- it's the social security when it is available, first

9  name, last name, date of birth.

10      MR. COOPER:  Yeah.  And there's more in those data fields,

11  Your Honor, that's sent over.  It's not just those.  It's all

12  the -- all the data that they have from DMV goes to Elect, and

13  then --

14      THE COURT:  And this is according to --

15      MR. COOPER:  I know Ms. Coles in her -- in her declaration

16  identifies some of those data fields, yes.  And this is

17  paragraph 5 of her declaration.  She says it contains extensive

18  data fields for each individual sent -- I can't read this.

19      THE COURT:  Well, I'm -- okay.

20      MR. COOPER:  Let me pull it up here.  That allowed both

21  Elect and the general registrars to accurately compare the

22  individual to the list of registered voters.  Those data fields

23  include among other things, this -- honestly --

24      THE COURT:  So it -- but essentially it is identity,

25  right?

1          MR. COOPER:  Yes.

2          THE COURT:  These are things that go to identity?

3          MR. COOPER:  Yeah.  Yes, exactly.

4          THE COURT:  Because it is -- and that's from the DMV to

5    the voter registration roll -- to the VERIS system and then from

6    what Elect sends to the registrars is the same thing.

7          MR. COOPER:  Yes.

8          THE COURT:  It's the --

9          MR. COOPER:  Well --

10         THE COURT:  -- information to establish identity.

11         MR. COOPER:  That's exactly right.  And it's all the

12   information that they have that enables them to make a match or

13   to reject it.  And the computer process, the search process in

14   the VERIS system rejects a lot of them as being in the -- you

15   know, most of them, probably, I don't know, but most of them as

16   being registered, but there are hits, yes.

17         THE COURT:  But it's an identity.  It's to say that

18   these -- it's to have -- to the best extent possible -- because

19   what your records say the manual says is that one of -- at least

20   one of the following sets of criteria must be the same for a

21   match to occur between the DMV and VERIS, and it's one of each

22   of -- one of these, full social security, name -- social security

23   number, or first and last name, or last name and date of birth.

24         MR. COOPER:  Right.

25         THE COURT:  So not even all of those, just one.

1    MR. COOPER:  Well, Your Honor --

2    THE COURT:  This is according to Docket Number 9-5 --

3    MR. COOPER:  -- That is --

4    THE COURT:  -- 21.

5    MR. COOPER:  That is how it reads, Your Honor.

6    THE COURT:  Okay.

7    MR. COOPER:  I guess what I am representing to you, which

8    has been represented to me, and I believe is now being

9    represented to you as well in this declaration, is that while the

10   manual requires at least one, the practices they send over, you

11   know, a lot of data fields, and there's more than just the ones

12   listed here.

13   And those data fields coming from -- or data points I

14   guess coming from DMV then do -- kind of go into the Elect's,

15   VERIS database, and the matching process data-to-data takes

16   place.

17   Now, again, I think the analogy to the search process in

18   a -- in a document production is quite apt.  There'll be some

19   hits that are unresponsive.  There'll be -- there'll be some

20   people who don't come out of that search, who may well should

21   have, but the point is that the computer does serve as a

22   screening tool designed to either confirm or -- to determine

23   whether or not the individual who has self-identified as a

24   noncitizen is on the voter rolls.

25   But, Your Honor, the place -- and I agree that's hard to

1   call individualized, but does that mean that the whole process is

2   not and cannot be individualized?  I think that's what I

3   understand my friends on the other side to say.  And I don't

4   think that's -- I don't think that's sustainable.

5        And I -- for example, because, after that screening

6   process takes place, the names, as I say, go to each general

7   local registrar.  The general local registrar is to manually

8   review the data, both the date coming from the DMV and the data

9   that's in the Elect's possession.  And the registrar either

10   concludes with a high level of confidence, "Yeah, this is a

11   match.  This person is on the voter list," or concludes, "No,

12   this is a false positive, if you will, from the data search" and

13   excludes them.

14        So that's an individualized review, just like a lawyer

15   looking at documents that come out of a result of search terms.

16        And then, Your Honor, yes, a computer is used to send each

17   individual a notice of intent to cancel that advised -- you have

18   the notice in front of you.  You know exactly what it says, but

19   it advises the individual that Elect has information to the

20   effect that the individual may be a noncitizen, and it invites --

21   well, and it says:  If this is in error, send back this

22   affirmation of citizenship.  That's all you have to do.  We don't

23   want -- we don't need any more proof than that.  Send it back in

24   this pre-addressed envelope.  A process that the Supreme Court in

25   *Husted*, we cited to the Court, said was a very simple, easy

1  process, one that anyone truly interested in voting would

2  undertake.

3        THE COURT:  That was a very different circumstance in that

4  case than this case, when you're talking about any interested

5  voter would respond or send back the card.  In that case, it was

6  a card and also, you know, whether or not you can vote in the

7  election over the next four years.  Here we're talking about

8  sending back a card in 14 or 21 days.  I don't want to be

9  dismissive of, you know, people and their life and thinking

10 they're not interested because they didn't send the card back in

11 that timeframe because, you know, things happen.  You know, I

12 just don't want to be dismissive of that.  That was a different

13 case.  It was a longer period than just 14 days that Justice

14 Alito was speaking to.

15       MR. COOPER:  Your Honor, point taken.  I don't mean to be

16 dismissive of the circumstance, just to point out that that

17 process itself is not one that is -- it's one that the -- that

18 the Commonwealth has attempted to make as convenient as it can

19 for the individual to confirm their citizenship -- to affirm it.

20       And the next step, Your Honor, in this process is, if the

21 affirmation is not returned, then another notice, it's a notice

22 of cancellation, goes to the individual, and it advises the

23 person of their -- the cancellation of their voting registration,

24 which by the way, doesn't actually occur for another seven days,

25 but it then also again invites the person, if it's an error,

1    please contact this office.

2         So, Your Honor, I guess our submission to you is that this

3    process is designed to identify only noncitizens.  It's designed

4    to catch mistakes, if mistakes have been made, either by the

5    Commonwealth or by the individual in executing forms.  And it's

6    designed to correct those mistakes as much as possible and on an

7    individualized basis.

8         And if the Court has no additional questions, I'll move on

9    to the next point.

10        THE COURT:  I don't.  Thank you.

11        MR. COOPER:  Very well.  Your Honor, I guess I want to --

12        THE COURT:  Oh, you know what, I'm sorry, Mr. Cooper.  I

13   did have this question, if you can answer it, because I wasn't

14   entirely clear on it:  When does -- when is -- who is using SAVE

15   and when do they use SAVE, because that appears inconsistent in

16   the materials.  I think in the statute it appears that the DMV

17   would be using SAVE --

18        MR. COOPER:  That's right.

19        THE COURT:  -- but then I also saw where I guess the MOU

20   was between Elect and USCIS for the use of SAVE.  So, can you --

21   can you shed any light on that?

22        MR. COOPER:  Well, the SAVE process was introduced into

23   this case.

24        THE COURT:  Oh, only in the ad hoc process?

25        MR. COOPER:  Yes.

1          THE COURT:  Okay.  Then let's move from that.

2          MR. COOPER:  That ad hoc process -- and it's described in

3     the declarations before you, and I know no more about it.

4          THE COURT:  I was clear on the ad hoc process.

5          MR. COOPER:  Yeah.

6          THE COURT:  It was just outside of that process, so thank

7     you.

8          MR. COOPER:  Yeah.  If there's anything outside of that

9     process, I don't know it.  Okay.

10          Your Honor, I want to just touch briefly on the claim made

11     by the Private Plaintiffs that this is discriminatory.  And, of

12     course, the statute requires that any program of removal be

13     nondiscriminatory and uniform.

14          We submit that this process is facially neutral.  It is

15     indifferent to what the status is of somebody who self-identifies

16     as a noncitizen.  Anyone who does, then, is entered into this

17     process.  And, Your Honor, I guess the place where I think their

18     argument falters is on the notion that this process, which may

19     well -- though I don't know -- have a disproportionate impact on

20     naturalized citizens, and which in turn may have a

21     disproportionate impact along the lines of national origin.  I

22     think that's -- that's a premise of their argument.  That fact,

23     if it is a fact, would not -- would not kind of get them over the

24     goal line because the -- there's a discriminatory intent

25     requirement here, and they just -- there's no intent or any

1    evidence of any discriminatory intent to disadvantage in any way

2    naturalized citizens or people on the basis of their national

3    origin.

4         And, Your Honor, I think that the requirement of intent

5    isn't just the, I guess, knowledge, if you will -- and this is

6    not something I understand the Plaintiffs to have said, but I

7    want to address it.  It's not -- it's not knowledge that this

8    process may land more heavily on naturalized citizens or people

9    on the basis of national origin.  That -- knowledge of that is

10   not discriminatory intent.  We know from the *Feeney* case, I think

11   it was, that discriminatory intent requires doing something

12   because it will land more heavily on that class of people.

13   There's just no evidence -- and, Your Honor, I can just tell you

14   there's just -- that's not what's at work at all in this process.

15        So I'll turn now to irreparable harm, which is the --

16   which is the second requirement.  Whether the Court welcomes the

17   *Purcell* standard that I've urged deponent, or whether it sticks

18   with the traditional standard, irreparable harm is an element.

19        And, Your Honor, our argument here is that the irreparable

20   harm thing is -- it's a balance of harms in this context.

21        First of all, I want to address each step in this process.

22   We would submit that getting -- that being identified in the

23   process and getting a notice of intent to cancel with a request

24   to affirm your citizenship if it's an error, is not itself

25   irreparable harm.  Even if the comment made about that process in

1    *Husted*, I think is how it'd be pronounced by the Supreme Court,

2    is -- was in a different context, still, it's hard to call

3    that -- we would submit, it's very hard to call placing that

4    onus, if you will, on somebody who's self-identified to the

5    Commonwealth that their a noncitizen to clear it up, to correct

6    them, to correct it.

7          And even the cancellation notice, being cancelled, we

8    would argue is very hard to understand as irreparable harm for

9    reasons counsel's already addressed, and that is that an

10   individual who has been cancelled, number one, is once again

11   provided a request, if the you will, to correct this if it's

12   wrong by calling into your local registrar, number one.  And,

13   Your Honor, that individual can still vote -- can still vote

14   under the same-day registration and voting from the date that it

15   begins right up until election day.

16         And let me also address the notion of the absentee

17   ballots.  There's some force to that point.  There's some force

18   to that point.  But I also don't think it's dispositive by any

19   stretch for two reasons.  First, if somebody who has missed or I

20   guess it just -- the circumstance is kind of -- is premised on

21   the notion the individual did not get either notice and then they

22   sought an absentee blot.  But if they didn't get either notice in

23   the mail, it's not -- it's not obvious that it's likely they're

24   going to get their absentee ballots in the mail.  So that

25   universe of possible citizens who ultimately get disadvantaged, I

1    don't think it -- I think has been exaggerated.

2        But finally, Your Honor -- and this is what I meant when I

3    said there's a balance of harms -- the Commonwealth is of the

4    belief that the individuals who have self-identified as

5    noncitizens and who have not returned the form and who have not

6    sought to correct the Commonwealth's records when they received

7    the notice of cancellation, that those individuals are

8    noncitizens.  That's the premise of the law, the Commonwealth

9    law, that --

10    THE COURT:  I understand that that's your premise, and it

11    could be that some of those individuals are noncitizens, and it's

12    also -- it's part of it, and we've seen it borne out, where these

13    people were not citizens, they were naturalized, and they could

14    not have returned the form.  So it's not enough to say that all

15    of these are noncitizens.

16    MR. COOPER:  Yeah, I -- and, Your Honor, I'm not

17    suggesting to you that this process or any process would

18    eliminate every unfortunate error.  I -- the Commonwealth gets

19    that, and that would be extremely unfortunate, and the

20    Commonwealth seeks to avoid it, but --

21    THE COURT:  I think of the evidence that we have with

22    respect to Mr. Olsen -- Olsen's statement, he's the one who's the

23    registrar in Prince William County and indicated that there were

24    43 people who were removed, that he knows were -- had attested in

25    the past people who were citizens.  He says that in his e-mail.

1    MR. COOPER:  Well, Your Honor, I think they was

2  identifying -- I thought he was identifying 43 people who either

3  had moved away or who did reregister or who did return the

4  affirmation, and I don't have it at hand, but -- but to whatever

5  extent this process surfaced citizens and those citizens

6  nonetheless were -- because of the process or other reasons that

7  are apart from the process, still able to vote, then this process

8  worked to that extent.  It worked to that extent.

9    He also identifies 17 who -- there's no way to -- at all

10  to conclude that those are not noncitizens and are citizens.

11    But where does this bring us?  Where does it bring us?  It

12  brings us to the place where entering the order that they want is

13  not a cost-free option, Your Honor.

14    There is no doubt at all that if 1,600 people that the

15  Commonwealth believes to be noncitizens, understanding that there

16  may be some -- there may be mistakes there, but there are going

17  to be hundreds of noncitizens back on those rolls, and every

18  time -- and if a noncitizen votes, it will cancel out a legal

19  vote, so that is a harm as well.  That is a harm.  That is a harm

20  that they're asking the Court to bring forward.  And it's our

21  earnest belief that that harm represents a significantly larger

22  threat than does the -- than does the possibility of error as a

23  result of this system, an error that results, despite same-day

24  registration and all the rest of it, in the awful circumstance

25  where an individual loses their opportunity to vote.

1    We're not making light in any way of that, but it's no

2  more awful than a person's legal vote being canceled by somebody

3  who's not authorized to vote, who's not eligible to vote.

4    Your Honor, I guess my final -- my final point from this

5  standard that I believe the Court should be applying here is

6  whether or not the measures that are being ordered or that the

7  plaintiff is seeking, whether those measures are, at least,

8  feasible before the election without significant cost, confusion,

9  or hardship.

10    Now, the measures here, I think it's self-evident, if the

11  you will, that those will entail -- the ones that the Plaintiffs

12  seek will entail significant -- more than just significant, but

13  significant cost, confusion, and hardship.  This -- again, it's

14  ten days before the election, and --

15    THE COURT:  I don't take that lightly.  I do not.

16    MR. COOPER:  Forgive me.

17    THE COURT:  I don't take that lightly.  I do not.

18    MR. COOPER:  Yeah, I'm sure.

19    THE COURT:  But what it would entail would be the

20  registrars sending out new letters to the individuals who had

21  been removed.  It would require them being restored to the rolls.

22  What else?

23    MR. COOPER:  Oh, well --

24    THE COURT:  I --

25    MR. COOPER:  -- that ultimately will depend on you.  But

1    the -- but the request is much more extensive than just that.

2    That is the most aggressive, if you will, relief that they seek.

3    And, you know, without that relief, they -- the rest of it, you

4    know, obviously doesn't matter, so that's the dog here.  The

5    other stuff is the tail, but the other stuff is very important

6    and it's very costly, and it also is very -- it -- with the time

7    that's left, it would cause a lot of confusion.  It would cause

8    confusion within the election machinery, among the election

9    workers, among the poll workers.  They're asking that they be

10   provided guidance and education on the restoration to the rolls;

11   that press releases be sent out, that websites contain certain

12   information.  And, Your Honor, I guess our point is:  Those

13   things can't happen without a confusion and potential, you know,

14   chaotic results within the election administration itself.

15        But apart from that, there'll be confusion among voters.

16   There may be -- there may be voters who are noncitizens who now

17   will go and vote and commit a crime and not really -- not

18   really --

19        THE COURT:  They have -- one of their requests is that the

20   letter would inform that noncitizens -- if you're a noncitizen,

21   you still can't vote.

22        MR. COOPER:  If they're being put back on the rolls, Your

23   Honor, that seems like the definition of confusion.  But -- and,

24   that does not, to the Commonwealth, seem like a genuine safeguard

25   against noncitizen voting.

1          So, Your Honor, I have just one final point to make, and

2     this is -- this is on the balance of equities --

3          THE COURT:  Yes.

4          MR. COOPER:  -- which is -- which is really subsumed in

5     the points we've been discussing about the delay issue and about

6     this last point we've been discussing.

7          But the government says that the public interest is on

8     their side.  Well, that's true.  They represent the public

9     interest, but no more so in the Commonwealth than the

10    government -- the sovereign government of the Commonwealth.  The

11    cases they cite are cases in which the government stands against

12    private individuals, private corporations.  There's no contest

13    there who has the public interest.  Here, Your Honor, just

14    suggesting to you, it's a wash.

15         And I think I've come to the place where I say thank you

16    very much for your patience and indulging me for this lengthy

17    period of time.  And if you have any questions now or at any

18    point, we stand ready to respond.

19         THE COURT:  Thank you.

20         MS. JHAVERI:  Your Honor, good afternoon.  Sejal Jhaveri

21    again for the United States.  I would like to touch -- I would

22    like to start with one of the conversations that you finished

23    talking about with counsel for the Commonwealth, and that is our

24    proposed order, the remedy that we seek in this case.

25         For the benefit of the record, I'm referring to ECF

1   document number 924.  That's our proposed order in this case.

2        As your order -- Your Honor -- excuse me -- already

3   pointed out, the order is pretty limited in its nature, and the

4   additional information we now have from State Defendants

5   quantifies the number of people affected.  So we're talking about

6   mailing around 1,600 letters.  I think that's the number we've

7   all been using.  We know that they can do that.  We know that

8   these are the text of letters that they've been sending as part

9   of this program.

10       And the other aspects of the proposed order are also not

11  onerous on the Defendants.  They have stated that it will harm

12  election machinery, but my understanding is Virginia uses e-poll

13  books, which mean these voters can be returned to the active

14  polls pretty seamlessly.

15       And as you already noted, the letter would advise the

16  individual who receives it that U.S. citizenship is a requirement

17  to cast a ballot in Virginia.

18       And we also do ask that there be some information passed

19  onto general registrars, but we do know that that is a process

20  that the State already has in place to pass along this

21  information.  And so, while certainly there is some burden --

22  because no action comes with no burden -- we have worked to try

23  and tailor a remedy that would have minimal burden on the State.

24       And in reference to voter confusion, like I said when I

25  was up here this morning, what this order would do is remediate

1   the voter confusion caused by Virginia's actions in violating the

2   quiet period.

3        And, unless you have any questions specifically on the

4   proposed order, I would then turn to some of the legal points --

5        THE COURT:  Go to the legal points.

6        MS. JHAVERI:  Yes, Your Honor.  First, our claim, the

7   United States' claim, is limited simply to the violation of the

8   90-day quiet period, which means that the program that the State

9   -- excuse me, that the Commonwealth would use at other times of

10  the year might be perfectly allowable.

11       This program is systematic.  Counsel essentially agreed

12  with the description of the program that we have -- we discussed

13  earlier this morning.  The portion that counsel argues makes it

14  individualized is that matching, but again, that is just to make

15  sure that that person is the same person on the rolls as the DMV

16  data indicates.

17       In addition, the notices do not make this an

18  individualized process.  There were notices in *Arcia*, which is

19  the Eleventh Circuit case, and also in the same program that was

20  found by an Alabama District Court to violate the Quiet Period

21  Provision just last week.

22       In this case, the particular harm is compounded by the

23  short time period that individuals have to respond, and they are

24  removed from the rolls by a failure to respond, which is not an

25  individualized data point.  It's simply a failure to respond to

1    information provided.

2         Counsel made a note that errors are just a part of this

3    type of process, and that's true, and that's exactly what

4    Congress was thinking when it passed the Quiet Period Provision.

5    Those types of errors, they may be acceptable at other times of

6    the year when there's time to remediate them, but they are not

7    acceptable, per Congress' policy choice, in the 90 days before an

8    election, and that's the issue we have before us.

9         So, this is not an individualized process.  This is a

10   systematic process, as falls under the Quiet Period Provision,

11   very clearly within the case law that's been established.

12        I apologize.  I'm just looking at my notes to make sure

13   I've covered that.

14        If I could just jump back to the proposed order for a

15   minute.  I failed to make one point.  Virginia has noted in its

16   papers that it stopped sending out the notices of intent to

17   cancel on October 14th, but as we saw from the list that was

18   entered into the evidence as Exhibit EE, there were individuals

19   removed as recently as October 21st.  So, an important part of

20   any injunction is to prohibit any removals in these final 12 days

21   before the election, and that is something that this Court can

22   order, and we've sought in our proposed order.

23        I will turn next just briefly to address the Purcell --

24   Justice Kavanaugh's test related to Purcell.  Counsel cited a

25   Fourth Circuit case, which I think is *Pierce* -- and I apologize.

1  I've lost the citation.  My understanding is that case is not one

2  in which the Fourth Circuit has adopted the four prongs of

3  Kavanaugh's *Purcell* test.  They merely reference it because the

4  Plaintiffs said they could meet the test.  Now they find that the

5  Plaintiffs could not, but there's no analysis in that case, or I

6  think it's less than a paragraph that's even mentioned on it, and

7  they certainly don't adopt the test.

8      And so I would just echo what I said when I was up here

9  earlier, that *Purcell* -- the goals of *Purcell* are the same as

10  those of the 90-day quiet period and that this Court's order

11  in -- if it were to order a preliminary injunction here, would

12  have the same goals as the *Purcell* principle of maintaining the

13  status quo of those individuals who were on the rolls at the

14  90-day mark and also helping to remediate the confusion caused by

15  Virginia's actions.

16      Um, Your Honor, if you have no further questions for me, I

17  would ask that you enter a preliminary injunction as the -- as

18  the United States' proposed order indicates.

19      THE COURT:  No questions.  Thank you.

20      MS. JHAVERI:  Thank you.

21      MR. FERGUSON:  Good afternoon, Your Honor.  Once again,

22  Brent Ferguson for the Private Plaintiffs.

23      Your Honor, just a few points in response to the defense.

24  And first, I'll take them in order.  I think Mr. Cooper began by

25  talking about a delay in bringing this suit, and so I want to

1     point out a few things in response to that.

2          So, Virginia waited until August 7th to issue a public

3     order stating their plan to implement this escalated purge

4     program.  That's what created this dispute largely with regard to

5     the 90-day provision.  We know from Virginia's submissions thus

6     far and that ad hoc process we've talked about, that this was

7     long planned, and that there was a backlog of many people that

8     would be purged.  And then they would -- they were actually

9     purged at the end of August, so that's what created the delay

10    here.  That's why we're rushing at this point.

11         Now, my colleague mentioned that there's an existing law

12    on the book since 2006, and there's a manual that talks about

13    this process.  What I would say is it's very common for states to

14    have general removal programs, and it's also very common for them

15    not to apply them within the 90-day period because that's against

16    federal law.  So the existence, the mere existence of that 2006

17    law, doesn't notify Plaintiffs or anyone that it will be applied

18    in this manner.

19         Now, I think one thing Mr. Cooper brought up was that the

20    EO was issued on August 7th and seemed to believe that Plaintiffs

21    could file a lawsuit shortly thereafter.  Certainly, Your Honor,

22    there are a lot of things that go into making a showing for a

23    preliminary injunction, as Mr. Cooper has highlighted at some

24    length today.  And so Plaintiffs need to investigate, as we

25    mentioned, with regard to this program, how it was operating,

1    this list maintenance procedure, the fact that people were being

2    removed, and that there is irreparable harm.  And I think we've

3    shown all that now.  That's not something that you can show on

4    the day after an executive order is issued.

5         On this point, I just want to highlight the NVRA's window

6    to sue once again.  Now, we've said that we are unable to file

7    suit until that 30-day window opened, and that's the day that we

8    did file suit on October 7th.  Now, Mr. Cooper noted that there

9    is a 20-day waiting period separately for actions that are taken

10   within the 120-day window before an election.  Of course that

11   ignores what I've just gone over, is the necessity to do

12   investigation and to prepare for this.  And while we certainly

13   would have liked to have been able to file suit in late

14   September, that 20-day waiting period prevented us from doing so.

15        Now, Your Honor, I can also respond some on the points

16   discussed about the 90-day interpretation, whether it applies to

17   citizenship programs generally.  I don't want to do that unless

18   you're interested in hearing some follow-up on that.

19        THE COURT:  I don't know if I need that.

20        MR. FERGUSON:  Okay.  I'll move on, in that case.

21        Just a couple of points on whether this program is

22   systematic.  Now, Your Honor, we've talked about the roughly

23   1,600 people on this list that have been purged in the last 90

24   days.

25        Now, the evidence shows that we received in discovery that

1    many of these people were entered multiple times.  That means

2    that they got caught up in the system more than once, and I think

3    that's when we talked about that difference between 1,649 and

4    1,610.  And the mere fact that people can affirm their

5    citizenship again and that then get purged again just shows why

6    this is systematic -- a systematic process and it's not

7    individualized.

8         I want to highlight again, as I noted this morning, the

9    DMV has citizenship documents for a good number of these people,

10   including passports, including the stamp that says "New Citizen,"

11   and the election's department doesn't ask for that data when

12   they're doing this process with regard to the checkbox.

13        Now, I brought that up this morning.  It's in the Coles'

14   declaration, and the defense provided no response to that.  I

15   think that's pretty clear-cut showing that this is a systematic

16   program.

17        I'll move on to the harm, Your Honor.  The Defendants

18   respond about the same-day registration process and claim that

19   because people can register on the day that they go, there's no

20   harm here.  I also want to note that in the production that we

21   received on Tuesday there is a separate list of 75 people who

22   have tried to register to vote during this 90-day period and been

23   rejected because of this purge program, and so I would say

24   that --

25        THE COURT:  Where's that?  Where's that reflected?

1     MR. FERGUSON:  So, Your Honor, I made a motion this

2  morning to introduce that full set of evidence that we got that's

3  separate from the paper one we had for you.  I want to clarify

4  that I want to move to submit that under seal, and I have it

5  right here.

6     THE COURT:  Oh, Is that the flash drive you --

7     MR. FERGUSON:  Yup.

8     THE COURT:  -- all were referencing?

9     MR. FERGUSON:  Yup.

10     THE COURT:  And what is on the flash drive that isn't on

11  the printed copy?

12     MR. FERGUSON:  So, I believe what we just -- what we gave

13  you is the list of 1,600.

14     THE COURT:  Yes.

15     MR. FERGUSON:  What we also received from Defendants were

16  a list of -- I believe it's 75 people who tried to register

17  during this period and were ejected.  Those are initial

18  registrations rather than purges.

19     THE COURT:  Okay.

20     MR. FERGUSON:  And then -- and we had asked for that in

21  the expedited discovery motion.  And then separately it's two

22  voter file snapshots, one from August 7th and one from current

23  day, and so comparing those lists shows the difference in who's

24  eligible, so --

25     THE COURT:  How so?  Because explain those two screenshots

1    for me, because you did request the screenshot for -- are you

2    saying the number that we can see the decrease in the number of

3    people who've just --

4         MR. FERGUSON:  Right, or we would see -- we would be able

5    to see who's on the list on August 7th and who's not on the list

6    as of the day it was created, which I believe is probably October

7    21st.  I can't be --

8         THE COURT:  Okay.  Is it a list of --

9         MR. FERGUSON:  It's the full voter file, to my

10   understanding.

11        THE COURT:  The full voter file for --

12        MR. FERGUSON:  It's something that --

13        THE COURT:  -- the Commonwealth?

14        MR. FERGUSON:  Sorry.  Yeah, something that just Virginia

15   maintains in the common practice.

16        So, just to be clear, I'm giving you a list of what's on

17   this and what is within the discovery.  We just wanted to provide

18   that.  That's not necessary for the point I'm making about the 75

19   voters that were --

20        THE COURT:  Then I don't know if I need that list filed

21   with the Court --

22        MR. FERGUSON:  So --

23        THE COURT:  -- unless you have a reason why the Court

24   would need a list of every registered voter in the Commonwealth.

25   I don't think that is something that the Court needs.  I'm open

1    to hear your position on that, Mr. Cooper, as well.

2    Mr. Ferguson.

3        MR. FERGUSON:  So, the one response I would make to that,

4    Your Honor, is we have that list of 1,600 includes people who

5    were purged and have not reregistered, to my understanding.

6    This -- the comparing the voter file snapshots would show you

7    also who's gone off and then gone back on, I believe.

8        THE COURT:  Okay.  Candidly, that's going to be -- that

9    will be too complicated for this Court to figure out.

10        MR. FERGUSON:  I understand.

11        THE COURT:  Because it will require, I guess, for me to do

12    this comparison to figure out who, from the list of 1,600, has

13    not made it back on the list.

14        MR. FERGUSON:  I understand, and that -- I believe that's

15    something Dr. McDonald was planning to testify to you, but

16    totally understood, Your Honor.  We have the flash drive with

17    everything, and if not all of it is admitted by the Court, we

18    understand.

19        In that event, I'd like to just move on to some of the

20    discussion from the defense about noncitizens who may be on this

21    list.  And so Mr. Cooper said, you know, Virginia can't eliminate

22    every unfortunate error, but they believe that it must contain

23    hundreds of noncitizens.  And I think that is based on pure

24    speculation, and everything we know to date shows that that's

25    probably not true.

1    Now, let's remember for one thing that every time someone

2  registers to vote they affirm under penalty of perjury that

3  they're a United States citizen.  And all the Defendants are

4  asking them to do here that they claim solves this problem is to

5  just do that one more time.

6    Now, we also have the initial evidence that we've gotten

7  in the last couple of days that we discussed this morning that a

8  lot of U.S. citizens are on this list.

9    And then I think what's most powerful, Your Honor, is that

10  when you look at these cases we've been discussing all day,

11  including *Arcia*, including *ACIJ* from Alabama, and the *Whitley*

12  case from Texas that we haven't talked about as much, anytime

13  these programs are put into actual scrutiny and courts or experts

14  look at the number of actual noncitizens on the list, it's always

15  a tiny percentage of the people on that list.  And that's, I

16  think, a really powerful point.  And, of course, that's the

17  reason that Congress banned this type of voter purge.

18    Your Honor, I'll move on just to make one final point

19  about the burden Mr. Cooper testified to in restoring voters to

20  the rolls in the next ten days.

21    I would say that one thing to know is that the State --

22  the Commonwealth was taking these steps in the last few months,

23  knowing that this program was likely unlawful, having received,

24  of course, letters from Plaintiffs raising this issue, decided to

25  move ahead with this, knowing this was the problem, and then

1    taking all of these steps within this preelection window.  And

2    that includes continuing to purge people from the rolls as we

3    speak.

4        Now, they've said on their papers that the program stopped

5    on October 15th, but what I think they're saying is that they

6    stopped sending the letters on October 15th.  Then there's a 14-

7    or 21-day window that extends from that.  And the evidence that

8    we're discussing here that we just received shows that people

9    were being removed up to October 21st, I believe.  And, of

10   course, that will continue.

11       So if the State has the resources to continue removing

12   people from the rolls under this unlawful program, I think they

13   can do the opposite and move people back through a simple

14   electronic process.

15       If there's nothing further, Your Honor, we ask that you

16   grant Plaintiffs' motion.

17       THE COURT:  Thank you.  Is there anything else from

18   Plaintiffs?

19       MS. JHAVERI:  Not for United States.

20       THE COURT:  From our Private Plaintiffs, is there anything

21   else?

22       MR. FERGUSON:  Nothing from us, Your Honor.  Thank you.

23       THE COURT:  And so, are you -- because I said I would take

24   up the issue with Dr. McDonald, so you all are --

25       MR. FERGUSON:  If I may confer with my colleague for a

1  moment?

2  THE COURT:  Yes.

3  (Discussion had off the record.)

4  MR. FERGUSON:  Nothing further from us.

5  THE COURT:  Okay.

6  MR. FERGUSON:  Thank you.

7  THE COURT:  Thank you.  Okay.  And nothing further on this

8  side as well.  So, it's 3:35.  You said that -- do I -- is there

9  anything on that flash drive that you were submitting to the

10  Court, or was it only the -- that is what held that complete data

11  file?

12  MR. FERGUSON:  Your Honor, there's one additional piece of

13  evidence.  I was -- the reason I brought this drive up is because

14  there's a separate list of 75 people who have attempted to

15  register, I believe, for the first time during this window and

16  been rejected under the program.  And the point I'm making there,

17  why that's important, is because that shows that it's probably

18  not so simple to do same-day registration as the other side is

19  claiming.

20  And so, if we submit this to you, you can see that that

21  list exists.  That's something, again, that we received on

22  Tuesday night, but just --

23  THE COURT:  Is there a way to extract that from the other

24  part of the file?

25  MR. FERGUSON:  I'm sure there is.  It might just take a

1  moment for us --

2  THE COURT:  Okay.

3  MR. FERGUSON:  -- but we can do that.

4  THE COURT:  Well, why don't we take -- Mr. Cooper, you're

5  standing?

6  MR. COOPER:  I just want to be able to get some

7  confirmation that the Defendants are going to be able to have

8  access to whatever this is he's talking about.

9  THE COURT:  Oh, of course.  So --

10  (Discussion had off the record.)

11  THE COURT:  Okay.  Let's just talk on the record.  I --

12  we're going to make sure that, you know, before it's admitted,

13  that you have the opportunity to review it, and then -- are you

14  coming forward?  You have something?

15  MR. SANFORD:  Your Honor, Thomas Sanford.  I believe

16  Plaintiffs are saying this is something that we provided to them,

17  but I'm not familiar with this list of 75, so I think there might

18  have been some --

19  THE COURT:  Well, you all can -- we're going to take a

20  recess, and you all can figure that out.  And once you do, please

21  alert Mr. Jones, and we will resume just so that I can receive

22  that, okay, if it's appropriate or if I need to hear something

23  further on it.  But why don't you take a moment to let them see

24  it and see what you can do about extracting it.  I think we can

25  at least a, what, 20 minutes?  Is that sufficient?

1          MR. FERGUSON:  That's fine.

2          THE COURT:  Okay.  So 20 minutes.

3          (Thereupon, a recess in the proceedings occurred from

4     3:37 p.m. until 4:05 p.m.)

5          THE COURT:  Mr. Ferguson.

6          MR. FERGUSON:  Your Honor, so we conferred with defense

7     counsel.  We've shown -- here's what we did.  We took the flash

8     drive and we removed those lawyer file snapshots that you didn't

9     want to see.  The only things that are on the flash drive now are

10    that spreadsheet we gave you already on paper, and then the

11    second spreadsheet that's the 75 voters who were denied

12    registration within the 90-day period.

13         I want to just make a couple things clear.  Again, I want

14    to -- I just want to highlight that we move to admit this under

15    seal because this flash drive doesn't have the redactions that

16    the paper copy did.

17         I also want to highlight, this doesn't --

18         THE COURT:  Okay.  Hold on a second.  So, the flash drive

19    has what we referred to in court today as EE?

20         MR. FERGUSON:  Yes.

21         THE COURT:  Okay.  Your list.  And that is not what's

22    redacted.  Why do I need that if I have admitted this redacted

23    list?

24         MR. FERGUSON:  We can take that off as well.

25         THE COURT:  Take that off as well, and then allow -- since

1    I'm -- since I'm taking custody of a flash drive, I --

2        MR. FERGUSON:  Yes.

3        THE COURT:  -- just want them to then review it so that

4    they're clear of what is being admitted into evidence.

5        MR. FERGUSON:  Yeah.  And Mr. Sanford reviewed it on our

6    computer --

7        THE COURT:  Okay.

8        MR. FERGUSON:  -- the one remaining document, which is the

9    list of 75.  And of course I'll let him speak on reviewing that.

10       I just want to say that -- so, I just want to make clear

11   what this -- the purpose of this is.  It doesn't affect any of

12   the relief that we're asking for or that the United States is

13   asking for.

14       I brought it up only to show the point that people within

15   the 90-day period were also being denied registration rather than

16   just being taken off the existing rolls.

17       And then a final note.  This was a document provided in

18   response to Judge Porter's discovery order, which was document

19   number 72.  And there's number 2 on the list of documents he

20   required, and what order says is that the Defendants needed to

21   provide "Individual voter registration information for voter

22   registration applicants denied registration based on alleged

23   non-citizenship on or after August 7th."

24       THE COURT:  Okay.  And so, just to be clear, on this flash

25   drive what I'm going to get at this time, though, is only the

1  list of the 75?

2      MR. FERGUSON:  Yes, Your Honor.

3      THE COURT:  Because you're going to take off that other

4  item --

5      MR. FERGUSON:  Yes.

6      THE COURT:  -- that I don't need because the redacted copy

7  is already in evidence.

8      MR. FERGUSON:  Yes.

9      THE COURT:  And that's what I'm asking you to let -- is it

10  Mr. Sanford?

11      MR. SANFORD:  Yes, Mr. Sanford, Your Honor.

12      THE COURT:  Mr. Sanford review just so it's clear that

13  he's seeing the final thing that's coming back to the Court --

14      MR. FERGUSON:  Yup.

15      THE COURT:  -- and that I'm receiving as evidence.

16      Okay.  Thank you, Mr. Ferguson.

17      MR. FERGUSON:  Sure.

18      THE COURT:  And so -- oh, did you have something?

19      MR. SANFORD:  Yes, Your Honor.  On this list, I do just

20  want to clarify what it is.  And, again, it's what was responsive

21  to that order from the magistrate judge for voter registration

22  information, for voter registration applicants denied

23  registration based on alleged non-citizenship.  So I don't think

24  that's particularly relevant in this case because, for example,

25  if you submit a paper application form to register to vote and

1    you check "I'm not a citizen" on that, the registration is going

2    to be denied.  I don't think this really tells you anything

3    related to the existing statutory process and EO35 and just kind

4    of wraps up a lot more information.  And so I don't -- how

5    Plaintiffs are viewing this list is somewhat different from what

6    it actually is, Your Honor.

7         THE COURT:  Okay.  And so, is it clear on it -- from

8    what I'll be seeing, is it clear that -- because you said it --

9    why was it denied?

10        MR. SANFORD:  It -- these are just denials based on

11   non-citizenship, and it's not set forth in the list of what's

12   causing that denial.  And so I don't think it really, at this

13   stage, sheds light on pretty much anything, because we -- you

14   know, this could just be someone checked "I'm not a citizen," in

15   which case --

16        THE COURT:  I understand.

17        MR. SANFORD:  -- it should be denied.

18        THE COURT:  And so, to be clear, what is in evidence is

19   essentially everything that was attached to Private Plaintiffs'

20   initial motion, with the exception of I'm not receiving

21   Dr. McDonald's declaration.  Okay?

22        Then everything attached to the United States' motion and

23   reply, everything that's attached to the Defendants' motion, and

24   I am receiving over your objection the declarations that were

25   submitted today.  I think it's BB, CC, and DD.  Okay.  I am

1    receiving those, but I think it's -- one was the declaration of a

2    citizen who indicates that they were cancelled, and the other two

3    declarations are from plaintiff organizations and relay

4    information that they received.

5         I appreciate what you're saying in terms of the

6    individuals are anonymous, but I don't think that makes it

7    inadmissible within -- in these -- the context of what we have

8    going on here.  In some other time it would be hearsay on top of

9    hearsay, but for these purposes, I think it is -- it's

10   appropriate.

11        Is there anything else?

12        MR. FERGUSON:  Nothing from the Private Plaintiffs, Your

13   Honor.

14        MS. JHAVERI:  Your Honor, I have something just to

15   clarify.  I apologize.  I apologize if I missed it, but I just

16   want to note that Exhibit EE that we've been referring to today,

17   that list is also in evidence.

18        THE COURT:  Yes.  If I -- I received that when it was --

19   this morning, so yes, it is in evidence.  EE is in.

20        MS. JHAVERI:  Thank you, Your Honor, and I apologize.

21        THE COURT:  Okay.

22        MR. COOPER:  Nor anything from the Defendants, Your Honor.

23   Thank you.

24        THE COURT:  All right.  Thank you.  So let's talk about

25   next steps, because time is of the essence.  We have to move

1    quickly, and I understand and I appreciate the importance here

2    for all sides.

3         And so, I need a little time to look at some things, so

4    I'm going to -- we've got two options, because this is going to

5    have to be oral, because that will, you know -- an oral

6    announcement of the judgment because that will be fast.  Okay?

7         And so, I'm inclined to adjourn for today and bring you

8    back tomorrow early to do that.  Is -- are you agreeable?

9         MR. FERGUSON:  Yes, Your Honor.

10        MR. COOPER:  Yes, Your Honor.  We'll be represented

11   tomorrow.  It may not be by me.

12        THE COURT:  And that's unfortunate, Mr. Cooper.

13        MR. COOPER:  Indeed.

14        THE COURT:  It's been a pleasure.

15        MR. COOPER:  Thank you.

16        THE COURT:  Let's say 9:30.  Does that work for all

17   parties?

18        MS. JHAVERI:  Yes, Your Honor.

19        MR. FERGUSON:  Yes, Your Honor.

20        MR. COOPER:  Yes, Your Honor.

21        THE COURT:  Okay.  Thank you.  Then we'll be adjourned for

22   today.  Thank you.

23        (Proceedings adjourned at 4:14 p.m.).

24

25

REALTIME UNEDITED TRANSLATION DISCLAIMER IN THE MATTER OF


**VIRGINIA COALITION FOR IMMIGRANT RIGHTS, et al.,**

**v.**

**SUSAN BEALS, et al.,**

**Case Number: 1:24-cv-01778-PTG-WBP**

The realtime unedited translation of proceedings in the above-titled matter is delivered unedited and uncertified by the court reporter at the request of the undersigned. Readability is <u>DECREASED</u> if the rate of speech is <u>INCREASED</u> or there is more than one person speaking at at time.
You agree that you will not distribute this realtime translation in any form, written or electronic,
to the public, including news organizations and other nonparticipants.


     The realtime translation may not be relied upon for purposes of verbatim citation of the record
or used for any purpose that requires a certified transcript of a proceeding.
The realtime translation has not been edited, proofread or corrected. It is a draft transcript
and is not certified to be true and correct. It may contain computer-generated mistranslations
of stenotype code or electronic transmission errors, resulting in inaccurate or nonsensical word combinations, or untranslated stenotype symbols which cannot be deciphered by non-stenotypists. The realtime translation may differ from a certified transcript of the same proceedings in content, page and line numbers, punctuation and formatting. The realtime translation contains no appearance page, index or certification page.

     The undersigned agrees to indemnify and hold harmless the court reporter for any use by any
person of the realtime translation.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **VIRGINIA COALITION FOR** | : | |
| **IMMIGRANT RIGHTS,** | : | |
| | : | |
| **et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | Civil Action |
| **v.** | : | No. 1:24-cv-01778-PTG-WBP |
| | : | |
| **SUSAN BEALS,** | : | |
| **(In Her Official Capacity As** | : | October 25, 2024 |
| **Virginia Commissioner of** | : | 10:00 a.m. |
| **Elections),** | : | |
| | : | |
| **et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| ............................ | : | |

**TRANSCRIPT OF MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE PATRICIA TOLLIVER GILES,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

APPEARANCES:

For the Plaintiffs:        **Robert Brent Ferguson, Esq.**
                           CAMPAIGN LEGAL CENTER (DC-NA)
                           1101 14th Street NW
                           Suite 400
                           Washington, DC 20005
                           202-736-2200
                           Fax: 202-736-2222
                           Email:
                           Bferguson@campaignlegalcenter.org

                           **Sejal Jhaveri, Trial Attorney**
                           DOJ-CRT
                           950 Pennsylvania Avenue
                           Washington, DC 20530
                           202-532-5610
                           Email: Sejal.jhaveri@usdoj.gov

APPEARANCES: (Cont.)

For the Plaintiffs:

**Rodkangyil Orion Danjuma, Esq.**
THE PROTECT DEMOCRACY PROJECT,
INC.
82 Nassau Street, #601
New York, NY 10038
202-579-4582
Fax: 202-769-3176
Email:
Orion.danjuma@protectdemocracy.org

**John Michael Powers, Esq.**
ADVANCEMENT PROJECT (DC-NA)
1220 L Street Northwest
Suite 850
Washington, DC 20005
202-728-9557
Fax: 202-728-9558
Email:
Jpowers@advancementproject.org

**Simone Tyler Leeper, Esq.**
CAMPAIGN LEGAL CENTER (DC-NA)
1101 14th Street NW
Suite 400
Washington, DC 20005
(202) 736-2200
Fax: (202) 736-2222
Email:
Sleeper@campaignlegalcenter.org

**Shanna Marie Ports, Esq.**
CAMPAIGN LEGAL CENTER
1101 14th Street, NW
Suite 400
Washington, DC 20005
202-736-2200
Email:
Sports@campaignlegalcenter.org

**Danielle Marie Lang, Esq.**
CAMPAIGN LEGAL CENTER
District of Columbia
1101 14th Street, NW
Suite 400
Washington, DC 20005
267-205-0578
Email:
Dlang@campaignlegalcenter.org

APPEARANCES: (Cont.)

For the Defendants:

**Thomas John Sanford, Trial Attorney**
OFFICE OF THE ATTORNEY GENERAL
202 North 9th Street
Richmond, VA 23219
646-285-8691
Email: Tsanford@oag.state.va.us

**Joseph O'meara Masterman, Esq.**
COOPER & KIRK, PLLC (DC-NA)
1523 New Hampshire Avenue, NW
Washington, DC 20036
202-220-9600
Fax: 202-220-9601
Email: Jmasterman@cooperkirk.com

**Bradley L. Larson, Esq.**
COOPER & KIRK, PLLC (DC-NA)
1523 New Hampshire Avenue, NW
Washington, DC 20036
202-220-9600
Fax: 202-220-9601
Email: Blarson@cooperkirk.com

Court Reporter:

**Scott L. Wallace, RDR, RMR, CRR**
Official Court Reporter
United States District Court
401 Courthouse Square
Alexandria, VA 22314-5798
Cell: 443-584-6558
Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

1        **<u>FRIDAY MORNING SESSION, OCTOBER 25, 2024</u>**

2   (9:31 a.m.)

3       THE COURTROOM CLERK:  Court calls *Virginia Coalition for*

4 *Immigrant Rights, et al. versus Susan Beals, et al.*, Case Number

5 1:24-cv-1778.

6       May I have appearances, please, first for the Plaintiffs.

7       MR. FERGUSON:  Brent Ferguson for the Private Plaintiffs.

8       MR. GORDON:  Steve Gordon on behalf of the United States.

9       MS. JHAVERI:  Sejal Jhaveri on behalf of the United

10 States.

11      MR. DANJUMA:  Orion Danjuma on behalf of the Private

12 Plaintiffs.

13      MR. POWERS:  John Powers on behalf of the Private

14 Plaintiffs.

15      MS. PORTS:  Shanna Ports on behalf of the Private

16 Plaintiffs.

17      MS. LANG:  Danielle Lang on behalf of the Private

18 Plaintiffs.

19      MR. POWERS:  John on behalf of the United States.

20      THE COURT:  Good morning to all of you.

21      MR. SANFORD:  Good morning, Your Honor.  Thomas Sanford on

22 behalf of all the Defendants.

23      THE COURT:  And -- yeah.

24      MR. MASTERMAN:  Oh.  Good morning.  Joe Masterman on

25 behalf of all the Defendants as well.

1    MR. LARSON:  Good morning, Your Honor.  Brad Larson, also

2 on behalf of all the Defendants.

3    THE COURT:  And good morning to all of you.

4    And good morning to everyone in the courtroom as well.

5    Is there anything for me to take up before I issue my

6 ruling?

7    MR. FERGUSON:  Nothing from us, Your Honor.

8    MR. SANFORD:  Nothing from the Defendants, Your Honor.

9 Thank you.

10    THE COURT:  Thank you.  So, this matter is before the

11 Court on Plaintiff Virginia Coalition For Immigrant Rights,

12 et al.'s motion for preliminary injunction, and the United

13 States' motion for preliminary injunction.

14    As I said before, I consolidated these cases, and I set

15 this expedited briefing schedule.  And the parties have complied

16 with that.  And I thank you for the quality of your briefing, as

17 well as your advocacy in this courtroom yesterday.

18    The Private Plaintiffs and the Department of Justice seek

19 to enjoin the Defendants from continuing the program because they

20 allege it violates the 90-day provision under the NVRA.

21    Private Plaintiffs also challenge the program, even the

22 portion that occurred outside the 90-day provision as being

23 nonuniform and discriminatory.

24    And I want to emphasize that my ruling today only speaks

25 to the 90-day provision.  The evidence that I have considered

1    consists of the documents, records, that were attached to the

2    parties' respective briefs, as well as what I received yesterday.

3         The only item that I did not consider, which I indicated

4    yesterday, was the declaration of Dr. Michael McDonald.

5         I also considered the flash drive that I received at the

6    end of the day that you all filed under seal and what has been

7    marked for the record as Plaintiffs' Exhibit FF.

8         So now the Court makes the following Findings of Facts and

9    Conclusions of Law.  First, with respect to standing, there is no

10   question in this case that the United States has standing, and

11   only one Plaintiff must have standing for us to proceed.

12        But I also want to -- I also find that our Private

13   Plaintiffs have established organizational standing under *Havens*

14   *Realty* as well as *Hippocratic Medicine*.

15        An organization has standing to sue on its own behalf when

16   the defendant's actions interfere with the organization's core

17   business activities.  But an organization cannot spend its way

18   into standing by spending money and resources only, but it's only

19   when the actions have impaired an organization's ability to carry

20   out its mission, and that consequently drains the organization's

21   resources that an organization can establish injury in fact.

22        And I find that for our Private Plaintiffs, at least --

23   and I'm making only the findings today that are necessary,

24   because I understand that there will probably be a motion to

25   dismiss in this case, and so I'm only making certain findings

1  today.

2      But with respect to Plaintiff African Communities

3  Together, they identify voter access and participation as central

4  to its mission, and they did that in their declaration, which is

5  attached at Docket Number 26-25 and paragraph 5.

6      And they also indicated that they had to divert resources

7  away from supporting core activities to address the impact of the

8  Executive Order 35.

9      Therefore, the Defendants' program of canceling the

10  registration of eligible voters who Defendants claimed were

11  noncitizens interfered with African Communities Together's core

12  mission.  African Communities Together is also a member of the

13  Virginia Coalition, the lead Plaintiff, and as I said, these are

14  the only findings that I need to make to establish standing for

15  our organizational -- our Private Plaintiffs today.

16      But even still, I'd like to put on the record that it is

17  likely that they are going to be able to establish associational

18  standing as well because they have identified members of their

19  organizations who would have standing to sue.  Therefore, Private

20  Plaintiffs have established standing to bring this suit.

21      Now, the statute -- the Virginia law at issue in this case

22  are that it partly provides some of the framework today, is the

23  Section 24.2-427.  And it provides that the general registrar

24  shall cancel the registrations of all persons known by him not to

25  be U.S. citizens by reasons of report from the DMV or from the

1    Department of Elections based on information received from SAVE,

2    which is the Systematic Alien Verification For Entitlements

3    Program.

4          The statute directs that general registrars are to mail

5    notices of cancellation to all persons before canceling their

6    registration.  It further provides that the person will submit an

7    affirmation of their -- it further provides that either the

8    person will submit an affirmation of their citizenship within 14

9    days, or they would have their registration canceled.

10         Now, Virginia Code Section 410.1 required the DMV to

11   provide these reports about these transactions on a monthly

12   basis.

13         Section 24.2-404 of the Virginia Code provided that the

14   Department of Elections was also -- required the general

15   registrars to delete the names of any voter from the record of

16   registered voters who they or the DMV identified as purported

17   noncitizens.  The Board of Elections institutes the procedures to

18   ensure the requirements of 24.2-404 are fulfilled.

19         Now, the following are my findings that are pertinent to

20   this case.  On August 7th of 2024, Governor Glenn Youngkin issued

21   Executive Order 35.  It announced that county boards must

22   continue to cancel the registrations of those voters the

23   Department of Elections identified as noncitizens.  Specifically,

24   Executive Order 35 directed the Department of Motor Vehicles to

25   expedite the interagency data sharing with the Department of

1    Elections of noncitizens by generating a daily file of all

2    noncitizen transactions.  So instead of these reports being done

3    monthly, based on the executive order that was issued on August

4    7th, it required daily, daily data sharing and daily generation

5    of these removals.

6        The DMV was to share with the Department of Elections the

7    daily files of all people who were unable to verify that they

8    were citizens or -- and for the voter list to be updated daily

9    with the removal of individuals who are unable to verify that

10    they are citizens.

11        ELECT is headed by Commissioner Susan Beals.  And by

12    letter dated September 19th of 2024, Commissioner Beals confirmed

13    to the governor that the DMV now sends daily updates of

14    noncitizen data to ELECT.

15        Now, the program's process of removing purported citizens

16    from voter rolls starts at the DMV.  The DMV aggregates the data

17    of individuals who have indicated in some way or another

18    noncitizenship status through a variety of forms.  This evidence

19    came from the declaration of Ms. Ashley Coles, which is attached

20    at 92-1; the declaration of Steven Koski, which is attached at

21    document number 92-2; as well as ELECT'S standing operating

22    procedure; voter registration list maintenance, which is found at

23    Docket Number 92-8; and ELECT'S handbook list maintenance, which

24    is found at Docket Number 100-2.

25        The process continues in this way:  The data is then

1  aggregated and transferred to ELECT.  This is done

2  electronically.  ELECT then uses an electronic matching process

3  to determine whether the purported noncitizens from the DMV data

4  are the same people on the voter rolls.  ELECT then looks to see

5  where any person who has been identified as a purported

6  noncitizen lives and is registered and then sends that person's

7  information to the appropriate general registrar.

8        The general registrars then check to see if the purported

9  noncitizen from the ELECT data are the same as the people on

10  their voter rolls.  If the registrars find a match, the

11  registrars then send an automated created notice called a Notice

12  of Intent to Cancel to the people that they have identified as

13  noncitizens who appear on their voter rolls.  The Notice of

14  Intent to Cancel is created in the VERIS system, and, as I said,

15  it's automated.

16        The registrars then mail the automatic notices.  The

17  notices direct the person that they have 14 days to respond and

18  complete and attach attestation of citizenship.  If a person

19  completes it, the attestation goes back to the appropriate

20  registrar.  If the person doesn't respond, the registrar can

21  manually cancel that person's registration after 14 days.  The

22  person's registration is automatically canceled in the VERIS

23  system after 21 days.

24        Now, Defendants yesterday conceded that between August 7th

25  of 2024, which is when that executive order was issued, and

1   October 21st of 2024, over 1,600 individuals have been removed

2   from the voter rolls as a result of this process.  In Loudoun

3   County, 98 people had their registrations canceled since August

4   of 2024.  That was contained in the Electoral Board meeting

5   minutes found at Docket Number 9-13.

6           Incidentally, in August there had only been eight people

7   canceled, but there were 90 alone in September.

8           According to the general registrar's reports from Fairfax

9   County, 28 voter registrations were canceled from August 1st

10  through August 31st.  And these are just samples of times when

11  there were voters that were canceled, and it reflects that the

12  increase in those voters once -- or the increase in cancellations

13  once the executive order was issued.

14          The Federal Rules of Civil Procedure authorize courts to

15  issue preliminary injunctive relief, but it is an extraordinary

16  relief, and it should be issued sparingly.

17          Now, Defendants argue that the Court should apply the

18  standard articulated by Justice Kavanaugh in his concurrence in

19  *Merrill versus Milligan*, and that lays out factors for overcoming

20  the *Purcell* doctrine.

21          This Court finds that that standard is not appropriate

22  here in this case.  This case involves challenges on the

23  violations of the quiet provision of the NVRA, which by its very

24  nature, these types of challenges are always going to be close to

25  elections.

1    This ruling only focuses on the request for injunctive

2 relief related to the violation of the quiet provision, and not

3 Private Plaintiffs' challenge to the program being nonuniform and

4 discriminatory.

5    This Court also looked at the *Pierce* case which Defendants

6 cited and relied on in its support for why I should apply the

7 standard for *Merrill*, and the Court finds that is -- would be

8 inappropriate in this place at this time because, for one, the

9 *Pierce* case did not provide a challenge under the Quiet

10 Provision.

11    Two, the Court was not announcing a new standard.  It was

12 simply accepting the analysis, what the Plaintiff had put forth

13 and the framework that that Plaintiff had put forth.

14    And third, this is not a case where the Plaintiffs are

15 seeking to enjoin the enforcement of Virginia's election laws.

16 Instead, these Plaintiffs seek to enforce federal law, and what

17 they argue is a continuing violation of federal law.  Therefore,

18 this Court has applied the factors -- the *Winter* factors, and

19 those are simply whether or not Plaintiffs have demonstrated that

20 they are likely to succeed on the merits of their claim, that

21 they are likely to suffer irreparable harm without an injunction,

22 that the balance of equities tilts in their favor, and issuing an

23 injunction is in the public interest.

24    Now, the authority of the District Court to issue a

25 preliminary injunction, especially a mandatory one, should be

1    sparingly exercised.  Mandatory preliminary injunctions do not

2    preserve the status quo, and normally should be granted only in

3    those circumstances when exigencies of the situation demand such

4    relief.  So, it must be necessary to protect against irreparable

5    harm in deteriorating circumstances created by the defendant, and

6    it must preserve the Court's ability to enter ultimate relief on

7    the merits of the same kind.

8         To obtain a mandatory preliminary injunction, Plaintiffs

9    must show a likelihood of success by clear and convincing

10   evidence.  So, I'll start with the first factor, the likelihood

11   of success on the merits.  I do find that Plaintiffs have shown

12   by clear and convincing evidence that they are substantially

13   likely to succeed on the merits of their claim; that the

14   Defendants' process violates the 90-day provision.  The 90-day

15   provision provides that a state shall complete not later than 90

16   days prior to the date of a primary or general election for

17   federal office, any program, the purpose of which is to

18   systematically remove the names of ineligible voters from the

19   official list of eligible voters.

20        It further instructs that this provision should not be

21   construed to preclude the removal of names of people who have

22   been convicted of felonies, who have died, who have been declared

23   mentally incapacitated, or who have been removed from the

24   official list of voters, or who have requested to be removed from

25   the official list of voters, or by correction of the registration

1  records.  Those are the only exceptions.

2       So here, in order to show the violation of the 90-day

3  provisions, the Plaintiffs had to show that the Defendants'

4  process is a program whose purpose is to systematically remove

5  the names of ineligible voters which was continued or not

6  completed later than 90 days before the general election.

7       Starting with whether or not this is a program.  The

8  Defendants don't appear to challenge whether or not this process

9  is considered a program, but even if they did, the Court would

10  conclude that it is a program.  A program is simply a plan or

11  system under which action may be taken toward a goal, and clearly

12  that applies here.

13       In the case of *Project Vote/Voting for America versus*

14  *Long*, it's a Fourth Circuit case, the Fourth Circuit found that

15  the definition of program within the meaning of the NVRA was a

16  process of review carried out in the service of a specified end,

17  and that's clearly what we have here.

18       The Defendants' process was comparing lists of names and

19  flagging registrations for cancellation, and so that clearly

20  constitutes a program.

21       The second issue is whether or not this is systematic, and

22  the Court finds that it most certainly is.  The plain meaning of

23  systematic is "methodical in procedure or plan; of, relating to,

24  or concerned with classification."  That's from the

25  Merriam-Webster dictionary.

1      Now, in *Arcia*, which is not binding on this Court because

2  it's an 11th Circuit case, that court concluded that a procedure

3  which involved a mass computerized data matching process to

4  compare the rolls with other state and federal databases, and

5  then following with mailing of notices, qualified as systematic,

6  and I agree with that.  This program involved just matching data

7  fields.  Under the executive order, the DMV was to furnish on a

8  daily basis -- it was already doing it on a monthly basis under

9  the statute, but under the executive order it was on a daily

10  basis, and it was preparing a list of the people who had declared

11  that they were not citizens on a motor voter transaction or

12  another DMV transaction.  And the fields or the information that

13  the DMV was collecting was -- and later providing to ELECT was

14  the name, social security number, date of birth, sex, DMV

15  customer number, and transaction date.  This is from the *Coles*

16  declaration.

17      When ELECT received this information from the DMV, it

18  then, quote-unquote, "electronically compares."  That is the

19  quote from Ms. Coles' declaration.  It is an electronic

20  comparison between the information provided by the DMV and with

21  the voter information in ELECT's statewide Voter Registration

22  System.

23      And according to ELECT's Voter Registration List Manual,

24  Standard Operating Procedure, which is found at Docket Number

25  9-5, there could be a match when any one of the following sets of

criteria -- in any of these criteria it could establish a match

if it was the full social security number, if it was the first

and last name, or if it was the last name and date of birth, not

all three. At a minimum, just any one of those could provide the

match.

ELECT then would send the information to the registrar.

The registrar would simply confirm that the person identified is

the same individual listed on their voter rolls, and then send

the cancellation. This process is clearly methodical, and it's

concerned with classification. Neither ELECT nor the local

registrars performed additional research or review to confirm

whether the flagged voter was a citizen or not.

This process closely resembles that which in the *Arcia*

case was found as being systematic, because it left no room for

individualized inquiry, and that is the same here.

Although the Defendants argue that this process was

somehow individualized because it started with an individual

transaction at the DMV, which prompted the reports, and then,

because there were individual letters sent out at the end, that

does not make this an individualized inquiry. It is simply

checking data fields, matching in mass.

The Defendants conceded in argument yesterday that the

processes for matching the records by ELECT and the registrars is

limited to identification purposes. A registrar may only confirm

that the person identified by ELECT matches the record on the

1    registrar's rolls.

2         And I don't think it can be ignored that even though

3    Defendants say that these individuals started these -- the

4    process by having a transaction at the DMV, the Defendants

5    started this process by having the list compiled, and it

6    continued with the process through the electronic matching

7    period.  Therefore, this is systematic.

8         Third, the Court finds that the purpose of the Defendants'

9    process was to remove ineligible voters from the voter rolls

10   because it is triggered by a data point indicating that the

11   registered voter may be a noncitizen.

12        Now, the Defendants appear to concede that the program's

13   purpose is to remove ineligible voters from the voter rolls, and

14   that's clearly stated in the executive order at page 2.

15        Now, the NVRA is clearly premised on the idea that

16   citizenship is an eligibility requirement.  Thus, any program

17   designed to remove alleged noncitizens from the voter rolls is

18   necessarily removing ineligible voters from the voter rolls.

19        Now, the Defendants argue that they believe their process

20   is permissible under the 90-day provision because the words

21   "ineligible voter" and "registrant "appear -- as they appear in

22   other parts of the statute, suggest that a person must have been

23   eligible to vote at the time they're registered in order for the

24   90-day provision to apply.  This reading is inconsistent with

25   Congress' intent.  It cannot be that Congress would carve out

1    exceptions for those individuals who are felons or who were

2    declared mentally incapacitated and then failed to include the

3    exception for noncitizens.  And it seems less likely that

4    Congress would nevertheless permit that exception when the

5    process used to remove the names involved no individualized

6    inquiry.

7         I also -- the Defendants also argued that the 90-day

8    provision is limited to registers -- or this argument was also

9    rejected by the Court in *Arcia*, and I'm rejecting it here for the

10   same reason.  It simply -- the Defendants are arguing that this

11   statute applies to people who are determined that they are

12   ineligible later.  But the same can be said of people who are

13   felons or are mentally incapacitated.  They could have had those

14   same characterizations or characteristics at the time that they

15   applied for their registration, so that cannot have been what

16   Congress intended.

17        To be clear, the Commonwealth and the Board of Elections

18   have the authority -- I want to say that again -- the

19   Commonwealth and the Board of Elections have the authority to

20   investigate and remove noncitizens from the registration rolls,

21   but it must -- when it is in the 90-day provision, it must be

22   done on an individualized basis.

23        Defendants argue that this process is merely compliant

24   with, if not required by, Virginia law.  But the Supreme Court

25   has already determined that Congress intended the NVRA to preempt

1    conflicting state law.

2          Now, I'm not saying that the Virginia statute contains a

3    provision, because it would be conflicting if it contained a

4    provision that says this process could continue within that

5    90-day period before election.  It doesn't say that.  But even if

6    it did, it would be preempted.

7          And lastly, the Court finds that the Defendants' process

8    continued well into the 90 days before election.  As stated

9    above, on August 7th of 2024, Governor Youngkin announced via his

10   executive order this program.  August 7 is exactly 90 days before

11   the 2024 federal election.  And in that order he directed the DMV

12   to expedite the interagency data sharing with daily files of all

13   noncitizen transactions.

14         And in order for the voter list to be updated daily with

15   the removal of individuals who are unable to verify that they are

16   citizens.  And Commissioner Beals certified that this was, in

17   fact, happening.

18         So this Court finds by clear and convincing evidence that

19   Plaintiffs have shown that the Defendants' list maintenance

20   program is a program whose purpose is to systematically remove

21   ineligible voters from the voter rolls subject to the 90-day

22   provision.  Thus, the Court concludes that the Plaintiffs have

23   demonstrated a substantial likelihood of success on the merits.

24         This brings me to irreparable harm.  Now, the United

25   States argues that the government is always harmed by violations

1    arising under federal law.  The Defendants counter that the harm

2    here is not irreparable because there are other options, such as

3    filling out a provisional ballot on election day, and this would

4    cure the harm to eligible voters who have had their registrations

5    canceled, but this is not sufficient.

6         Defendants' program has curtailed the right of eligible

7    voters to cast their ballots in the same way as all other

8    eligible voters.  And even if provisional ballots are ultimately

9    counted, the fact that they are counted as provisional renders

10   them suspect and subject to being discounted in a way that they

11   would not otherwise be if the voters did not have their

12   registrations canceled in the first instance.

13        Further, the Fourth Circuit has said other -- in other

14   voting rights cases, that even if some voting mechanisms are

15   denied but do not absolutely preclude participations, voters may

16   still be irreparably harmed.  That was in the *League of Women*

17   *Voters of North Carolina*.  It's found at 769 F.3d 20 -- 224.

18        Defendants yesterday conceded that eligible voters who

19   have had their registrations canceled can no longer vote absentee

20   or by mail if they had planned to.  Thus, the evidence in this

21   case shows that Virginians who had been removed from the rolls

22   pursuant to this program will suffer irreparable harm without an

23   injunction.

24        The balance of equities.  Defendants have argued that

25   unwinding the acts of the Department of Elections of removing

1    these individuals from the rolls since August 7th would be

2    costly, particularly because of their impending election date,

3    and that that could also create some confusion amongst election

4    officials.

5         Defendants argue that the United States and Private

6    Plaintiffs unreasonably delayed in bringing this case.  This

7    Court disagrees.

8         Based on the evidence in this case, the Private Plaintiffs

9    engaged in communications and discussions with the Department of

10   Elections beginning in August of 2024 and continuing through

11   September of 2024.  They sought records that they were not

12   provided.  The United States also engaged in discussions with the

13   Department of Elections.  And I agree with them.  When you are

14   coming to court and seeking an injunction, you must do your due

15   diligence.  And from the evidence that they have attached to

16   their motions, it shows just that, the gathering of evidence.

17   So, under those circumstances, I do not find that this has been

18   unreasonable delay.

19        Moreover, it cannot be overlooked that it is the

20   Defendants who started down this road with what I find is a clear

21   violation of the 90-day Quiet Provision.  It was not happenstance

22   that this executive order intensifying these efforts was

23   announced exactly on the 90th day.

24        Plaintiffs argue that the inequities greatly favor them as

25   the right to vote as an eligible citizen is a fundamental right,

1    and it is.

2         The department and the Private Plaintiffs have also

3    presented evidence demonstrating that eligible citizens, eligible

4    citizens, natural born and naturalized, have had their

5    registrations canceled and were unaware that this was even so.

6    That is supported by Exhibits BB, Exhibits CC, Exhibits DD, as

7    well as the exhibits that were attached to the government's reply

8    brief.

9         I will also add that the evidence submitted by the Private

10   Plaintiffs was provided to this Court, part of that evidence,

11   just a day or two or less than a -- less than two days of when

12   they received it from the Defendants in this case.  And they have

13   already identified these citizens.  How many more are there?

14        Plaintiffs' declarations also appear to suggest that at

15   least some voters who realized too late that their registrations

16   had been canceled may still experience barriers in reregistering

17   or voting on election day.  That is in Exhibit DD at paragraphs

18   5, 12 through 14.

19        Further, the relevant inequity at issue is against the

20   citizens of the Commonwealth whose registrations were canceled

21   due to the removal program in violation of the NVRA's 90-day

22   provision.  At this juncture, this Court does not know that all

23   the persons who were removed pursuant to the Defendants' program

24   were noncitizens.  Repeatedly, it was said yesterday that these

25   were noncitizens who have been removed.  The evidence does not

show that.  What the evidence shows is that these are the
individuals who failed to return a form and attest that they were
citizens.  But at some point -- and also, at some point they may
have said on a form at the DMV that they were not citizens.  It's
not clear if that was intentional or not, if it was a mistake or
not, but later they attested that they were citizens, so they had
already attested before, but that when they were contacted during
the course of this program, at that point they did not send in an
attestation.  So, at best, what is before the Court is that there
was conflicting information.

So, neither the Court nor the parties, either side, as we
sit in this courtroom, know that those removed from those rolls
were, in fact, noncitizens.  And as I noted, the Plaintiffs have
already provided some evidence that revealed that citizens have
been removed from those rolls.

So I want these parties, these individuals, to be
referenced appropriately.  These are individuals who have failed
to send in attestations in response to the cancellation notices
that they received.  That is who these people are.

Thus, restoring the right to vote of all eligible voters
affected by this program strongly outweighs the burden to
Defendants of restoring those names to the rolls.  Thus, the
Court finds that the balance of equities favors Plaintiff.

And finally, the Court considers the public interest.  It
is undoubtedly in the public interest for ineligible voters to be

removed from voter rolls. It is also in the public interest for states to comply with federal law, particularly those laws which protect the right to vote, a fundamental right. This Court's order does not prevent the Commonwealth from removing registrants who they determine are ineligible through an individualized inquiry. Thus, the Commonwealth can still investigate and remove citizens. The NVRA also does not prevent states from using systematic processes to remove voters from voter rolls altogether. It only prevents them from doing so within 90 days before a federal election. And, as discussed above, this process has resulted in eligible voters having their registrations flagged for cancellation.

Plaintiffs have also provided evidence that people are continuing to be removed from these rolls, because from that snapshot that was provided on October 21st, we know that people were removed after the October 14th date that the program was supposed to cease. But the reason that the people are still being removed is because notices are sent out, and then if the response is not received, they are then canceled.

So, these violations are continuing. Given all of these facts, the Court finds that the public interest favors the Plaintiffs, and so, for these reasons, the Court will grant in part and deny in part Plaintiffs' motions for preliminary injunction.

Now, in terms of the substance of this order. Before I do

1    that, I will say this, that both Plaintiffs attached proposed

2    injunction orders to their filings, and I have reviewed those.

3          I'm enjoining the Defendants from continuing any

4    systematic program intended to remove the names of ineligible

5    voters from the voter registration list.

6          I am also directing Defendants to restore the voter

7    registration of the registrants that were canceled pursuant to

8    the Defendants' programs after August 7th of 2024, and those

9    individuals are identified in Plaintiffs' Exhibit EE.  It would

10    be those individuals that need to be restored.

11          Within five days of this order, the Defendants are to

12    issue guidance to county registrars in every local jurisdiction

13    in Virginia to immediately restore the voter registration records

14    of registrants that were removed pursuant to the program during

15    this, and by the program I mean -- every time I say "program,"

16    I'm talking about from August 7th.

17          They're to restore those, except for -- so long as those

18    individuals did not subsequently submit a voter removal request

19    or are not subject to removal by reason of criminal conviction or

20    mental capacity as provided by state law or by reason of death or

21    the registrant.  That also applies to the restoration.  Okay?

22          Additionally, Defendants are ordered to make all

23    reasonable and practical efforts to educate local officials, poll

24    workers, and the general public on the Defendants' program, the

25    restoration of the voter registrations of impacted voters, and

1    the ability of impacted voters to cast a regular ballot without

2    submitting supplemental paperwork.

3         And within five days of this order, the Defendants shall

4    submit to this Court under seal a report detailing every voter

5    registration canceled on or after August 8th to the present, and

6    I will include specific details in my order.

7         As I said, the Defendants' authority or ability to cancel

8    the voter registration of noncitizens through individualized

9    review is not limited by this order, nor does the order limit the

10   Defendants' authority or ability to investigate noncitizens who

11   register to vote or who vote in Virginia's election.  The

12   preliminary injunction applies only to Defendants' systematic

13   program.

14        It is further ordered that the motions for preliminary

15   injunction are denied in all other respects, and that this

16   injunction will expire on the day after the 2024 general

17   election.

18        Is there anything further?

19        MR. FERGUSON:  Brent Ferguson for the Private Plaintiffs,

20   Your Honor.  Could I just ask one question to clarify?  I know

21   you -- the order included a requirement for --

22        THE COURT:  I didn't read my order verbatim.  I did not

23   read it verbatim.

24        MR. FERGUSON:  You did not?

25        THE COURT:  I did not, so there may be some specifics in

1    the order.

2           MR. FERGUSON:  Okay.

3           THE COURT:  Okay.

4           MR. FERGUSON:  My question, the part about educating local

5    officials to make people aware that they've been restored, does

6    that include contacting affected voters here, the 1,600, with a

7    follow-up letter?

8           THE COURT:  Yes.

9           MR. FERGUSON:  Okay.  Thank you.  And I believe that was

10   within five days.  Could we clarify that that's five days

11   meaning --

12          THE COURT:  Yeah.

13          MR. FERGUSON:  -- Wednesday?

14          THE COURT:  Yes.  The -- and thank you for bringing it up

15   because I meant to include that.  I don't think I read that from

16   my order, but within five days of this order, the Defendants must

17   provide a remedial mailing to each registrant informing them that

18   their voter registration has been restored, explaining that they

19   may cast their regular ballot on election day in the same manner

20   as any other eligible voter, explaining that the registrant may

21   cast a regular ballot through any other method, including

22   requesting and voting through an absentee ballot by mail made

23   available to eligible voters in the same manner as other eligible

24   voters.  And I know that there's an issue there because of the

25   deadline, but in order to put them in the same position, that has

1  to be complied with.  And advising them that the registration --

2  that the cancellation of their registration pursuant to this

3  removal program after August 7th does not in and of itself

4  establish that they are ineligible voters or subject to -- or

5  ineligible to vote or subject to criminal prosecution or any

6  other penalty for registering to vote or for voting.  And also

7  advising that registrants who are not U.S. citizens, that they

8  remain ineligible to cast a ballot in Virginia elections.

9        MR. FERGUSON:  Thank you, Your Honor.  Could I ask one

10  other follow-up question?  That same part of the order you read

11  originally about educating the public, does that include, I

12  suppose, some form of correcting the record from the Statewide

13  Defendants, meaning on their website basically correcting

14  information and then issuing a Press release about the current

15  state of the program and that these voters are now eligible?

16        THE COURT:  Well, I don't want to -- what are you

17  proposing, in terms of -- and I'm going to give Mr. Sanford --

18        MR. FERGUSON:  Sure.

19        THE COURT:  -- an opportunity to be heard on this.

20        MR. FERGUSON:  Your Honor, I think what -- in addition to

21  individually contacting voters, what's important here is that the

22  executive order was issued very publicly and made the whole state

23  aware of this -- the whole Commonwealth aware of this program.

24  And I think there is some risk, if the -- if the correction of

25  the record only goes to individual people by mail, the people

1   will be unaware that they have been restored.  And so I think

2   what we'd ask for is reasonable efforts to let all Virginians

3   know that this program has ended and that these people are

4   restored.  And I'd point to the order in Alabama from last week

5   that required the Secretary of State there to issue a corrective

6   Press release.  Here, it could be similar in response to the EO,

7   and then just make sure that any information on the Board of

8   Elections' website, the Department of Elections' website is

9   corrected about the program.

10      THE COURT:  Mr. Sanford, did you need to respond?  I do

11  find a Press release is appropriate.  I didn't read my

12  preliminary injunction order verbatim.  It did include a

13  directive to provide a Press release.  I do think that that is

14  important.

15      MR. SANFORD:  So, you are ordering a Press release, Your

16  Honor?

17      THE COURT:  Yes, I am.

18      MR. SANFORD:  The one point I would like to take up is the

19  discussion of the absentee ballot.  And with the deadline of

20  requesting an absentee ballot being today, I just wanted to

21  clarify what Your Honor is ordering the Commonwealth Defendants

22  to do with respect to -- are we changing the process of absentee

23  ballots?  I mean, I think that kind of creates the risk of

24  confusion and chaos in the electoral system if we have different

25  rules around the absentee ballots, rather than the voting process

1    that's still in place otherwise, how Your Honor envisions ELECT

2    implementing a different approach to absentee ballots just for

3    this subset of individuals.

4         THE COURT:  I'm going to let Mr. Ferguson respond about

5    the absentee ballots.

6         MR. FERGUSON:  Your Honor, I believe Ms. Jhaveri might

7    have something to say, too.

8         We would suggest, Your Honor, an extension of that

9    deadline, at least until these affected voters are able to

10   understand they're back on the rolls and --

11        THE COURT:  Because we are ten days away, so if I'm giving

12   five days, I see their point in some way, and I do see their

13   point, because if there are five days to provide the notice by

14   mailing, and today is already the 25th.  Then, in terms of even

15   getting the ballot out to them, I don't understand --

16        MR. FERGUSON:  -- Your Honor, I --

17        THE COURT:  -- the practicality of how that would happen.

18        MR. FERGUSON:  I know the State will make representations

19   about what's possible.  I would -- Your Honor, with respect to

20   the five days, I do think that, given the -- give the fact that

21   the election is so close, and given the fact that these mailings,

22   you know, are a systematic process from the counties, I believe

23   it's reasonable to ask the counties to send that follow-up letter

24   more quickly.

25        And then there's also the fact that -- I believe under

1   this order there will be a Press release, and certainly I believe

2   media that will be informing people that they're back on the

3   rolls, so I think some kind of extension of the --

4        THE COURT:  I think that may lead to -- let me hear from,

5   I think -- yes.

6        MS. JHAVERI:  Your Honor, on the absentee ballot point, I

7   wanted to offer that Virginia -- and Mr. Sanford can speak to

8   this more.  Virginia does have a process for emergency absentee

9   ballots that continues past the official date, and maybe there is

10   a way.  And the United States is certainly open to working with

11   the Commonwealth to figure out a method.  We want to make sure

12   that voters have access to the voting methods that they should,

13   but also not to cause confusion or burden on the Commonwealth.

14        So, I raise that as a potential way.  My understanding --

15   and certainly Mr. Sanford can correct me -- is those requests can

16   be made after the close of the -- today, which is the request to

17   mail the absentee ballot.  I do think the process is a little bit

18   different.  It typically involves a person authorized to request

19   the ballot.  So, if I'm the voter, it's typically for someone

20   who's, like, in the hospital or something and unable to request

21   it.  I believe the language says "or other emergency," and this

22   might -- again, Mr. Sanford can speak to this more -- be a way to

23   kind of reach some sort of compromise on this issue, because we

24   certainly understand the Commonwealth's concern about confusion

25   on a deadline like this.  But we, again, also think it's

1    important to make sure these voters are given opportunities to

2    vote.

3         THE COURT:  Is that an option, Mr. Sanford?  That does

4    seem --

5         MR. SANFORD:  Your Honor, I'm not particularly familiar

6    with the emergency program that my friends on the other side are

7    referring to, so I'm not sure if that would work.

8         My concern is also with the timeline of when -- if

9    absentee ballots are going out and kind of the normal course of

10    absentee ballots going out and the time it takes for someone to

11    return those kind of ballots coming in after the deadline for

12    submitting ballots and receiving ballots, such that we'd end up

13    with kind of -- you know, we sort of put people into a trap of

14    their ballot coming in too late in the process to be counted.

15         And I think like we're kind of just setting up a risk of

16    creating confusion rather than, you know, not just confusion and

17    burden on Defendants but on the people that we're sending these

18    to, rather than having a clear direction to use to go and vote at

19    a polling location where it's kind of -- we can have far more

20    certainty around the relief that the Court is ordering actually

21    being effective.

22         MS. JHAVERI:  Your Honor, if I might add one thing.  My

23    understanding of these emergency procedures is that the ballots

24    are still required to be returned along the same timeline that

25    would be required for any ballot under Virginia law.  And I

1   don't -- the United States would not ask for a change to that.

2       THE COURT:  It does create the potential that it may not

3   be returned in time.  You know, if the letters are going out --

4   because they're not going to be multiple letters, you know, and

5   if the letters are going out -- I mean, we are, what, 10 days, 11

6   days?

7       MS. JHAVERI:  Yes, Your Honor.  And I would just second

8   Mr. Ferguson's suggestion that potentially these letters could go

9   out earlier.  The -- this is an automated -- it should be an

10  automated process.  We have the list.  The county -- I think the

11  state will have to direct -- sort of break down the list into

12  which local registrars need to send which letters, but it seems

13  like something that is largely automated.

14      THE COURT:  It's Friday.  Okay?

15      MS. JHAVERI:  Yes, Your Honor.

16      THE COURT:  It's Friday; it's not Monday, and these are

17  government employees.  Not to say we don't work weekends, because

18  we do, but just the practicality of things.  It's -- I want -- I

19  don't want to set us all up for failure.  Okay?

20      MS. JHAVERI:  Yes, Your Honor.

21      THE COURT:  And so we may not be able to achieve

22  everything that we would want --

23      MS. JHAVERI:  Yes, Your Honor.

24      THE COURT:  -- in this order or in terms of restoring

25  everything because of just the timetable of this.  That is just

1    the reality of things.

2         MS. JHAVERI:  Yes, Your Honor.  Understood.  May I ask

3    just one other clarification question?

4         THE COURT:  Yes.

5         MS. JHAVERI:  Earlier when you spoke about the voters

6    affected, you referenced the Exhibit -- I think it's EE.  I just

7    think we may need some clarification that there have been no

8    other voters removed since then, because if there have been, they

9    could be added to the same list and sent the letters at the same

10   timeline.

11        THE COURT:  Okay.  Are there more after that October 21st

12   or --

13        MR. SANFORD:  I'm not aware, Your Honor, but we could have

14   ELECT run the same process that they used to generate that list

15   and use --

16        THE COURT:  Okay.

17        MR. SANFORD:  -- I guess what we'd call like an updated

18   EE --

19        THE COURT:  Okay.

20        MR. SANFORD:  -- in the event that there is an update to

21   it or not.  And, obviously, we would need to de-duplicate that

22   list --

23        THE COURT:  -- Okay --

24        MR. SANFORD:  -- so it represents the -- since it's not --

25   I -- Your Honor is not directing us to send multiple letters to

1    the same individual, correct?

2          THE COURT:  No.

3          MR. FERGUSON:  Okay.

4          THE COURT:  Absolutely not.

5          MR. FERGUSON:  So, Your Honor, may I add one more point on

6    that, back on the absentee issue?  One other at least partial

7    solution, I believe, is that Virginia, I believe, maintains a

8    permanent absentee voter list.

9          And so to the extent that anyone on this list of 1600 was

10   removed from -- you know, both from the voter rolls and this

11   list, I think it would be appropriate just to order that those

12   individuals be automatically mailed an absentee ballot along with

13   the other ones.

14         THE COURT:  Okay.  So you want them to do a search to

15   cross-reference the list that was run against the list of

16   permanent people who are on the voter absentee rolls?

17         MR. FERGUSON:  I think the -- yes.

18         THE COURT:  I'm going to deny that.  Okay?

19         MR. FERGUSON:  Okay.

20         THE COURT:  Because we have got to come up with a process.

21   We are 11 days away, and we've got to come up with something that

22   will work, okay, to get these 1,600 people back on these rolls.

23   Okay?

24         MR. FERGUSON:  Understood.

25         THE COURT:  I appreciate you all trying.  And if I didn't

1    say it earlier, I want to commend you all on your work in this

2    case, both sides, all sides, especially on this timeframe.

3          Now, I'm going to -- the order with respect -- and I

4    didn't from the bench -- my order will be more detailed, let me

5    be clear.  Okay?

6          I am going to -- with respect to the absentee voter issue,

7    I'm going to -- I'm going to go ahead and sign my order that I'm

8    going to issue.  I'm going to leave the absentee voter portion

9    out of this order now.  If I need to supplement my order, I will.

10   I will give you all the opportunity to see if you can come up

11   with something.  I don't know if you will, because this timeline

12   is really -- what I don't want is to create some confusion

13   between some people who think that the absentee voter -- you

14   know, like people who -- other people who aren't even involved in

15   this process all of a sudden think that they have a -- could

16   somehow have access to this and confuse them.  We don't want

17   confusion.  Okay?  We want our voters back on the rolls, but we

18   don't want confusion.  Okay.  Anything else?

19         MR. FERGUSON:  Nothing else from me, Your Honor.

20         THE COURT:  Mr. Sanford?

21         MR. SANFORD:  Your Honor, just two remaining points.

22   First, I do just want to confirm that, with respect to putting --

23   I guess we'll call it the updated EE exhibit, all of those voters

24   back onto the rolls -- is -- you know, even if the Commonwealth

25   believes and its understanding is that those individuals are not

1    citizens, the order is to place them back onto the rolls?

2         THE COURT:  See, you keep going back to this Commonwealth

3    believes that they are noncitizens.  Are you saying that the

4    Commonwealth did not receive the attestation?

5         MR. SANFORD:  Yes, but if the Commonwealth believes, based

6    on the process, that --

7         THE COURT:  I'm not dealing with beliefs.  I'm dealing

8    with evidence.  Okay?  And what I said was the evidence that I

9    have on my record is these were individuals -- the Commonwealth

10   can remove ineligible voters from their rolls.  They can remove

11   ineligible voters who are noncitizens, but they must do so after

12   an individualized inquiry and determination and not systematic

13   removal.  Understood?

14        MR. SANFORD:  Yes.  And so it applies to all of --

15        THE COURT:  You may have a seat.  Thank you.

16        MR. SANFORD:  Your Honor, one other point.  And I

17   understand that I'll be likely charging uphill on this, but just

18   to make the record on it, the Commonwealth Defendants would move,

19   Your Honor, respectfully, to stay your order on the preliminary

20   injunction pending our appeal, and I, you know, understand that

21   Your Honor likely sees this request in a different light than we

22   do, but we believe that the Fourth Circuit will view these issues

23   differently, and we believe that we've kind of satisfied the

24   requirements for a stay pending appeal based on our view that we

25   will likely succeed on the merits with the Fourth Circuit that

1    the NVRA does not apply to the removal of noncitizens from the

2    voter rolls.

3            And we also believe that the irreparable harm requirement

4    for such a stay is met because enjoining a state from enforcing

5    its duly enacted laws is an irreparable harm to the state, and we

6    don't believe that the opposing parties will be substantially

7    injured by a stay in this case because of the issues addressed

8    yesterday at the hearing where we believe they aren't irreparably

9    injured by this process at all.

10           And finally, we believe that the public interest is in

11   favor of a stay due to Virginia's obligation to protect the

12   integrity of its elections.

13           So we respectfully ask that you move to -- or we

14   respectfully ask that you stay the preliminary -- the order on

15   the preliminary injunction pending our forthcoming appeal.

16           But I understand that Your Honor likely has a view on this

17   motion, but to preserve it for the record, I do need to make it,

18   Your Honor.

19           THE COURT:  I understand your making that motion, and I am

20   going to deny it for all of the reasons I've previously stated

21   for why this injunction is necessary.  And if I were to grant

22   this stay, it would deny them the relief.  These -- because

23   this -- this goes to the voters.  Okay?

24           MR. SANFORD:  Thank you, Your Honor.

25           THE COURT:  Anything else?

1    (No response.)

2    THE COURT:  I'll be issuing my order.  We're adjourned.

3    (Proceedings adjourned at 10:39 a.m.)

4

5              **C E R T I F I C A T E**

6

7

8              I, Scott L. Wallace, RDR-CRR, certify that

9    the foregoing is a correct transcript from the record of

10   proceedings in the above-entitled matter.

11

12

13   /s/ Scott L. Wallace              10/25/24

14   ----------------------------     ----------------

15   **Scott L. Wallace, RDR, CRR              Date**

16      **Official Court Reporter**

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| VIRGINIA COALITION FOR<br>    IMMIGRANT RIGHTS, *et al.*,<br><br>    *Plaintiffs,*<br><br>v.<br><br>SUSAN BEALS,<br>*in her official capacity as Virginia*<br>    *Commissioner of Elections, et al.,*<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 1:24-cv-1778 (PTG/WBP) |

\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>v.<br><br>COMMONWEALTH OF VIRGINIA, *et al.,*<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 1:24-cv-1807 (PTG/WBP)<br>)<br>)<br>)<br>)<br>) |

## <u>ORDER</u>

This matter is before the Court on Motions for Preliminary Injunction (Dkt. 26; Civil

Action No. 1:24-cv-1807, Dkt. 9) filed by the Virginia Coalition for Immigrant Rights, the League

of Women Voters of Virginia, the League of Women Voters of Virginia Education Fund, African

Communities Together, and the United States ("Plaintiffs").

To receive a preliminary injunction, Plaintiffs bear the burden of establishing: (1) they are

likely to succeed on the merits of the case; (2) they are likely to suffer irreparable harm in the

1

absence of injunctive relief; (3) the balance of equities tips in their favor; and (4) an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Roe v. Dept. of Defense*, 947 F.3d 207, 219 (4th Cir. 2020).

For the reasons stated in open court, the Court finds that Plaintiffs have established the four elements of the *Winter* test for preliminary injunctive relief.

Accordingly, it is hereby

1. **ORDERED** that Plaintiffs' Motions for Preliminary Injunction (Dkt. 26; Civil Action No. 1:24-cv-1807, Dkt. 9) are **GRANTED in part** and **DENIED in part**; it is further

2. **ORDERED** that the Commonwealth of Virginia, the Virginia State Board of Elections, and Susan Beals, John O'Bannon, Rosalyn Dance, Georgia Alvis-Long, Donald Merricks, and Matthew Weinstein in their official capacities ("Defendants"), along with their agents, are enjoined from continuing any systematic program intended to remove the names of ineligible voters from registration lists less than 90 days before the November 5, 2024, federal General Election, although this does not preclude removal of names from the official list of voters at the request of the registrant, by reason of criminal conviction or mental incapacity (as provided by Virginia law), individual correction, or by reason of the death of the registrant; and it is further

3. **ORDERED** that Defendants and their agents restore voter registration of registrants cancelled pursuant to Defendants' Program after August 7, 2024, unless the registrant (1) subsequently submits a voter removal request, or (2) is subject to removal by reason of criminal conviction or mental incapacity (as provided by Virginia law), or by reason of the death of the registrant; it is further

4. **ORDERED** that within five (5) days of this Order, Defendants and their agents issue guidance to county registrars in every local jurisdiction in Virginia to immediately restore

2

**A-490**

the voter registration records of registrants removed pursuant to Defendants' Program, so long as those individuals (1) did not subsequently submit a voter removal request, or (2) are not subject to removal by reason of criminal conviction or mental incapacity (as provided by Virginia law), or by reason of the death of the registrant; it is further

5.      **ORDERED** that within five (5) days of this Order, Defendants and their agents provide a remedial mailing to each registrant described in Paragraph 3:

    a. Informing the registrant that their voter registration has been restored to the voter rolls;

    b. Explaining that the registrant may cast a regular ballot on Election Day in the same manner as other eligible voters;

    c. Advising the registrant that cancellation of their registration pursuant to the purported noncitizen removal program after August 7, 2024, does not in itself establish that they are ineligible to vote or subject to criminal prosecution or any other penalty for registering to vote or for voting; and

    d. Advising registrants who are not U.S. citizens that they remain ineligible to cast a ballot in Virginia elections; it is further

6.      **ORDERED** that within five (5) days of this Order, Defendants and their agents shall:

    a. Post template copies of the remedial mailing described in Paragraph 5, along with a copy of this Order, on the website of the Virginia Department of Elections; and

    b. Issue a press release in the customary manner of the Department of Elections that announces this Court's Order; it is further

7.      **ORDERED** that within five (5) days of this Order, Defendants and their agents make all reasonable and practicable efforts to educate local officials, poll workers, and the general public on Defendants' program, the restoration of the voter registrations of impacted voters, and the ability of impacted voters to cast a regular ballot without submitting supplemental paperwork or documentation.  Such efforts shall include the tracking of poll worker training in all 95 counties and independent cities in the Commonwealth concerning cessation of the purported noncitizen removal program and the remedial actions required by this Order; it is further

8.      **ORDERED** that within five (5) days of this Order, Defendants shall submit to this Court under seal a report detailing every voter registration cancelled on or after August 8, 2024, to the present.  That report shall include the voter's full name (including first, middle, and last names and any suffixes), address, voter identification number, social security number (if available), driver's license number (if available), date of voter registration, date of cancellation, and reason for cancellation; it is further

9.      **ORDERED** that Defendants' authority or ability to cancel the voter registration of noncitizens through individualized review is not limited by this Order.  Nor does this Order limit Defendants' authority or ability to investigate noncitizens who register to vote or who vote in Virginia's elections.  The preliminary injunction applies only to Defendants' systematic Program which occurred after August 7, 2024; it is further

10.     **ORDERED** that the Motions for Preliminary Injunction (Dkt. 26; Civil Action No. 1:24-cv-1807, Dkt. 9) are **DENIED** in all other respects; and it is further

11.     **ORDERED** that this injunction expires on the day after the 2024 General Election.

Entered this 25th day of October, 2024.
Alexandria, Virginia

_____ /s/
Patricia Tolliver Giles
United States District Judge

4

A-492