IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————————

VIRGINIA COALITION FOR IMMIGRANT RIGHTS, *et al.*,

*Plaintiffs/Appellees,*

v.

SUSAN BEALS, in her official capacity of Virginia Commissioner of
Elections, *et al.*,

*Defendants/Appellants.*

———————————————

On Appeal from the United States District Court
for the Eastern District of Virginia, Alexandria Division

———————————————

**PRIVATE PLAINTIFFS-APPELLEES' RESPONSE OPPOSING
APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL**

———————————————

Ezra D. Rosenberg
Ryan Snow
Javon Davis
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington, DC 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
rsnow@lawyerscommittee.org
jdavis@lawyerscommittee.org

Simone Leeper
Danielle Lang
Kevin Hancock
Brent Ferguson
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
dlang@campaignlegalcenter.org
khancock@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
sleeper@campaignlegalcenter.org

Orion Danjuma
John Paredes
THE PROTECT DEMOCRACY PROJECT, INC.
82 Nassau Street, # 601
New York, NY 10038
Telephone: (202) 579-4582
orion.danjuma@protectdemocracy.org
john.paredes@protectdemocracy.org

Benjamin L. Berwick
THE PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Anna Dorman
THE PROTECT DEMOCRACY PROJECT, INC.
200 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
anna.dorman@protectdemocracy.org

John Powers
Hani Mirza
ADVANCEMENT PROJECT
1220 L Street Northwest, Suite 850
Washington, D.C. 20005
(202) 728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org

*Counsel for Plaintiffs-Appellees Virginia Coalition for Immigrant Rights, the League of Women Voters of Virginia, the League of Women Voters of Virginia Education Fund, and African Communities Together*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION .................................................................................. 1

LEGAL STANDARD ............................................................................. 5

BACKGROUND ..................................................................................... 6

PROCEDURAL HISTORY AND KEY FACTUAL FINDINGS ............................ 9

ARGUMENT ....................................................................................... 11

I.     Appellees are likely to succeed on the merits. ........................................... 11

     A.     The 90 Day Provision applies to programs with the purpose of removing noncitizens. .......................................... 11

     B.     Virginia's Purge Program is systematic. .............................. 16

II.    Appellees did not unreasonably delay. ......................................... 18

III.   Appellees and eligible Virginia voters face irreparable harm. ...................... 19

IV.   The balance of equities and public interest weigh in favor of the district court's tailored injunction. ............................................................. 23

CONCLUSION ..................................................................................... 26

CERTIFICATE OF COMPLIANCE........................................................... 28

CERTIFICATE OF SERVICE ................................................................. 29

# TABLE OF AUTHORITIES

| Cases | Page |
|---|---|

*Alabama Coalition for Immigrant Justice, et. Al v. Allen, et al.*,
2:24-cv-1254, 2024 WL 4510476
(N.D. Ala. Oct. 16, 2024)(*ACIJ*).....................................3, 13, 16, 22, 25

*Arcia v. Florida Secretary of State*,
772 F.3d 1335 (11th Cir. 2014).....................................13, 14, 16, 17, 24

*Arcia v. Detzner*, 908 F. Supp. 2d 1276 (S.D. Fla. 2012) .........................13

*Association of American Publishers, Inc. v. Frosh*,
586 F. Supp. 3d 379 (D. Md. 2022) ......................................19

*Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004) ...............................13, 14

*Husted v. A. Philip Randolph Institute*, 584 U.S. 756 (2018)...............17

*League of United Latin American Citizens v. Whitley*, No. SA-19-CA-074-FB,
2019 WL 7938511 (W.D. Tex. Feb. 27, 2019).......................................3

*League of Women Voters of North Carolina v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) (*LWVNC*) .......................... 23, 24

*Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970)...............................5

*Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077 (D. Ariz. 2023).........13, 14, 16, 21

*Nken v. Holder*, 556 U.S. 418 (2009).......................................5

*North Carolina State Conference of the NAACP v. Bipartisan Board of Elections &
Ethics Enforcement*, No. 1:16CV1274, 2018 WL 3748172
(M.D.N.C. Aug. 7, 2018) .................................................23

*North Carolina State Conference of the NAACP v. North Carolina State Board of
Elections*, 1:16-cv-1274, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) ......16, 17

*Public Interest Law Foundation v. North Carolina State Board of Elections*,
996 F. 3d 257 (4th Cir. 2021) (*PILF*).......................................12, 18, 22

*Pulsifer v. United States*, 601 U.S. 124 (2024) ...................................14

*Purcell v. Gonzalez*, 549 U.S. 1 (2006).......................................6

*Scotts Company v. United Industries Corporation*,
315 F.3d 264 (4th Cir. 2002).................................................5

*United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012) ................3, 13, 22

*United States v. Gonzalez*, 520 U.S. 1, 5 (1997).......................................14

ii

*United States Student Association Foundation v. Land*,
   546 F.3d 373 (6th Cir. 2008) .................................................................24

*Winston–Salem/Forsyth County Board of Education v. Scott*,
   404 U.S. 1221 (1971) .........................................................................5

**Codes and Statutes**                                  **Page**

52 U.S.C. § 20501 ................................................................................23

52 U.S.C. § 20507(a)(3) .......................................................................14

52 U.S.C. § 20507(b)(1) .......................................................................14

52 U.S.C. § 20507(c)(2)(A) ..........................................................1, 12, 14

52 U.S.C. § 20507(d)(1)(B)(ii) ...........................................................17

52 U.S.C. § 20510(b)(3) ...................................................................6, 9

Va. Code Ann. § 24.2-410.1(A) .............................................................7

Va. Code Ann. § 24.2-420.1 ...............................................................26

Va. Code Ann. § 24.2-427 ....................................................................7

**Other Authorities**                                      **Page**

Elizabeth Beyer, et al., *Meet some Virginians who almost lost their right to vote after being declared 'noncitizens'*, Cardinal News (Oct. 25, 2024), https://cardinalnews.org/2024/10/25/meet-a-few-virginians-who-almost-lost-their-right-to-vote-after-being-declared-noncitizens/ ..........................................2

Parisa Dehghani-Tafti (@parisa4justice), X (Oct. 25, 2024, 7:01PM), https://x.com/parisa4justice/status/1849949556139540508 ...............................3

Prince William County Electoral Board, Meeting Recording for September 30, 2024, https://www.youtube.com/watch?v=Zr0LSt3xwCk. .................................2

Sarah Rankin, *Youngkin administration says 3,400 voters removed from rolls in error, but nearly all now reinstated*, NBC Washington (Oct. 27, 2023)

https://www.nbcwashington.com/news/local/youngkin-administration-says-3400-voters-removed-from-rolls-in-error-but-nearly-all-now-reinstated/3455577/ ...25

iii

**INTRODUCTION**

In the National Voter Registration Act of 1993 ("NVRA"), Congress recognized that systematic programs to purge voter rolls on the eve of a federal election inevitably threaten the rights of eligible voters. Congress thus prohibited "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" fewer than "90 days prior to the date of a primary or general election for Federal office." 52 U.S.C. § 20507(c)(2)(A). Flouting this prohibition, Governor Glenn Youngkin issued Executive Order 35 ("E.O. 35") exactly 90 days before Election Day, creating a process that is "most certainly" systematic and relies on faulty data to purge allegedly ineligible voters from the rolls (the "Purge Program"). A463.

Between August 7 and October 21, a period entirely within the NVRA's 90 day "quiet period," over 1,600 voters were removed from the rolls because of the Purge Program. SA229-313. The voters purged have one thing in common: every single one attested to their citizenship under penalty of perjury *when they registered to vote*. A472. It should come as no surprise, then, that as a result of the Purge Program, "eligible citizens, natural born and naturalized, have had their registrations canceled and were unaware that this was even so." A471; *see also* SA212-228.

Within 36 hours of receiving the list of purged voters, Appellees uncovered numerous eligible citizens, including Appellees' own members, wrongfully purged

from the rolls. SA212-215 (identifying eligible, purged LWVVA member); SA216-219 (identifying 14 eligible purged voters including three ACT members); SA220-222 (declaration from additional wrongfully removed voter); SA223-228 (identifying two additional wrongfully purged voters). The district court asked "[h]ow many more are there?" A471. Unfortunately, the citizens identified in 36 hours are just the tip of the iceberg.[1] The Director of Elections and General Registrar of Prince William County has explained that E.O. 35 required him to cancel the registration of 43 individuals he believed to be citizens (because they had verified their citizenship as many as five times).[2] One of the voters removed in Loudoun County even had a "NEW CITIZEN" stamp on their 2015 voter registration application. SA137. Several more from Loudoun County alone have returned attestations re-affirming their citizenship. SA134-155.

The Commonwealth's Attorney for Arlington County and the City of Falls Church recently explained that her office's investigation of alleged noncitizen voters

---

[1] Elizabeth Beyer, et al., *Meet some Virginians who almost lost their right to vote after being declared 'noncitizens'*, Cardinal News (Oct. 25, 2024), https://cardinalnews.org/2024/10/25/meet-a-few-virginians-who-almost-lost-their-right-to-vote-after-being-declared-noncitizens/ (profiling two additional wrongfully purged voters).

[2] *See* Prince William County Electoral Board, Meeting Recording for September 30, 2024 at 29:25-29:47, https://www.youtube.com/watch?v=Zr0LSt3xwCk. Mr. Olsen has explained that his research revealed "NO basis that any 'illegal ballots' have been cast by individuals" and "[i]f anything, there is ample and consistent that these individuals are fully qualified U.S. citizens who have had their voter registration cancelled due to an honest mistake and poor form design." SA089.

referred by the Purge Program "served as one more data point that the incidence of intentional voting by non-citizens is vanishingly rare to the point of being nonexistent."[3] She warned that, rather than removing ineligible voters, "the blanket approach in removing people from the voting rolls poses grave risk in disenfranchising voters." *Id*.

This squares with the findings of courts across the country that programs like E.O. 35, which rely on faulty DMV data and the Systematic Alien Verification for Entitlements (SAVE) database, sweep almost exclusively eligible citizens off the voter rolls. *See*, *e.g.*, *United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012); *League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019); *Alabama Coalition for Immigrant Justice, et. al v. Allen, et al.*, 2:24-cv-1254, 2024 WL 4510476 (N.D. Ala. Oct. 16, 2024) (*ACIJ*).

There *are* significant checks in place to prevent noncitizens from voting, including the requirement that voters attest to their citizenship when registering, criminal penalties for ineligible voters who attempt to cast a ballot, and provision for individualized investigations and removals even within the NVRA's 90-day quiet period. But E.O. 35's Purge Program is emblematic of why Congress banned

---

[3] Parisa Dehghani-Tafti (@parisa4justice), X (Oct. 25, 2024, 7:01PM), https://x.com/parisa4justice/status/1849949556139540508.

systematic voter purges during the quiet period. The fundamental right of eligible Virginians to vote is not protected by this Program, but rather is undermined by it.

Appellants are not likely to prevail on appeal. Their position rests on a reading of the statute that ignores the plain text and contradicts settled precedent from sister jurisdictions, and adopting Appellants' position would create a circuit split. Appellants also urge the Court to apply the *Purcell* principle, but here that principle counsels against a stay, in large part because Congress explicitly provided standing for private plaintiffs to challenge unlawful Purge Programs beginning 30 days before an election. Despite Appellants' stonewalling of Appellees' efforts to obtain information about the Program, Appellees did their "due diligence" in gathering evidence, A470, and filed suit on the first day permissible in the NVRA's pre-election period. No court has ever applied *Purcell* to bar suit under such circumstances, and doing so would override express congressional intent permitting injunctive relief to halt unlawful purges within 30 days of an election.

Appellants will suffer no irreparable injury absent a stay, whereas Appellees, their members, and the hundreds of unlawfully purged, eligible Virginian voters *will* be irreparably harmed if the stay is granted. To prevent that harm, Appellees urge this Court to deny Appellants' motion. Finally, Appellants ask this Court "at a minimum" for a stay until November 1 so that they can seek relief from the Supreme Court. As Appellants are aware, such a delay in restoring voters' registration and

attempting to notify voters only four days before an election would make any relief illusory. Appellants have made no showing that would entitle them to nullify the district court's ruling and bypass effective relief for this election.

## LEGAL STANDARD

Appellants must carry a heavy burden to prevail, and they fail to do so here. *See Winston–Salem/Forsyth Cty Bd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971). "A stay is an 'intrusion into the ordinary processes of administration and judicial review,'" *Nken v. Holder*, 556 U.S. 418, 427, 433–34 (2009), and granting a stay pending appeal is "extraordinary relief." Appellants must show each of the following: that (1) they will likely prevail on appeal, (2) they will suffer irreparable injury absent the stay, (3) other parties will not be substantially harmed by the stay, and (4) the public interest will be served by granting the stay. *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970). In fact, a stay "is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken*, 556 U.S. at 427, 433–43.

A district court's findings when granting or denying a preliminary injunction "shall not be set aside unless clearly erroneous." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 274 (4th Cir. 2002).

Appellants ask the Court to stay the injunction based on *Purcell v. Gonzalez*, 549 U.S. 1 (2006), but that would be wholly improper here.[4] The NVRA specifically authorizes litigation to commence within 30 days of an election, 52 U.S.C. § 20510(b)(3), and Appellees filed suit on the first day of that window. No case applying *Purcell* has ever suggested that it can override express congressional intent permitting lawsuits within this timeframe. And Appellants cannot cite to any case applying *Purcell* to a suit authorized under § 20510(b)(3).

More fundamentally, the *Purcell* principle is intended to prevent chaos and confusion just before an election—just like the 90 Day Provision. But under Appellants' construction, the 90 Day Provision would become entirely unenforceable, and *Purcell*'s own purpose would be thwarted. The last-minute nature of these proceedings is entirely of Appellants' making, and *Purcell* cannot be construed to reward their violation of the NVRA.

## BACKGROUND

The Virginia Code provides that the general registrar shall cancel the registrations of all persons who are known not to be U.S. citizens by reasons of report from the Department of Motor Vehicles ("DMV") or from the Department of

---

[4] Even if this Court applied *Purcell* and the factors identified in a concurrence by Justice Kavanaugh to stay decision in *Merrill v. Milligan*, Appellees would prevail because the merits are clear-cut, Appellees and eligible Virginia voters face irreparable harm, Appellees did not delay, and the relief ordered is eminently reasonable. *See infra.*

Elections ("ELECT") based on information received from the Systematic Alien Verification for Entitlements Program ("SAVE"). Va. Code Ann. § 24.2-427. Section 24.2-410.1(A) of the Virginia Code requires the DMV to provide a list of people "who have indicated a noncitizen status" to ELECT monthly. These provisions are silent as to their applicability during the NVRA's 90 Day Provision.

On August 7th of 2024, exactly 90 days before the November Presidential Election, Governor Youngkin issued E.O. 35. It announced that county boards must continue to cancel the registrations of those voters the DMV and ELECT identified as alleged noncitizens, despite the start of the NVRA's 90-day quiet period. Departing from the monthly process laid out in state law, E.O. 35 also directed the DMV to expedite the interagency data sharing with ELECT of alleged noncitizens by "generating a *daily* file of all noncitizen transactions." SA0845 (emphasis added).

Under the Purge Program, the DMV aggregates the data of individuals who were deemed to be noncitizens at some point in time. *See* A172; A181; A199; SA113-133. Data are then transferred to ELECT, which uses an electronic data matching process to determine whether the purported noncitizens are on the voter rolls. ELECT identifies where individuals identified as purported noncitizens are registered and sends that person's information to the appropriate general registrar.

The registrars then verify solely that the purported noncitizen indicated from the ELECT data is the same person on their voter rolls. They conduct no further

inquiry into the individual's citizenship status. A465-466. When there is a match, the registrars send a letter to the individual suggesting that they have been identified as potential noncitizens. The letter is created in the VERIS system via an automated process. The notices direct the person that they have 14 days to respond and complete and attach an attestation of citizenship. If the person does not respond, the registrar can manually cancel that person's registration after 14 days. The person is automatically canceled and removed from the voter rolls by the VERIS system after 21 days.

Since E.O. 35 was issued on August 7th, more than 1,600 people have been removed from the voter rolls under the Program. SA229-313. In Prince William County, during the September 30 Board of Elections meeting, General Registrar Eric Olsen described 162 individuals as being listed as noncitizens in the VERIS system. SA074-075; *see also* SA086-092. Of those individuals, 43 had voted, all 43 had verified their citizenship previously (some as many as five times). *Id*. Yet, the county still was forced to cancel their registration to follow the dictate of E.O. 35. Olsen noted that being identified as a

> non-citizen in the VERIS system does not mean someone is not dispositively not a citizen. It is a categorization that largely comes from the DMV transfer  of data and what it has done, if anything, is more likely has trapped a lot of people who are valid citizens who are being canceled from the process.

SA074-075.

## PROCEDURAL HISTORY AND KEY FACTUAL FINDINGS

After the announcement of E.O. 35, Appellees immediately began making good faith efforts to understand the Program, and initially requested information from Appellants on August 13th and 20th. SA076-085. Appellees filed suit after it became clear that Appellant Beals would stonewall Appellees' requests and would continue to refuse to provide information about the Purge Program despite the August letters and an additional NVRA request sent in early October, and after diligent pre-suit investigation revealed that U.S. citizens were being removed from the voter rolls. Further, Appellees filed their complaint the first day that was permissible under the NVRA's 30-day preelection period, following the October letter. *See* 52 U.S.C. § 20510(b)(3).

Appellees filed an emergency motion for expedited discovery the day after the complaint, and only eight days later, they amended their complaint and moved for a preliminary injunction. SA051-065; A013; A047. The district court held a hearing on Appellees' emergency motion for expedited discovery on Monday, October 21st and ordered Appellants to provide some of the information requested by Appellees within 48 hours. Based on the expedited discovery provided by Appellants, Appellees were able to find multiple citizens harmed by the Purge Program. SA216-219; SA223-228.

The district court held a full day hearing on Appellees' Motion for Preliminary Injunction on October 24th. The court heard the parties' legal arguments and reviewed evidence provided by Appellants related to the administration of the Purge Program, both before and after E.O. 35, and the lists of voters purged by the Program. The district court also reviewed declarations provided by Appellees showing that citizens were improperly purged by the Program. SA212-228. On October 25th, the court granted Appellees' preliminary injunction motion only as to the 90-day claim.

The district court made several critical factual findings. *First*, it concluded that the program "involved just matching data fields" because, as Appellants' own declarant observes, the DMV collects customer data—name, social security number—and sends it to ELECT to conduct a computerized data matching process. A464-465; A173.

*Second*, the court found that this program "left no room for individualized inquiry." A465. Registrars are required to mail notices of intent to cancel, and as the court noted, "[t]he [Appellants] conceded . . . that the processes for matching the records by ELECT and the registrars is limited to identification purposes. A registrar may only confirm that the person identified by ELECT matches the record." A465-466.

*Third*, the Court found that "[Appellants'] program has curtailed the right of eligible voters to cast their ballots in the same way as all other eligible voters." A469.

Critically, while Appellants failed to show that any of the 1,610 individuals removed from the rolls from this program were in fact noncitizens, the court credited Appellees' "evidence that revealed that citizens have been removed from those rolls." A471-472. The district court found that these citizens had already suffered irreparable harm. In particular, Appellants "conceded that eligible voters who have had their registrations canceled can no longer vote absentee or by mail if they had planned to." A469.

*Fourth*, the Court found that Appellees did not unreasonably delay in bringing the case, pointing out that the Private Appellees began communicating with Appellants in August, shortly after E.O. 35 was issued, and were delayed in bringing suit by Appellants' refusal to produce documents and information that the Private Appellees had requested in an August public records request. *See id.*

These carefully crafted factual findings cannot be disturbed unless they are found to be clearly erroneous.

## ARGUMENT

### I. Appellees are likely to succeed on the merits.

A. The 90 Day Provision applies to programs with the purpose of removing noncitizens.

The NVRA's 90 Day Provision prohibits "*any program* the purpose of which is to systematically remove the names of ineligible voters" from the rolls. 52 U.S.C. § 20507(c)(2)(A) (emphasis added). Appellants assert that, despite the statute's

broad language, it in fact prevents states only from "removing registrants based on change in residence." ECF 11-1 at 14. But the district court properly rejected that strained reading of the statute and instead followed the prevailing case law to conclude that the 90 Day Provision applies here.

At the outset, Appellants' bizarre statutory analysis is foreclosed by this Court's precedent. In *Public Interest Legal Foundation v. North Carolina State Board of Elections* (*PILF*), this Court already concluded that a very similar program to identify and remove alleged noncitizens from the rolls qualifies as a "program . . . for the purpose of ensuring the accuracy and currency of official lists of eligible voters" under the NVRA's Public Disclosure Provision. 996 F. 3d 257, 260 (4th Cir. 2021). It would be strange indeed if Virginia's program *is* a "program . . . for the purpose of ensuring the accuracy and currency of official lists of eligible voters" but *not* a "program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." *Id*.

Moreover, *all* existing precedent aligns with the district court's understanding of the 90 Day Provision.[5] In *Arcia v. Fla. Sec'y of State*, the Eleventh Circuit held

---

[5] Appellants rely on *Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004), but that case was not about the 90 Day Provision, and as explained below, its analysis of a different NVRA provision is inapposite here. Below, Appellants relied on *Arcia v. Detzner*, 908 F. Supp. 2d 1276 (S.D. Fla. 2012); *United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012), neither of which are good law after *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014).

that Florida's noncitizen removal program—which was almost identical to Virgnia's current program—violated the 90 Day Provision. 772 F.3d 1335, 1339 (11th Cir. 2014). That Court specifically rejected the warped understanding of the law Appellants now offer. *Id.* at 1348. The court in *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1093 (D. Ariz. 2023), reached the same conclusion, as did a federal district court in Alabama just last week. *ACIJ*, 2024 WL 4510476.

Those courts were correct. Most fundamentally, it is simply incomprehensible why Congress would write a provision that applies to "*any* program," and then include a list of three numerated exceptions, when it meant to address only a *single* type of program—one having to do with address changes—as Appellants would have it. The *Arcia* Court made this very point: Appellants' interpretation "would functionally eviscerate the meaning of the phrase 'any program' in the 90 Day Provision." 772 F.3d at 1348.

But even on its own terms, Appellants' proposed statutory analysis is nothing but a long and complicated red herring. Despite Appellants' efforts, this is not a case about the NVRA's "General Removal Provision" or its provisions governing removal of "registrants." All parties (and courts) agree that the NVRA does not bar Appellants from removing noncitizens from the rolls.[6] And all parties agree that

_____

[6] *See* A473; SA193; SA197; A153; *Arcia*, 772 F.3d at 1348; *Mi Familia Vota*, 691 F. Supp. 3d at 1092-1093; *Bell*, 367 F.3d at 592.

outside the 90-day period, Appellants may do so based on systematic list maintenance procedures,[7] and *inside* the 90-day period, Appellants may do so based on individualized inquiries. A492; A473.

Yet Appellants argue that the four reasons for removal of a "registrant" enumerated in the General Removal Provision, 52 U.S.C. § 20507(a)(3), *must* be the only types of removals at issue in the 90 Day Provision's prohibition on "*any* program the purpose of which is to systematically remove the names of *ineligible voters* from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A); *see* ECF 11-1 at 12-20. But these provisions use different terms altogether—"registrant" in the General Removal Provision and "ineligible voter" in the 90-Day Provision—so there is no reason for that to be so. Indeed, all Appellants can offer is an unsupported assertion that "[i]n the NVRA, [the word "voter"] is a synonym for 'registrant.'" ECF 11-1 at 17. But Appellants cannot make two words mean the same thing just because they wish it were true; in fact, Congress' choice to use different words in different sections of the same statute is a strong reason to conclude they should be given different meanings. *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning and different terms usually have different meanings.").

_____

[7] So long as those procedures comply with the NVRA's mandate that list maintenance be "uniform and nondiscriminatory." 52 U.S.C. § 20507(b)(1).

The 90 Day Provision is further distinguished by the textual provision covering "any" program, not just the "general" program described in §20507(a). Appellants cannot read in a limitation Congress did not include. *See United States v. Gonzalez*, 520 U.S. 1, 5 (1997) (finding that "'any' has an expansive meaning," namely, "one or some indiscriminately of whatever kind.") (cleaned up).

Similarly problematic, Appellants twist the phrase "ineligible voters" in knots. Under their reading, "ineligible voters" means not what it says, but "someone who once had the legal right to vote but is no longer qualified." That is not what the statute says. Moreover, they highlight one dictionary definition of the word "voter"—someone who "has the legal right to vote"—while completely ignoring the other—someone who "votes." ECF 11-1 at 17.[8] That is because their reading of the law fails if the full definition is used; if the 90 Day Provision applies to people who actually *vote*, it undoubtedly applies here, where hundreds of people on Appellants' Purge List actually vote.

Finally, Appellants' argument rests on a faulty factual assertion. They maintain that "ineligible voters" refers only to people who were once eligible but became ineligible, such as people who were convicted of crimes or are mentally incapacitated. *See* ECF 11-1 at 14. But of course, many people convicted of crimes

---

[8] Even more absurd, if the term "voter" is understood only to mean "people who are *eligible* to vote," then the 90 Day Provision's reference to "ineligible voters" would have to mean "ineligible people who are eligible to vote."

or with "mental incapacity" may have been ineligible due to that reason before they registered to vote or would have otherwise become eligible—thus, they would not qualify as eligible voters who became ineligible after registration.

B. Virginia's Purge Program is systematic.

While Appellants also contend that the Purge Program is not "systematic," *see* ECF 11-1 at 20-23, that effort falls short. As they cannot dispute, the Program relies on database matching and a mass mailing, just like the programs invalidated in *Arcia*, *Mi Familia Vota*, and *ACIJ*, as well as *N.C. State Conf. of NAACP v. N.C. State Bd. of Elections*, 1:16-cv-1274, 2016 WL 6581284 at *6-7 (M.D.N.C. Nov. 4, 2016).

Appellants appear to argue that the first "step" of individualized review occurs when state agencies forward lists of voters to one another or to local registrars. ECF 11-1 at 21. But as the record demonstrates, *no* government official reviews those names individually to determine citizenship before initiating the purge process.[9] Indeed, even if the DMV has a voter's passport or other citizenship documentation, they do not send that to ELECT in the database matching process, further showing how the Program is systematic. A172.[10]

---

[9] Appellants conceded that registrars only review the list of names they receive to confirm the identity of the people on the list. A415-416.

[10] To the extent Appellants argue that the program is individualized because it starts with an individual's interaction with DMV, that fails. A program based on the national change of address (NCOA) system undoubtedly starts with an individual submitted a change of address, yet no one would doubt that an NCOA removal process is systematic. *See* 52 U.S.C. § 20507(d)(1)(B)(ii)

Nor does the sending of a mailing make the process "individualized," as courts, including in this Circuit, have uniformly concluded. *See*, *e.g.*, *Arcia*, 772 F.3d at 1344; *NC NAACP*, 2016 WL 6581284 at *6-7.[11] Sending a mailing and removing voters from the rolls without receiving any response does not constitute an individualized inquiry that protects against errors; even at this early stage, evidence in this case has begun to show that voters who were removed are naturalized citizens who were unaware of any removal letter. SA214; SA218.

Finally, the use of a SAVE check on *some* of the purged voters, *see* ECF 11-1 at 22, does not solve the problem. Of course, SAVE is simply another database—one that has the word "Systematic" in its name. Indeed, the programs invalidated in *Arcia* and *Mi Familia Vota* both relied on SAVE. Appellants appear to simply assert that SAVE is a sufficiently reliable method of determining citizenship. But this Circuit has called that into question. *PILF*, 996 F.3d 257 at 261. And more fundamentally, the 90 Day Provision does not ask a court to review a systematic program's reliability—it prohibits *all* systematic removals in the 90 Day period.

---

[11] Appellants' reliance on *Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 779 (2018), is misplaced. *Husted* did not involve the 90 Day Provision, but a cancellation system explicitly provided for in the NVRA, *see id.* at 765, which is only triggered after a voter does not vote in two consecutive federal elections, *see* 52 U.S. C. § 20507(d)(1)(B)(ii). Indeed, that provision demonstrates that Congress did not think a notice and failure to respond alone was nearly enough to justify immediate removal (even for those appearing on the NCOA list).

## II.    Appellees did not unreasonably delay.

Appellants' claims of delay fail both on the merits and because they bring them with unclean hands. With respect to Appellants' claim that Virginia has been removing alleged noncitizens during the quiet period since 2010, Appellees would have had no reason to suspect such violations. While many states have routine list maintenance procedures on the books that may not specifically reference the 90-day quiet period, states nonetheless pause those programs during that time. Appellees had no reason to suspect otherwise until E.O. 35.

Since that time, Appellees have acted diligently while Appellants have obstructed their access to information about the Program. What Appellants fail to mention is that Appellees put them on notice about the potential NVRA violations in August and requested information about the program, but Appellants said they would not provide that data until *after* the election. SA031-035; SA036-048; SA049-050. Thus, Appellants could have both resolved the violation voluntarily upon receiving notice or expedited Appellees' ability to act by providing transparency. They did neither.

Despite Appellants' stonewalling, Appellees engaged in their due diligence investigation to establish the requisite violations, standing, and other evidence necessary to meet the preliminary injunction factors, including by gathering evidence from local election boards. The district court did not err in finding no

"unreasonable delay." A470. Nor did the district court err in finding that Appellants are the ones who "started down this road": they were well aware of the 90 Day Provision, and it was "not happenstance that this executive order intensifying these efforts was announced exactly on the 90th day." *Id.*

## III. Appellees and eligible Virginia voters face irreparable harm.

Virginia will suffer no irreparable harm because of the district court's narrow injunction (which lapses in less than two weeks) enforcing the plain language of a decades-old federal law. "[T]he State and the public have no legitimate interest in the operation of a state law that is likely preempted by federal law." *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 397 (D. Md. 2022).

It is Appellees, their members, and other eligible citizens who face irreparable harm if this Court stays the district court's injunction. Appellees have already uncovered evidence of *many* eligible citizens removed from the rolls, including members of Appellee's organizations, other voters who quickly responded to phone calls and could verify their citizenship, a voter with a "new citizen" stamp on the face of his voter registration application, and voters whose citizenship has been verified by election officials. *See* SA134-137; SA138-155; SA156-184; SA212-215; SA216-219; SA220-222; SA223-228. This is information Appellants could have uncovered themselves if they had engaged in individualized inquiries rather than systematic list maintenance.

The likely high error rate of Appellants' program should come as no surprise for a few reasons.

*First*, some people removed under Appellants' program were removed because they checked a box indicating noncitizenship during a DMV transaction. As the Prince William County Director of Elections and General Registrar has explained, this is largely a problem of form design. SA086-092. That is borne out by the many U.S. citizens caught up in this system. *See supra.* When Alabama engaged in a similar system based on checkboxes on forms from the Alabama Department of Labor, the error rate was astronomical. After a lawsuit was filed, the Secretary cross-checked the checkbox data with documents on file with the driver's license agency and immediately confirmed the citizenship of 93.8% of them.[12] SA066-073.

It appears Appellants have made little effort to uncover errors. As established by the *other* method by which individuals find themselves removed under the Program (based on noncitizenship documents), the DMV collects records pertaining to citizenship status during certain DMV transactions. *See* A175. Yet Appellants do not even claim to check with the DMV to determine if they already have documentation proving a voter's citizenship. Thus, individuals can be purged based

---

[12] To be clear, the data did not confirm noncitizenship among the remaining 6.2 percent. Rather, the driver's license agency just could not verify citizenship because it either had no match or it had potentially outdated noncitizenship data on file for those remaining individuals.

on a checkbox error even when they showed documentary proof of citizenship contemporaneously with that error. Disenfranchisement based on such a flimsy rationale cannot be permitted, particularly within the 90-day period. *See Mi Familia Vota,* 691 F.Supp.3d at 1100 ("[W]hen an applicant includes [documentary proof of citizenship], it makes little sense to accept an incomplete citizenship checkbox on her registration form as 'true and correct' when it is clearly not[.]").

*Second*, Appellants tout their use of "fresh SAVE searches" for over 1,000 of the removed individuals as confirmation of noncitizenship. But not only did Appellants' declarations fail to provide clarity on the precise timing of these searches, this Circuit has already seen a case involving high SAVE error rates. In *PILF*, this Court considered PILF's attempt to uncover records related to a similar program in North Carolina. 996 F.3d 257. In that case, this Court explained that the elections board ultimately "found that the DMV and SAVE information had a high rate of inaccuracy." *Id. a*t 261. Indeed, it "determined that 97.6% of persons identified by the DMV as noncitizens, in fact were citizens, and that about 75% of individuals who later provided proof of citizenship continued to be listed as noncitizens in the SAVE system." *Id.* Such figures hardly inspire confidence. And we now know that despite Appellants' assertions, their SAVE checks did *not* "ensure[] that no naturalized citizens were removed from the voter rolls based on outdated DMV documents." ECF 11-1 at 11; *see, e.g.,* SA212-215 (LWVVA declaration identifying

naturalized member removed); SA216-219 (ACT declaration); SA134-137 (registration with new citizen stamp).

None of this should be surprising to Appellants. Every time such a program has been tried before, it has resulted in high error rates that remove eligible U.S. citizens (largely naturalized citizens). *See, e.g., Florida*, 870 F. Supp. 2d 1346; *League of United Latin Am. Citizens v. Whitley*, 2019 WL 7938511; *ACIJ*, 2024 WL 4510476.

The 90 Day Provision is designed not to protect ineligible voters—be they noncitizens or nonresidents—but the inevitable *eligible* voters caught up erroneously in systematic list maintenance. As to those individuals, irreparable injury is plain. "Courts routinely deem restrictions on fundamental voting rights irreparable injury," especially "discriminatory voting procedures." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) *(LWVNC)*. And while Appellants argue that these voters can cast provisional ballots, the district court correctly determined that does not extinguish their irreparable injury, because there is no guarantee a provisional ballot will be counted. Further, as a result of the program, these voters are prevented from "cast[ing] their ballots in the same way as all other eligible voters." A469; *see N. C. Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172 at *13 n.11 (M.D.N.C. Aug. 7, 2018) (being offered a provisional ballot could not cure violation caused by

cancellation of voter's registration in violation of the NVRA). Moreover, that response wrongly assumes voters will understand this option and ignores the intimidation voters experience after receiving a letter accusing them of noncitizenship and potentially referring them for criminal prosecution.

## IV. The balance of equities and public interest weigh in favor of the district court's tailored injunction.

The ongoing harm to Appellees and Virginia voters jeopardizes the fundamental right to vote and outweighs any interest in implementing the Purge Program. A primary purpose of the NVRA is to ensure that all eligible voters can cast their ballots. *See* 52 U.S.C. § 20501. Congress, understanding that list maintenance programs are faulty, decided that ensuring eligible voters can vote outweighs a state's interest in having flawless voter rolls right before an election. *See U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388 (6th Cir. 2008). This Court must protect the eligible voters swept up in the Purge Program, because there is "no do-over and no redress" for those unable to exercise their fundamental right to vote. *LWVNC,* 769 F.3d at 247. Granting the stay and permitting this program to continue would undermine the public interest: "the public has a strong interest in exercising the fundamental political right to vote." *Id*. at 248 (quotation omitted). This close to an election and in cases such as these, "the public interest favors permitting as many qualified voters to vote as possible." *Id*. at 247 (quotation omitted).

The district court's remedy is proper and precisely tailored to the violation. Congress designed the 90 Day Provision to avoid the inevitable chaos and disruption caused by purges conducted on the threshold of an election. *See Arcia*, 772 F.3d at 1346. The wisdom in enacting the provision has certainly been borne out here. As discussed above, 36 hours after receiving the list of voters purged, Appellees have identified both naturalized and lifelong citizens unlawfully removed. And as noted, news reports have uncovered still more eligible citizens wrongfully purged.

Appellants suggest that under *Purcell*, the state should not have to bear the cost of restoring these voters. But even if *Purcell* applied—and it does not—it is the Commonwealth that disrupted the status quo by removing these voters during a period when federal law expressly forbids it. If Appellants could reward their own legal violation by protesting the remedy as too costly close to the election, it would render the 90 Day Provision unenforceable because violations can only occur shortly before an election.

Nor is the cost of restoring people's fundamental rights too high. The district ordered targeted relief aimed at restoring a discrete group of 1,600 voters and notifying them of their restoration, and rejected the broader relief requested. This order closely mirrors the injunction issued in *ACIJ* just over a week ago requiring restoration of over 3,000 registrants. *ACIJ,* 2024 WL 4510476 at *1-2. The Alabama injunction has not created any widespread confusion or disruption for election

administrators or for the public. To the contrary, Alabama has declined to appeal, simply complying with the injunction without incident.

We know that Appellants can administer the proper remedy because they took nearly identical steps just last year even closer to an election. On October 27, 2023, ELECT acknowledged that 3,400 eligible voters were improperly removed from voter rolls.[13] These purges were more complex because they involved erroneous removals of people with felony convictions whose rights had been restored. Nevertheless, ELECT worked with county registrars to ensure that *nearly twice as many voters* were restored to the rolls. *See id*. Appellants' representations about disruptions caused by late registrations are also inconsistent with Virginia law, which expressly contemplates that "any person who is qualified to register to vote shall be entitled to register in person up to and including the day of the election at the office of the general registrar in the locality in which such person resides or at the polling place for the precinct in which such person resides." Va. Code Ann. § 24.2-420.1. The district court's order simply requires Appellants to restore half the number of people restored just last year on a comparable timeline. And while Appellants suggest that any notice might confuse ineligible persons into voting, the

---

[13] Sarah Rankin, *Youngkin administration says 3,400 voters removed from rolls in error, but nearly all now reinstated*, NBC Washington (Oct. 27, 2023) https://www.nbcwashington.com/news/local/youngkin-administration-says-3400-voters-removed-from-rolls-in-error-but-nearly-all-now-reinstated/3455577/.

court's order already safeguards against any such risk by requiring the mailer to explain that noncitizens are ineligible to vote.

## CONCLUSION

For these reasons, Appellants' motion should be denied.

Date: October 26, 2024                           Respectfully submitted,

                                                /s/ Simone Leeper
Ezra D. Rosenberg                               Simone Leeper
Ryan Snow                                       Danielle Lang
Javon Davis                                     Kevin Hancock
LAWYERS' COMMITTEE FOR CIVIL                    Brent Ferguson
RIGHTS UNDER LAW                                CAMPAIGN LEGAL CENTER
1500 K Street, NW, Ste. 900                     1101 14th Street NW, Suite 400
Washington, DC 20005                            Washington, DC 20005
(202) 662-8600                                  Tel: (202) 736-2200
erosenberg@lawyerscommittee.org                 Fax: (202) 736-2222
rsnow@lawyerscommittee.org                      dlang@campaignlegalcenter.org
jdavis@lawyerscommittee.org                     khancock@campaignlegalcenter.org
                                                bferguson@campaignlegalcenter.org
                                                sleeper@campaignlegalcenter.org


Orion Danjuma                                   John Powers
John Paredes                                    Hani Mirza
THE PROTECT DEMOCRACY PROJECT,                  ADVANCEMENT PROJECT
INC.                                            1220 L Street Northwest, Suite 850
82 Nassau Street, # 601                         Washington, D.C. 20005
New York, NY 10038                              (202) 728-9557
Telephone: (202) 579-4582                       jpowers@advancementproject.org
orion.danjuma@protectdemocracy.org              hmirza@advancementproject.org
john.paredes@protectdemocracy.org

Benjamin L. Berwick
THE PROTECT DEMOCRACY PROJECT,
INC.
15 Main Street, Suite 312
Watertown, MA 02472

(202) 579-4582
ben.berwick@protectdemocracy.org

Anna Dorman
THE PROTECT DEMOCRACY PROJECT,
INC.
200 Pennsylvania Ave. NW, Suite #
163
Washington, DC 20006
Telephone: (202) 579-4582
anna.dorman@protectdemocracy.org

*Counsel for Plaintiffs-Appellees Virginia
Coalition for Immigrant Rights, the
League of Women Voters of Virginia, the
League of Women Voters of Virginia
Education Fund, and African
Communities Together*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) and the Court's October 26, 2024 Order, ECF 15, because it contains 6,080 words. This response complies with the typeface and the type-style requirements of Rule 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.

/s/ Simone Leeper
Simone Leeper

**CERTIFICATE OF SERVICE**

I certify that on October 26, 2024, I electronically filed the foregoing motion with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Simone Leeper
Simone Leeper