# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

VIRGINIA COALITION FOR IMMIGRANT RIGHTS, *et al.*,

Plaintiffs-Appellees

v.

SUSAN BEALS, in her official capacity as
Virginia Commissioner of Elections, *et al.*,

Defendants-Appellants

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

———————————

PLAINTIFF-APPELLEE UNITED STATES' OPPOSITION TO
EMERGENCY MOTION FOR STAY PENDING APPEAL

———————————

KRISTEN CLARKE
  Assistant Attorney General

SYDNEY A.R. FOSTER
ANNA M. BALDWIN
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 305-4278

## INTRODUCTION

Defendants-appellants—the Commonwealth of Virginia, the Virginia State Board of Elections, and Susan Beals in her official capacity as the Commissioner of Elections (Defendants)—seek an emergency stay of the preliminary injunction issued by the district court to remedy defendants' violations of the Quiet Period Provision, Section 8(c)(2) of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20507(c)(2). As the district court found, those serious violations have resulted in the removal of *citizens* eligible to vote from Virginia's voting rolls. Because Defendants do not come close to meeting the demanding standard for that extraordinary relief, their request for a stay should be denied.

The Quiet Period Provision requires states to complete any "systematic[]" "programs" intended to "remove the names of ineligible voters from the official list of eligible voters" prior to 90 days before any federal election. 52 U.S.C. 20507(c)(2)(A). That general mandate is subject to certain enumerated exceptions, such as when removal efforts are based on the death of a registered voter. 52 U.S.C. 20507(c)(2)(B) (cross-referencing 52 U.S.C. 20507(a)(3)(A)-(B) and (4)(A)). The statute

does not, however, contain an exception allowing systematic efforts to remove purported *noncitizens* within 90 days of an election. As the Eleventh Circuit has held, it follows that there is no such exception. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014).

Significantly, Virginia and other States remain free to remove noncitizens from their voting rolls at any time based on individualized investigations. And they remain free to engage in systematic efforts to remove noncitizens from their voting rolls except during the 90-day period before federal elections. But, as the Eleventh Circuit explained in *Arcia*, the Quiet Period Provision reflects Congress's judgment that the risk of error inherent in "systematic" removals of individuals from the voting rolls within 90 days of an election—when there may be insufficient time for removed individuals to show they are citizens and then exercise their fundamental right to vote—is too great to allow systematic removals during that period. 772 F.3d at 1346.

Despite this bright-line rule, on August 7, 2024—90 days before the November 5, 2024, federal General Election—the Virginia Governor issued Executive Order 35 formalizing a program aimed at removing noncitizens from the Commonwealth's voting rolls and requiring that

the program be carried out each day (the Program). This Program reliedon unverified data from the Virginia Department of Motor Vehicles to flag individuals for removal. That limited data was bound to—and did in fact—lead to the erroneous removal of many citizens from the voter rolls. The district court therefore correctly found that Virginia's Program violates the Quiet Period Provision, and it acted well within its discretion in entering narrowly-tailored relief.

Not only does Virginia have little likelihood of success on the merits of its challenge, but the State will not suffer irreparable harm in the absence of a stay, given that the preliminary injunction merely directs Virginia to take limited steps to reverse its removal of affected voters. By contrast, a stay would seriously harm the voters unlawfully removed from Virginia's voting rolls, the United States' strong interest in enforcing its laws, and the public's interest in ensuring that all eligible voters may exercise their right to vote. The United States respectfully requests that the motion for a stay be denied.

## STATEMENT

### A. Statutory Background

Enacted in 1993, the NVRA establishes uniform procedures and practices for voter registration—and the maintenance of voter-registration lists—for federal elections. 52 U.S.C. 20501 *et seq.* As the Act itself specifies, the NVRA's purpose is to "establish procedures that will increase the number of eligible citizens who register to vote"; "enhance[] the participation of eligible citizens as voters"; "ensure that accurate and current voter registration rolls are maintained"; and "protect the integrity of the electoral process." 52 U.S.C. 20501(b). Congress deemed it critical to enact the statute to protect the "fundamental right" of citizens to vote, emphasizing that "discriminatory and unfair registration laws" can have a "direct and damaging effect on voter participation" in federal elections and "disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. 20501(a); *see also* S. Rep. No. 103-6, at 2-4 (1993) (Senate Report); H.R. Rep. No. 103-9, at 2-5 (1993) (House Report).

Section 8 of the NVRA governs the administration of voter-registration lists for federal elections. *See* 52 U.S.C 20507. Section 8(c)(2), the NVRA's Quiet Period Provision, place limits on the removal

of voters from the voter rolls during the 90 days preceding a federal election. It directs that a "State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. 20507(c)(2)(A). This provision was enacted to ensure that "State outreach activity, such as the mailing of list verification notices or conducting a canvas, [is] concluded not later than 90 days before an election." Senate Report at 18-19; *see also* House Report at 16 ("This requirement applies to the State outreach activity such as a mailing or a door-to-door canvas and requires that such activity be completed by the 90-day deadline.").

This general prohibition on systematic removal efforts within 90 days of an election is subject to several enumerated exceptions. As relevant here, it "shall not be construed to preclude" the "removal of names from official lists of voters" when done "at the request of the regist[ered voter]," "by reason of criminal conviction or mental incapacity," or "by reason of the death of the registrant."
52 U.S.C. 20507(c)(2)(B) (incorporating 52 U.S.C. 20507(a)(3)(A)-(B)

and (4)(A)); *see also* Senate Report at 19; House Report at 16.  The Quiet Period Provision contains no other express exceptions, including an exception for removing noncitizens from the voting rolls.

## B.    Factual Background

All persons who register to vote in Virginia must affirm that they are a United States citizen when they register. Va. Code 24.2-418.  It is a crime for a noncitizen to vote.  *See* Va. Code 24.2-1004(B)(iii); 18 U.S.C. 611.

On August 7, 2024, 90 days before the November 5, 2024, federal election day, the Virginia Governor issued Executive Order 35.  *See* Doc. 9-3*,* no. 1-24-cv-01807 (Exhibit 2, Commonwealth of Va., Office of the Governor, Executive Order Number Thirty-Five: Comprehensive Election Security Protecting Legal Voters and Accurate Counting (Aug. 7, 2024), https://perma.cc/CK4L-PQ3K(Executive Order 35)).[1]  This

---

[1] "Doc. _" refers to the docket number of documents filed in the district court.  If not otherwise specified, "Doc." citations refer to documents filed in the consolidated case, No. 1-24-cv-1778, not the United States' initial action, No. 1-24-cv-1807.  "Mot. _" refers to defendants' stay motion filed in this Court.  "A-__" refers to pages of the Appendix to defendants' stay motion.

Executive Order required that the Commissioner of Elections "certify" to the Governor that procedures were in place to provide "Daily Updates to the Voter List." Those "Daily Updates" required "[r]emov[ing] individuals who are unable to verify that they are citizens to the Department of Motor Vehicles" from the "statewide voter registration list" by "compar[ing] the list of individuals who have been identified as non-citizens to the list of existing registered voters and then [requiring] registrars notify any matches of their pending cancellation unless they affirm their citizenship within 14 days." Executive Order 35, at 3-4. The Program identifies voters as possible noncitizens if they choose "No" in response to questions about their United States citizenship status on certain forms submitted to the DMV. User error and confusing form design likely causes many U.S. citizens completing those forms to answer questions about U.S. citizenship incorrectly. *See* Doc. 9-4, no. 1-24-cv-01807 (Exhibit 3).

The Virginia DMV sends the Virginia Department of Elections (ELECT) a list of purported noncitizens generated by the above process. ELECT then attempts to match individuals on the list provided by the DMV to individuals on the voting rolls. *See* Doc. 9-5, no. 1-24-cv-01807

(Ex. 4); Doc. 9-6, no. 1-24-cv-01807 (Ex 5.) (Letter from Glenn Youngkin, Governor, Commonwealth of Va., to Gerald E. Connolly, Rep., U.S. House of Reps. (Oct. 10, 2024) ("ELECT matches [DMV information] to the list of existing registered voters, and any matches are provided to the appropriate general registrar.").

Upon receipt of a list from ELECT, the local registrar is required to review each entry on the list and confirm that it matches a voter on their jurisdiction's voter rolls.  The local registrar sends a Notice of Intent to Cancel to each voter identified by the Program who appears on their jurisdiction's voter rolls.   As the district court found, "[n]either ELECT nor the local registrars performed additional research or review to confirm whether the flagged voter was a citizen or not."  10/25/24 Tr. 16 (A-465).  Indeed, the Program did not allow for such individualized inquiry.

If the voter fails to respond within 14 days, the voter is automatically removed from the rolls and receives a Voter Registration Cancellation Notice. *See* Doc. 9-9, no. 1-24-cv-01807 (Exhibit 8) (Cancellation Notice).  The Notice states that the voter has been "Declared Non-citizen" based on their failure to respond to the Notice of

Intent to Cancel. The Cancellation Notice does not include information on re-registering to vote, nor does it provide information on Virginia's Election Day voter-registration process. The only action the Notice suggests a voter take if they "believe the removal of [their registration] from the Voter Registration List is incorrect" is to contact "this office." Cancellation Notice.

## C. Procedural History

On October 8, 2024, the United States notified Virginia officials of concerns that the Program may violate the Quiet Period Provision. Doc. 9-17, no. 1-24-cv-01807 (Ex. 16). The United States and Virginia officials conferred on October 10, and the United States filed suit the next day. Doc. 1, no. 1:24-cv-01807. The United States filed its motion for a preliminary injunction on October 16. Doc. 9, no. 1:24-cv-01807. After consolidating the United States' action with a similar action filed by private plaintiffs, and following a hearing on October 24, the district court issued a preliminary injunction on October 25. Doc. 112.

The district court found by clear and convincing evidence that plaintiffs are substantially likely to succeed on the merits of their claim. The court found that the Quiet Period Provision applies to Virginia's

program and bars its operation within 90 days of a federal election. 10/25/24 Tr. 12, 14-15, 17-18 (A-461, A-463-464, A-466-467). The court stressed that the "Commonwealth and the Board of Elections have the authority to investigate and remove noncitizens from the registration rolls," including during the 90 days prior to the election. 10/25/24 Tr. 18 (A-467). But any investigations and removals during this period "must be done on an individualized basis." 10/25/24 Tr. 18 (A-467).

The district court noted that "defendants . . . conceded that between August 7, 2024," when the Executive Order 35 was issued, and October 21, 2024, "over 1,600 individuals [were] removed from the voter rolls" as a result of the Program. 10/25/24 Tr. 8-9 (A-457-458). The court further found that the United States and private plaintiffs had presented "evidence demonstrating that eligible citizens, ... natural born and naturalized, have had their registrations canceled" as a result of the Program. 10/25/24 Tr. 22 (A-471).

While defendants asserted that the list of removed voters consisted of noncitizens, the district court found that "[t]he evidence does not show that." 10/25/24 Tr. 22-23 (A-471-472). Instead, "[w]hat the evidence shows is that these are the individuals who failed to return

a form and attest that they were citizens." 10/25/24 Tr. 23 (A-472).
And, "at some point[,] they may have said on a form at the DMV that
they were not citizens," but the court explained that it was not clear
whether that was the result of a mistake. *Id.* The court noted that
while defendants had produced the list of removed voters only two days
before private plaintiffs sought a preliminary injunction, plaintiffs in
that short time had already identified citizens among the voters
removed. 10/25/24 Tr. 22-23 (A-471-472).

The district court further found that restoring the right to vote of
all eligible voters affected by the program "strongly outweighs the
burden to Defendants of restoring those names to the rolls." 10/25/24
Tr. 23 (A-472). In addition, the court found that while "it is
undoubtedly in the public interest for ineligible voters to be removed
from voter rolls," it is also in the public interest to comply with federal
laws protecting the right to vote. 10/25/24 Tr. 23-24 (A-472-473).
Again, the court stressed that its order does not prevent the
Commonwealth from removing registrants "who they determined are
ineligible through an individualized inquiry" and emphasized that "the

Commonwealth can still investigate and remove [non]citizens" on an individualized basis at any time. 10/25/24 Tr. 24 (A-473).

The district court accordingly entered a preliminary injunction enjoining defendants "from continuing any systematic program intended to remove the names of ineligible voters from registration lists less than 90 days before the November 5, 2024, federal General Election," and noting that this prohibition "does not preclude removal of names from the official list of voters at the request of the registrant, by reason of criminal conviction or mental incapacity (as provided by Virginia law), individual correction, or by reason of the death of the registrant." Doc. 112, at 2.

Within five days, the court ordered defendants to restore the voter registration of voters who were cancelled pursuant to the Program and, to issue a remedial mailing informing such voters that:

- their voter registration has been restored to the voter rolls;
- the registrant may cast a regular ballot on Election Day in the same manner as other eligible voters;
- the prior cancellation of their registration pursuant to the Program does not in itself establish that they are ineligible to vote; and
- registrants who are not U.S. citizens remain ineligible to cast a ballot.

Doc. 112, at 3.

The order made explicit that "Defendants' ability to cancel the voter registration of noncitizens through individualized review is not limited by this Order." Doc. 112, at 4. The order also clarified that it does not "limit Defendants' authority or ability to investigate noncitizens who register to vote or who vote in Virginia's elections." Doc. 112, at 4. The injunction "expires on the day after the 2024 General Election." Doc. 112, at 4.

## ARGUMENT

"A stay is not a matter of right, . . . [i]t is instead an exercise of judicial discretion ." *Nken v. Holder*, 556 U.S. 418, 433 (2009). In exercising that discretion, this Court considers four factors: (1) whether the movant has made a "strong showing that he is likely to succeed on the merits"; (2) whether the movant will be "irreparably injured" absent a stay; (3) whether a stay would "substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." *Id.* at 434 (citation omitted). Defendants have not come close to establishing their heavy burden under these factors. This Court should therefore deny the extraordinary relief of a stay pending appeal.

Nor is the result changed by defendants' invocation of *Purcell v. Gonzalez*, 549 U.S. 1 (per curiam). The equitable considerations underlying *Purcell* are the same as those embodied in the Quiet Period Provision—both seek to prevent changes to the status quo likely to cause voter confusion and disruption too close to an election. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). This Court should therefore not apply *Purcell* to claims under the Quiet Period Provision, and *Purcell*'s application here would in any event counsel in favor of denying a stay.

## I.     Virginia Violated The NVRA's Quiet Period Provision

Defendants cannot demonstrate a likelihood of success on appeal because the district court correctly concluded that (1) the Quiet Period Provision applies to programs seeking to remove noncitizens; and (2) defendants' challenged program is "systematic" in nature. *Accord United States v. State of Alabama*, No. 2:24-cv-01329 (N.D. Ala. Oct. 16, 2024) (enjoining similar program operated by Alabama).

### A.     The Quiet Period Provision Applies To Programs That Seek To Remove Noncitizens.

The Quiet Period Provision is squarely applicable to Defendants' Program, as the district court found. During the Quiet Period, States

may not conduct "*any program* the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. 20507(c)(2)(A) (emphasis added). The phrase "any program" carries an "expansive meaning." *Arcia*, 772 F.3d at 1344 (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)); *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (same).

The NVRA sets out only three categories of removals not subject to the Quiet Period Provision—those made (1) at the request of the registrant, (2) because of a criminal conviction or mental incapacity, or (3) because the registrant has died. *See* 52 U.S.C. § 20507(c)(2)(B) (cross-referencing 52 U.S.C. 20507(a)(3)(A)-(B) and (4)(A)). "Noticeably absent from the list of exceptions" to the Quiet Period Provision "is any exception for removal of non-citizens." *Arcia*, 772 F.3d at 1345; *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1092-93 (D. Ariz. 2023) (same), *appeal on other grounds pending*, No. 24-3188 (9th Cir.); Alabama PI (same). Because citizenship is not one of those grounds, defendants' attempt to read a further exception into the statute fails, as the Eleventh Circuit has held, *Arcia*, 772 F.3d at 1345. *See Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 439 (2023) ("We assume that

Congress 'acts intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another section of the same Act.'" (citation omitted)).

Defendants assert that if a different part of Section 8—Section 8(a)(3) and (4), 52 U.S.C. 20507(a)(3)-(4)—is understood to include noncitizens within the definition of "registrants," then the NVRA "bars States from removing noncitizens from its rolls *at any time*." Mot. 20. But that is not so. As the Eleventh Circuit has correctly held, nothing in the NVRA bars a state from investigating "potential non-citizens and removing them on the basis of individualized information, even within the 90-day window." *Arcia*, 772 F.3d at 1348.

Defendants' statutory-purpose arguments fare no better. Indeed, Virigina misses the point in arguing "that statutory-purpose section of the NVRA further indicates that noncitizens are not protected by the Quiet Period Provision." Mot. 18. No one argues that the purpose of the Quiet Period Provision is to protect non-citizens. It is the stated goal of the NVRA—and of the United States in filing this suit—to "promote the exercise of" the "right of *citizens* of the United States to vote" and to "ensure that accurate and current voter registration rolls

are maintained." 52 U.S.C. § 20501(a), (b) (emphasis added). But

Congress enacted the Quiet Period Provision to prevent the mistaken

disenfranchisement of qualified voters, concluding that the systematic

removal from the rolls close to Election Day is likely to remove qualified

voters from the rolls.

Notwithstanding defendants' arguments to the contrary, the most

straightforward reading of the statutory text—as applied by the district

court—raises no constitutional concerns. As the district court

recognized, Virginia has multiple methods to enforce its citizenship

requirements during the Quiet Period, including individualized voter

removals and scrutinizing whether new registrants are qualified. See

Doc. 112 at 4. Because Virginia continues to have multiple "means of

enforcing its constitutional power to determine voting qualifications,"

no constitutional doubt is raised by giving the Quiet Period Provision its

"fairest reading." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570

U.S. 1, 19 (2013).

### B. The Quiet Period Provision Applies To Defendants' Program Because It Was Systematic.

1. The district court also correctly concluded that the challenged

program is "systematic." 10/25/24 Tr. 14-17 (A-462-465). In doing so, it

agreed with the conclusion reached by the Eleventh Circuit that a very similar removal program was "systematic." *Arcia*, 772 F.3d at 1344 (holding "a mass computerized data-matching process to compare the voter rolls with other state and federal databases, followed by the mailing of notices" and without any "individualized information or investigation" to be systematic for purposes of the Quiet Period Provision).

A removal program that proceeds without "any reliable first-hand evidence specific to the voters" targeted is "the type of 'systematic' removal prohibited by the NVRA." *N.C. Conf. of the NAACP*, 2016 WL 6581284, at *5; *see also, e.g.*, *Bell v. Marinko*, 367 F.3d 588, 590 n.2, 592 (6th Cir. 2004) (setting out examples of individualized "investiga[ions] and examin[ations]"); *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348, 1355 (M.D. Ga. 2020).

In this case, a voter is caught up in the State's Program when she has provided the State with conflicting information about her citizenship. Despite a covered individual's having attested to U.S. citizenship when registering, DMV data reflects that the individual indicated on certain DMV forms that she is not a U.S. citizen.

Crucially, Virginia's program did nothing to evaluate which of these two data points is accurate, thus raising the distinct possibility of mistaken voter-registration cancellations during the Quiet Period—the time "when the risk of disfranchising eligible voters is greatest." *Arcia*, 772 F.3d at 1346.

Rather, as the district court correctly found, Virginia's program is based on database matching—which is the very definition of a non-individualized process. *See* 10/25/24 Tr. 16 (A-465) ("It is simply checking data fields, matching in mass."). And once ELECT matched a name provided by the DMV to a name on its voter lists, ELECT "would send the information to registrar," who would "simply confirm that the person identified is the same individual listed on the voter rolls, and then send [a] cancellation notice." *Id.* The court found that "[n]either ELECT nor the local registrars performed additional research or review to confirm whether the flagged voter was a citizen or not." *Id.*

Rather than conduct an individualized inquiry to determine which data point is accurate, the Commonwealth unlawfully placed the burden on the voter to affirm their citizenship within 14 days or have their registration immediately cancelled. But that is precisely what

Congress has forbidden States to do during the Quiet Period. *Cf. N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16-cv-1274, 2018 WL 3748172, at \*7 (M.D.N.C. Aug. 7, 2018) (explaining that requiring challenged voters to prove their eligibility during the Quiet Period "demonstrates precisely why Congress prohibited states from conducting systematic programs to remove ineligible voters within 90 days of a federal general election"); *Mi Familia Vota*, 691 F. Supp. 3d at 1085-86, 1092-94 (holding state statute requiring voter to affirm citizenship when county recorder "obtain[ed] information" that the voter was a noncitizen violated the Quiet Period Provision).

Because Virginia's Program did not depend on "individualized information or investigation" to identify ineligible voters, the Program is "systematic" and forbidden by the Quiet Period provision. *Arcia*, 772 F.3d at 1344.

2. In its motion for a stay, Virginia also describes a *second* voter-removal process carried out during the Quiet Period. Under that second process, the names of certain voters engaged in DMV transactions who had noncitizen documents on file were also removed from the voting

rolls after running their names through a federal database called the SAVE database.  Mot. 5-6.  These removals, however, occurred only once, not on a daily basis.

In the hearing below, defendants barely discussed this process. Rather, it described that the approximately 1,600 voter registrations cancelled during the Quiet Period as "self-identified noncitizens," *id.* at 71 (A-391), indicating that they were cancelled through the process discussed in Section B(1).  *See also* 10/24/24 Tr. 92 (A-412); *id.* at 95 (A-415) (agreeing that the DMV is "daily sending over these files of names").  The Commonwealth never argued or asserted that the majority of the removals resulted from a process involving the SAVE database, or that it had confirmatory information about the citizenship status of the individuals removed.  Consistent with that approach, the court found that "neither the Court nor the parties, either side, as we sit in this courtroom, know that those removed from those rolls were, in fact, noncitizens."  *See* 10/25/24 Tr. 23 (A-472).

Because Virigina did not make arguments based on these alleged facts below, it has waived any reliance on them now.  And at any rate,

none of these untested allegations change the applicability of the Quiet Period Provision.

## II. The United States And Eligible Citizen Voters Will Suffer Irreparable Harm If The Injunction Is Stayed.

"The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state" action. *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see also Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (recognizing that the United States may suffer "injury to its sovereignty arising from violation of its laws"). Virginia's violation of the Quiet Period Provision constitutes an ongoing and irreparable harm to the United States. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989).

Absent immediate injunctive relief to remedy the Quiet Period Provision violation, eligible U.S. citizens identified by the Program will suffer unreasonable burdens on their right to vote during the November 5, 2024, federal general election and risk disenfranchisement based on understandable confusion, distrust, and deterrence.

The right to vote is "the essence of a democratic society," meaning that "any restrictions on that right strike at the heart of representative

government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  As such,

"[c]ourts routinely deem restrictions on fundamental voting rights

irreparable injury."  *League of Women Voters of N.C. v. North Carolina*,

769 F.3d 224, 247 (4th Cir. 2014).  In turn, the NVRA protects voters

from systematic list-maintenance activities that are prone to creating

voter confusion and deterring participation at a time when errors are

most likely to harm eligible voters. *See Arcia*, 772 F.3d at 1346; *see also*

*Purcell,* 549 U.S. at 4-5.

The Quiet Period Provision recognizes that many "[e]igible voters

removed days or weeks before Election Day will likely not be able to

correct the State's errors" before an election and may not attempt to

vote at all.  *Arcia*, 772 F.3d at 1346.  Indeed, if a stay is granted, U.S.

citizen voters whose registrations were cancelled by the Program will

lack access to voting methods available to other citizens.  In Virginia,

voter registration closes 21 days before the November 5, 2024. Va. Code

§ 24.2-416(A).

Compounding the problem, voters on the permanent absentee-

voter list simply will not receive a ballot without further notice, as

cancellation of a voter's registration will also result in the voter's

removal from the that list.  Va. Code § 24.2-703.1(D)(ii).[2]  And though Virginia allows eligible persons to provisionally register in the 20 days preceding Election Day and on Election Day, those registration requests must be made in person at early voting sites (prior to Election Day) or at the person's polling place (on Election Day).  *See* Va. Code § 24.2-652(B).

In practical terms, this means that if a stay is granted, many voters are at a significant risk of disenfranchisement.  For example, a voter swept up by the Program who relies on absentee voting because they have difficulty traveling to their polling place will have no meaningful opportunity to vote.

And, even if a voter whose registration has been canceled does re-register in the twenty days preceding the Election or on Election Day, that voter is barred from casting a regular ballot.  They will instead be allowed only to cast a provisional ballot. Va. Code § 24.2-653(A).

As the district court recognized, these denials of a voter's "right to participate in elections on an equal basis with other citizens in the

---

[2] Such voters also will not receive the notices mailed when polling places change close to an election.  *See* Va. Code § 24.2-306(B).

jurisdiction," *League of Women Voters of N.C.,* 769 F.3d at 229 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)), constitute irreparable harm. *See id.* at 243, 247-49 (holding, in a challenge under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, that denial of "voting mechanisms . . . that do not absolutely preclude participation" was nevertheless irreparable harm).

In addition to the removal itself, Virginia's communications with qualified U.S. citizen voters swept up by the Program are also likely to cause irreparable harm by "discourag[ing] future participation by voters." *United States v. Berks Cnty.*, 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003). When a Voter Registration Cancellation Notice is sent to voters who do not respond to the State's initial notice, the cancellation notice suggests only that a voter who "believe[s] the removal of [their registration] from the Voter Registration List is incorrect" should contact "this office." The cancellation notice contains no information on whether the recipient is eligible to re-register, how the recipient might re-register, or how the recipient might register on Election Day. The lack of information in the notice, combined with cancellation of the voter's registration, is likely to result in irreparable harm by

"discourag[ing]" that voter's "equal participation in the democratic system." *See Berks Cnty.*, 250 F.Supp.2d at 541. The district court's injunction mandates direct communication via letter with impacted voters that is essential to mitigating these harms.

### III. The Balance Of Equities And The Public Interest Support Denying The Stay.

"The equities weigh in favor of enjoining [state actions] that are preempted by federal law." *Alabama*, 691 F.3d at 1301. Once state election procedures have been found to be unlawful, "it would be the unusual case in which a court would be justified in not taking appropriate action" before the next election. *Reynolds*, 377 U.S. at 585. In this case, the balance of equities favors ensuring the tailored remedial measures ordered by the district court are available to protect the rights of impacted eligible voters.

The Quiet Period Provision "is designed to carefully balance the[] four competing purposes [of] the NVRA," *Arcia*, 772 F.3d at 1346; *see also N.C. State Conf. of the NAACP,* 2016 WL 6581284, at *5 (same); 52 U.S.C. § 20501(b) (establishing purposes), and so the equities favor injunctive relief when the balance established by Congress is upset through noncompliance. *See also Arcia*, 772 F.3d at 1346 ("At most

times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors. In the final days before an election, however, the calculus changes."); *Mi Familia Vota*, 691 F. Supp. 3d at 1093 (same).

Although the "State indisputably has a compelling interest in preserving the integrity of its election process," *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989), that interest alone does not justify violating the NVRA and removing voters from the rolls in the weeks before Election Day when eligible voters "will likely not be able to correct" errors, *Arcia*, 772 F.3d at 1346. "This is why the [Quiet Period] Provision strikes a careful balance: it permits systematic removal programs at any time *except* for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest." *Arcia*, 772 F.3d at 1346.

The injunction issued by the district court respects this balance. Virginia can enforce its citizenship requirements through citizenship questions on registration forms and timely systematic list maintenance. Virginia can also continue—even during the 90-day period preceding an

election—to "cancel the voter registration of noncitizens through individualized review." Doc. 112, at 4. And the injunction does not limit "Defendants' authority or ability to investigate noncitizens who register to vote or who vote in Virginia's elections." Doc. 112, at 4. In the rare instance where noncitizens nonetheless vote, they are subject to prosecution. *See* Va. Code § 24.2-1004(B)(iii).

Given that the injunction does not disturb the careful balance that Congress itself struck, the public interest favors injunctive relief as well, principally because "the public undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe v. Dep't of Def.*, 947 F.3d 207, 230-32 (4th Cir. 2020) (quotation marks omitted); *see also Alabama*, 691 F.3d at 1301 ("Frustration of federal statutes and prerogatives are not in the public interest.").

Contrary to Virginia's arguments, those factors are unchanged by the timing of this suit. Mot. 25- 26. To start, the district court specifically rejected Defendants contention that the United States and private plaintiffs unreasonably delayed in bringing this case. *See* 10/25/24 Tr. 21 (A-470). The Governor's Executive Order was issued in August 2024. Once the United States learned of the order, it began an

appropriately diligent investigation into whether voters were in fact being removed.  It became clear that they were in mid-September (*see, e.g.*, Docs. 9-14, 9-15, No. 1-24-cv-1807) , and the United States then promptly completed its investigation, contacted the Commonwealth, conferred with its counsel, and filed suit on October 11.  For their part, private plaintiffs began discussions with the State immediately after the issuance of the order, including seeking records "that were not provided." *See id.*  Moreover, the NVRA's private right of action provision contains a notice requirement, requiring an aggrieved person to provide written notice to the State of any asserted violation 20 days prior to filing suit.  *See* 52 U.S.C. 20510(b).  After the private plaintiffs sent their notice letter, the United States likewise commenced discussions with Defendants to attempt to resolve the case without litigation.  When that failed, the United States promptly filed a motion for preliminary injunction.  10/25/24 Tr. 21 (A-470).

Finally, defendants' arguments that relief is inconsistent with *Purcell* also fails.  No court has applied *Purcell* to preclude remedying a violation of the Quiet Period Provision.   And indeed, the equitable considerations articulated in *Purcell* favor relief for a Quiet Period

Provision violation that has unlawfully disturbed the status quo. *See Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) ("When an election is close at hand, the rules of the road should be clear and settled."). Significantly, violations of the Quiet Period Provision immediately prior to an election are necessarily the sole fault of the offending jurisdiction.

As Defendants note, Justice Kavanaugh has proposed a four-factor inquiry that should apply when evaluating last-minute injunctions impacting election administration outside of the Quiet Period Provision context. Under those factors, *Purcell* might be overcome when "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (citations omitted). These guideposts are not mandatory, have never been treated as such by this Court or the Supreme Court, and are of limited relevance to a Quiet Period Provision claim, which by its nature will

occur close to the election.  Indeed, Justice Kavanaugh himself recognized that "[h]ow close to an election is too close may depend in part on the nature of the election law at issue." *Id.* at 881 n.1.  Because the Quiet Period Provision aims to maintain the status quo, and because by definition it can only be violated in the period immediately before the election, its enforcement is consistent with *Purcell*.

Applying *Purcell* to foreclose enforcement of the Quiet Period Provision would also contradict equitable principles.  *Purcell* is "best understood as a sensible refinement of ordinary stay principles for the election context," *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring)—that is, a guide to the exercise of courts' equitable discretion in deciding whether to grant injunctive relief.  But it is well settled that "[i]n considering the propriety" of such relief, the federal courts' equitable discretion does not permit them to "ignore the judgment of Congress, deliberately expressed in legislation." *Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 551 (1937); *see, e.g.*, *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497-98 (2001).  Here, Congress barred States from engaging in systematic list-maintenance efforts in the period just before an election and specifically

contemplated the possibility of suits seeking injunctive relief to enforce the provisions of the NVRA "within 30 days before the date of an election," 52 U.S.C. 20510(b)(3). To withhold relief for a violation of the Quiet Period Provision merely based on the imminence of the election would be to contradict that congressional judgment.

While these *Purcell* guideposts are not properly applicable to a Quiet Period Provision claim, they nonetheless weigh in the plaintiffs favor. Again, there is no legal basis for finding that the Quiet Period Provision does not apply here; if unremedied, the Defendants' conduct will cause eligible U.S. citizen voters and the United States irreparable harm; plaintiffs acted promptly within the Quiet Period to discern the nature of the violation and remedy it; and the district court's narrow injunction as to the impacted voters is a feasible and needed to ensure a remedy.

## CONCLUSION

The Court should deny a stay.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Anna M. Baldwin
SYDNEY A.R. FOSTER
ANNA M. BALDWIN
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 305-4278

# CERTIFICATE OF COMPLIANCE

This response contains 6195 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This response also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Anna M. Baldwin
ANNA M. BALDWIN
  Attorney

Date: October 26, 2024